## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DEB WHITEWOOD and SUSAN WHITEWOOD, FREDIA HURDLE and LYNN HURDLE, EDWIN HILL and DAVID PALMER, HEATHER POEHLER and KATH POEHLER, FERNANDO CHANG-MUY and LEN RIESER, DAWN PLUMMER and DIANA POLSON, ANGELA GILLEM and GAIL LLOYD, HELENA MILLER and DARA RASPBERRY, RON GEBHARDTSBAUER and GREG WRIGHT, MARLA CATTERMOLE and JULIA LOBUR, MAUREEN HENNESSEY, and A.W. AND K.W., minor children, by and through their parents and next friends, DEB WHITEWOOD and SUSAN WHITEWOOD,<br><br>**Plaintiffs,**<br><br>v.<br><br>THOMAS W. CORBETT, in his official capacity as Governor of Pennsylvania; MICHAEL WOLF, in his official capacity as Secretary of the Pennsylvania Department of Health; KATHLEEN KANE, in her official capacity as Attorney General of Pennsylvania; MARY JO POKNIS, in her official capacity as Register of Wills of Washington County; and DONALD PETRILLE, JR., in his official capacity as Register of Wills and Clerk of Orphans' Court of Bucks County,<br><br>**Defendants.** | Civil Action<br><br>No. _____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1.　Plaintiffs bring this action to challenge the constitutionality of Pennsylvania's laws excluding same-sex couples from marriage and voiding within Pennsylvania the marriages of same-sex couples entered into in other states. 23 Pa. C.S. §§ 1102 and 1704.

2.　Plaintiffs Deb and Susan Whitewood, Fredia and Lynn Hurdle, Fernando Chang-Muy and Len Rieser, Dawn Plummer and Diana Polson, Angela Gillem and Gail Lloyd, and Ron Gebhardtsbauer and Greg Wright, are lesbian and gay couples in committed relationships who wish to marry for the same reasons so many other couples get married – to publicly declare their love and commitment before their family, friends and community, and to give one another the security and protections that only marriage provides.

3.　Plaintiffs Edwin Hill and David Palmer, Heather and Kath Poehler, Helena Miller and Dara Raspberry, and Marla Cattermole and Julia Lobur are already married, having wed in other states, but are treated as legal strangers in their home state, the Commonwealth of Pennsylvania.

4.　Plaintiff Maureen Hennessey is a widow who lost her spouse after 29 years together. Because her spouse was a woman, their marriage is not recognized by the Commonwealth of Pennsylvania and she is not provided the protections afforded to widows under Pennsylvania law.

5.     Plaintiffs A.W. and K.W. are the children of one of the plaintiff couples. The fact that their parents are not permitted to marry harms them materially by reducing family resources and stigmatizes them by denying their family social recognition and respect.

6.     The plaintiffs come from across the Commonwealth, hailing from Philadelphia, Downingtown, Bangor, Harrisburg, State College, and Pittsburgh. They come from all walks of life: they include an emergency room doctor, university professors, a truck driver, an executive at BNY Mellon, a psychologist, a dog trainer, state employees, lawyers, an artist, a stay-at-home mom, and retirees. One of the plaintiffs served in the Navy in Vietnam; another is a 12-year veteran of the Army. The plaintiffs reflect the rich diversity of the Commonwealth: they are African-American, Caucasian, Latino, and Asian; they are Methodist, Baptist, Catholic, Quaker, Jewish, Buddhist, and secular. Many have been together for decades, and some are raising children together. The situations faced by these couples are similar to those faced by the thousands of same-sex couples in Pennsylvania who are being denied the basic rights that are afforded by marriage.

7.     The plaintiff couples, like other committed couples, have cared for each other, supported each other, sacrificed for each other, and made plans for the future with each other. Some have endured great challenges and hardships together, such as financial troubles and serious illness. Maureen Hennessey's

2

commitment to her spouse endured through her spouse's four year battle with cancer and untimely death.

8.     Like other couples who have made a lifetime commitment to each other, the plaintiff couples are spouses in every sense, except that Pennsylvania law says they cannot marry and, if they are married under the laws of another state, their marriages are not honored here.

9.     The Commonwealth's exclusion of same-sex couples from marriage adversely impacts the plaintiffs and same-sex couples across the Commonwealth in significant ways.  It excludes them from the many legal protections available to spouses.  For example, when one partner dies, the surviving partner may face serious financial hardship, including the loss of her home, because she is denied the inheritance tax exemption provided to widows.  Lesbian and gay police officers, firefighters and other first responders are denied the peace of mind of knowing that if they make the ultimate sacrifice, their partner will be taken care of through the financial support available to help those who lost their spouses in service to the community.  Because of Pennsylvania's refusal to allow or recognize their marriages, same-sex couples are also denied many federal protections afforded to married couples such as the ability to take time off work to care for a sick spouse under the Family Medical Leave Act and access to a spouse's social security retirement benefits.

10. The exclusion from marriage undermines the plaintiff couples' ability to achieve their life goals and dreams, threatens their mutual economic stability, and denies them "a dignity and status of immense import." *United States v. Windsor*, No. 12-307, Slip Op., at 18 (U.S. June 26, 2013). Moreover, they and their children are stigmatized and relegated to a second class status by being barred from marriage. The exclusion "tells [same-sex] couples and all the world that their relationships are unworthy" of recognition. *Id.* at 22-23. And it "humiliates the . . . children now being raised by same-sex couples" and "makes it even more difficult for the children to understand the integrity and closeness of their own family and its concord with other families in their community and in their daily lives." *Id.* at 23.

11. Some of the plaintiffs are old enough to remember when a majority of states had laws prohibiting marriage between people of different races and when the Supreme Court struck down such prohibitions in *Loving v. Virginia*, 388 U.S. 1, 12 (1967), declaring: "The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men."

12. Our courts and our society have discarded, one by one, marriage laws that violated the Constitution's mandate of equality, such as anti-miscegenation laws and laws that denied married women legal independence and the right to make decisions for themselves. History has taught us that the vitality of marriage

does not depend on maintaining such discriminatory laws. To the contrary, eliminating these unconstitutional aspects of marriage has enhanced the institution. Ending the exclusion of lesbian and gay couples from marriage is no different. Indeed, in 13 states and the District of Columbia, same-sex couples are marrying and the institution of marriage continues to thrive.

13.     This is because, at its heart, marriage is both a personal and a public commitment of two people to one another, licensed by the state. Through marriage, the Commonwealth recognizes a couple's decision to establish a family unit together and support one another and any children of the marriage.

14.     Marriage contributes to the happiness of countless couples and their families and also contributes to society. Pennsylvania, like other states, encourages and regulates marriage through hundreds of laws that provide benefits to and impose obligations on married couples. In exchange, the Commonwealth receives the well-established benefits that marriage brings: stable, supportive families that contribute to both the social and economic well-being of the Commonwealth.

15.     Pennsylvania's exclusion of same-sex couples from marriage infringes on the Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. This discriminatory treatment is subject to heightened scrutiny because it burdens the fundamental right

to marry and because it discriminates based on sex and sexual orientation. But it cannot stand under any level of scrutiny because the exclusion does not rationally further any legitimate government interest. It serves only to disparage and injure lesbian and gay couples and their families.

16.     Plaintiffs bring this suit pursuant to 42 U.S.C. § 1983 for declaratory and injunctive relief against defendants. Specifically, plaintiffs seek: (a) a declaration that the Commonwealth's prohibition of marriage for same-sex couples and its refusal to recognize marriages of same-sex couples validly entered into outside of the Commonwealth violate the Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution; and (b) a permanent injunction i) preventing defendants from denying the plaintiff couples and all other same-sex couples otherwise eligible to marry the right to marry in the Commonwealth of Pennsylvania, and ii) directing defendants to recognize the marriages of the plaintiff couples and other same-sex couples validly entered into outside of Pennsylvania.

## THE PARTIES

### Plaintiffs

*Deb and Susan Whitewood and A.W. and K.W.*

17.     Plaintiffs Deb Whitewood ("Deb") and Susan Whitewood ("Susan") have lived together in a committed relationship for 22 years. Deb and Susan live

in Bridgeville, in Allegheny County, with their three children. Susan, 49, is a human resources executive at BNY Mellon. Deb, 45, is a stay-at-home mom. Deb was born and raised in Pittsburgh. Susan has lived in Pennsylvania since attending college in Pittsburgh.

18. Deb and Susan have two daughters, Plaintiff A.W., who is 16, and Plaintiff A.W., who will turn 15 this month. Deb is the children's biological mother and Susan obtained second parent adoptions after the children's births to establish a legal parent-child relationship with both children. Deb and Susan also have a two-year-old son, L.W. He was placed with them by the Allegheny County Department of Children and Youth Services when he was 11 months old. The placement initially was a foster placement. When L.W. was 20 months old, Deb and Susan jointly adopted him. The judge in the Allegheny County Children's Court granted the adoption after determining that the welfare of L.W. will be promoted by this adoption.

19. Deb and Susan are very involved in their children's school and activities. Susan has coached their volleyball and softball teams. When the girls were younger, Deb was active in the PTA and was the "classroom mom" who planned activities and parties for the class and chaperoned field trips. Deb is currently chair of the band festival, which raises most of the money to support the high school band. She also coordinates the concession stand at volleyball games.

20.     Deb and Susan are devout Christians and they and their children are members of and actively involved in the Christ United Methodist Church of Bethel Park. Deb is the president of the Altar Guild, which prepares the church's communion, cares for the sanctuary and holy items, and decorates for the holidays. A.W. and K.W. are in the church choir and sing every Sunday. A.W. is also in the Youth Praise band, which sings contemporary Christian songs at church and at community performances.

21.     In 1993, Deb and Susan had a Holy Union ceremony at the church they attended at the time. They both changed their last names to Whitewood, a combination of their surnames. They entered into a civil union in Vermont after that became possible.

22.     Deb and Susan would like to be able to get married in order to have the legal protections married couples rely on. They are fearful of how they might be treated in a time of crisis and therefore had a lawyer draw up powers of attorney for them, which they carry with them everywhere

23.     In addition, the exclusion from marriage impacts the family financially. The health insurance Deb gets from Susan's company is taxable income that costs them approximately $1,600 a year; if they were married, it would not be taxed. Moreover, if anything were to happen to Susan, Deb would be

8

denied Susan's social security and she would have to pay a 15% inheritance tax on half of the couple's joint property, a tax from which spouses are exempt.

24.     Deb and Susan also want to be able to marry because they are concerned that their children are being taught the message that their family is less deserving of respect and support than other families.

25.     On June 24, 2013, they went to the office of the Register of Wills of Washington County to apply for a marriage license. The Register of Wills refused their application for a marriage license because they are a same-sex couple.

26.     A.W. and K.W. grew up assuming that their moms were married. As they got older and came to learn that their parents were not allowed to marry in Pennsylvania, both girls felt that this was unfair to the whole family. They know they are a family and want to be legally recognized as one. They believe they should not be deprived of economic resources available to families headed by married couples. And they feel stigmatized by the fact that their parents are excluded from marriage. They believe that allowing their parents to marry would demonstrate that society accepts their family and considers it worthy of respect.

*Fredia and Lynn Hurdle*

27.     Plaintiffs Fredia Hurdle ("Fredia") and Lynn Hurdle ("Lynn") of Pittsburgh have lived together in a committed relationship for 22 years. Fredia, 49,

is a member of the Teamsters' Union and drives a truck for the Pittsburgh Post-Gazette. Lynn, 43, is a pediatric nurse.

28.     Fredia and Lynn met in 1990 when Fredia was a Greyhound bus driver and Lynn was a passenger. Fredia had been assigned to a new route and Lynn tried to help her out with directions. They ended up dating via Greyhound for about five months until Fredia moved to Pittsburgh.

29.     Fredia and Lynn's family includes Lynn's daughter Ashley, now 25, who lived with Fredia and Lynn from the time she was two years old until she went to college. After Fredia's sister died, two of Fredia's nephews and a niece came to live with Fredia and Lynn until they were ready to move out on their own. One of the boys lived with them for 9 years.

30.     Fredia and Lynn are caregivers by nature and have become known locally as the couple people go to when there are people in need of care. They took care of two children in the neighborhood when their families were going through difficult times. And an elderly family friend of Lynn's lived with Fredia and Lynn, who looked after her for 16 years until she passed away.

31.     Fredia and Lynn had a commitment ceremony at a church in 2009. More than 200 friends and family members celebrated with them. Lynn took Fredia's last name.

32.     Fredia and Lynn want to get married because they love each other and believe that families should be recognized through marriage. Because they cannot be married, when Fredia was hospitalized for emergency gall bladder surgery, the nurses refused to give Lynn any information about Fredia's condition because she was not considered family. When Fredia had to undergo medical testing after an injury, Lynn was not allowed to be present because she was not considered a relative. Because of these experiences, they hired an attorney to prepare powers of attorney for them, which they carry with them at all times.

33.     The exclusion from marriage has also meant that Lynn had to go without health insurance for about 3 years because her job did not offer health benefits and Fredia could not add Lynn to her employee health plan. During that time, Lynn had an accident in which she injured her shoulder and had to pay about $2,000 in hospital bills.

34.     Because they cannot be married in Pennsylvania, the couple worries about how Lynn will support herself if Fredia passes away first because Lynn would not be able to count on Fredia's social security (Fredia earns a larger income than Lynn) or pension for support.

35.     Fredia and Lynn also feel that the exclusion from marriage stigmatizes them and other lesbian and gay couples and sends the message that they are not entitled to the same respect other couples enjoy. As an interracial couple, Fredia

and Lynn are very aware that before the Supreme Court's historic decision in *Loving v. Virginia*, they would have been barred from marrying based on their races. And as an African American who grew up in Virginia and attended a segregated school until third grade, Fredia has experienced the profound social and dignitary harms that come with discrimination. She and Lynn pray that they will soon be permitted to marry and be treated as full and equal citizens in Pennsylvania.

**Edwin Hill and David Palmer**

36.  Plaintiffs Edwin Hill ("Ed") and David Palmer ("David") have lived together in a committed relationship for 25 years. Ed, 67, and David, 65, live in Bangor, in Northampton County, the town where they met in 1988 while attending a Christian retreat.

37.  Both Ed and David were born and raised in Pennsylvania. Ed grew up just outside of Pittsburgh and graduated from the University of Pittsburgh. David is from Trucksville, just outside of Wilkes-Barre, and he is a graduate of Wilkes University. He also holds a masters' degree in theology from Drew University.

38.  Both men are retired. Ed is a veteran of the United States Navy, having served from 1968 to 1971. He served in Vietnam as a sonar technician aboard the U.S.S. Brooke. He also worked for over 20 years at the Department of Veterans Affairs where he oversaw programs to support veterans. David worked at

a museum for 30 years, eventually obtaining the position of Director of Exhibitions. In 1996, after they retired from their careers, David and Ed opened the Arrowheart Inn, a bed and breakfast in Bangor, which they ran for 12 years until, as they say, they retired "for real" in 2008.

39.     Ed and David were married on May 10, 2013, in Kennebunk, Maine, accompanied by a few of their dearest friends and members of Ed's family who live in Maine. Their marriage license was witnessed by Ed's ninety-year-old aunt and David's oldest friend. They would have preferred to marry in their home state of Pennsylvania, where more of their friends and family could have joined in their celebration. But after 25 years together, they did not want to wait any longer to marry. And as seniors, they worried that they might not live to see the day when they could marry at home. Since they couldn't have their wedding in Pennsylvania, they are planning a party in their home town in August for more than seventy family members and friends to celebrate their 25th anniversary as a couple.

40.     Even after a quarter century together, the act of marrying has had a profound impact on Ed and David. It meant the world to them to be able to stand before loved ones and declare their love and commitment and to be able to call one another husband.

41.     However, Ed and David cannot enjoy the protections and security that marriage brings other couples because their marriage is not recognized in their home state of Pennsylvania. Like many seniors on fixed incomes, they are concerned about managing financially in their retirement. They are especially worried about the fact that when one of them passes away, the widower will be denied the estate tax protections Pennsylvania law provides to married couples. Any inheritance from one to the other – including one half of the value of their home and joint bank accounts – will be taxed at the rate of 15%, the highest rate. If their marriage were recognized, there would be no such tax. Ed and David have worked hard to save extra money for retirement so that neither of them will be forced out of their home due to the large tax bill that will come when one of them passes. But losing such a large share of the family's assets will significantly reduce the economic security of the surviving spouse and the standard of living he will have for the rest of his years.

42.     Ed and David have talked about moving to another state where their marriage would be recognized and they would have more financial security. But they do not want to leave their home and community. They want to grow old together in the place where they met twenty-five years ago.

*Heather and Kath Poehler*

43.    Plaintiffs Heather Poehler ("Heather") and Katherine Poehler
("Kath") have lived together in a committed relationship for 10 years.  Heather, 44,
and Kath, 41, live in Downingtown, in Chester County.  They live off a country
road on 8 acres of land with three dogs that they rescued from an animal shelter,
two cats, and seven chickens.  Heather is a Medicaid Liaison Manager at a
healthcare auditing firm.  Kath owns a dog training and dog walking business.

44.    On September 10, 2005, Heather and Kath got married in
Massachusetts, their home state at the time.  Heather changed her last name to
share Kath's.

45.    In 2007, during difficult economic times, Heather was offered a
promising job in Philadelphia and the couple relocated there.  Going from being
treated as the married couple that they are in Massachusetts to being treated as
legal strangers in Pennsylvania has been hard for them logistically, financially, and
emotionally.  For example, they had difficulty preparing their tax returns and
completing mortgage paperwork in Pennsylvania because accountants and bank
officials were unsure whether to treat the couple as married or unmarried.  They
pay more for health insurance than they would if their marriage were recognized in
Pennsylvania because they must pay taxes on the health insurance for Kath that
Heather gets through her employer.

15

46.     Having their marriage disregarded by the Commonwealth has also taken an emotional toll on the couple. It is painful not to be respected as a married couple or recognized as a family. And they feel vulnerable about what could happen in times of crisis. They felt especially anxious last year when Heather underwent surgeries for a broken leg and Kath had to be hospitalized for a severe allergic reaction. Because they are not recognized as spouses in Pennsylvania, neither is automatically legally authorized to make medical decisions for the other if necessary. Instead, with each trip to the hospital or doctor, they have had to explain their relationship and prove it with paperwork.

47.     Heather and Kath have developed roots in Pennsylvania. It has become their home. The idea of having to leave the community they love in order to have their marriage respected saddens them.

### Fernando Chang-Muy and Len Rieser

48.     Plaintiffs Fernando Chang-Muy ("Fernando") and Len Rieser ("Len") have lived together in a committed relationship for 32 years. Fernando, who is 58, was born in Cuba and emigrated to the United States with his family when he was a child. Len, 64, grew up in Vermont. The couple moved to Philadelphia in 1982, when Fernando was offered a job there. Philadelphia has been their home ever since.

16

49.     Fernando and Len are the proud parents of Isabel, whom they adopted when she was 10 months old.  Isabel, now 21, is a student at Temple University and aspires to be a teacher.

50.     Fernando and Len are both lawyers and professors who have dedicated their careers to the public interest.  Fernando currently teaches a course on refugee law and policy at the University of Pennsylvania Law School and non-profit management and immigration policy courses at the University's Graduate School of Social Policy and Practice.  Len has dedicated his career to advocating for children in the educational, mental health, and child welfare settings.  For approximately 17 years, he co-directed and directed the Education Law Center-PA.  He currently teaches in the clinical program at the University of Pennsylvania Law School and is an adjunct professor at Temple University and Arcadia University.

51.     Fernando and Len entered into a civil union in Vermont on February 14, 2004.  They celebrated with their family at Len's parents' house there.  Although obtaining the civil union was an important moment for them, it also reinforced the fact that their relationship is not legally recognized in the state where they actually live.

52.     Fernando and Len want to be able to be married and have their marriage recognized in Pennsylvania.  They see marriage as an appropriate recognition of the deep and permanent commitment they have made to each other.

More importantly, Fernando and Len know that if they could marry, it would mean

a lot to their daughter, who would like her parents to be married to each other.

53.     When Isabel was growing up, it was important to Fernando and Len

for her to have the same sense of security that any other child gets from being part

of a loving family. Fernando and Len made a point, when Isabel was in

elementary and secondary school, of making sure her teachers understood that they

were a family and that they desired to be active in the school community just like

any other parents. Fortunately, they managed to find school personnel who would

support them, as well as health care providers, a religious community, neighbors,

and other essential components of their lives as a family.

54.     Fernando and Len recognize that even if they had been able to be

married, the process of establishing themselves and their daughter as a family

would still have had its challenges, as they know that there are people who

disapprove of relationships such as theirs. But they are convinced that if marriage

had been available to them, a major barrier to their acceptance and well-being as a

family would have been removed, and that, even now, the availability of marriage

would make a significant, positive difference to their life as a family.

55.     Moreover, as lawyers, Fernando and Len are aware of how vulnerable

they are because they are excluded from the many legal protections of marriage.

They have done everything that lawyers can do to protect themselves in the

absence of marriage, such as drawing up wills and powers of attorney, but they know that there is nothing they can do to access most of the protections available to married couples.

### *Dawn Plummer and Diana Polson*

56. Plaintiffs Dawn Plummer ("Dawn") and Diana Polson ("Diana") of Pittsburgh have lived together in a committed relationship for 13 years. They met as college students on a study abroad program in Brazil.

57. Dawn, 36, is a fundraiser for The Poverty Initiative, an anti-poverty organization. Diana, 37, recently finished her Ph.D. and now works for a nonprofit research think tank aimed at improving the Pennsylvania economy for working people.

58. Dawn and Diana settled in Pittsburgh in 2011 because Dawn has Pennsylvania roots, having grown up in Camp Hill and having family in Pittsburgh, and they thought Pittsburgh would be a great city in which to raise children.

59. Dawn and Diana have two sons – a five-year-old, E.P., and a seven-month-old, J.P. They each gave birth to one of the children. They have completed a second parent adoption for E.P. They plan to do the same for J.P. but need to save money to be able to pay the more than $2,500 they were told it will cost. Until then, they feel vulnerable because if anything were to happen to Diana, J.P.

has no legal tie to Dawn. If they were legally married in Pennsylvania this would not be the case because both spouses would be recognized as parents from the moment of the child's birth.

60.    Dawn and Diana had a commitment ceremony in the Catskills in front of 50 family members and friends in 2007. They want to be legally married because they want the same legal protections other couples enjoy. Every time they have to check the "single" box on a form, it feels demeaning to their relationship. And it would mean a lot to their relatives for them to marry. Moreover, Dawn and Diana's five-year-old son is beginning to understand what marriage is. He asks a lot of questions, and they struggle to come up with a way to explain to him why his parents aren't allowed to get legally married.

### Angela Gillem and Gail Lloyd

61.    Plaintiffs Angela Gillem ("Angela") and Gail Lloyd ("Gail") of Philadelphia have lived together in a committed relationship for 17 years. Angela, 60, is a clinical psychologist and professor at Arcadia University whose current area of research is multi-cultural competency for counselors. Gail, 55, is a filmmaker and visual artist who graduated from Temple University's Film and Media Arts Program.

62.    Angela and Gail feel incredibly lucky to have found one another and have long known that they would be together forever. They wear matching rings

to symbolize their commitment to one another and to show the world that they each "belong to someone." They are registered domestic partners in Philadelphia.

63.     Angela and Gail would like to get married and be recognized as a married couple in their home state because they love each other and want the chance to stand up and have their family and community witness them make the fullest commitment two people can make to one another.

64.     They also want the security that comes with marriage and the protections the law provides to married couples in times of need. Because Angela is the primary breadwinner and Gail, as an artist, does not draw a steady paycheck to contribute to social security, the couple fears for Gail's economic security should Angela be the first of them to pass away. Because they cannot be married, Gail would not get Angela's social security and she would lose a substantial portion of the family's assets because she would not be entitled to the spousal exemption from the inheritance tax.

65.     They have tried to replicate some of the security that comes with marriage by having wills and healthcare and financial powers of attorney drawn up to grant each other some of the rights and decision-making power that would have come automatically with marriage.

66. On July 1, 2013, Angela and Gail went to the office of the Register of Wills and Clerk of Orphans' Court of Bucks County to apply for a marriage license. Their application was refused because they are a same-sex couple.

### Helena Miller and Dara Raspberry

67. Plaintiffs Helena Miller ("Helena") and Dara Raspberry ("Dara") of Philadelphia have lived together in a committed relationship for six years. Helena, 39, is a teacher and educational consultant. Dara, 43, is an emergency medicine physician at Einstein Medical Center Philadelphia.

68. In 2010, Helena and Dara decided to get married. They wanted to make a public commitment to each other in front of their friends and families, to join their families together, and to start a new family together. They got married in Connecticut on September 25, 2010, with 140 of their loved ones in attendance.

69. In the fall of 2011, because they were hoping to soon have children of their own, they decided to move from New York to Philadelphia in order to be closer to their families.

70. Helena and Dara's dream to start a family came true on May 28, 2013, when Helena gave birth to their daughter, Z.R. They have hired an attorney for Dara to do a second parent adoption of Z.R. This process is expected to take about 6 months, during which time Z.R. will have only one legally recognized parent, and they have been told it will cost about $1,800. If their marriage were

recognized in Pennsylvania, Dara would automatically be recognized as a parent to any child born to her spouse.

71.     Sadly, for Helena and Dara, the cost of moving to Pennsylvania to be close to family was to be effectively "unmarried" and, thus, considered less of a family in the eyes of the state. Helena and Dara would like their marriage to be recognized in Pennsylvania not only because of the concrete protections it would provide to them and their daughter, but also because they feel that being treated as an unmarried couple disrespects the commitment they have made to one another and devalues their family. They hope that their marriage will be recognized in Pennsylvania before their baby is old enough to be aware that the Commonwealth does not consider her family deserving of the same respect afforded other families.

### Ron Gebhardtsbauer and Greg Wright

72.     Plaintiffs Ron Gebhardtsbauer ("Ron") and Greg Wright ("Greg") have lived together in a committed relationship for 19 years. Ron, who is 60, is a Clinical Associate Professor and head of the Actuarial Science Program at Penn State University. Greg, 56, is an acupuncturist in private practice. Ron and Greg have lived in State College since 2008.

73.     Ron and Greg registered as domestic partners in State College when that became possible in 2011. They are engaged to be married. They want to get married to declare publicly and officially their commitment. They would like to be

23

able to refer to one another officially as spouses. They feel that using the term "partner" is inadequate as it does not convey the level of commitment they have made to one another.

74.     It is important to them to marry in Pennsylvania, where they have made their home and built their lives together. And they would like to be able to marry in their own church. Their minister has already agreed to officiate at the ceremony if that becomes an option for them legally.

75.     Because their relationship is not legally recognized in Pennsylvania, when one of them passes away, the surviving partner will be denied the spousal exemption from the inheritance tax and will have to pay a 15% tax on half of everything the couple owns together, including their home.

**Marla Cattermole and Julia Lobur**

76.     Plaintiffs Marla Cattermole ("Marla") and Julia Lobur ("Julia") of Harrisburg have lived together in a committed relationship for 27 years. They met during Army basic training.

77.     Julia, who is 58, is a lifelong Pennsylvanian, born and raised in New Kensington, just outside of Pittsburgh. Marla, 54, grew up in Iowa but moved to Pennsylvania in 1986 to be with Julia. Marla and Julia both work for the Commonwealth, Julia as a software architect and project manager and Marla as a

senior benefits manager. Julia is also an adjunct lecturer in computer science at Penn State Harrisburg.

78.     Marla is a 12-year veteran of the Army. She left the Army as a sergeant in 1995, having earned various commendations. Julia attempted to serve her country and enlisted in the Army in 1983 but she was discharged during basic training after her sexual orientation was revealed to her superiors. Military policy at the time barred service by lesbians and gay men.

79.     Marla and Julia strongly support each other. They share finances and all of their property, including their home, is jointly owned. They not only take care of each other, they also took care of Julia's mother for 12 years when it became difficult for her physically and financially to live on her own. She lived with them until she passed away in 1997.

80.     In 2009, Marla and Julia got married in Carroll, Iowa, where Marla grew up. Marla's mother and sister were there to celebrate with them. They had wanted to marry for years but did not want to do it far from home. They decided to marry in Iowa as soon as that became a possibility because it was the closest thing they thought they would get to marrying at "home."

81.     Because their marriage is not recognized in their home state of Pennsylvania, Marla and Julia have gone to considerable expense to have an attorney draw up documents, such as living wills and healthcare proxies, to try to

protect themselves.  They understand, however, that this affords them only a fraction of the protections that come with marriage and they are concerned that those papers will not hold up in times of crisis.

82.    The non-recognition of their marriage also affects them financially. They pay over $100 a month more for health insurance than they would if they had spousal coverage.  Moreover, they worked hard to save money for their retirement but worry that when one of them dies, the widow will be left financially insecure because she will be denied the spousal exemption from the inheritance tax.  A financial advisor estimated that the tax bill could be up to approximately $50,000. Marla and Julia pay hundreds of dollars a year to carry life insurance policies in order to cover the cost of inheritance tax when one of them dies.

83.    The recognition and legitimacy that marriage provides to them means the world to Marla and Julia when they get to experience it.  Most recently, when they visited Washington State, they felt joyful and free every time they were recognized as a legal couple, even in matters as mundane as renting a car together. They feel the loss of that freedom every time they return to home to Pennsylvania after travelling in a state where their marriage is respected.

*Maureen Hennessey*

84.    Plaintiff Maureen Hennessey ("Maureen"), 53, lived in a committed relationship with Mary Beth McIntyre ("Mary Beth") from 1984 until Mary Beth's death on May 18, 2013, at the age of 55.

85.    Both Maureen and Mary Beth were born and raised in Philadelphia and they shared their lives together in Philadelphia for 29 years.  They raised 3 children together – Maureen's son from a previous relationship, and Mary Beth's niece and nephew, whose mother died when they were young.  And they became grandmothers to three grandchildren, now 19, 9, and 8.  They registered as Life Partners with the city of Philadelphia in 2002.

86.    In August 2009, Mary Beth was diagnosed with inoperable Stage 4 lung cancer that had spread to her brain and bones.  After Mary Beth fell ill, Maureen left her job as a middle school teacher in the Philadelphia School District to care for Mary Beth and help Mary Beth run her business, which was the family's primary source of income.

87.    Maureen and Mary Beth were married in Massachusetts on June 9, 2011.  They would have preferred to marry in their home state of Pennsylvania because their loved ones are there and they would have liked to have been able to solemnize their marriage at Germantown Friends Meeting.  But getting married in

Pennsylvania was not an option and they knew their time together was too limited to try to wait for that to change to come.

88.   As Mary Beth's condition deteriorated, she was unable to take basic care of herself.  She needed Maureen's help to get in and out of bed and to the bathroom.  Maureen helped bathe her and administered her medications.  Because Mary Beth had difficulty chewing and swallowing, Maureen prepared foods that were easy to swallow.

89.   While Mary Beth was suffering the physical and emotional pain of end stage cancer, she had the additional burden of worrying about how Maureen would manage financially after she was gone.  The couple consulted with an attorney about ways to protect Maureen financially.  The attorney was able to provide some protections, such as a will to ensure that Mary Beth's wishes to leave her property to Maureen would be honored.  But there was nothing the attorney could do to establish most of the legal protections that are available to widows and widowers.

90.   Because Maureen's marriage to Mary Beth is not recognized in Pennsylvania, Maureen must pay a 15% inheritance tax on all of the property that Mary Beth left to her, including their shared home.  And unless their marriage is recognized in Pennsylvania, Maureen will not be eligible to receive Mary Beth's

social security benefits when she turns 65. Because Mary Beth was the primary breadwinner, this will leave Maureen financially vulnerable in her retirement.

91.    Pennsylvania's refusal to recognize her marriage to Mary Beth does not just cause Maureen economic hardship. In her time of grief, she is denied the comfort and dignity of being acknowledged as Mary Beth's widow.

-------------------

92.    Plaintiffs Deb and Susan Whitewood, Fredia and Lynn Hurdle, Fernando Chang-Muy and Len Rieser, Dawn Plummer and Diana Polson, Angela Gillem and Gail Lloyd, and Ron Gebhardtsbauer and Greg Wright are all eligible to marry but for the fact that they wish to marry someone of the same sex. They are all over the age of 18, fully competent, are not married to anyone else, are not within a prohibited degree of consanguinity of each other, and are prepared to provide the required information and pay the license fee. They are willing and able to assume all of the obligations of marriage.

93.    Plaintiffs Edwin Hill and David Palmer, Heather and Kath Poehler, Helena Miller and Dara Raspberry, Marla Cattermole and Julia Lobur, and Maureen Hennessey all were married legally under the laws of other states and their marriages would be recognized within the Commonwealth but for the fact that they are married to a person of the same sex.

## **Defendants**

94.     Defendant THOMAS W. CORBETT is the Governor of the Commonwealth of Pennsylvania.  In his official capacity, he is the chief executive officer of the Commonwealth and is, pursuant to Article IV, Section 2 of the Pennsylvania Constitution, responsible for the faithful execution of the laws of the Commonwealth of Pennsylvania, including the laws that exclude same-sex couples from marrying or having their marriages recognized (23 Pa. C.S. §§ 1102 and 1704).

95.     Defendant KATHLEEN G. KANE is the Attorney General of the Commonwealth of Pennsylvania.  She is sued in her official capacity pursuant to the Commonwealth Attorneys Act, 71 P.S. § 732-204.

96.     Defendant MICHAEL WOLF is the Secretary of Health of the Commonwealth of Pennsylvania and as such serves as chief executive of the Pennsylvania Department of Health.  In his official capacity, pursuant to 23 Pa. C.S. §§ 1104 and 1306, he is responsible for preparing and approving the marriage license application and marriage license forms used in county offices across the Commonwealth, which presently prohibit persons of the same sex from marrying by requiring both a "Bride" and "Groom."  In his official capacity, pursuant to 23 Pa. C.S. § 1106, he is charged with receiving reports of issued marriage licenses from individual counties and with publishing statistics derived from those reports.

97.     The Commonwealth's Marriage Law provides that "[n]o person shall be joined in marriage in this Commonwealth until a marriage license has been obtained," and "[n]o marriage license shall be issued except upon written and verified application made by both of the parties intending to marry." 23 Pa. C.S. §§ 1301(a), 1302(a).

98.     In each county in the Commonwealth, either the county Register of Wills or the county Clerk of Orphans' Court issues marriage licenses.

99.     Defendant MARY JO POKNIS is the Register of Wills of Washington County, Pennsylvania, and her office is responsible for issuing marriage licenses in that county.

100.    On June 24, 2013, invoking Commonwealth law, the office of Ms. Poknis refused to issue a marriage license to Plaintiffs Deb and Susan Whitewood because they are a same-sex couple.

101.    Defendant DONALD PETRILLE, JR., is the Register of Wills and Clerk of Orphans' Court of Bucks County, Pennsylvania, and his office is responsible for issuing marriage licenses in that county.

102.    On July 1, 2013, invoking Commonwealth law, the office of Mr. Petrille refused to issue a marriage license to plaintiffs Angela Gillem and Gail Lloyd because they are a same-sex couple.

103. All defendants named above are, and at all relevant times have been, acting under color of state law, and are sued in their official capacities.

## JURISDICTION AND VENUE

104. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343 because the suit raises federal questions under 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution.

105. Venue is proper in the Middle District of Pennsylvania under 28 U.S.C. § 1391(b) because defendants CORBETT, KANE, and WOLF reside in this district.

## FACTUAL BACKGROUND

### Pennsylvania's Prohibition of Marriage for Same-Sex Couples

106. Pennsylvania's Marriage Law, 23 Pa. C.S. §§ 1101 *et seq.*, governs marriages in the Commonwealth. In 1996, the Marriage Law was amended to expressly prohibit marriage for same-sex couples. The 1996 amendment had two parts. First, it defined marriage as "[a] civil contract by which one man and one woman take each other for husband and wife." 23 Pa. C.S. § 1102. Second, in a stark departure from Pennsylvania's usual recognition of marriages entered into in other states, it made "void in this Commonwealth" any "marriage between persons of the same sex . . . entered into in another state or foreign jurisdiction, even if valid where entered into." 23 Pa. C.S. § 1704.

32

107. As a result, marriage in Pennsylvania is legally available only to opposite-sex couples. Same-sex couples may not marry in Pennsylvania, and if they are married elsewhere, their marriages are not recognized in Pennsylvania.

**Same-Sex and Opposite-Sex Couples Are Similarly Situated for Purposes of Marriage**

108. The Supreme Court has called marriage "the most important relation in life," *Zablocki v. Redhail*, 434 U.S. 374, 384 (1978) (internal quotation marks omitted), and an "expression[] of emotional support and public commitment." *Turner v. Safley*, 482 U.S. 78, 95 (1987). It is "a far-reaching legal acknowledgement of the intimate relationship between two people. . . ." *Windsor*, Slip. Op. at 20. This is as true for same-sex couples as it is for opposite-sex couples.

109. Same-sex couples such as the plaintiff couples are identical to opposite-sex couples in all of the characteristics relevant to marriage.

110. Same-sex couples make the same commitment to one another as opposite-sex couples. Like opposite-sex couples, same-sex couples build their lives together, plan their futures together and hope to grow old together. Like opposite-sex couples, same-sex couples support one another emotionally and financially and take care of one another physically when faced with injury or illness. For example, when plaintiff Maureen Hennessey's spouse, Mary Beth, was dying of cancer, Maureen left her job as a teacher to take care of Mary Beth until

33

Mary Beth passed away. Maureen's devotion to Mary Beth, the person with whom she shared her life for 29 years, is what marriage is about.

111. Like some opposite-sex couples, some same-sex couples like plaintiffs Deb and Susan Whitewood, Fernando Chang-Muy and Len Rieser, Dawn Plummer and Diana Polson, and Helena Miller and Dara Raspberry, are parents raising children together.

112. Same-sex couples seeking to marry are just as willing and able as opposite-sex couples to assume the obligations of marriage.

113. The plaintiff couples and other same-sex couples in Pennsylvania, if permitted to marry, would benefit no less than opposite-sex couples from the many legal protections and the social recognition afforded to married couples.

114. There was a time when an individual's sex was relevant to his or her legal rights and duties within the marital relationship. For example, husbands had a duty to support their wives but not vice versa and husbands had legal ownership of all property belonging to their wives. But these legal distinctions have all been removed such that the legal rights and duties of husbands and wives are now identical. *See also* 1 Pa. C.S. § 2301(a) ("[W]here in any statute heretofore enacted there is a designation restricted to a single sex, the designation shall be deemed to refer to both sexes unless the designation does not operate to deny or

34

abridge equality of rights under the law of this Commonwealth because of the sex of the individual.").

### The Exclusion of Same-Sex Couples from Marriage
### Causes Substantial Harm to Couples and Their Families

115. By preventing same-sex couples from marrying and refusing to recognize their marriages from others states, Commonwealth law deprives them of numerous legal protections that are available to opposite-sex couples in Pennsylvania by virtue of their marriages. By way of example only:

a. A married person is exempt from inheritance tax on property left to him by an opposite-sex spouse, including the spouse's share of the couple's home, and, thus, protected against economic distress or loss of a home because of an estate tax bill. 72 P.S. § 9116(a)(1.1)(ii). A same-sex surviving spouse or partner is denied this exemption and must pay a 15% tax, the highest rate, which applies to non-family members. 72 P.S. § 9116(a)(3).

b. A widow or widower of an opposite-sex spouse is entitled to 50% to 100% of his or her deceased spouse's estate if the spouse died without a will. 20 Pa. C.S. § 2102. A same-sex surviving spouse or partner in this situation receives nothing.

c. If an opposite-sex spouse becomes incapacitated, her spouse is automatically authorized to make decisions regarding her care. 20 Pa. C.S. § 5461(d)(1)(i). This protection does not extend to a same-sex spouse or partner.

d. Under the workers' compensation laws, the opposite-sex spouse of someone who dies or is injured in the workplace is entitled to damages and may bring suit. 77 P.S. §§ 431 *et seq.* Same-sex spouses or partners have no legal standing to sue over their spouse or partner's workplace injury.

e. The Commonwealth requires opposite-sex spouses to support one another financially. 23 Pa. C.S. § 4603(a)(1)(i). There is no support obligation for same-sex spouses or partners.

f. Commonwealth laws promote the stability of marriages through rules such as mandatory waiting periods prior to divorce by mutual consent. 23 Pa. C.S. § 3301(c). The divorce laws, including these provisions, do not apply to same-sex spouses or partners.

g. Opposite-sex widows and widowers of military personnel and veterans are eligible for numerous assistance programs. *E.g.*, 51 Pa. C.S. §§ 3502, 7319, 8502; 51 P.S. §§ 20010, 20046, 20096, 20125, 20305. These programs are not available to same-sex surviving spouses or partners of military personnel and veterans.

h. Opposite-sex widows and widowers of public employees in the Commonwealth are eligible to receive various pensions and survivor benefits upon their spouse's death. *E.g.*, 53 P.S. §§767(a)(2)(i), 23654.1, 23654–23654.2 (receipt of police officer spouse's pension by surviving spouse); 53 P.S. § 881.115 (tax exemption of public employee spouse's retirement allowance); 53 P.S. §§ 23609.2, 23609.3 (lifetime survivor benefits for spouse of retired pensioner); 53 P.S. § 39320 (receipt of fireman's pension by surviving spouse). These benefits are not provided to surviving same-sex spouses or partners of public employees.

i. Opposite-sex widows and widowers of firefighters, police officers, and other first responders killed in the line of duty are provided financial assistance. 53 P.S. § 891(d) ($100,000 payment to surviving spouse of a firefighter, ambulance or rescue squad member, hazardous material response team member, law enforcement officer, or National Guard member who died in the line of duty). This assistance is not provided to same-sex surviving spouses or partners of first responders.

j. Property tax rebates or rent rebates are available under Pennsylvania law to certain people over the age of 50 who are widows and widowers of opposite-sex spouses. 53 P.S. §§ 6926.1303-6926.1306. They are not available to same-sex surviving spouses or partners.

    k. "Gold Star Family" license plates are available to the opposite-sex widows and widowers of people killed on active military duty. 75 Pa. C.S. § 1365. Surviving same-sex spouses or partners are not eligible for license plates recognizing their loved one's sacrifice.

116. Same-sex couples are excluded from these and many other legal protections provided for married couples under Pennsylvania law.

117. The exclusion of same-sex couples from marriage also denies them eligibility for numerous federal protections afforded to married couples including in the areas of immigration and citizenship, taxes, and social security. Some of the federal protections for married couples are only available to couples if their marriages are legally recognized in the state in which they live. *See, e.g.*, 42 U.S.C. § 416(h)(1)(A)(i) (marriage for eligibility for social security benefits based on law of state where couple resides at time of application); 29 C.F.R. § 825.122(b) (same for Family Medical Leave Act). Thus, even plaintiffs Edwin Hill and David Palmer, Heather and Kath Poehler, Helena Miller and Dara Raspberry, Marla Cattermole and Julia Lobur, and Maureen Hennessey, who are already married, cannot access such federal protections as long as Pennsylvania refuses to recognize their existing marriages.

118. The exclusion from marriage also harms same-sex couples and their families in less tangible ways.

119.  Although the plaintiff couples are all in long-term committed relationships, they and other same-sex couples are denied the stabilizing effects of marriage, which helps keep couples together during times of crisis or conflict.

120.  Excluding same-sex couples from marriage also harms couples and their children by denying them the social recognition that comes with marriage. Marriage has profound social significance both for the couple that gets married and the family, friends and community that surround them. The terms "married" and "spouse" have universally understood meanings that command respect for a couple's relationship and the commitment they have made.

121.  The exclusion from the esteemed institution of marriage also demeans and stigmatizes lesbian and gay couples and their children by sending the message that they are less worthy and valued than families headed by opposite-sex couples.

122.  The impact of the exclusion from marriage on same-sex couples and their families is extensive and real. The denial of the right to marry causes these couples and their families to suffer significant emotional, physical, and economic harms.

123.  The plaintiff couples recognize that marriage entails both benefits to and obligations on the partners and they welcome both.

**Excluding Same-Sex Couples from Marriage Is Not
Rationally Related to a Legitimate Government Interest,
Let Alone Able to Withstand Heightened Scrutiny**

124.    As the evidence will show, the prohibition against marriage for same-

sex couples in Pennsylvania is not closely tailored to serve an important

government interest or substantially related to an exceedingly persuasive

justification.  In fact, as the evidence also will show, the prohibition fails any level

of constitutional scrutiny.  It is not even rationally related to any legitimate

justifications that were offered in support of it when the Marriage Law was

amended in 1996 nor to any legitimate interest of the Commonwealth that

defendants might now offer as a basis for denying same-sex couples the freedom to

marry in Pennsylvania.

125.    When the Commonwealth enacted the 1996 amendment prohibiting

marriage for same-sex couples, legislators in favor of the amendment relied on

"moral opposition to same-sex marriages . . . and support of the traditional family

unit." 1996 Pa. Legis. J. (House), at 2017; *see also id.* at 2019 ("[T]he large

majority [of Pennsylvanians] do not want our traditional marriage institution and

our state of morals to be changed."); *id.* at 2022 ("This is a vote about family

values and traditional beliefs . . . .").  Some legislators said there was a need to

protect against a financial burden on businesses and taxpayers. *Id.* at 2018 ("[I]f

we are forced to recognize same-sex marriages, this would put an unfunded

mandate on our businesses, another burden on our taxpayers, and so on."); *id.* at

2017 ("Social Security, tax and other benefits presently conferred on spouses

would have to be expanded to include married partners of the same sex. The

financial costs imposed on society by the forced recognition of same-sex marriage

cannot even be calculated at this time."). And, it was argued, "it is imperative that

we in Pennsylvania should stand up for traditional marriage for the benefit of

families and children in the Commonwealth and our future." *Id.* at 2022. None of

these justifications – or any other justification that might now be offered – passes

constitutional muster.

### *Moral Opposition to Marriage for Same-Sex Couples and Support of the Traditional Family*

126.   Neither tradition nor moral disapproval of same-sex relationships or

marriage for lesbian and gay couples is a legitimate basis for unequal treatment of

same-sex couples under the law. The fact that a discriminatory law is long-

standing does not immunize it from constitutional scrutiny. And the Supreme

Court has made clear that the law cannot, directly or indirectly, give effect to

private biases and has expressly rejected moral disapproval of marriage for same-

sex couples as a legitimate basis for discriminatory treatment of lesbian and gay

couples. *Windsor*, Slip Op., at 21 (an "interest in protecting traditional moral

teachings reflected in heterosexual-only marriage laws" was not a legitimate

justification for federal Defense of Marriage Act).

### *Preserving the Public Fisc and the Coffers of Private Business*

127. The Commonwealth cannot justify its denial of marriage to lesbian and gay couples by claiming an interest in preserving the public fisc or the coffers of private business. Saving money is not a justification for excluding a group from a government benefit without an independent rationale for why the cost savings ought to be borne by the particular group denied the benefit. Moreover, the evidence will show that there is no factual basis for the notion that allowing and recognizing the marriages of same-sex couples will burden the Commonwealth financially or constitute a burden on businesses.

### *Protection of Children*

128. The Commonwealth's ban on marriage for same-sex couples is not rationally related to child welfare concerns. The government has a vital interest in protecting the well-being of children, but the exclusion of same-sex couples from marriage bears no relation to this interest. To the contrary, it harms children in the Commonwealth.

129. Commonwealth law recognizes that neither sexual orientation nor gender has any bearing on a couple's ability to successfully rear children and, thus, treats gay and lesbian couples the same as heterosexual couples with respect to adoption and recognition as parents through the *in loco parentis* doctrine. Pennsylvania judges routinely grant adoptions to same-sex couples, recognizing

that the adoptions are in the best interest of the child. Indeed, the government itself places children for adoption with same-sex couples like plaintiffs Deb and Susan Whitewood, who jointly adopted their son L.W. out of the foster care system. Any assertion that the Commonwealth does not consider same-sex couples equally effective parents cannot be credited given its own conduct evidencing a different view.

130. Moreover, there is no valid basis for the Commonwealth to assert a preference for child-rearing by opposite-sex couples over same-sex couples. The evidence will demonstrate that there is a consensus within the scientific community, based on over thirty years of research, that children raised by same-sex couples are just as well adjusted as children raised by opposite-sex couples. This is recognized by every major professional organization dedicated to children's health and welfare including the American Academy of Pediatrics, the American Psychological Association, the American Medical Association, the National Association of Social Workers and the Child Welfare League of America.

131. Other courts have found, after trials involving expert testimony, that there is no rational basis for favoring parenting by heterosexual couples over gay and lesbian couples. *See, e.g., Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 980 (N.D. Cal. 2010) (finding that the research supporting the conclusion that "[c]hildren raised by gay or lesbian parents are as likely as children raised by

heterosexual parents to be healthy, successful and well-adjusted" is "accepted beyond serious debate in the field of developmental psychology"), *aff'd sub nom. Perry v. Brown*, 671 F.3d 1052 (9th Cir. 2012), *vacated for lack of standing sub nom Hollingsworth v. Perry*, No. 12-144, 2013 WL 3196927 (U.S. June 26, 2013); *In re Adoption of Doe*, 2008 WL 5006172, at *20 (Fla. Cir. Ct. Nov. 25, 2008) ("[B]ased on the robust nature of the evidence available in the field, this Court is satisfied that the issue is so far beyond dispute that it would be irrational to hold otherwise; the best interests of children are not preserved by prohibiting homosexual adoption."), *aff'd sub nom Florida Dep't of Children & Families v. Adoption of X.X.G.*, 45 So.3d 79 (Fla. Dist. Ct. App. 2010); *Howard v. Child Welfare Agency Review Bd.*, Nos. 1999-9881, 2004 WL 3154530, at *9 and 2004 WL 3200916, at *3-4 (Ark. Cir. Ct. Dec. 29, 2004) (holding based on factual findings regarding the well-being of children of gay parents that "there was no rational relationship between the [exclusion of gay people from becoming foster parents] and the health, safety, and welfare of the foster children."), *aff'd sub nom Dep't of Human Servs. v. Howard*, 238 S.W.3d 1 (Ark. 2006).

132. Excluding same-sex couples from marriage has no conceivable benefit to children of heterosexual couples. Denying same-sex couples the right to marry does not encourage opposite-sex couples who have children to marry or stay married for the benefit of their children. And regardless of whether same-sex

couples are permitted to marry, the children of opposite-sex spouses will continue to enjoy the same benefits and protections that flow from their parents' marriage.

133. Excluding same-sex couples from marriage serves only to harm the children raised by lesbian and gay couples by denying their families significant benefits and by branding their families as inferior and less deserving of respect and, thus, encouraging private bias and discrimination. According to the 2010 United States Census, there are over 6,000 same-sex couples raising children in Pennsylvania. The state's interest in the welfare of children of lesbian and gay parents is or should be as great as its interest in the welfare of other children.

## CLAIMS FOR RELIEF

### COUNT I:
**Deprivation of the Fundamental Right to Marry in
Violation of the Due Process Clause of the
Fourteenth Amendment to the United States Constitution
(42 U.S.C. § 1983)**

134. Plaintiffs incorporate by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

135. The Fourteenth Amendment to the United States Constitution precludes any State from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Governmental interference with a fundamental right may be sustained only upon a showing that the legislation is closely tailored to serve an important governmental interest.

44

136. The Supreme Court has long recognized that marriage is a fundamental right and that choices about marriage, like choices about other aspects of family, are a central part of the liberty protected by the Due Process Clause.

137. Pennsylvania law denies the plaintiff couples and other same-sex couples this fundamental right by denying them access to the state-recognized institution of marriage and refusing to recognize the marriages they entered into in other states.

138. The Commonwealth can demonstrate no important interest to justify denying the plaintiff couples this fundamental right. Indeed, it cannot demonstrate that the denial is tailored to any legitimate interest at all.

139. The Commonwealth's prohibition of marriage between persons of the same sex and its refusal to recognize marriages entered into by same-sex couples in other jurisdictions violates the Due Process Clause.

140. Defendants, acting under color of state law, are depriving plaintiffs of rights secured by the Due Process Clause of the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. § 1983.

## COUNT II:
### Discrimination on the Basis of Sexual Orientation in Violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution (42 U.S.C. § 1983)

141.    Plaintiffs incorporate by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

142.    The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that "no State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

143.    By denying the plaintiff couples and other lesbian and gay couples the ability to marry and to have their out-of-state marriages recognized, the Commonwealth, through defendants, disadvantages lesbian and gay people on the basis of their sexual orientation. It denies them significant legal protections. And it "degrade[s] [and] demean[s]" them by "instruct[ing] . . . all persons with whom same-sex couples interact, including their own children," that their relationship is "less worthy" than the relationships of others. *Windsor*, Slip Op., at 25.

144.    Same-sex couples and opposite-sex couples are similarly situated for purposes of marriage.

145.    The evidence will show that classifications based on sexual orientation demand heightened scrutiny.

46

146. Lesbians and gay men are members of a discrete and insular minority that has suffered a history of discrimination in the Commonwealth and across the United States.

147. Sexual orientation bears no relation to an individual's ability to perform or contribute to society.

148. Sexual orientation is a core, defining trait that is so fundamental to one's identity that a person may not legitimately be required to abandon it (even if that were possible) as a condition of equal treatment. Sexual orientation generally is fixed at an early age and highly resistant to change through intervention. Efforts to change a person's sexual orientation through interventions by medical professionals have not been shown to be effective. No mainstream mental health professional organization approves interventions that attempt to change sexual orientation, and many – including the American Psychological Association and the American Psychiatric Association – have adopted policy statements cautioning professionals and the public about these treatments.

149. Prejudice against lesbians and gay men continues to seriously curtail the operation of the political process preventing this group from obtaining redress through legislative means. Lesbians and gay men lack statutory protection against discrimination in employment, public accommodations, and housing at the federal level and in more than half of the states, including Pennsylvania. Lesbians and gay

men have far fewer civil rights protections at the state and federal level than women and racial minorities had when sex and race classifications were declared to be suspect or quasi suspect. They have been stripped of the right to marry through 30 state constitutional amendments, and have been targeted through the voter initiative process more than any other group.

150. For all these reasons, classification based on sexual orientation should be reviewed under heightened scrutiny, but this one cannot survive under any level of constitutional scrutiny The Commonwealth's exclusion of same-sex couples from marriage is not rationally related to any legitimate governmental interest. All it does it disparage and injure lesbian and gay couples and their children.

151. The Commonwealth's prohibition of marriage for same-sex couples and its refusal to recognize the marriages of same-sex couples entered into elsewhere violates the Equal Protection Clause.

152. Defendants, acting under color of state law, are depriving plaintiffs of rights secured by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

## COUNT III:
### Discrimination on the Basis of Sex in
### Violation of the Equal Protection Clause of the
### Fourteenth Amendment to the United States Constitution
### (42 U.S.C. § 1983)

153.   Plaintiffs incorporate by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

154.   The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that "no State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

155.   Commonwealth law defines marriage as "[a] civil contract by which one man and one woman take each other for husband and wife." 23 Pa. C.S. § 1102.

156.   By defining marriage in this way, the Commonwealth discriminates on the basis of sex. For example, plaintiff Angela Gillem is not permitted to marry plaintiff Gail Lloyd solely because they are both women. If Angela (or Gail) were a man, the marriage would be allowed. The only reason the marriage is prohibited is the sex of the partners.

157.   In addition, the Commonwealths has made "void in this Commonwealth" any "marriage between persons of the same sex . . . entered into in another state or foreign jurisdiction, even if valid where entered into." 23 Pa.

49

C.S. § 1704. The marriage of Edwin Hill and David Palmer, for example, is denied recognition solely because they are both men.

158. The Supreme Court has made clear that perpetuation of traditional gender roles is not a legitimate government interest.

159. Given that there are no longer legal distinctions between the duties of husbands and wives, there is no basis for the sex-based eligibility requirements for marriage.

160. The defendants can demonstrate no exceedingly persuasive justification for this discrimination based on sex.

161. Commonwealth law prohibiting marriage and recognition of marriage for same-sex couples thus violates the Equal Protection Clause.

162. Defendants, acting under color of state law, are depriving plaintiffs of rights secured by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. § 1983.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1. Enter a declaratory judgment that 23 Pa. C.S. §§ 1102 and 1704 violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution;

2.      Enter a declaratory judgment that 23 Pa. C.S. §§ 1102 and 1704

violate the Equal Protection Clause of the Fourteenth Amendment to the United

States Constitution;

3.      Enter a permanent injunction enjoining defendants from denying the

plaintiff couples and all other same-sex couples the right to marry in the

Commonwealth of Pennsylvania and directing defendants to recognize marriages

validly entered into by the plaintiff couples and other same-sex couples outside of

the Commonwealth of Pennsylvania;

4.      Award costs of suit, including reasonable attorneys' fees under 42

U.S.C. § 1988; and

5.      Enter all further relief to which plaintiffs may be justly entitled.

HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER

By: _____

Mark A. Aronchick (PA ID No. 20261)
John S. Stapleton (PA ID No. 200872)
Dylan J. Steinberg (PA ID No. 203222)
Rebecca S. Melley (PA ID No. 206210)
One Logan Square, 27th Floor
Philadelphia, PA  19103
(215) 568-6200
maronchick@hangley.com
jstapleton@hangley.com
dsteinberg@hangley.com
rmelley@hangley.com

James D. Esseks
Leslie Cooper
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
jesseks@aclu.org
lcooper@aclu.org

Witold J. Walczak (PA ID No. 62976)
ACLU FOUNDATION OF
PENNSYLVANIA
313 Atwood Street
Pittsburgh, PA 15213
(412) 681-7736
vwalczak@aclupa.org

Mary Catherine Roper (PA ID No. 71107)
Molly Tack-Hooper (PA ID No. 307828)
ACLU FOUNDATION OF
PENNSYLVANIA
P.O. Box 40008
Philadelphia, PA 19106
(215) 592-1513
mroper@aclupa.org
mtack-hooper@aclupa.org

Seth F. Kreimer (PA ID No. 26102)
3400 Chestnut St.
Philadelphia, Pa. 19104
(215) 898-7447
skreimer@law.upenn.edu

*Counsel for Plaintiffs*