# EXHIBIT A



# Corbett apologizes for remarks about same-sex couples

Tom Corbett
*(AP Photo/Matt Rourke, file)*
**John L. Micek | jmicek@pennlive.com** By John L. Micek | jmicek@pennlive.com
**Email the author | Follow on Twitter**
on October 04, 2013 at 11:30 AM, updated October 04, 2013 at 11:40 AM

**Gov. Tom Corbett** has **apologized for remarks he made during a televised interview earlier today in which he appeared to compare same-sex marriages to incest.**

Here's the full text of his statement:

*"During a recent interview, I was asked to comment on the ruling by Judge Pellegrini that the Montgomery County Clerk of Courts did not have the power to decide the constitutionality of state laws.*

*"My words were not intended to offend anyone. If they did, I apologize.*

*"I explained that current Pennsylvania statute delineates categories of individuals unable to obtain a marriage license. As an example, I cited siblings as one such category, which is clearly defined in state law. My intent was to provide an example of these categories.*

*"The constitutional question is now before a federal court and that is the venue in which same-sex couples wishing to legally marry have standing to intervene and be heard. Same-sex marriage is an important issue and the question of its legal status is one that will be heard and decided upon its merits, with respect and compassion shown to all sides."*

Corbett was speaking about gay marriage on Friday morning when an anchor on WHP-TV in Harrisburg asked about a statement his lawyers made in a recent court filing, comparing the marriage of gay couples to the marriage of children because neither can legally marry in the state, The Associated Press reported.

"It was an inappropriate analogy, you know," Corbett said. "I think a much better analogy would have been brother and sister, don't you?"

In August, administration attorneys said in a court filing that same-sex marriages were no more valid than a marriage between two 12-year-olds because state law bans both unions.

Corbett later rejected that analogy, saying the case revolved around the question of whether a public official had "the authority to disregard state law based on his own personal legal opinion about the constitutionality of a statute," the **Associated Press** reported.

© 2013 PennLive.com. All rights reserved.

# EXHIBIT B





**COMMONWEALTH OF PENNSYLVANIA**
GOVERNOR'S OFFICE OF GENERAL COUNSEL

August 30, 2013

<u>**VIA ELECTRONIC AND HAND DELIVERY**</u>

Susan J. Forney
Executive Deputy Attorney General
Director, Civil Law Division
Office of Attorney General
Strawberry Square, 15th Floor
Harrisburg, PA 17120

Re:  *Pa. Department of Health v. Hanes*
   No. 379 M.D. 2013 (Pa. Commw. Ct.)

Dear Sue:

   As you know, the Department of Health (DOH) on July 30, 2013, filed in Commonwealth Court an action in mandamus against D. Bruce Hanes in his capacity as the Clerk of the Orphans' Court of Montgomery County (Clerk). DOH's suit seeks a writ of mandamus to require the Clerk to comply with the Marriage Law by issuing marriage licenses only to couples of mixed gender, consistent with the definition of "marriage" under 23 Pa.C.S. § 1102 (defining "marriage" as "[a] civil contract by which one man and one woman take each other for husband and wife") and the policy of the Commonwealth as expressed in 23 Pa.C.S. § 1704 (expressing "the strong and longstanding public policy of this Commonwealth that marriage shall be between one man and one woman").

   DOH is pursuing its mandamus action based principally on its statutory duty to "[t]o see that the laws requiring the registration of ... marriages ... are uniformly and thoroughly enforced throughout the State." 71 P.S. § 534(c). DOH is represented in this action by the Office of General Counsel (OGC), including DOH's Office of Legal Counsel.

   On the day that the mandamus action was filed with Commonwealth Court, I communicated to you through electronic mail notice that DOH had filed the action and that OGC attorneys were providing representation. I also stated in that message that OGC filed the mandamus action without making the customary referral or request for delegation based on the decision of the Attorney General announced on July 11, 2013, that she: (i) would not defend the constitutionality of the same sex marriage restrictions contained in the Marriage Law; (ii) therefore could not represent the Secretary of Health in *Whitewood, et al. v. Corbett, et al.* (M.D. Pa.); and (iii) had decided to authorize the General Counsel to represent the Secretary of Health in her stead under section 204(c) of the Commonwealth Attorneys Act (71 P.S. § 732-204(c)).

Susan J. Forney
Executive Deputy Attorney General
August 30, 2013
Page Two

OGC's representation of the Secretary of Health in this matter is based on the reasons expressed by the Attorney General for the actions taken in connection with *Whitewood*, constituting an authorization we deemed broad enough to encompass litigation necessary to enforce the Marriage Law. In fact, in the weeks following OGC's filing of the mandamus action, the Office of Attorney General (OAG) has not communicated any objection to OGC's actions.

In opposition to DOH's mandamus action, the Clerk asserts that DOH lacks standing to pursue a mandamus action and that OGC also lacks authority to pursue the action. The Clerk argues that OGC can pursue the action only if, as provided by the Commonwealth Attorneys Act, the Attorney General has authorized the General Counsel to do so under section 204(c) of the Commonwealth Attorneys Act, or the Attorney General was asked to initiate the action and failed or refused to do so. OGC contends, of course, that it has authority under the Commonwealth Attorneys Act to initiate and pursue the mandamus action for the reasons expressed above. However, a recent Order of the Commonwealth Court prompts this request for confirmation of our actions.

In preparation for oral argument to consider DOH's motion for peremptory judgment, Commonwealth Court has directed the parties to address "the effect of the Attorney General's delegation of the duty to defend the constitutionality of Section 1704 of the Marriage Law, 23 Pa.C.S. § 1704[,] to the General Counsel." This direction from the Court appears to be related to the Clerk's assertion that OGC lacks authority under the Commonwealth Attorneys Act to initiate or pursue an action in mandamus.

OGC is confident that it has authority under the Commonwealth Attorneys Act to initiate and pursue the pending action in mandamus. However, in light of the Court's Order suggesting that the General Counsel's legal authority might be an issue, OGC requests that OAG act *expressly* under section 204(c) of the Commonwealth Attorneys Act (71 P.S. § 732-204(c)) to confirm authorization of OGC to conduct mandamus action litigation against the Clerk (such as is now pending in Commonwealth Court at No. 379 M.D. 2013).

We greatly appreciate your consideration of this request.

Sincerely,

Gregory E. Dunlap
Executive Deputy General Counsel

# EXHIBIT C

*NewsRoom*

8/30/13 Phila. Inquirer (Pg. Unavail. Online)
2013 WLNR 21620172

Philadelphia Inquirer, The
Copyright (c) 2013 The Philadelphia Inquirer

August 30, 2013

Corbett: Lawyers used "inappropriate analogy" on gay marriage

Aug. 30--HARRISBURG -- Gov. Corbett on Thursday said his attorneys used "an inappropriate analogy" in the latest legal brief in a high-profile same-sex marriage case.

Corbett was referring to a brief his office's attorneys filed Wednesday in a lawsuit seeking to halt Montgomery County Register of Wills D. Bruce Hanes from issuing marriage licenses to same-sex couples. In those legal papers, the attorneys argue that "had the clerk issued marriage licenses to 12-year-olds in violation of state law, would anyone seriously contend that each 12-year-old . . . is entitled to a hearing on the validity of his 'license'?"

The analogy quickly garnered headlines, with critics -- including the governor's political opponents -- contending the analogy displayed insensitivity, at best, bias at worst.

Nils Hagen-Frederiksen, spokesman for the governor's office of general counsel, which is handling the case for the state, said that Corbett believed the analogy was inappropriate, but that several media outlets, The Inquirer among them, misrepresented the remark.

"It was not a commentary on same-sex marriage," he said. "There was no intent to make disparaging statements about any group. It was a reference to the court that there is no other group in Pennsylvania, that is prohibited from marrying, that is allowed to walk into a courtroom and get a marriage license. To take that and turn it into an alleged commentary on same-sex marriage is twisting the nature of that legal filing."

A 1996 Pennsylvania law defines marriage as between a man and a woman. Hanes and his supporters have argued that the law is unconstitutional and discriminatory, and they will appear in Commonwealth Court next week to fight it.

Since July 24, Hanes has issued 154 marriage licenses to gay and lesbian couples. Thirty-two of the couples have petitioned to intervene in the case, arguing that a ruling against Hanes could also invalidate their marriages. The state filed a brief Wednesday opposing the couples' participation, arguing that their marriage licenses hold no "actual value or legitimacy" and thus have no right to be defended in court.

Contact Angela Couloumbis at 717-787-5934 or acouloumbis@phillynews.com, or follow on Twitter @AngelasInk.

___

(c)2013 The Philadelphia Inquirer

Visit The Philadelphia Inquirer at www.philly.com

Distributed by MCT Information Services

**---- Index References ----**

News Subject: (Divorces (1DI23); Gay & Lesbian Issues (1GA65); Health & Family (1HE30); Human Sexuality (1HU27); Legal (1LE33); Personal & Family Law (1PE02); Social Issues (1SO05))

Region: (Americas (1AM92); North America (1NO39); Pennsylvania (1PE71); U.S. Mid-Atlantic Region (1MI18); USA (1US73))

Language: EN

Other Indexing: (D. Bruce Hanes; Nils Hagen-Frederiksen; Corbett)

Word Count: 373

**End of Document**

© 2013 Thomson Reuters. No claim to original U.S. Government Works.



WestlawNext® © 2013 Thomson Reuters. No claim to original U.S. Government Works.                                                                                    2

# EXHIBIT D

| | |
|---|---|
| CAROLE ANNE KERN,<br>Plaintiff | IN THE COURT OF COMMON PLEAS OF<br>BERKS COUNTY, PENNSYLVANIA<br>CIVIL ACTION – LAW |
| v. | DIVORCE NO. 09-10738 #2 |
| ROBIN LYNN TANEY,<br>Defendant | ASSIGNED TO:  Lash, J. |

## NOTICE OF INTERVENTION

Notice is hereby given that the Attorney General intervenes in this matter pursuant to 71 P.S. § 732-204(c) and Pa. R.C.P. 235.

Respectfully submitted,

THOMAS W. CORBETT, JR.
Attorney General

By:

CALVIN R. KOONS
Senior Deputy Attorney General
Pa. I.D. No. 32536

JOHN G. KNORR, III
Chief Deputy Attorney General
Chief, Appellate Litigation Section

Office of Attorney General
Appellate Litigation Section
15th Floor, Strawberry Square
Harrisburg, PA  17120
717-783-6709 - Direct
717-772-4526 – Fax

Date:  February 11, 2010

## CERTIFICATE OF SERVICE

I, Calvin R. Koons, Senior Deputy Attorney General, Commonwealth of Pennsylvania, hereby certify that on February 11, 2010, I caused to be served a copy of the foregoing **NOTICE OF INTERVENTION** by depositing a copy in the United States mail, first class postage prepaid, in Harrisburg, Pennsylvania, addressed to the following individual:

Lisa D. Gentile, Esquire
519 Walnut Street
Reading, PA  19601
(*Counsel for Plaintiff*)

Robin Lynn Taney
1053 Park Road
Blandon, PA  19510
(*Pro Se Defendant*)

**CALVIN R. KOONS**
**Senior Deputy Attorney General**

| CAROLE ANNE KERN, | IN THE COURT OF COMMON PLEAS OF |
|---|---|
| Plaintiff | BERKS COUNTY, PENNSYLVANIA |
| | CIVIL ACTION – LAW |
| v. | |
| | DIVORCE NO. 09-10738 #2 |
| ROBIN LYNN TANEY, | |
| Defendant | ASSIGNED TO:  Lash, J. |

## ATTORNEY GENERAL'S MEMORANDUM OF LAW PURSUANT TO PA. R.C.P. 235, AS INTERVENOR

### STATEMENT OF QUESTION

Whether the Court has jurisdiction over the Complaint for Divorce?

### STATEMENT OF THE CASE

Before the Court is a complaint for divorce filed October 19, 2009 by Carole Anne Kern who seeks to be divorced from Robin Lee Taney, whom she alleges to have married in Massachusetts on June 25, 2009.  Both parties are women who are alleged to reside in Pennsylvania, and it is alleged that "the marriage between the parties is irretrievably broken."  The preliminary question for the Court is whether it has jurisdiction to entertain divorce proceedings.

### ARGUMENT

The Court is without jurisdiction to consider the complaint in divorce because, under Pennsylvania law, there is no marriage in the first place.

The basis of jurisdiction is statutory:   "The courts shall have original jurisdiction in cases of divorce . . ." 23 Pa. C.S.A. §3104(a), divorce is defined as "divorce from the bounds of matrimony," 23 Pa. C.S.A. §3103, and the grounds for divorce alleged in the complaint – irretrievable breakdown – is defined as "estrangement due to marital difficulties with no reasonable prospect of reconciliation." *Id.* The import is clear.  To be divorced, the parties must first be married.

Here, the marriage is alleged to have occurred in Massachusetts, which permits same sex marriage, but Pennsylvania is not bound to recognize that marriage under the Full Faith and Credit Clause of the United States Constitution which provides that : "[f]ull faith and credit shall be given in each State to the public acts, records, and judicial proceedings or every other state," U.S. Const. Art. IV, sec. 1, but then goes on to say that "Congress may by general laws proscribe the manner in which such acts, records, and proceedings shall be proved *and the effect thereof.*" *Id.* (emphasis added).  The federal Full Faith and Credit Statute specifically provides that a state shall not have same-sex marriage imposed upon it by the usages of another state:

> No state . . . shall be required to give effect to any public act, record, or judicial proceedings of any other State . . . respecting a relationship between persons of the same sex that is treated as a

marriage under the laws of such other State . . . or a right or claim arising from such relationship.

28 U.S.C. §1738C.

The Full Faith and Credit statute thus leaves each state free to recognize same sex marriage, or not, and, by statute, Pennsylvania does not.[1]   In Pennsylvania, marriage is defined as "[a] civil contract by which one man and one woman take each other for husband and wife," 23 Pa. C.S. §1102, and expresses the public policy behind this definition:

> It is hereby declared to be the strong and longstanding public policy of this Commonwealth that marriage shall be between one mane and one woman.  A marriage between persons of the same sex which was entered into in another jurisdiction, even if valid where entered into, shall be void in this Commonwealth.

23 Pa. C.S. §1704.

Because there is no marriage recognized by Pennsylvania law, the Court is without jurisdiction to entertain the Complaint in Divorce.[2]

---

[1]   Even absent statutory authority, it has long been the law that a State need not recognize the acts of other States – and specifically marriages celebrated in other States – which are repugnant to its own public policy. *See, e.g., Com. v. Case*, 200 Pa. Super. Ct. 200, 189 A.2d 756 (1963).

[2]   Although plaintiff argues that Pennsylvania law is unconstitutional and cites some cases in support from other jurisdictions, the laws are presumptively constitutional and similar laws have been upheld in other jurisdictions. *See, e.g. Conaway v. Deane*, 401 Md. 219, 932 A.2d 571 (2007)(Maryland Constitution); *Standhardt v. Superior Court, ex rel. County of Maricopa*, 206 Ariz. 276, 77 P.3d

## CONCLUSION

The Court should dismiss the complaint for want of jurisdiction.

**Respectfully submitted,**

**THOMAS W. CORBETT, JR.**
**Attorney General**

**By:**

**CALVIN R. KOONS**
**Senior Deputy Attorney General**
**Pa. I.D. No. 32536**

**JOHN G. KNORR, III**
**Chief Deputy Attorney General**
**Chief, Appellate Litigation Section**

**Office of Attorney General**
**Appellate Litigation Section**
**15th Floor, Strawberry Square**
**Harrisburg, PA 17120**
**717-783-6709 - Direct**
**717-772-4526 – Fax**

**Date:  February 11, 2010**

---

451 (Ariz. App. Div. 2003); *Lewis v. Harris*, 2003 W.L. 23191114, N.J. Super. 2003 (unpublished opinion) (N.J. Constitution); *Anderson v. King County*, 158 Wash.2d 1, 138 P.3d 963 (20006); *Hernandez v. Robles*, 7 N.Y.3d 338, 855 N.E.2d 1 (N.Y. Court of Appeals 2006).

## CERTIFICATE OF SERVICE

I, Calvin R. Koons, Senior Deputy Attorney General, Commonwealth of Pennsylvania, hereby certify that on February 11, 2010, I caused to be served a copy of the foregoing ATTORNEY GENERAL'S MEMORANDUM OF LAW PURSUANT TO PA. R.A.P. 235, AS INTERVENOR by depositing a copy in the United States mail, first class postage prepaid, in Harrisburg, Pennsylvania, addressed to the following individual:

Lisa D. Gentile, Esquire
519 Walnut Street
Reading, PA 19601
(*Counsel for Plaintiff*)

Robin Lynn Taney
1053 Park Road
Blandon, PA 19510
(*Pro Se Defendant*)

CALVIN R. KOONS
Senior Deputy Attorney General

**[Page 1]**

```
1  CAROLE ANN KERN        :  In the Court of Common Pleas
                          :  of Berks County, Pennsylvania
2       v.                :  Civil
                          :
3  ROBIN LYNN TANEY       :  No. 09-10738  ID# 02

4                        _____

5                  Transcript of Proceedings
6                 Wednesday, February 17, 2010
                     Reading, Pennsylvania

7
             Before The HONORABLE SCOTT E. LASH, Judge
8                        _____

9

10 APPEARANCES:

11
   For the Plaintiff:    LISA GENTILE, ESQUIRE
12                        519 Walnut Street
                          Reading, PA 19601
13
14 For the Commonwealth:  CALVIN KOONS, ESQUIRE
                          Senior Deputy Attorney General
15                        Strawberry Square
                          Harrisburg, PA 17120
16
17 ALSO PRESENT:          Carole Ann Kern, Plaintiff

18

19

20 DISTRIBUTION:  Original and one (1) copy filed with the
                  Prothonotary's Office for distribution to
21                Attorney Lisa Gentile.

22

23

24                BOBBIE J. SHANFELDER, RPR
25                Official Court Reporter
```

**[Page 2]**

```
1  (Reading, Pennsylvania, February 17, 2010 at 1:35 p.m.)
2       THE COURT:  All right.  Ms. Gentile?  Is Attorney
3  Gentile here?  All right.  Now, you received a copy of the
4  Attorney General's Brief?
5       MS. GENTILE:  Yes, I did.
6       THE COURT:  We're going to need to have a record.  I
7  don't know that there's any facts in dispute here.  But I
8  don't know if you want to stipulate to the facts or whether
9  we should have a record under oath.  I mean, basically all I
10 need to do is their residence, they were married such and
11 such a date in Massachusetts, and they want a divorce.
12      MS. GENTILE:  I'm certainly willing to stipulate to
13 those facts.  If not, my client is here.  She can testify to
14 it.
15      MR. KOONS:  I think they're alleged in the Complaint,
16 and that would be sufficient.
17      THE COURT:  All right.  Well, let me look at the
18 Complaint.  Okay.  It has them both residing in Berks County.
19 It does say they were married June 25th in Brewster,
20 Massachusetts, and the marriage is irretrievably broken.
21      MS. GENTILE:  Yes, Your Honor.  Correct.
22      THE COURT:  And your client is Carole Kern?
23      MS. GENTILE:  Yes, Your Honor.
24      THE COURT:  Let me put her under oath.  She doesn't
25 have to get on the stand.  What happened to you?
```

**[Page 3]**

```
1       MS. GENTILE:  This was the PFA.
2       THE COURT:  Really?  Oh.
3  CAROLE ANN KERN, called and sworn.
4       THE COURT:  Ms. Gentile, will you show her a copy of
5  the Divorce Complaint?  I have it here if you want it.
6  Ms. Kern, would you review those statements in that Divorce
7  Complaint?  I'm going to ask you if you believe them to be
8  true.
9       THE WITNESS:  Yes.
10      THE COURT:  Everything in that Divorce Complaint
11 true?
12      THE WITNESS:  Yes.
13      THE COURT:  And how long have you been a resident of
14 Berks County?
15      THE WITNESS:  All my life.
16      THE COURT:  All your life?
17      THE WITNESS:  46 years.
18      THE COURT:  And you are, as we speak today?
19      THE WITNESS:  Yes.
20      THE COURT:  All right.  I think we must have a
21 record.  Everyone is satisfied?
22      MS. GENTILE:  Yes, Your Honor.
23      THE COURT:  All right.  Then let's hear some
24 argument.  Go ahead, Ms. Gentile.
25      MS. GENTILE:  Thank you, Your Honor.  I believe that
```

**[Page 4]**

```
1  the Brief that we submitted addressed a lot of case law and
2  constitutional law issues.  But there are some things that I
3  did want to address today.  Obviously the Attorney General's
4  Office has intervened in this case.  They have taken the
5  position of defending the statute, specifically Section 1102
6  and 1704 of Title 23 which states that a marriage is between
7  a man and a woman.  In their Brief that they submitted, they
8  rely heavily on DOMA, the Defense of Marriage Act which
9  states it's a federal statute that states that the full faith
10 and credit act is not given effect when it comes to safe sex
11 -- same sex marriages.
12      THE COURT:  Did you say safe sex?
13      MS. GENTILE:  I did say safe sex and then I changed
14 it to same sex.  Same sex marriages and whether states have
15 to recognize those marriages performed in other states.
16      THE COURT:  Well, looking at that act, the Defense Of
17 Marriage Act, it says there that a marriage of some other
18 state between two persons of the same sex are to be
19 considered void by this Commonwealth.  Is that your
20 understanding?  So if you're looking at that, other than
21 declaring that act to be unconstitutional, do you have any
22 argument?
23      MS. GENTILE:  Right.  I think that under the
24 Pennsylvania Constitution that there are more rights granted
25 because of the Pennsylvania Constitution and because of
```

**5**

1  Pennsylvania case law.

2      THE COURT:  So you're saying that act is

3  unconstitutional or are you saying that there is some reading

4  of that act that would accommodate your client?

5      MS. GENTILE:  I'm saying that that statute is

6  unconstitutional.

7      THE COURT:  All right.

8      MS. GENTILE:  I also believe that under the

9  Pennsylvania Constitution, Pennsylvania does allow -- and I

10  think if you look at the statute itself, neither the

11  Commonwealth nor any political subdivision shall deny any

12  person the enjoyment of any right nor discriminate against

13  any person in the exercise of any civil right, Article 1.

14      THE COURT:  So your argument is that a divorce is a

15  right?

16      MS. GENTILE:  Yes.  Divorce is a fundamental right

17  that's already been found by the US and the Pennsylvania

18  Supreme Court.  It is a fundamental right.  None of those

19  findings did it say it was a fundamental right unless you

20  happened to be straight.  I think when we look at the reason

21  why Pennsylvania passed those two statutes for the protection

22  of marriage, I think that we need to look at the standard

23  that the state is held to.  The statute -- I believe both of

24  these statutes are unconstitutional.  It is a fundamental

25  right so it is subject to a strict scrutiny test.  So when we

**6**

1  look at that, we have to look at what is compelling.  Is

2  there a compelling or overwriting state interest in

3  protecting something?  And is there a compelling state

4  interest in protecting this marriage.  And although they may

5  have used that excuse for passing those two sections, I don't

6  believe that Pennsylvania -- I don't believe that we do

7  follow that there is a sanctity of marriage.  We have

8  no-fault divorce.  I mean, there's no compelling reason that

9  Pennsylvania doesn't consider it compelling to keep people

10  together.  We have no-fault divorce.  We don't give tests to

11  people that are getting married.  We don't say you can only

12  get married one time.  We don't care if somebody gets married

13  five, six, or seven times.  I practice family law.

14      THE COURT:  Well, we might care but we don't legally

15  restrict it.

16      MS. GENTILE:  You're right.  We don't restrict it.

17  We don't test.  We don't say you're not that mature enough,

18  you're not ready, you're not anything.  So where is the

19  compelling interest in marriage?

20      THE COURT:  Well, is this interest in marriage or

21  interest in divorce?

22      MS. GENTILE:  In the marriage because the marriage

23  laws -- the only thing that we prevent are first cousins and

24  insane people or gay people or underage people in

25  Pennsylvania.  And --

**7**

1      THE COURT:  And bigamists and potential bigamists.

2      MS. GENTILE:  And I think when you lump gay people

3  into that category, it's pretty offensive.  I think that

4  Pennsylvania, we are not looking at a compelling, you know, a

5  compelling state interest toward marriage because we don't

6  have rules for it.  So to say that we're only going to have

7  rules if you happen not to be heterosexual is

8  unconstitutional.  There's no compelling state interest in

9  that.

10      THE COURT:  All right.  Now my next question is, I

11  understand your argument.  What authority do I have that at

12  Common Pleas level to declare it to be unconstitutional as

13  opposed to someone above me?

14      MS. GENTILE:  Right.  There are no cases above you.

15  You're the first level case that we've got.  So if you take a

16  look at historically trial court judges have had the

17  authorization of finding statutes unconstitutional as

18  recently as October 5 of '09 in Commonwealth versus Omar.

19  Centre County Judge found statutes relating to trademark

20  counterfeiting were unconstitutional, and the Supreme Court

21  affirmed the trial court.  So there is a history in

22  Pennsylvania of trial courts being able and having the

23  authority to make those decisions.  If we look to other

24  states, Iowa, which has a very similar constitution of ours,

25  has allowed gay marriages in Iowa.  They went through the

**8**

1  whole procedure identical to ours and that started at the

2  Common Pleas level, too.

3      THE COURT:  Well, again you're talking about gay

4  marriages, allowing gay marriages.  Do I have to find that

5  the restriction under the Defense Of Marriage Act regarding

6  allowing gay marriages is unconstitutional to find that I

7  have an authority to grant a divorce to a gay marriage?

8  Because we're not arguing that they were already married and

9  that the marriage is valid in Massachusetts; correct?

10      MS. GENTILE:  Correct.

11      THE COURT:  So it's not -- I'm not involved in the

12  marriage process.  You want me involved in the divorce

13  process.

14      MS. GENTILE:  Correct.

15      THE COURT:  Am I making a distinction without a

16  difference or is there a difference here or do I have to find

17  that it's unconstitutional basis of refusal to grant gay

18  marriages or can that still be constitutional?  However, if

19  there is a valid marriage, is it unconstitutional for me to

20  refuse to grant it under that act or without authority to

21  grant it, I should say?

22      MS. GENTILE:  I think you do.  I think it applies

23  both ways.  And I think you can separate it and say I'm only

24  doing a divorce in this case in which case if marriage is a

25  fundamental right and Pennsylvania grants divorces, then

IN THE COURT OF COMMON PLEAS OF BERKS COUNTY, READING, PENNSYLVANIA

**9**

1  divorce is a fundamental right.  And so the same logic and
2  argument apply.
3      THE COURT:  Well, is a divorce a fundamental right?
4  Don't you have to meet requirements such as irretrievable
5  breakdown, a consent, or two-year separation?
6      MS. GENTILE:  Or two-year separation.
7      THE COURT:  One or the other.  But there's
8  conditions; correct?
9      MS. GENTILE:  Right, there are conditions just as
10 there are conditions for marriage.  They may be very minor
11 but there are conditions.
12     THE COURT:  Well, it may be.  It may be fundamentally
13 I have to look at the marriage issue to get to the divorce
14 issue.  But maybe not.  I don't know.
15     MS. GENTILE:  I think you can argue and say oh, we're
16 just deciding the divorce issue but I think the big picture
17 is that you are going to be deciding the marriage issue at
18 the same time.  I think that if we're going to say that we're
19 not recognizing right now, we're saying we're not recognizing
20 out-of-state marriages.  Then you have to look at
21 Pennsylvania's marriages and the reasons for it and the
22 reasons for their statutes in order to say that we need to
23 recognize out-of-state gay marriages.  I think that's a
24 logical flow that it has to happen.
25     THE COURT:  Well, ultimately all of that goes to

**10**

1  whether the Defense Of Marriage Act is unconstitutional.
2  Because if it isn't, if it passes muster, you're out of
3  court; right?  Do we agree?
4      MS. GENTILE:  No, I don't agree.
5      THE COURT:  If the Defense Of Marriage Act is
6  determined to be constitutional --
7      MS. GENTILE:  Okay.  Maybe in this particular
8  situation where it's an out-of-state marriage at this time
9  would we be out of luck, possibly.  But I don't think that
10 would necessarily --
11     THE COURT:  Well, that's all we have.  The facts are
12 the facts.  I can't get into advisory opinions on something
13 like this.
14     MS. GENTILE:  Right.  I think --
15     THE COURT:  That's my question.  Because on the one
16 hand, if you're saying that the act can pass muster and you
17 can get the relief, if you can argue that, you can argue
18 that.  But if you're saying from the reading of the facts we
19 cannot get a divorce in this state unless the act is thrown
20 out because it says what it says.  And the word void is, you
21 know, it's right in the statute.  So do we agree that for you
22 to prevail here I have to find that act to be
23 unconstitutional or someone above me to find that?
24     MS. GENTILE:  Yes.  But I think that you do have that
25 authority and I think that goes back to the case.

**11**

1      THE COURT:  I understand your argument on that.
2      MS. GENTILE:  So I would request that you take a look
3  at that Texas case which is identical to our case.  It's even
4  slightly more restrictive than our case because Texas
5  constitution also had their own DOMA in their constitution.
6  So we're not even dealing with that.  But that trial judge --
7  and it was the same level as you when it went and said that
8  both federal and state constitution, everything was
9  unconstitutional found that they did need to recognize the
10 Massachusetts marriage.  That case is currently on appeal by
11 the Attorney General from Texas.  But that's -- I mean, that
12 was another case where trial level judge made the same
13 decision that we're asking you to.
14     THE COURT:  All right.  Let's hear from the Attorney
15 General.  Your name, sir?
16     MR. KOONS:  My name is Calvin Koons, Your Honor, and
17 I think we all agreed you were right that you have to
18 essentially find the DOMA unconstitutional in order to grant
19 the divorce.  Because our position, as we have stated in the
20 brief, is that there can't be a divorce unless there's a
21 marriage.  Fundamentally divorce presumes a marriage.
22     THE COURT:  So if I don't recognize it, it doesn't
23 exist.
24     MR. KOONS:  Pardon?
25     THE COURT:  If it's void, it doesn't exist.

**12**

1      MR. KOONS:  The marriage doesn't exist.
2      THE COURT:  So I have no authority under the divorce
3  code.  So I have to -- for them to prevail, I have to find
4  that act unconstitutional.
5      MR. KOONS:  You have to.
6      THE COURT:  Do you agree that I have the authority
7  generally to find an act unconstitutional?
8      MR. KOONS:  I think there's authority that you do.
9  Whether it's a good idea to do it is another question.  And
10 we think that these acts are presumptively constitutional.
11 They're presumptively valid, and there's a strong presumption
12 in favor of validity.  We think there is not a fundamental
13 right to divorce.  There's a fundamental right to marriage
14 but not necessarily to same sex marriage.
15     If you look at the -- at one of the cases Conaway
16 versus Deane which is a Maryland case, it pretty much
17 exhaustively goes through all of the arguments which are very
18 similar to the ones that are made here.  And it talks about
19 federal law.  It talks about some of the Maryland
20 constitutional law.  The case is something like 147 pages
21 long.  So it really goes through everything.
22     It addresses this and says, well, to determine
23 whether the right is fundamental you have to look and see
24 whether it's traditional, historic, and among other things.
25 And here traditional, historic concept of marriage is between

IN THE COURT OF COMMON PLEAS OF BERKS COUNTY, READING, PENNSYLVANIA

**13**

1  a man and a woman.  And that being the case, we think that
2  the statute only has to survive rational basis review.  And
3  again, Conaway versus Deane and other cases have pretty much
4  said very similar cases that there are rational relationships
5  to legitimate state interest.
6         And in this case, for example, appropriation and
7  child rearing and that sort of thing.  And the cases also
8  said that even though certainly that occurs in same sex
9  marriages, these sorts of statutes don't have to be drawn
10  with mathematic precision.  We presented these arguments very
11  briefly, Your Honor, and certainly are happy to present
12  supplemental authority on the issues if you want.  But that's
13  our position succinctly.
14         THE COURT:  Well, back to you, Ms. Gentile.  What
15  provision of the constitution would the DOMA -- but what
16  provision of the constitution is being violated by DOMA in
17  your mind?
18         MS. GENTILE:  I think Article 1, Section 1 and
19  Article 1, Section 26 of the Pennsylvania Constitution where
20  we're saying that all men are born equally free and
21  independent and have certain inherent and indefeasible
22  rights.  DOMA separates that.  DOMA says gay people don't
23  have these rights, straight people do.  So I think that
24  violates there.  Article 1, Section 26, neither the
25  Commonwealth nor any political subdivision thereof shall deny

**14**

1  to any person the enjoyment of any civil right nor
2  discriminate against any person in the exercise of any civil
3  right.  And as I said, marriage is a fundamental right.
4         THE COURT:  So you're not arguing that this is a
5  violation of full faith and credit.
6         MS. GENTILE:  Not entirely, no.  I think that's an
7  alternate argument.
8         THE COURT:  All right.  You're saying that there's a
9  fundamental right here to divorce.
10         MS. GENTILE:  Yes, to a divorce, yes.
11         THE COURT:  Interesting.  All right.  I'll take it
12  under advisement.  I don't know how long this is going to
13  take because obviously this is a very foundational question.
14  Something that I don't have a whole lot of authority to draw
15  on.  All right.  Thank you for your argument.  Well done.
16         (The oral argument concluded at 1:54 p.m.)

**15**

C E R T I F I C A T E

3     I hereby certify that the proceedings and evidence are
4  contained fully and accurately in the notes taken by me on
5  the trial of the above cause, and that this copy is a correct
6  transcript of the same.

BOBBIE J. SHANFELDER, RPR
Official Court Reporter

13     The foregoing record of the proceedings upon the trial
14  of the above cause is hereby approved and directed to be
15  filed.

SCOTT E. LASH, J.

IN THE COURT OF COMMON PLEAS OF BERKS COUNTY, READING, PENNSYLVANIA

EXHIBIT E



Volume 25 Issue 1

Spring 2010

# VIEWPOINT

## Newsletter of the Pennsylvania Catholic Conference

# Pennsylvania Primary Election
# May 18, 2010

**T**here is a crowded field of candidates for U.S. Senator, governor and lieutenant governor in Pennsylvania's Democratic and Republican primary elections.   The Pennsylvania Catholic Conference (PCC) sent a questionnaire to the candidates to survey their positions on key issues that are important to Catholics.   The responses of the candidates for U.S. Senator and governor are inside this issue of Viewpoint.  Responses from the candidates for lieutenant governor as well as the full responses of the candidates for senate and governor are available online at **www.pacatholic.org/faith-politics**.



## CANDIDATES FOR U.S. SENATOR

**Democrats**

Joe Sestak

★

Arlen Specter

**Republicans**

Peg Luksik

★

Pat Toomey

## CANDIDATES FOR PENNSYLVANIA GOVERNOR

**Democrats**

Dan Onorato        Anthony Hardy Williams

★              ★

Jack Wagner         Joseph M. Hoeffel

**Republicans**

Tom Corbett

★

Samuel E. Rohrer



## CANDIDATES FOR PENNSYLVANIA LIEUTENANT GOVERNOR

**Democrats**

Doris A. Smith-Ribner

★

H. Scott Conklin

★

Jonathan A. Saidel

Steve Johnson

★

Jean Craig Pepper

★

Russ Diamond

★

Chet Beiler

★

Jim Cawley

**Republicans**

Billy McCue

★

John Kennedy

★

Stephen A. Urban

★

Daryl Metcalfe

**Look up your polling place at
www.votespa.com**



# What is the PCC?

The Pennsylvania Catholic Conference is the public affairs arm of Pennsylvania's Catholic bishops and the Catholic dioceses of Pennsylvania. There are 10 Catholic dioceses in the Commonwealth of Pennsylvania. Eight are Latin Rite dioceses, fully contained within the Commonwealth. Two are Byzantine Rite dioceses with Apostolic Sees in Philadelphia and Pittsburgh.

Dr. Robert J. O'Hara
EXECUTIVE DIRECTOR
rjoh@pacatholic.org

Francis J. Viglietta
DIRECTOR OF SOCIAL CONCERNS
fjv@pacatholic.org

Sean P. McAleer
DIRECTOR OF EDUCATION
smcaleer@pacatholic.org

Sr. Clare Christi Schiefer, OSF
PRESIDENT, PCHA
srccs@pacatholic.org

Amy B. Hill, APR
DIRECTOR OF COMMUNICATIONS
abhill@pacatholic.org

# CANDIDATE RESPONSES - U.S. SENATOR

■ Do you support or oppose the use of taxpayer funds to pay for abortion?

### DEMOCRATS
SESTAK        Did not respond
SPECTER       OPPOSE

### REPUBLICANS
LUKSIK        OPPOSE*
*Oppose abortion - period*
TOOMEY        OPPOSE

■ Do you support or oppose legislation to prevent federal agencies and states that receive federal funds from discriminating against health care providers who do not perform or participate in abortions (Hyde-Weldon Amendment)?

### DEMOCRATS
SESTAK        Did not respond
SPECTER       OPPOSE

### REPUBLICANS
LUKSIK        SUPPORT*
*Support conscience clause provisions for agencies and workers.*
TOOMEY        SUPPORT

■ Do you support or oppose legislation to continue and expand current federal laws that provide educational benefits to students and teachers in private and religious schools on an equitable basis in comparison to the benefits received by public school students and teachers?

### DEMOCRATS
SESTAK        Did not respond
SPECTER       OPPOSE*
*I have concerns about the constitutional separation of church and state.*

### REPUBLICANS
LUKSIK        Did not indicate*
*Support ending federal role in education. If federal gov't is involved, there should be no discrimination against non-government schools*
TOOMEY        SUPPORT*
*I have been a long-term advocate for expanding parents' choice in schools through different funding mechanism.*

■ What is your position on providing a federal tax credit to businesses that donate to scholarship organizations that provide scholarships for low-income students at private and religious schools in grades kindergarten through 12?

### DEMOCRATS
SESTAK        Did not respond
SPECTER       OPPOSE

### REPUBLICANS
LUKSIK        SUPPORT
TOOMEY        Did not indicate*
*I have been a long-term supporter of PA's EITC Program that is very similar.*

■ Will you support or oppose significant annual increases in poverty-focused development assistance to reduce global poverty and increase the percentage of gross domestic product (GDP) contributed in foreign aid?

### DEMOCRATS
SESTAK        Did not respond
SPECTER       SUPPORT

### REPUBLICANS
LUKSIK        OPPOSE*
*We have a federal debt of over $12 trillion dollars. We need to decrease federal spending, not pledge to spend more.*
TOOMEY        OPPOSE*
*Our perilous budget situation does not allow for this.*

■ Do you support or oppose legislation to increase aid for refugees who are fleeing from persecution abroad and to provide adequate funding for the U.S. refugee admissions program?

### DEMOCRATS
SESTAK        Did not respond
SPECTER       SUPPORT

### REPUBLICANS
LUKSIK        Did not indicate*
*Support appropriate asylum for those fleeing persecution.*
TOOMEY        Did not indicate*
*I support aid for refugees fleeing persecution, but I don't know if an increase in aid is necessary at this time.*

■Indicate your position on this statement: The government should assume financial responsibility for providing affordable, accessible health care for the uninsured.

### DEMOCRATS
**SESTAK**        Did not respond
**SPECTER**       SUPPORT

### REPUBLICANS
**LUKSIK**        Did not indicate*
*\* Do not support concept that everyone has a right to have someone else pay for their health care.  There is a place for state government to assist; however socialized medicine is a proven failure.*
**TOOMEY**        Did not indicate*
*\* I support helping those who are unable to help themselves.  Those who are capable of supporting themselves should do so.*

---

■Do you support or oppose embryonic stem cell research?

### DEMOCRATS
**SESTAK**        Did not respond
**SPECTER**       SUPPORT

### REPUBLICANS
**LUKSIK**        OPPOSE
**TOOMEY**        OPPOSE

■Do you support or oppose legislation that would guarantee comprehensive freedom of conscience for health care providers and health care institutions?

### DEMOCRATS
**SESTAK**        Did not respond
**SPECTER**       OPPOSE

### REPUBLICANS
**LUKSIK**        SUPPORT
**TOOMEY**        SUPPORT

■Do you support or oppose efforts to pass legislation that would make sexual orientation and gender identity or expression protected classes equivalent to other protected classes (e.g., race, religion, sex, etc.)?

### DEMOCRATS
**SESTAK**        Did not respond
**SPECTER**       SUPPORT

### REPUBLICANS
**LUKSIK**        OPPOSE
**TOOMEY**        OPPOSE

■Do you support or oppose overturning the federal Defense of Marriage Act (DOMA)?

### DEMOCRATS
**SESTAK**        Did not respond
**SPECTER**       SUPPORT

### REPUBLICANS
**LUKSIK**        OPPOSE
**TOOMEY**        OPPOSE

■Do you support or oppose legislation that would permit undocumented immigrants who have lived in the United States for a number of years, have worked and built equities in our country, and who do not have criminal records to register with the government and take steps to earn legal status?

### DEMOCRATS
**SESTAK**        Did not respond
**SPECTER**       SUPPORT

### REPUBLICANS
**LUKSIK**        OPPOSE*
*\* Do not support rewarding illegal activity with citizenship; do support addressing immigration issues by closing borders, removing incentives; and addressing those already here with a plan.*
**TOOMEY**        OPPOSE*
*\* I support higher levels of legal immigration but oppose granting legal status to those who have broken our laws.*

■Do you support or oppose legislation that would expedite the issuance of permanent visas for immediate family members, such as children, siblings, and spouses, of U.S. citizens and U.S. permanent residents?

### DEMOCRATS
**SESTAK**        Did not respond
**SPECTER**       SUPPORT

### REPUBLICANS
**LUKSIK**        Did not indicate*
*\* Cannot give a blanket answer to what should be a case-by-case decision.*
**TOOMEY**        Did not indicate*
*\* I would support this in some cases, but it must be done in a way that respects the rule of law and protects the security of our country.*

# CANDIDATE RESPONSES - PA GOVERNOR

■ Which statement reflects your position most accurately?

a.      I do not oppose legalized abortion.
b.      I oppose legalized abortion in all circumstances.
c.      I oppose legalized abortion, except when the life of the mother is in danger.
d.      I oppose legalized abortion, except when the life of the mother is in danger or the pregnancy is a result of rape or incest.

## DEMOCRATS
**ONORATO**      Did not indicate*
*\* As governor, I would support Pennsylvania's current law.*
**WAGNER**      d.*
*\* If Roe v. Wade were overturned and the decision to protect unborn human life were returned to the states, I would support a state law to protect unborn children with an exception to protect the life of the mother.  It is likely that any law passed by the General Assembly would also include exceptions for the cases of rape or incest; I would support such a law.*
**WILLIAMS**      Did not respond
**HOEFFEL**      a.*
*\* I trust women to make their own personal, private decisions regarding reproductive health issues.*

## REPUBLICANS
**CORBETT**      d.
**ROHRER**      Did not respond

■ What is your position on providing annual cost of living increases for low-income Pennsylvanians receiving cash assistance grants?

## DEMOCRATS
**ONORATO**      Did not indicate*
*\* I would support COLAs if the state's financial condition allows.*
**WAGNER**      Did not indicate*
*\* Support, if such increases are both necessary and fiscally responsible.*
**WILLIAMS**      Did not respond
**HOEFFEL**      SUPPORT

## REPUBLICANS
**CORBETT**      SUPPORT*
*\* I would prefer to promote financial independence through economic recovery.*
**ROHRER**      Did not respond

■ What is your position on legislation that would provide direct grants to parents to choose the schools that they believe are best suited for their children, including nonpublic schools?

## DEMOCRATS
**ONORATO**      Did not indicate*
*\* I support, and would expand, the Educational Improvement Tax Credit.*
**WAGNER**      Did not indicate*
*\* I have always been open-minded about new and innovative ways to strengthen the quality of education.  I voted for both the Charter School Law and the Educational Improvement Tax Credit Program. I would want to review the details of this legislation.*
**WILLIAMS**      Did not respond
**HOEFFEL**      OPPOSE*
*\* I believe public money should be spent on public schools.*

## REPUBLICANS
**CORBETT**      SUPPORT*
*\* I favor the EITC and promotion of greater educational options.*
**ROHRER**      Did not respond

■ Do you support or oppose embryonic stem cell research?

## DEMOCRATS
**ONORATO**      Did not indicate*
*\* I oppose the creation of embryos for stem cell research.*
**WAGNER**      OPPOSE*
*\* Oppose generally, but I would want to review the details of such legislation.*
**WILLIAMS**      Did not respond
**HOEFFEL**      SUPPORT

## REPUBLICANS
**CORBETT**      OPPOSE*
*\* Promising research can be pursued without creating or destroying embryos.*
**ROHRER**      Did not respond

■What is your position on amending the Pennsylvania Constitution to define marriage as the union between one man and one woman?

### DEMOCRATS
**ONORATO**     OPPOSE*
* I support the current law, which includes this definition.
**WAGNER**     Did not indicate*
* I voted for Act 124 of 1996 as a State Senator.
**WILLIAMS**     Did not respond
**HOEFFEL**     OPPOSE*
* I support full marriage equality for same-sex couples.

### REPUBLICANS
**CORBETT**     SUPPORT*
* Constitutional amendment would help safeguard marriage against an alternative agenda.
**ROHRER**     Did not respond

■Do you support or oppose legislation that would add state restrictions to existing federal prohibitions concerning the hiring of undocumented immigrants or the provision of healthcare or government services to the undocumented?

### DEMOCRATS
**ONORATO**     Did not indicate*
* This issue is best addressed at the federal level.
**WAGNER**     Did not indicate*
* These issues will generally be decided at the federal level.  I am open-minded about these issues at the state level and would want to see the details of such legislation.
**WILLIAMS**     Did not respond
**HOEFFEL**     OPPOSE

### REPUBLICANS
**CORBETT**     SUPPORT*
* Pennsylvania has a responsibility to ensure eligibility of all participants.
**ROHRER**     Did not respond

■What is your position on the death penalty in Pennsylvania?

### DEMOCRATS
**ONORATO**     SUPPORT
**WAGNER**     SUPPORT*
* I am open-minded to finding ways to validate the process of how the death penalty is applied, such as DNA testing.

**WILLIAMS**     Did not respond
**HOEFFEL**     SUPPORT*
* I support the death penalty only for murders that were pre-meditated.

### REPUBLICANS
**CORBETT**     SUPPORT*
* It's needed as a disincentive and penalty for heinous crimes.
**ROHRER**     Did not respond

■What is your position on restoring state funding to the Supplemental Security Income (SSI) program for the aged, blind and disabled Pennsylvanians?

### DEMOCRATS
**ONORATO**     Did not indicate*
* I support this restoration once the state's financial condition allows.
**WAGNER**     SUPPORT
**WILLIAMS**     Did not respond
**HOEFFEL**     SUPPORT

### REPUBLICANS
**CORBETT**     SUPPORT*
* Supporting targeted populations should be prioritized while reducing overall spending.
**ROHRER**     Did not respond

■What is your position on legislation requiring employers to provide employee benefits to which they are morally opposed, for example, mandating coverage for contraceptives or benefits to same-sex partners of employees?

### DEMOCRATS
**ONORATO**     Did not indicate*
* I would consider on a case-by-case basis with religious exemptions.
**WAGNER**     Did not indicate*
* I generally believe that employers should make these decisions.  I would want to see the details of such legislation.
**WILLIAMS**     Did not respond
**HOEFFEL**     SUPPORT

### REPUBLICANS
**CORBETT**     OPPOSE*
* I oppose mandates contrary to the moral conscience of employers.
**ROHRER**     Did not respond

# CANDIDATE RESPONSES - PA GOVERNOR (continued)

■ Which statement reflects your position most accurately?

a.   Religious childcare and pre-kindergarten providers should be subject to government review of educational content.

b.   Religious childcare and pre-kindergarten providers should follow state standards for health and safety of children, but be free to determine their own educational content based on the teachings of their faith tradition.

c.   Religious childcare and pre-kindergarten providers should be free from government regulation.

### DEMOCRATS
**ONORATO**    b.
**WAGNER**    b.
**WILLIAMS**    Did not respond
**HOEFFEL**    b.

### REPUBLICANS
**CORBETT**    c.*
*\* Providers should develop services appropriate for their faith and community.*
**ROHRER**    Did not respond

■ Indicate your position on this statement: The government should assume financial responsibility for providing affordable, accessible health care for the uninsured.

### DEMOCRATS
**ONORATO**    Did not indicate*
*\* The national government should ensure access to quality affordable healthcare.*
**WAGNER**    Did not indicate*
*\* I am open-minded to any proposal to expand access to health care for the uninsured in a fiscally responsible way. I would want to review the details of such legislation, which may be unnecessary in light of the recently enacted federal health care reform law.*
**WILLIAMS**    Did not respond
**HOEFFEL**    SUPPORT*
*\* I support establishing a single-payer system modeled on Medicare to provide health care for all Pennsylvanians.*

### REPUBLICANS
**CORBETT**    OPPOSE*
*\* I oppose public option but support greater access to healthcare.*
**ROHRER**    Did not respond

■ What is your position on legislation that forces health care providers to provide, pay for or refer for services contrary to their conscience for moral or religious reasons?

### DEMOCRATS
**ONORATO**    Did not indicate*
*\* We should protect both religious institutions and patient rights.*
**WAGNER**    OPPOSE
**WILLIAMS**    Did not respond
**HOEFFEL**    OPPOSE

### REPUBLICANS
**CORBETT**    OPPOSE*
*\* I support safeguarding the moral conscience of Pennsylvania's healthcare providers.*
**ROHRER**    Did not respond

■ Do you support or oppose increased funding for Educational Improvement Tax Credits (EITC) if the state budget includes an increase in public school funding?

### DEMOCRATS
**ONORATO**    SUPPORT*
*\* I support an increase if the state's financial condition allows.*
**WAGNER**    SUPPORT*
*\* As long as both sets of increases are fiscally responsible. I voted to create the Educational Improvement Tax Credit Program and, later, to expand and increase funding to the program.*
**WILLIAMS**    Did not respond
**HOEFFEL**    SUPPORT

### REPUBLICANS
**CORBETT**    SUPPORT*
*\* EITC is crucial to preserve an array of educational options.*
**ROHRER**    Did not respond

# CANDIDATES FOR LIEUTENANT GOVERNOR

Space constraints did not allow PCC to print the responses of the candidates for lieutenant governor in *Viewpoint*. Complete responses are available online on PCC's website:

**www.pacatholic.org/faith-politics**

# Legislative Review

*The PCC **supports** the following legislation:*

### Social Concerns Department

**House Bill 1968**    **Access to Adoption Records** - This bill would establish procedures for the disclosure of information regarding adoption without endangering the identity of any of the parties involved.  It would require certain procedures for the storage and maintenance of attorney or agency records in adoption.

### Pennsylvania Catholic Health Association

**Senate Bill 190**    **Children's Health InsuranceProgram (CHIP)** - This bill would extend the Children's Health Insurance Program (CHIP) through December 31, 2015.  NOTE: A different bill (SB 237) was amended to extend CHIP to 2013.  It was signed into law on March 22, 2010.  PCHA supported this alternative legislation.

*The PCC **opposes** the following legislation:*

### Social Concerns Department

**House Bill 1978**    **Privacy of birth parents in adoption** - This bill would drastically change protections found under current law for the privacy of birth parents in an adoption.  The bill does not allow a birth mother to "veto" the release of birth certificate information.

### Education Department

**State Budget**    **Educational Improvement Tax Credit (EITC) cuts** - Last year, the EITC program was cut $15 million.  It is scheduled for another $10 million cut in this year's budget.  PCC is lobbying to restore EITC to it's original funding of $75 million.

### Pennsylvania Catholic Health Association

**Senate Bill 1175**    **Purely Public Charity Act** - These bills seek to amend the Act to impose essential
**House Bill 2192**    service fees on tax-exempt properties owned by institutions of purely public charity.

## Online Election Resources

www.pacatholic.org/faith-politics
www.votespa.com



joesestak.com
specter2010.com
pegluksik.com
toomeyforsenate.com

voteonorato.com
jackwagner.org
williams4governor.com
joehoeffel2010.com
tomcorbettforgovernor.com
samrohrer.org

paforsaidel.com
scottconklin.net
smithribnerforlieutenantgovernor.com
billymccue.com
cawleyforlg.com
stevejohnson2010.com
electsteveurban.com
kennedyforlg.com
votechet.com
pepper2010.com
russdiamond.org
darylmetcalfe.com



 *Viewpoint* is published by the Pennsylvania Catholic Conference, the public affairs agency of Pennsylvania's Catholic bishops. For more information, contact Amy B. Hill, APR, editor, at (717) 238-9613 or email at *abhill@pacatholic.org*. Visit our website at *www.pacatholic.org.*

<div style="transform: rotate(180deg)">

CHANGE SERVICE REQUESTED

**VIEWPOINT**
Pennsylvania Catholic Conference
PO Box 2835, Harrisburg, PA 17105

NON-PROFIT
ORGANIZATION
U.S. POSTAGE
PAID
HARRISBURG, PA
PERMIT #378

</div>

EXHIBIT F



Home

Facebook Twitter Youtube RSS

Home News Archive Investigations Video Report Tips and Leads Contact

# News



June 27, 2013 | By Eric Boehm | Posted in Legislature

# Marriage equality is 'still a heavy lift' in Pennsylvania

By Gary Joseph Wilson | PA Independent

HARRISBURG — Gay marriage may be coming to courthouse or church near you, but the timetable for such is uncertain.



EQUALITY EVENTUALLY:
Frankel suspects gay marriage

will eventually be legal in Pennyslvania.

State **Rep. Dan Frankel**, D-Allegheny, on Wednesday said gay marriage eventually will be legal in **Pennsylvania**. Frankel's prediction came just hours after the **U.S. Supreme Court** delivered gay rights advocates their biggest court victory in history.

The courts rulings in two cases placed the subject firmly in the Keystone State's consciousness. Gay rights advocates say are hopeful the increased media attention will further their cause.

But marriage equality is "still a heavy lift" in Pennsylvania, according to Frankel.

The representative urged advocates to work for "civil rights protections," which gay people lack under Pennsylvania law.

Frankel was cautious about the timeline for marriage equality, saying the state "will be late to the game, as we are in many of these progressive issues" but that "at some point in time, there will be marriage equality in Pennsylvania."

"I think the Supreme Court decision just energizes those of us who that this is something we ought to be moving forward on," Frankel said.

But as far as the politics of legalizing gay marriage go, "heavy lift may be an understatement," said **Terry Madonna**, a pollster and professor of political science at **Franklin and Marshall College**.

Madonna said he suspects the Supreme Court will rule on statewide bans of gay marriage before the Pennsylvania Legislature addresses the issue.

A Franklin and Marshall poll taken in May showed 54 percent of state voters polled support gay marriage. Pollsters talked to 526 registered voters for the survey, which has a margin of error of plus or minus 4.3 percent.

Madonna cited this poll as evidence "voters are ahead of lawmakers" on the issue.

The two rulings Wednesday also may suggest the Supreme Court is ahead of lawmakers on the issue as well.



In the first case, the Court struck down the **Defense of Marriage Act** by a 5-4 vote.

The Defense of Marriage Act required the federal government to withhold any marriage benefits, such as tax breaks, from legally married same-sex couples.



FOREVER ALONE: Rep. Sims, the state's first openly gay lawmaker to be elected, can not marry in Pennsylvania.

In the second case, the Court was tasked with determining if the 14th amendment prevents states from defining marriage as a union between a man and a woman. The justices declined to rule definitively on the matter. However, as a practical result of the ruling, marriage equality was affirmed in California but not nationwide.

The two rulings were met with widespread acclaim across the country, but will have little practical effect on Pennsylvania residents.

**Gov. Tom Corbett** and the Republican majorities in the General Assembly do not figure to move quickly towards changing the rules for marriage in Pennsylvania.

In an email, **Janet Kelley**, a spokeswoman for Corbett said "the court's ruling clearly supports the power of states to regulate domestic relations issues such as marriage'' and that the "governor supports Pennsylvania law on marriage which is plainly defined as 'one man and one woman taking each other as for husband and wife.'"

State **Rep. Brian Sims**, D-Philadelphia, the first openly gay lawmaker elected to Pennsylvania's General Assembly, hailed the ruling for recognizing the validity and dignity of thousands of Pennsylvanian's relationships.

"The Supreme Court has spelled out in no uncertain terms that the LGBT community is deserving of respect under the law and that when legislatures use state law to punish and discriminate against LGBT people, those laws will be found unconstitutional," he said.

*Wilson can be reached at Gary@PAIndependent.com and follow @PAIndependent on Twitter for more.*

Be Sociable, Share!



Tweet | 3 | Like | 57 | 0

Eric Boehm is a reporter for PA Independent. He can be reached at Eric@PAIndependent.com or at (717) 350-0963.

View all posts by Eric Boehm »

Report Tips and Leads

*Pennsylvania Independent is a public interest journalism project dedicated to promoting open, transparent, and accountable state government by reporting on the activities of agencies, bureaucracies, and politicians in the Commonwealth of Pennsylvania.*

225 State Street, Suite 300 | Harrisburg, PA 17101 | Phone 717.350.0963 | Email tips@PAindependent.com

©2013 Pennsylvania Independent. All rights reserved.

Designed and implemented by Churchill Strategies.

EXHIBIT G



COMMONWEALTH OF PENNSYLVANIA
OFFICE OF ATTORNEY GENERAL
HARRISBURG, PA 17120

KATHLEEN G. KANE
ATTORNEY GENERAL

16TH FLOOR
STRAWBERRY SQUARE
HARRISBURG, PA 17120
(717) 787-3391

July 30, 2013

VIA E-MAIL

James D. Schultz, Esquire
General Counsel
Governor's Office of General Counsel
Commonwealth of Pennsylvania
333 Market Street, 17th Floor
Harrisburg, PA 17101

Re:   *Whitewood, et al. v. Corbett, et al., No. 13-01861 (U.S.D.C., M.D. Pa)*

Dear Mr. Schultz:

I am writing in response to your letter of today wherein you advised that the Governor's Office of General Counsel ("OGC") will assume the defense of the above-referenced matter.

Your letter goes to great lengths to discuss and dissect the Commonwealth Attorneys Act ("Act") and asserts that the Attorney General has – in refusing to defend the constitutionality of Pennsylvania's Marriage Law – acted "without legal cause."

In the letter I sent you on July 12, 2013, I outlined the specific legal bases for the Attorney General's determination that the delegation of this matter to OGC was the correct course of action.

First, I pointed out that as with all public officials, the Attorney General has an obligation – over and above any obligation imposed by the Act – to uphold and defend the constitutions of both the United States and our Commonwealth. Specifically, the Attorney General took the following oath on the date of her swearing into office:

> I do solemnly swear that I will support, obey and defend the Constitution of the United States and the Constitution of this Commonwealth and that I will discharge the duties of my office with fidelity.

Consistent with the United States Supreme Court's recent decision in *United States v. Windsor*, 570 U.S. ____ (2013), the Attorney General made not a personal determination, but, rather, a legal determination, that the Marriage Law violates the due process and equal protection provisions of the U.S. Constitution and Pennsylvania Constitution and, therefore, is not defensible.

James D. Schultz, Esquire
July 30, 2013
Page 2

Second, I indicated that the Attorney General, as an attorney bound by the Pennsylvania Rules of Professional Conduct, is in fact **_obligated_** to delegate the defense of the _Whitewood_ matter to the Governor's attorneys, OGC. As you know, Governor Corbett is a steadfast supporter of the Marriage Law. It is reasonable to assume that the Governor seeks to have his position vigorously represented before the court. Given the Attorney General's fundamental disagreement with the Governor on this issue – in her capacity as his attorney – the Rules of Professional Conduct clearly require her withdrawal. Rule of Professional Conduct 1.16 – Declining or Terminating Representation – states:

> [A] lawyer may withdraw from representing a client if . . . the client insists on taking action that the lawyer considers repugnant or with which the lawyer has a fundamental disagreement.

RPC 1.16(b)(4).

Notably, your letter of today conveniently ignores the Attorney General's obligations pursuant to her Oath of Office and the Rules of Professional Conduct. Rather, for self-serving purposes, you have chosen only to discuss the Act.

Your position that the Attorney General's action with respect to _Whitewood_ "establishes a very troubling precedent" is without merit. Universal equality is the essential ingredient of a fair and just society. The Marriage Law is one of the last discriminatory statutes in the Commonwealth. Just as discriminatory laws based on race, religion, gender, disability and ethnic origin have been struck down by the courts one by one, so too will the Marriage Law. In short, this is a watershed moment. It is certainly not the beginning of the "chaos and uncertainty" that you hysterically predict. Look no further than the Attorney General's defense of the Voter ID case for proof.

Furthermore, it is not your job to tell the Office of Attorney General ("OAG") – an independent agency - what its duties and obligations are. I previously expressed to you my hope that we could "agree to disagree" on the respective legal positions of the Attorney General and the Governor in this important matter, and further agree that each of us is acting in good faith to uphold the constitution and other legal duties and responsibilities of our respective offices. Going forward, I expect that OGC will respect OAG's position.

Sincerely,

ADRIAN R. KING, JR.
First Deputy Attorney General

EXHIBIT H

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| HEATHER FINSTUEN, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | No. CIV-04-1152-C |
| | ) | |
| DREW EDMONDSON, in his official | ) | |
| capacity as Attorney General of Oklahoma; | ) | |
| and BRAD HENRY, in his official capacity | ) | |
| as Governor of Oklahoma, | ) | |
| | ) | |
| Defendants. | ) | |

## O R D E R

Plaintiffs have sued Oklahoma's governor, Brad Henry (Henry), and attorney general,

Drew Edmondson (Edmondson), to enjoin their enforcement of Oklahoma's Adoption Code,

which prohibits the state, its agencies, or its courts from recognizing out-of-state adoptions

by same-sex couples.  Defendants have moved for dismissal, claiming that they are protected

from suit by Eleventh Amendment immunity.  The Court disagrees.  Because the Plaintiffs

are seeking prospective equitable relief from state officials for alleged violations of federal

law, Defendants are not shielded from suit by the Eleventh Amendment.  Therefore,

Defendants' motion to dismiss (Dkt. No. 13) is denied.

### BACKGROUND

On May 3, 2004, the Oklahoma legislature amended Oklahoma's Adoption Code to

prevent the state from recognizing "an adoption by more than one individual of the same sex

from any other state or foreign jurisdiction."  10 Okla. Stat. § 7502-1.4.  Plaintiffs allege that

the Adoption Code was amended in response to an Opinion issued by Edmondson concluding

that the U.S. Constitution and Oklahoma law required an Oklahoma agency to recognize adoption decrees issued by other states to same-sex couples. See 2004 OK AG 8, ¶¶ 14, 16. As a result, Edmondson concluded that the Oklahoma State Department of Health was required to issue supplementary birth certificates to persons adopted by same-gender parents. Id.

Plaintiffs are families composed of children adopted out-of-state by same-sex parents who either now live in or wish to travel to Oklahoma. Collectively, they filed this action challenging the amended statute as unconstitutional under the Full Faith & Credit Clause and the Equal Protection Clause, additionally claiming that the law violates their right to travel freely among the states. Plaintiffs seek a declaration that the newly-enacted provision of the Adoption Code is unconstitutional and request the entry of an injunction barring Edmondson and Henry from enforcing or attempting to enforce the subject provision.

## DISCUSSION

The Court begins by noting what Defendants are not arguing in this motion – Defendants are not challenging the justiciability of Plaintiffs' claims. Defendants appear specially to argue only that they are protected from suit by the Eleventh Amendment.

Generally, the Eleventh Amendment prevents a citizen from suing a state in federal court. U.S. Const. Amend. XI; Hans v. Louisiana, 134 U.S. 1, 13-15 (1890). A suit for money damages against a state official in his official capacity is usually considered a suit against the state and, consequently, is barred by the Eleventh Amendment. See Elephant Butte Irrigation District v. Dept. of the Interior, 160 F.3d 602, 607 (10th Cir. 1998).

Case 1:04-cv-00861-PEC   Document 240-2   Filed 10/07/13   Page 42 of 49

However, when a plaintiff names a state official as a defendant and seeks only prospective equitable relief for violations of federal law, the Eleventh Amendment does not bar the suit. Ex Parte Young, 209 U.S. 123, 159-60 (1908); id. at 607-08. In reaching the holding in Ex Parte Young, the Supreme Court concluded that state officials have no authority to violate federal law and, thus, the Eleventh Amendment does not shield them from liability. Ex Parte Young, 209 U.S. at 159-60. Ex Parte Young attempts to strike a balance between protecting states' sovereignty and holding states responsible for violations of federal law. Frew v. Hawkins, 540 us 431, ___, 124 S.Ct. 899, 903 (2004); see also Erwin Chemerinsky, Federal Jurisdiction § 7.1, 7.5.1 (4th ed. 2003). The Ex Parte Young doctrine permits suit against state officers upon satisfaction of a four-part test: (1) the action must be against the state officials and not the state itself; (2) Plaintiffs must have alleged a non-frivolous violation of federal law; (3) the relief sought must be prospective, equitable relief, rather than compensatory damages or other retroactive monetary relief to be paid from the state treasury; and (4) the suit cannot implicate "special sovereignty issues." Lewis v. New Mexico Dept. of Health, 261 F.3d 970, 975 (10th Cir. 2001); Elephant Butte, 160 F.3d at 609. If Plaintiffs meet each element of this test, they may proceed against the state officials.

Defendants do not specifically address the four-part test articulated by the Tenth Circuit. Defendants' arguments, however, appear to challenge whether Plaintiffs have satisfied the first prong of the test – is Plaintiffs' suit really one against the Defendants as state officials or against the state itself? Defendants argue that they are entitled to immunity because they have not enforced or threatened to enforce the amended statute. According to

Defendants, until they actually enforce or threaten to enforce the provisions, they are entitled to Eleventh Amendment Immunity.  Defendants also argue that they have no duty to enforce the newly-revised statute.  Defendants assert that the statute does not contain any procedures for its enforcement and Defendants have no "power or duty" to enforce the amended statute except for a general duty to uphold the laws of the State of Oklahoma.  Defendants contend that this general duty is insufficient to demonstrate that they have any connection to the enforcement of the statute.  Defendants' arguments are unavailing.

Defendants' arguments rely primarily on an 1899 case, Fitts v. McGhee, 172 U.S. 516 (1899), and language in Ex Parte Young distinguishing Fitts.  In Fitts, railroad companies sued the governor and attorney general of Alabama to challenge a statute fixing the maximum toll rates for crossing the bridges over the Tennessee River.  Fitts, 172 U.S. at 516.  If toll operators charged too much, the statute permitted the persons over-charged to collect penalties via a private civil action against the operator.  Id.  The Supreme Court found that the state officials named had no connection to the collection of the penalties and that naming them as parties was simply an effort to test the constitutionality of the statute.  Id. at 530.

The Court in Ex Parte Young examined Fitts.  The Court found that the named officials in Fitts had no connection whatsoever to the alleged unconstitutional act, and, in distinguishing that situation from the one before it in Ex Parte Young, stated that "some connection" with the enforcement of the unconstitutional act was necessary to make the state officials parties to the suit.  Ex Parte Young, 209 U.S. at 157-58.  A duty arising out of the

4

general law was sufficient to establish this connection; it was unnecessary that a duty to enforce stem from the unconstitutional act itself.  Id.

The Tenth Circuit has not directly addressed the "some connection" language of Ex Parte Young, although several other circuits have.  Defendants cite cases from the Third, Fifth, Sixth, and Ninth Circuits in support of their motion.  See 1st Westco Corp. v. School Dist., 6 F.3d 108, 113 (3d Cir. 1993); Okpalobi v. Foster, 244 F.3d 405, 417 (5th Cir. 2001); Children's Healthcare Is a Legal Duty, Inc. v. Deters, 92 F.3d 1412, 1415 (6th Cir. 1996); Long v. Van de Kamp, 961 F.2d 151, 152 (9th Cir. 1992).

Although the dicta in these other courts of appeals' cases suggests an expansive reading of Ex Parte Young, the actual holdings are fairly narrow and appear inapposite to this case.  To the extent these cases purport to expand the holding of Ex Parte Young, the Court finds that they are unpersuasive.  The holdings merely reinforce the rather unremarkable rule that you may not name the attorney general or governor as a party to challenge a statute enforced exclusively by either (1) other state officials, or (2) private parties through a private cause of action – or, put another way, when the state officials do not have any enforcement connection to the statute.  See e.g., Southern Pacific Transp. Co. v. Brown, 651 F.2d 613, 615 (6th Cir. 1980) (holding that under Oregon law, the district attorneys had autonomy from the attorney general and thus, the attorney general's power to advise and direct the district attorneys was insufficient to create an enforcement connection); 1st Westco Corp., 6 F.3d at 113-14 (holding that the attorney general was not a proper party because he had no authority to enforce a law requiring contractors to meet residency requirements before their

5

construction specifications are approved and because the attorney general did not have the duty to provide legal counsel to the school district with the power to enforce the subject law). See also Summit Medical Assoc., P.C. v. Pryor, 180 F.3d 1326, 1341 (11th Cir. 1999) (holding that the attorney general did not have any connection to a partial-birth abortion statute that provided for private civil enforcement); accord Okpalobi, 244 F.3d at 422. In each of these cases, then, the Fifth Circuit found the state officials' general duty to uphold the law or supervise those enforcing the law was irrelevant because the statute provided for enforcement *through other means*. As the modified statute does not provide any means for enforcement, but is directed to the state itself, its enforcement falls squarely on the shoulders of these defendants.

Governor Henry has both the authority and the duty to enforce the statute. The Oklahoma Constitution provides that the governor "shall cause the laws of the State to be faithfully executed." Okla. Const. art. VI § 8. According to the amended statute, the "state [or] any of its agencies ... *shall not* recognize an adoption by" a same-gender couple. 10 Okla. Stat. § 7502-1.4 (emphasis added). Therefore, if Governor Henry faithfully executes this Oklahoma law pursuant to his duty to do so, no state agency will recognize these Plaintiffs as a family and these Plaintiffs could be deprived of all the legal rights and obligations associated with that relationship. See Grimes v. City of Oklahoma City, 2002 OK 47, ¶ 11, 49 P.3d 719, 724 (noting that a statute that uses the term "'[s]hall' signifies a mandatory directive or command")

6

The constitutional duty to faithfully execute Oklahoma's laws, coupled with the mandatory language of the amended statute, is sufficient for the Court to conclude that the suit is being brought against Governor Henry as a state official, and not against the state itself.  See Harris, 264 F.3d at 1290 (holding that the governor's "supreme executive power" and duty to ensure the faithful execution of the law was sufficient authority to ensure compliance with law and, thus, they could be enjoined under Ex Parte Young); see also Robinson v. Kansas, 295 F.3d 1183, 1191-92 (10th Cir. 2002), cert. denied, 539 U.S. 926 (2003) (holding that the governor was a proper party to a suit to enjoin his enforcement of the Kansas School District Finance and Quality Performance Act in violation of the plaintiffs' federal rights).  The relevant and material fact simply is that Governor Henry, by virtue of his office, has the authority to enforce the amended statute and it does not matter that this authority arose from a general duty imposed on him through the Oklahoma Constitution rather than the amended statute itself.  See Ex Parte Young, 209 U.S. at 157.[1]

Similarly, the attorney general has a duty to:

> initiate or appear in any action in which the interests of the state or the people of the state are at issue, or to appear at the request of the Governor, the Legislature, or either branch thereof, and prosecute and defend ... any cause or proceeding, civil or criminal, in which the state may be a party or interested.

---

[1] As noted by Plaintiffs, the governor also has specific and special duties relevant to and dependent upon the legal relationships between parents and their children, such as child support enforcement in abandonment cases, and under the Uniform Interstate Family Support Act.  See 21 Okla. Stat. § 853, et seq., 43 Okla. Stat. § 601, et seq.

7

74 Okla. Stat. § 18b(A)(3).  The state has an interest in the welfare of its children and defining and enforcing parents' legal obligations accordingly.  See, e.g., 10 Okla. Stat. § 7202 (declaring the state's interests in and responsibility to children whose parents fail to fulfill their obligations to provide proper care, supervision, and protection).  In fact, Oklahoma's attorney general is charged with the specific duty of carrying out the Oklahoma Children's Code, an act purporting to "preserve, unify and strengthen ... family ties" by providing "expeditious and timely judicial and agency procedures ... [to] protect the health, safety and welfare of" allegedly deprived children. 10 Okla. Stat. §§ 7001-1.2 (B), 7002-3.1.

In the context of adoption, Oklahoma has declared a strong interest in ensuring that children placed for adoption are raised in stable, loving homes.  10 Okla. Stat. § 7501-1.2(8). Additionally, Oklahoma has expressed its interest in "[p]romot[ing] and strenthen[ing] the integrity and finality of adoptions."  Id. at § 7501-1.2(9).

Finally, it appears that the state is interested in defining family relationships to exclude units headed by same-sex couples.  The Oklahoma legislature passed the amended statute less than two months after Edmondson issued his Opinion concluding that the Department of Health must issue birth certificates with the names of both parents,[2] even when both parents are of the same gender.  Because the state's interests are numerous, the Court concludes that Edmondson has a statutory duty to enforce the amended statute.

---

[2]    Edmondson issued Attorney General Opinion 04-8 on March 19, 2004.

Further, the fact that neither Henry nor Edmondson have threatened to enforce the amended statute is irrelevant to the Eleventh Amendment inquiry. According to the Supreme Court, the Ex Parte Young analysis is a "'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" Verizon Maryland, Inc. v. Public Serv. Comm'n, 535 U.S. 635, 645 (2002) (citation omitted); Winnebago Tribe v. Stovall, 341 F.3d 1202, 1207 (10th Cir. 2003). As this statement is quite clear, the Court declines to read into it any sort of timing requirement or element mandating a threat of enforcement.

Of course, this does not mean that timing or the absence of enforcement is irrelevant to this suit; in fact, the converse is true, as timing and the absence of enforcement is likely to be highly relevant. See 17 Charles Alan Wright, et al., Federal Practice and Procedure § 4232 (2d ed. 1988) (stating that a plaintiff who has "brought his case within the Young doctrine must still overcome the other statutory and court-made barriers" to equitable relief). The problems that arise from an unripe controversy, however, are already adequately addressed by the justiciability doctrines, most notably the Article III and prudential ripeness requirements, and standing analysis. See Nova Health Systems. v. Gandy, ___ F.3d ___ (10th Cir. 2004) (discussing the constitutional standing requirements as including an actual or imminent injury suffered by the plaintiff and caused by the named defendants); Nat'l Audubon Soc'y, Inc. v. Davis, 307 F.3d 835, 846-47 (9th Cir. 2002) (declining to read a "ripeness" or "imminence" requirement into Ex Parte Young). Thus, "[t]here is ... no need

9

to strain [the] <u>Ex Parte Young</u> doctrine to serve that purpose."[3] <u>Nat'l Audubon Soc'y</u> at 847.

Indeed, Defendants have expressly reserved their right to challenge Plaintiffs' complaint on

the basis of the justiciability doctrines, including lack of ripeness and lack of standing (<u>see</u>

Defs.' Br. 1, n.1).  As those issues have not been briefed and are not currently before the

Court, the Court declines to speculate as to the potential impact Defendants' lack of

enforcement will play in that context.

<div align="center">

CONCLUSION

</div>

Because the Plaintiffs are seeking prospective relief against state officials for an

alleged violation of their federal rights, Defendants are not entitled to Eleventh Amendment

immunity.  As immunity was the only ground challenged by Defendants, their Motion to

Dismiss (Dkt. No. 13) is DENIED.

IT IS SO ORDERED this 7th day of December, 2004.

ROBIN J. CAUTHRON
United States District Judge

---

[3]  <u>Nat'l Audubon Soc'y</u> interprets prior Ninth Circuit law (and that of other circuits) purporting to impose an imminence requirement as simply addressing the "question of whether a named state official has direct authority and practical ability to enforce the challenged statute, rather than the question of whether enforcement is imminent."  <u>Nat'l Audubon Soc'y</u>, 307 F.3d at 846. Ultimately, the question for Eleventh Amendment purposes is "who" can be sued, not "when."  <u>Id.</u>

<div align="center">

10

</div>