UNPUBLISHED OPINIONS

Westlaw.

Not Reported in S.W.3d, 2004 WL 3154530 (Ark.Cir.)
**(Cite as: 2004 WL 3154530 (Ark.Cir.))**

**H**
Only the Westlaw citation is currently available.

Circuit Court of Arkansas.
Matthew Lee HOWARD, Craig Stoops, Anne Shelley, and
William Wagner Plaintiffs
v.
THE CHILD WELFARE AGENCY REVIEW BOARD
and The Arkansas Department of Human Services De-
fendants

No. CV 1999-9881.
Dec. 29, 2004.

*MEMORANDUM OPINION*

FOX, J.

  *1 On March 23, 2004, October 5, 2004, and De-
cember 20, 2004, this matter came on for trial. Testimony
was taken from plaintiff Matthew Howard, plaintiff Anne
Shelley, plaintiff William Wagner, Robin Woodruff,
James Balcom, Dr. Cheralyn Powers, Dr. Rebecca Martin,
Judith Faust, Dr. Michael Lamb, Dr. Frederick Berlin, Dr.
George Rekers, Dr. Susan Cochran, and Dr. Pepper
Schwartz. In addition to the testimony and evidence, the
parties filed *Stipulated Facts* on March 17, 2004.

*STATEMENT OF THE CASE*

  This action is a challenge to an administrative regula-
tion promulgated subsequent to the enactment of Act No.
1041 of 1997. Act No. 1041, commonly referred to as "The
Child Welfare Agency Licensing Act," is codified as
A.C.A. § 9-28-401, *et seq.* A.C.A. § 9-28-402 contains the
legislative definitions relating to "The Child Welfare
Agency Licensing Act." A.C.A. § 9-28-402(13) defines
"foster home" as follows:

  (13) "Foster Home" means a private residence of one (1)
  or more family members that receives from a child
  placement agency any minor child who is unattended by

a parent or guardian in order to provide care, training,
education, custody, or supervision on a twenty-four hour
basis, not to include adoptive homes.

  The defendant Child Welfare Agency Review Board
was created pursuant to A.C.A. § 9-28-403(a)(1). The
General Assembly legislatively delegated the authority,
pursuant to A.C.A. § 9-28-403(a)(2), to the Child Welfare
Review Board to "promulgate rules and regulations to
enforce the provisions of this subchapter."

  In 1999, the Child Welfare Agency Review Board
enacted section 200.3.2 of the Minimum Licensing Stan-
dards, which states:

  No person may serve as a foster parent if any adult
  member of that person's household is a homosexual.
  Homosexual, for purposes of this rule, shall mean any
  person who voluntarily and knowingly engages in or
  submits to any sexual contact involving the genitals of
  one person and the mouth or anus of another person of
  the same gender, and who has engaged in such activity
  after the foster home is approved or at a point in time that
  is reasonably close in time to the filing of the application
  to be a foster parent.

  The *First Amended Complaint* alleges seven causes of
action: first, that the subject regulation is outside the scope
of the areas of authority granted to the defendant Board;
second, that the subject regulation is in violation of the
Board's statutory responsibilities; third, the enactment of
the subject regulation was violative of the Administrative
Procedure Act because there was not substantial evidence
before the Board for it to conclude that the subject regula-
tion was within its' statutory authority; fourth, that the
subject regulation is violative of the Equal Protection
Clause of the United States Constitution and of 42 U.S.C. §
1983; fifth, that the subject regulation is violative of the
plaintiffs' rights to equal protection under Article 2, sec-
tions 2, 3 and 18 of the Arkansas Constitution; sixth, that

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in S.W.3d, 2004 WL 3154530 (Ark.Cir.)
**(Cite as: 2004 WL 3154530 (Ark.Cir.))**

the subject regulation is violative of the plaintiffs' rights to privacy and intimate association under the United States Constitution and 42 U.S.C. § 1983; and seventh, that the subject regulation is violative of the plaintiffs' rights to privacy and intimate association under the Arkansas Constitution. During the course of the proceedings, the plaintiffs dismissed Count III, the cause of action under the Administrative Procedure Act.

### TESTIMONY-ANNE SHELLEY

**\*2** Anne Shelley testified that she is a lesbian, has been in an intimate sexual relationship with a partner since 1999, applied to be a foster parent, and was advised that she could not be a foster parent because a law was passed prohibiting homosexuals and lesbians from fostering.

### TESTIMONY-WILLIAM WAGNER

William Wagner testified that he was a 50 year old optical lab technician, married for over 30 years with two children, a daughter and a son. He and his wife founded "Fulfill a Dream" when they lived in Fort Smith. After moving to Fayetteville, he and his wife volunteered at "Camp Rainbow," an oncology camp for children with catastrophic illness and cancer and Mr. Wagner was a counselor there for seven years. Over the years Mr. Wagner and his wife have taken care of about eighty children who were not in their legal custody, most for only a day or two. Their son, who is over eighteen, is gay. Some of the children that stayed with the Wagners who were kicked out of their homes were kicked out because of their actual or perceived sexual orientation. One girl that stayed with them was beaten by a log chain because her father perceived her to be a lesbian. The Wagners have never been licensed as foster parents by the State of Arkansas. They called and went through the questionnaire and answered the questions truthfully. When they got to the question "do you have gays or lesbians living in the household?" they answered yes because their son sometimes lives with them.

### TESTIMONY-MATTHEW HOWARD

Matthew Howard testified that he is forty-four years old and lives in Little Rock. He has a masters degree in theology, two years of seminary, and is an ordained minister with the Fellowship of Metropolitan Community Churches, a denomination that has an outreach primarily to the gay and lesbian community. He works at Easter Seals of Arkansas as a case manager dealing with families who have children with developmental disabilities. Mr. Howard has been together with his partner, a librarian, for 19 years in a sexually monogamous committed relationship. He has two children of his own, three years old and two years old, who he is co-parenting with a lesbian couple. His children are with him a minimum of two and a half days a week and his extended family is very involved with his children. Mr. Howard was interested in becoming a foster parent and was rejected because he was gay.

### TESTIMONY-ROBIN WOODRUFF

Robin Woodruff testified that she was a member of the Child Welfare Agency Review Board in 1999 when the regulation was passed and that she made the initial proposal for the regulation. Her initial proposal was for a heterosexual married couple qualification for foster care. She noticed in looking through the regulations that there was an absence of an absolute for role modeling and stability as in a home with both a mom and dad. The Board didn't agree with her regulation as originally proposed and a lawyer for the Board advised the Board that it couldn't limit fostering to married couples because it would be inconsistent with state law. Ms. Woodruff stated that she does not object to a celibate gay person who is otherwise qualified from serving as a foster parent, that she believes that same sex relationships are wrong, that homosexual behavior is a sin just like she has issues in her life that are sins, and that homosexuality violates her biblical convictions. She further testified that she believes that adults who have same sex orientation should remain celibate and that she would not be a proponent of her children spending time with openly gay couples.

### TESTIMONY-JAMES BALCOM

**\*3** Mr. James Balcom testified that he has been employed for thirty years at a residential foster care adoption agency and that he was a member of the Child Welfare Agency Review Board. He stated that if there was a de-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in S.W.3d, 2004 WL 3154530 (Ark.Cir.)
**(Cite as: 2004 WL 3154530 (Ark.Cir.))**

termination that the child would be best served in a home with a homosexual individual or homosexual couple that were actively engaged in homosexual conduct that there are provisions in the regulations that would permit placement with such individuals under "alternative compliance." Mr. Balcom stated that there were three components to his decision, scientific evidence, his personal beliefs including his religious beliefs, and societal mores. He also testified that he personally believed that gay relationships are immoral, that people with homosexual orientation should remain celibate, and that he has a moral objection to people being in a household where there is a same sex relationship going on. He stated that the Board had received a position statement from the Child Welfare League of America stating its opposition to restrictions on gay parents; a statement from the National Association of Social Workers opposing restrictions on parenting by gay people; and a position statement from the American Psychological Association opposing restrictions on placements with gay parents. Mr. Balcom believes people choose to be gay, that gay people recruit others to become gay, that gay recruitment is done by "gay militants," and that "gay militants" have people who act as coaches to teach other people how to practice homosexual acts and bring them into the lifestyle. He also believes that the process of gay recruitment is a gradual one like religious proselytizing, and he believes that "militant gays are recruiting in schools in Massachusetts." One of such militant gay organizations active in recruiting in the schools is a group called "Parents and Friends of Lesbians and Gays," an organization in which the members are not gay but are parents and friends of gay people.

Mr. Balcom also testified that a "gay foster parent might be a good placement for a gay identified teen," depending upon the specific child and that placement could be accessed through alternative compliance. He stated that individual applicants can't utilize the alternative compliance procedure because they have no standing before the Board as an individual. Agencies have to make the request to the Child Welfare Agency Review Board.

*TESTIMONY-DR. CHERALYN POWERS*

Dr. Cheralyn Powers has a Ph.D. in clinical psychology and began working in 1979 with adults and children in general clinical work, therapy, and assessment. She is a past president of the Arkansas Psychological Association and is affiliated with the American Psychological Association. She was authorized by the Arkansas Psychological Association to testify about the proposed regulation before the Child Welfare Agency Review Board. She testified that in matters that are so personal and so emotional that extra care needs to be taken in evaluating the basis for making decisions. She further testified that after conducting a "meta-analysis" of the results of many studies, the conclusions she drew were that:

**\*4** the sexual orientation of the parents did not negatively affect the development of the child, result in any kind of pathology, was not contraindicated for child health. That, in fact, when studies looked at both heterosexual parents and homosexual parents, the differences were not related. The differences in child development were not related to gender identity of the parents.

Dr. Powers concluded that with regard to good outcomes for the child, differentiating foster parents on the basis of sexual orientation was not a meaningful way to distinguish foster parents.

*TESTIMONYDR. REBECCA MARTIN*

Dr. Rebecca Martin received her M.D. in 1980 and completed an internship and residency in internal medicine, followed by a fellowship at University of Arkansas Medical School in infectious diseases. She has served as both a teacher and a clinician at the VA and at UAMS. She has treated 350-400 HIV patients over her career, published articles in academic journals, and is a frequent lecturer on HIV. According to Dr. Martin, the latest data on new HIV infections was that 31% of new infections were from men having sex with men, women having sex with women is not generally thought to be a risk. Fifty percent (50%) of the new infections are in people less than 25 years of age with almost half of those being heterosexual transmissions. People of color are disproportionately affected, with African-Americans making up twelve percent

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in S.W.3d, 2004 WL 3154530 (Ark.Cir.)
**(Cite as: 2004 WL 3154530 (Ark.Cir.))**

(12%) of the population, but over half of the new HIV infections. She further testified that someone who lives in a household with someone who is HIV positive is not at risk unless they are having sexual activity with them. Dr. Martin also testified that with the advent of new treatments starting in 1996 she considers HIV to be a chronic disease and treats it as such, much as she would treat <u>diabetes</u> or <u>heart disease</u>. With respect to agency regulation section 200.2, subsection 4, which requires every member of a foster family to have a physical exam within 6 months before the initial approval of the foster home, if such regulation required HIV testing as part of the routine physical examination then the six month window should adequately <u>test for HIV.</u>

*TESTIMONY JUDITH FAUST*

Judith Faust received a masters degree in social work in 1971 and has worked in child welfare and was Director of the Division of Children and Family Services in Arkansas from 1991-1993. She is currently employed as a faculty member at the University of Arkansas at Little Rock School of Social Work, teaching full time in the Masters of Social Work program. Ms. Faust stated that when a child can't stay with his or her family there are a range of placement options such as kinship care, foster-family care, and residential group care with the determination of which type of setting is most appropriate for a particular child being a determination that "needs to be based on careful and thorough assessment of each individual child, his or her circumstances and conditions, strengths and needs, at the time of placement." She testified that blanket exclusions of groups of people from fostering really only enter the picture with respect to child abuse and violent crime convictions and that during her career there used to be blanket exclusions for single people, for couples who applied as foster parents but said they wanted to adopt, and it was also common practice to not make trans-racial placements. All of such blanket exclusions have changed. Ms. Faust stated that blanket exclusions don't make sense for two reasons. First, categorical exclusions eliminate from consideration people who would otherwise be good foster parents. Second, the child welfare system struggles with having a large enough pool

of well-qualified foster parents to make good reasonable matches. When the system doesn't have enough well-qualified foster parents, less than ideal matches occur, which might result in multiple foster home placements which are not good for the children. She also testified that there are situations in which a gay foster parent might be the "placement of choice." Ms. Faust's opinion was that the importance of individual evaluations of both the needs of the child as well as the strengths of the applicant was a well established principal in the child welfare field and that such principal was at the "heart of all social case work practice and certainly at the heart of child welfare practice." She further testified that the chief professional organization that guides child welfare practice across the country is the Child Welfare League of America (CWLA) and that such organization publishes standards of excellence for foster family care. DCFS is a member of CWLA. CWLA has a standard that says that applicants for foster parenting should not be denied solely on the basis of age, marital status, income, sexual orientation, race, physical condition, handicap, or location. There is also an organization named National Association of Social Workers (NASW). NASW has policy statements regarding best practices in the field of social work. One of the policy statements states that barriers to foster parenting that are unsupported by evidence need to be removed, the three examples of unsupported barriers being fostering single parents, fostering by parents who want to adopt, and fostering by non-traditional families, including gay and lesbian parents.

**\*5** Ms. Faust additionally testified that when the UALR social work faculty learned of the proposed regulation there was "unanimous dismay at a policy that would categorically exclude gay and lesbian people from foster parenting." She further testified that there was an, "unanimous sense that this policy didn't make sense in light of what the children the system serves need, in light of what would best serve the children in the system."

*TESTIMONY-DR. MICHAEL LAMB*

Dr. Lamb received his Ph.D. in psychology from Yale University in 1976. He took academic positions from then

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in S.W.3d, 2004 WL 3154530 (Ark.Cir.)

**(Cite as: 2004 WL 3154530 (Ark.Cir.))**

until 1987 when he moved to his then current position as Senior Research Psychologist at the National Institute of Child Health and Human Development, one of the constituent agencies of the National Institutes of Health. In such capacity, Dr. Lamb was in charge of the section on social and emotional development. During his career he has authored over 500 publications in either professional peer-review journals or chapters in professional books. Additionally, he has written or edited about thirty books. He was qualified, for the purpose of this litigation, as an expert in developmental psychology and specifically in parenting and children's adjustment, including the adjustment of children raised by gay parents. Dr. Lamb testified that there are four well known predictors of healthy child adjustment: (i) the quality of the child's relationship with the parent primarily responsible for his or her care: (ii) the relationship the child has with another parent figure; (iii) the quality of the relationships between the adults; and (iv) the resources available to the child. Dr. Lamb also testified that at this time the traditional family form is clearly the minority family form in this country. Dr. Lamb stated that being raised by gay parents: (i) does not increase the risk of problems in adjustment for children; (ii) does not increase the risk of psychological problems for children; (iii) does not increase the risk of behavioral problems; (iv) does not prevent children from forming healthy relationships with their peers and others; (v) does not cause academic problems; (vi) does not cause gender identity problems; and (vii) does not cause any adjustment problems at all.

He further testified that both men and women have the capacity to be good parents and that there is nothing about gender, per se, that affects one's ability to be a good parent. There is research that indicates that there are benefits to children's adjustment in having two parents as opposed to one parent and that children in single parent families are more likely to have adjustment difficulties than children in two parent families. The studies consistently report that children of lesbian or gay parents are equivalently adjusted to children of heterosexual parents and that there is no evidence to support an assertion that there is more likely to be child abuse and domestic violence in families with gay

parents than families with heterosexual parents. Dr. Lamb's opinion is that it is an ideological position that children are best off when raised by married mothers and fathers and that there are clearly differences in what people believe based on things other than scientific research. He also testified that there is no basis: (i) for making the statement that heterosexual parents might be better able to guide their children through adolescence than gay parents; (ii) for believing that the sexual orientation of a parent or foster parent can predict children's adjustment; and (iii) for believing that being raised by lesbian or gay parents has a negative effect on children's adjustment.

**\*6** Dr. Lamb stated that there is no child welfare basis to categorically exclude gay people from being foster parents, that such categorical exclusion could be harmful to promoting children's healthy adjustment because it excludes a pool of effective foster parents, and that there is no reason in which the health, safety, or welfare of a foster child might be negatively impacted by being placed with a heterosexual foster parent who has an adult gay family member residing in that home.

*TESTIMONY-DR. FREDERICK BERLIN*

Dr. Berlin has both an M.D. and a Ph.D., the latter being obtained in 1974. He is an associate professor at Johns Hopkins Hospital and founder of the John Hopkins Sexual Disorders Clinic. Dr. Berlin is also Director of the National Institute for the Study, Prevention and Treatment of Sexual Trauma. He has served as a consultant to the ad hoc committee on sexual abuse of the National Conference of Catholic Bishops, as a member of the Cardinals' Commission in Boston, provided consultation to the Episcopal Church for screening of individuals, provided consultation to the European Parliament, and has been a participant in a White House conference on child sexual abuse. He has also been invited to address the United States Senate subcommittee on the same issue. Additionally, Dr. Berlin has conducted seminars for the United States Department of Justice as well as seminars for the Federal Bureau of Investigation. He was qualified, for purposes of the trial, as a specialist in forensic psychiatry with his special area of expertise within psychiatry being sexual disorders and the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in S.W.3d, 2004 WL 3154530 (Ark.Cir.)
**(Cite as: 2004 WL 3154530 (Ark.Cir.))**

spectrum of human sexuality.

Dr. Berlin testified that homosexuality is not a mental disorder and by 1986 any reference to homosexuality as a mental disorder was removed from the DSM. He further testified that people discover their sexual interests, they don't decide voluntarily to have them and that there is no evidence to support the idea that a person's sexual orientation is affected by the sexual orientation of that person's parent. According to Dr. Berlin, it is extremely difficult, if not impossible, for someone to change their sexual orientation. The American Psychiatric Association has developed an official policy statement that there is no evidence that methods used to try to reorient a person sexually work and since there is no evidence it is unethical for a professional to try to utilize such methods. He also testified that there is no evidence to support that gay people, as a group, are more likely to engage in domestic violence than heterosexuals and that gay people are not more likely to sexually abuse children than heterosexuals.

*TESTIMONY-DR. GEORGE REKERS*

Dr. Rekers testified that he has a Ph.D. in psychology from UCLA, has a Diplomate in clinical psychology from the American Board of Professional Psychology, and is licensed in South Carolina in both clinical psychology and experimental psychology. He is a tenured full professor of neuropsychiatry and behavioral science at the University of South Carolina School of Medicine in addition to being a psychologist on the children's inpatient service at the Hall Psychiatric Institute. Dr. Rekers is also an ordained minister and has a doctorate in theology. He has treated gay patients to try to change their sexual orientation, some of such patients being minors brought in by parents. He has children of his own and would not allow openly homosexual people to spend time with them unsupervised. Dr. Rekers testified that, for several reasons, a homosexual household is an inferior family structure in terms of promoting the best interests of a child. He further testified that a married family was the best setting.

*TESTIMONY-DR. SUSAN COCHRAN*

*7 Dr. Cochran has a Ph.D. in clinical psychology and a Master's degree in epidemiology. She has had approximately sixty publications in peer review journals and is a professor of epidemiology and statistics at the UCLA School of Public Health. She has conducted studies, including epidemiology studies, concerning alcohol and drug abuse. Dr. Cochran's testimony was presented as an expert in psychology and epidemiology with a specialization in health disparities among minority communities including lesbians and gay men and including substance abuse within that community. Dr. Cochran testified that demographic factors relating to substance abuse or dependance include gender, age, education, employment status, race, urbanity, and religiosity. Some of the statistical information presented by Dr. Cochran concerning percentage of individuals meeting the alcohol/substance abuse criteria was:

| | | |
|---|---|---|
| (a) | men under 25 - | 12%; |
| (b) | women under 25 - | 6%; |
| (c) | general population, age 21 - | 24%; |
| (d) | general population, age 26 - | 7%; |
| (e) | American Indians - | 17%; |
| (f) | Asian Americans - | 6% |
| (g) | Full time employed - | 10%; |
| (h) | Unemployed - | 17%; |
| (i) | College graduates - | 7%; |

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in S.W.3d, 2004 WL 3154530 (Ark.Cir.)
**(Cite as: 2004 WL 3154530 (Ark.Cir.))**

| (j) | Not finishing high school - | 11%; |
| (k) | Urban population - | 9%; and |
| (l) | Rural population - | 6%. |

Dr. Cochran further testified that there is no statistically significant difference in the overall rate of alcohol dependency diagnosis among heterosexual men and homosexual men. There is a somewhat higher rate among homosexual women than heterosexual women for both alcohol and drug dependency but not for abuse. Heterosexual males, homosexual females, and homosexual males all have similar rates of substance abuse and dependency. The best predictors for whether a person will meet the criteria for drug abuse and dependency are age, gender, and employment status.

### TESTIMONY-DR. PEPPER SCHWARTZ

Dr. Schwartz obtained a M.A. from Washington University in Sociology, a Masters in Philosophy from Yale University in Sociology, and her Ph.D. from Yale University in Sociology. She is a tenured Professor of Sociology at the University of Washington, has served on numerous editorial boards and reviews, published approximately eight books, published about forty articles in academic journals, and is the recipient of the 2004 American Sociological Association "Public Understanding of Sociology" award. Dr. Schwartz was qualified as an expert in sociology with an expertise in couple relationships including both heterosexual and same sex couples. She testified that a comparison of the quality of relationship between heterosexual and homosexual relationships has been done and that in terms of quality of relationships, same sex couples of both men and women were higher in certain categories. According to Dr. Schwartz, the divorce rate varies by region, overall it is about 50%, the rate being higher in urban areas and about 1/3 of children are growing up in single parent families with some demographers say up to 1/2 of all kids are growing up in single parent families. The same factors apply to same sex or heterosexual couples in evaluating couple stability and leading to couples breakup-how much of a couple are they, common friends, work, extended family relationships, how well do they know each other, have they handled hard times in the relationship, and have they had continuous residence for periods of time. She testified that there are a number of demographic factors correlating with number of sexual partners; age and cohort difference, ethnicity, religiosity, and gender being some of the variables. The determination of relationship durability requires a multi-variable approach, a prediction about relationship stability can't be made only using sexual orientation. She further testified that if the State's goal is to have foster parents with stable relationships, excluding gay applicants, as a group, does not advance such goal.

### CREDIBILITY OF WITNESSES

**\*8** It was a privilege for the court to hear testimony from experts having the credentials, qualifications and experience presented by some of the expert witnesses in this case. For any lay person, such as the court, willing to listen to the knowledge, training, and experience of such experts, their testimony provided much in the way of life affirming information about the resiliency and adaptability of mankind with respect to individual behavior modification to insure the existence of nurturing relationships with our children.

The most outstanding of the expert witnesses was Dr. Michael Lamb. Without a single note to refer to and without any hint of animus or bias, for or against any of the parties, Dr. Lamb succinctly provided full and complete responses to every single question put to him by all counsel and was very frank in responding to inquiries from the court. Of all of the trials in which the court has participated, whether as a member of the bench or of the bar, Dr. Lamb may have been the best example of what an expert witness is supposed to do in a trial, simply provide data to the trier of fact so that the trier of fact can make an informed, impartial decision.

In counterpoint to the quality of Dr. Lamb's testimony

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in S.W.3d, 2004 WL 3154530 (Ark.Cir.)
**(Cite as: 2004 WL 3154530 (Ark.Cir.))**

was the testimony provided by Dr. George Rekers. It was apparent from both Dr. Rekers' testimony and attitude on the stand that he was there primarily to promote his own personal ideology. If the furtherance of such ideology meant providing the court with only partial information or selectively analyzing study results that was acceptable to Dr. Rekers. Dr. Rekers was unable to testify without referring to approximately seventy pages of notes. A large part of his testimony was not responsive to the questions being asked of him but consisted of Dr. Rekers simply reading his prepared notes on a topic he wished to promote. For the most part, whether on direct examination or cross examination, he was either unable or unwilling to directly answer a question. Dr. Rekers is obviously an intelligent, educated, sincere individual, who has very strong personal beliefs, all traits for which Dr. Rekers should be commended. But Dr. Rekers' willingness to prioritize his personal beliefs over his function as an expert provider of fact rendered his testimony extremely suspect and of little, if any, assistance to the court in resolving the difficult issues presented by this case. Dr. Rekers' personal agenda caused him to have inconsistent testimony on several issues. One example being that after testifying at length about how transitions were stressful for foster children and should be avoided if possible, Dr. Rekers then testified that it was hypothetically in a child's best interests to be removed from a successful fourteen year foster relationship in a homosexual household for the sole purpose of placement in a heterosexual household. When informed of Dr. Rekers' statement on such point Dr. Lamb testified that such statement was an "extraordinary suggestion" that "flies in the face of all we know about the importance of relationships between children and parent figures." Such portion of Dr. Rekers' testimony is also directly contrary to the expressed legislative policy of the Arkansas General Assembly found at A.C.A. § 9-28-410(a)(1) which states that, "The policy of the State of Arkansas is that children in the custody of the Department of Human Services should have stable placements."

*Count I*
*Regulation 200.3.2 Is Outside The Board's Areas of Responsibilities*

**\*9** The plaintiffs' first cause of action is that Regulation 200.3.2 is violative of the Separation of Powers Doctrine. Such doctrine was discussed by the Arkansas Supreme Court in *Federal Express Corporation v. Skelton,* 265 Ark. 187, 578 S.W.2d 1 (1979), as follows:

> Our government is composed of three separate independent branches: legislative, executive and judicial. Each branch has certain specified powers delegated to it. The legislative branch of the State government has the power and responsibility to proclaim the law through statutory enactment. The judicial branch has the power and responsibility to interpret the legislative enactments. The executive branch has the power and responsibility to enforce the laws as enacted and interpreted by the other two branches. The "Separation of Powers Doctrine" is a basic principle upon which our government is founded, and should not be violated or abridged.

The General Assembly delegated the power to the defendant Board to legislate rules and regulations that, "promote the health, safety, and welfare of children", A.C.A. § 9-28-405(c)(1). The testimony and evidence overwhelmingly showed that there was no rational relationship between the Rule 200.3.2 blanket exclusion and the health, safety, and welfare of the foster children.

What the defendant Board was attempting to do was to legislate public morality. The law is well settled that there is a legitimate social interest in morality. In *Virginia v. Black,* 538 U.S. 343, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003), a case involving the First Amendment, a fundamental right case, the Court stated:

> The First Amendment permits "restrictions upon the content of speech in a few limited areas, which are 'of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.' *R.A.V. v. City of St. Paul,* supra at 382-282, 112 S.Ct. 2538 (quoting *Chaplinsky v. New Hampshire,* supra, at 572, 62 S.Ct. 766).

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in S.W.3d, 2004 WL 3154530 (Ark.Cir.)
**(Cite as: 2004 WL 3154530 (Ark.Cir.))**

The General Assembly has used the word "moral" in over two hundred instances in the Arkansas Code. It is also clear that there is a legislative and legal difference between the words "health", "welfare", "safety", and "morals". [FN1] As evidenced by the cited statutes, the General Assembly legislatively delegates its authority to the executive branch in varying degrees. Sometimes it is the entire panoply of health, safety, welfare, and morals; other times, it is a subset of the four areas. In the case before the court, the defendant Board was not delegated the authority to legislate for the General Assembly with respect to "public morality ." Accordingly, Regulation 200.3.2 is unconstitutional as being violative of the separation of powers doctrine.

> FN1. *i.e.,* A.C.A. § 9-29-101(a)(1)-"It is found and declared: (1) That juveniles who are not under proper supervision and control, or who have absconded, escaped, or run away, are likely to endanger their own *health, morals, and welfare, and the health, morals, and welfare of others"*; A.C.A. § 11-6-205-"No child under sixteen (16) years shall be employed or permitted to work in any occupation dangerous to the life and limb, or injurious to the health and morals of the child, or in any saloon, resort, or bar where intoxicating liquors of any kind are sold or dispensed"; A.C.A. § 11-12-104(b)(1)-"No child under sixteen (16) years of age may be employed in the entertainment industry: (1) In a role or in an environment deemed to be hazardous or detrimental to the *health, morals, education, or welfare* of the child as determined by the Director of Department of Labor"; A.C.A. § 3-5-213-"All incorporated cities and towns in the State of Arkansas are authorized to pass proper ordinances governing the issuance and revocation of licenses ...... Cities and towns may impose additional restrictions, ... and such other rules and regulations as will *promote public health, morals, and safety* which they may be ordinance provide"; A.C.A. § 3-9-205(b)-"Nothing in this subchapter, however, shall be construed as limiting the power of other proper state or local governmental bodies to regulate .... as may be necessary for the protection of *public health, welfare, safety and morals".* A.C.A. § 5-64-101(o)(1)-"Narcotic drug" means any drug which is defined as a narcotic drug.... In the formulation of definitions of narcotic drugs, the Director of the Department of Health is authorized to ....... which threaten harm to the public health, safety, or morals"; A.C.A. § 5-68-402-"(a) The General Assembly determines that that during the past several years, the spread of obscene publications has become a matter of increasingly grave concern to the people of the state. (b) The elimination of this evil and the consequent protection of the citizens and residents of this state against those publications are in *the best interests of the morals and general welfare of the people";* A.C.A. § 11-10-102(1) As a guide to the interpretation and application of this chapter, the public policy of this state is declared to be as follows: (1) Economic insecurity due to unemployment is a serious menace to the *health, morals, and welfare* of the people of this state"; A.C.A. § 14-54-104(C)-"In order to better provide for the public welfare, safety, comfort, and convenience of inhabitants of cities of the first class, the following enlarged and additional powers are conferred upon these cities: (C) To prevent or regulate the carrying on of any trade, business, or vocation of a tendency dangerous to *morals, health, or safety, or calculated to promote dishonesty of crime";* A.C.A. § 14-56-403(a)-"The plans of the municipality shall be prepared in order to promote, in accordance with present and future needs, *the safety, morals, order, convenience, prosperity, and general welfare of the citizens";* A.C.A. § 14-68-301(3)(A)-"Blighted area" means an area ............, are detrimental to *the public health, safety, morals, or welfare";* A.C.A. § 15-5-102(c)-"It is declared to be the public policy and responsibility of this state to promote *the health, welfare, safety, morals, and*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in S.W.3d, 2004 WL 3154530 (Ark.Cir.)
**(Cite as: 2004 WL 3154530 (Ark.Cir.))**

*economic security of its inhabitants ....*"; A.C.A. § 16-105-303-"The operation of a dance hall in which, or around which, public disturbances ...... a public nuisance and detrimental to the public morals ........"; and A.C.A. § 17-17-114(a)(3)-".... The penalty may be imposed only if the board formally finds that *the public health, safety, welfare, and morals* would not be impaired thereby ..."

*Count II*
*Regulation 200.3.2 Is In Violation Of The Board's Statutory Responsibilities*

The plaintiffs' argument under Count II is corollary to their argument under Count I. There was one point on which every single expert that testified was in agreement. That point was that the number one rule with respect to foster children is that the needs of each and every foster child should be individually examined and a foster home placement made based upon that child's individual needs. Section 210.1 of the Minimum Licensing Standards promulgated by the defendant Board addresses such primary rule, as follows:

**\*10** The agency shall select the home that is in the best interest of the child, the least restrictive possible, and is matched to the child's physical and emotional needs. The placement decision shall be based on an individual assessment of the child's needs.

It is apparent from the testimony and evidence that the blanket prohibition contained in Regulation 200.3.2 is contrary to Section 210.1 and to the defendant Board's statutory responsibility to promulgated rules to "promote the health, safety, and welfare" of foster children.

*Counts IV & V-Violation Of Equal Protection*
Ordinarily the court's finding that Regulation 200.3.2 is invalid under the separation of powers doctrine would render any decision concerning the equal protection challenge moot. However, the present case has been pending for over five years at the trial court level and addresses issues that are of paramount interest to some of the most vulnerable members of our society. If possible, all of the constitutional issues raised by this litigation need to be resolved at the appellate level. In an effort to insure that the appellate courts have the opportunity to fully and completely address all constitutional challenges to the subject regulation this court will rule on the equal protection challenge.

Unless a challenged classification burdens a fundamental right or targets a suspect class, the Equal Protection Clause requires only that the classification be rationally related to a legitimate state interest, *Romer v. Evans,* 517 U.S. 620, 631, 116 S.Ct. 1620, 1627 (1996). At this point the law is well settled that in cases involving homosexuals or "gay rights," a suspect class does not exist. Nor is there any precedent for application of "heightened scrutiny." The plaintiffs argue violation of their fundamental rights of privacy and intimate association, such causes of action addressed below. This case involves the grant of a statutory privilege in a situation in which the state acts in *loco parentis* for minor children. Like adoption, foster parenting is a privilege created by statute and not by common law. There is no fundamental right to be a foster parent, nor any fundamental right to apply to be a foster parent. In *Jegley v. Picado,* 349 Ark. 600, 80 S.W.3d 332 (2002), the Arkansas Supreme Court stated:

Though homosexual citizens do not constitute a protected class, they are separate and identifiable class for purposes of equal-protection analysis. Under well-settled equal-protection analysis, any legislation that distinguishes between two groups of people must be rationally related to a legitimate governmental purpose. *Romer v. Evans,* 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996); *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S.432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)."

The base level "rational basis" standard is the appropriate standard for resolution of this matter.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in S.W.3d, 2004 WL 3154530 (Ark.Cir.)
**(Cite as: 2004 WL 3154530 (Ark.Cir.))**

To resolve the equal protection claim, three questions must be answered. First, is there a discrimination? Second, is there a legitimate governmental purpose or interest involved? And third, is the discrimination "rationally related" to the governmental purpose? There is clearly a discrimination. Qualified individuals who fall within the blanket exclusion of the subject regulation are barred from being foster parents. Qualified individuals for whom the blanket exclusion is not applicable are not barred. There is also a legitimate governmental interest involved, with the State having, "a duty of the highest order to protect the interests of minor children, particularly those of tender years," *Palmore v. Sidotti, 466 U.S. 429, 104 S.Ct. 1879 (1984).* Within the penumbra of such interest are subset interests including health, safety, welfare, and morality. The remaining question then is that of "rational relationship."

**\*11** The Eleventh Circuit recently decided the case of *Lofton v. Gilmore, 358 F.3d 804 (11th Cir.2004).* The *Lofton* case was a challenge to the Florida blanket ban on homosexual adoption. In Florida single gay individuals are eligible to be foster parents but not adoptive parents, the reverse of the present situation in Arkansas. There are both important factual similarities and differences between the present matter and that presented to the court in *Lofton.* The most important difference however is that *Lofton* was decided by the court based upon cross-summary judgment motions, without the opportunity for an in depth evidentiary analysis.

The *Lofton* case provides insight into just how difficult it is to resolve the constitutional issues in this area. In connection with the denial of the petition for rehearing en banc, *Lofton v. Gilmore, 377 F.3d 1275 (July 1, 2004),* the learned judges of the Eleventh Circuit issued a lengthy concurring opinion, one dissenting opinion in which three judges participated and a second dissenting opinion in which three other judges participated.

Clearly if the subject regulation was rationally related to insuring the health, welfare, and safety of minor children the equal protection challenge would fail. As determined in the ruling on Count I, by eliminating otherwise qualified individuals, the 200.3.2 blanket exclusion not only doesn't promote the health, safety, and welfare of minor children, it may actually run contrary to furthering such state interests. Although such determination ended the inquiry with respect to the Separation of Powers claim, it does not conclusively resolve the plaintiffs' Equal Protection claims.

Public morality, as determined by the elected representatives of the people and as long as it is within constitutional limits, is also a legitimate state interest. Black's Law Dictionary defines "public morality" as "the ideals or general moral beliefs of a society." The majority of the people may feel that homosexual relationships are contrary to the "general moral beliefs of society ." As of the present time there has been no legislative expression defining "public morality" on this exact point. In the absence of specific legislative direction the courts have the authority to search the common law of our state for an answer. The court finds no assistance from such quarter. For all persons fortunate enough to be engaged in public service there will be situations in which the dichotomy of personal conviction and professional obligation becomes fully realized. However, it would be inappropriate for this court to attempt to impose its moral compass upon another just as it is inappropriate for the courts to attempt to sit as "super-legislatures." As stated by Carl Sunstein, in his article entitled *Foreward: Leaving Things Undecided, 110 Harvard L.Rev. 4, 101.* Mr. Sunstein stated:

Courts do best by proceeding in a way that is catalytic rather than preclusive, and that is closely attuned to the fact that courts are participants in the system of democratic deliberation. It is both inevitable and proper that the lasting solutions to the great questions of political morality will come from democratic politics, not the judiciary.

**\*12** Having struck the blanket exclusion there is no need for this court to make a decision by judicial fiat as to what the public policy is with respect to "public morality" in this area.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in S.W.3d, 2004 WL 3154530 (Ark.Cir.)
**(Cite as: 2004 WL 3154530 (Ark.Cir.))**

The plaintiffs, citing *Lawrence v. Texas,* 539 U.S. 558 (2203) and *Romer v. Evans,* 517 U.S. 620 (1996), argue that "public morality" is an insufficient reason separate and apart from any separate legitimate reason and is unconstitutional because it constitutes "bias" or "irrational prejudice." The legal issues in *Lawrence* and *Romer* are vastly different than those presented in this case, a case in which the primary focus of the governmental action is the protection of minor children. This legal issue leads us straight into the gaping maw of the philisophical dispute between legal utilitarians, proponents of natural law, originalists, and those advocating judicial minimalism. It is also an issue that appears to be of first impression. All of the other stand alone legitimate state interests are quantifiable, subject to being proved or disapproved by some form of data, evidence, or scientific measurement. In the absence of quantifiable information, "bias" is an insufficient reason to discriminate even under a rational basis examination. By its very nature "public morality" is qualifiable not quantifiable. Can "public morality" be a stand alone legitimate state interest in an equal protection case or must it be appended to some quantifiable state interest, such as safety or welfare? This issue was mentioned but not resolved at the trial court level in Lofton.[FN2]

> FN2. *See,* Footnote 17, *Lofton v. Gilmore,* 358 F.3d 804 (11th Cir.2004). Florida also asserts that the statute is rationally related to its interest in promoting public morality both in the context of child rearing and in the context of determining which types of households should be accorded legal recognition as families. Appellants respond that public morality cannot serve as a legitimate state interest. Because of our conclusion that Florida's interest in promoting married-couple adoption provides a rational basis, it is unnecessary for us to resolve the question. We do note, however, the Supreme Court's conclusion that there is not only a legitimate interest, but "a substantial government interest in protecting order and morality," Barnes v. Glen Theatre, Inc., *501 U.S. 560, 569, 111 S.Ct. 2456, 2462, 115 L.Ed.2d*

*504 (1991),* and its observation that "[i]n a democratic society legislatures, not courts, are constituted to respond to the will and consequently the moral values of the people." Gregg v. Georgia, *428 U.S. 153, 175, 96 S.Ct. 2909, 2926, 49 L.Ed.2d 859 (1976)* (plurality opinion) (citation omitted). We also note that our own recent precedent has unequivocally affirmed the furtherance of public morality as a legitimate state interest. *See, e.g.,* Williams v. Pryor, *240 F.3d 944, 949 (11th Cir.2001)* ("The crafting and safeguarding of public morality has long been an established part of the States' plenary police power to legislate and indisputably is a legitimate government interest under rational basis scrutiny."); *see also id.* at 949 n. 3 ("In fact, the State's interest in public morality is sufficiently substantial to satisfy the government's burden under the more rigorous intermediate level of constitutional scrutiny applicable in some cases.").

If the General Assembly determines the moral pulse of the majority, does it matter if such determination is subject to extrinsic, empirical measurement? If not, then isn't this the exact situation that Justice Scalia was writing about in his dissenting opinion in *Romer v. Evans,* 517 U.S. 620, 116 S.Ct. 1620 (1996) when he stated:

I do not mean to be critical of these legislative successes; homosexuals are entitled to use the legal system for reinforcement of their moral sentiments as is the rest of society. But they are subject to being countered by lawful, democratic countermeasures as well.

The ruling of this court is that, in an equal protection challenge in which the State stands *in loco parentis* to minor children, where there is no suspect class, no heightened scrutiny, and no fundamental right involved, that for purposes of a rational basis review, "public morality" is a stand alone legitimate state interest and that rules, regulations, and/or statutes rationally related to furthering the legislatively determined "public morality" are constitutional.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in S.W.3d, 2004 WL 3154530 (Ark.Cir.)
**(Cite as: 2004 WL 3154530 (Ark.Cir.))**

*Counts VI & VII-Rights To Privacy & Intimate Association*
   The plaintiffs also claim that Regulation 200.3.2 violates their rights to privacy and intimate association under both the U.S. and Arkansas Constitutions. In support of such claim they cite *Lawrence v. Texas,* 123 S.Ct. 2472 (2003). The legal principles addressed by *Lawrence* are different than those presented by this case.[FN3] The balance of the legal argument on these two issues is the same legal argument made to the Eleventh Circuit and rejected by such court in *Lofton v. Gilmore,* 358 F.3d 804 (2004). The *Lofton* court's analysis on the issues of privacy and intimate association is adopted by this court. The plaintiffs' claims for relief under Counts VI and VII are accordingly denied.

   FN3. With an exception not specifically addressed by the parties. With respect to plaintiff Wagner who is heterosexual but has an adult gay son, the portion of the Regulation addressing "any adult member of that person's household" might unconstitutionally restrict plaintiff Wagner's constitutional rights of privacy and association.

*CONCLUSION*
   **\*13** It is given to the courts to be the guardians of the four corners of our Constitution, to insure that the "tyranny of the majority" does not infringe upon the rights given to all, including the minority. The legislative branch is charged with the stewardship of public policy, a tremendous privilege that is at the same time a heavy burden. Over the centuries the system of checks and balances between the three branches of government, each proceeding in good faith to perform its constitutional duties, has proven an excellent mechanism for resolution. Jerome Bruner has suggested that one of the reasons people believe in our system of justice may be as simple as "our faith that confrontation is a good way to get to the bottom of things."[FN4] The "confrontation" in this case has presented us all with an excellent opportunity to replace ignorance with knowledge and to make an informed decision based on information as opposed to assumption.

   FN4. *Making Stories, Law, Literature,* Life. p. 42.

   We must always remain mindful that we are creatures of the temporal, that some of the cherished societal mores of our present may very well one day become the regretted bigotry of our past. Things change, sometimes too fast for those who are comfortable in the skin of the status quo, sometimes excruciatingly slow for those waiting their time under the sun. For those truly interested in reaching an informed decision as to what public policy or public morality should be with respect to the appropriate qualifications for foster parents necessary to best nurture and protect the children placed into foster homes in Arkansas the court strongly recommends careful reading of the information and expert opinions assembled in the record of this case.

*JUDGMENT*
   In accordance with the *Memorandum Opinion* and *Findings of Fact and Conclusions of Law* issued on even date herewith, the court declares that:

   1. The Arkansas General Assembly legislatively delegated to the defendant Child Welfare Agency Review Board the authority to promulgate rules and regulations that "promote the health, safety, and welfare of children."

   2. The blanket exclusion contained in Section 200.3.2 of the Minimum Licensing Standards, promulgated by the defendant Board, is not a rule or regulation that "promotes the health, safety, or welfare of children."

   3. Section 200.3.2 of the Minimum Licensing Standards is unconstitutional as being violative of the Separation of Powers Doctrine.

   4. Section 200.3.2 of the Minimum Licensing Standards does not violate the Equal Protection provisions of the United States Constitution or the Arkansas Constitution.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in S.W.3d, 2004 WL 3154530 (Ark.Cir.)
**(Cite as: 2004 WL 3154530 (Ark.Cir.))**

5. Section 200.3.2 of the Minimum Licensing Standards does not violate the plaintiffs' constitutional rights to privacy or intimate association under either the United States Constitution or the Arkansas Constitution.

IT IS ACCORDINGLY ADJUDGED AND DECREED THAT Section 200.3.2 of the Minimum Licensing Standards is unconstitutional under the Separation of Powers Doctrine and the defendants are enjoined from enforcement of such regulation.

Ark.Cir.,2004.
Howard v. Child Welfare Agency Review Bd.
Not Reported in S.W.3d, 2004 WL 3154530 (Ark.Cir.)

END OF DOCUMENT

Westlaw.

Not Reported in S.W.3d, 2004 WL 3200916 (Ark.Cir.)
**(Cite as: 2004 WL 3200916 (Ark.Cir.))**

**H**
Only the Westlaw citation is currently available.

Circuit Court of Arkansas.
Matthew Lee HOWARD, Craig Stoops, Anne Shelley, and William Wagner Plaintiffs
v.
THE CHILD WELFARE AGENCY REVIEW BOARD and The Arkansas Department of Human Services Defendants

No. CV 1999-9881.
Dec. 29, 2004.

*FINDINGS OF FACT AND CONCLUSIONS OF LAW*

FOX, J.

  **\*1** The court issues the following findings of fact and conclusions of law pursuant to Rule 52 of the Arkansas Rules of Civil Procedure:

*FINDINGS OF FACT*

1. Act No. 1041 of 1997, commonly referred to as "The Child Welfare Agency Licensing Act" is codified as A.C.A. § 9-28-401, *et seq.*

2. The defendant Child Welfare Agency Review Board was created pursuant to A.C.A. § 9-28-403(a)(1).

3. A.C.A. § 9-28-402(13) defines "foster home" as follows:

(13)"Foster Home" means a private residence of one (1) or more family members that receives from a child placement agency any minor child who is unattended by a parent or guardian in order to provide care, training, education, custody, or supervision on a twenty-four hour basis, not to include adoptive homes.

4. When the Child Welfare Agency regulations were first promulgated in 1997 there was no provision excluding lesbians, gay men, or persons living with such individuals because the Child Welfare Agency saw no need for such exclusion ( *Stipulated Facts,* # 6).

5. In 1999, the Child Welfare Agency Review Board enacted section 200.3.2 of the Minimum Licensing Standards, which states:

No person may serve as a foster parent if any adult member of that person's household is a homosexual. Homosexual, for purposes of this rule, shall mean any person who voluntarily and knowingly engages in or submits to any sexual contact involving the genitals of one person and the mouth or anus of another person of the same gender, and who has engaged in such activity after the foster home is approved or at a point in time that is reasonably close in time to the filing of the application to be a foster parent (*Stipulated Facts,* # 7).

6. The Board's attorney advised the Board that there was no need to enact the exclusionary provision because the preexisting regulations already gave the Board the enforcement power to take care of any concerns and to adequately protect the interests of children (*Stipulated Facts,* # 14).

7. Lesbians and gay men are not excluded from adopting children in Arkansas (*Stipulated Facts,* # 23).

8. Lesbians and gay applicants seeking to adopt are subjected to the same screening process as every other applicant (*Stipulated Facts,* # 25).

9. Prior to 1999, there was no prohibition under any Arkansas law or regulation excluding lesbians or gay men or those living with them from being foster parents (*Stipulated Facts,* # 26).

10. The defendants are aware of "homosexuals," as defined, who have served as foster parents in Arkansas (*Stipulated Facts,* # 27).

11. The defendants are not aware of any child

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in S.W.3d, 2004 WL 3200916 (Ark.Cir.)
**(Cite as: 2004 WL 3200916 (Ark.Cir.))**

whose health, safety, and/or welfare has been endangered by the fact that such child's foster parent, or other household member, was "homosexual", as defined. (*Stipulated Facts, # 28*).

12. The State has no statistics indicating that gays are more prone to violence than heterosexuals or that gay households are more unhealthy than heterosexual households (*Stipulated Facts, # 30*).

*2 13. Based on its foster care statistics the defendants do not know of any reason that lesbians and gay men would be unsuitable to be foster parents (*Stipulated Facts, # 31*).

14. The regulations in place prior to enactment of the "homosexual" exclusion ensured that only individuals capable of providing stable, nurturing, safe, healthy homes would be approved to be foster parents (*Stipulated Facts, # 33*).

15. The plaintiff, Anne Shelley, is a lesbian, applied to be a foster parent and was advised that she could not be a foster parent because a law was passed prohibiting homosexuals and lesbians from fostering.

16. The plaintiff, William Wagner, has been married for over 30 years and is ineligible to be a foster parent because his adult gay son sometimes lives with Mr. Wagner and his wife.

17. The plaintiff, Matthew Howard, is an ordained minister, is gay, has been with his partner in a sexually monogamous relationship for 19 years, has two children of his own that he is co-parenting with a lesbian couple, and was rejected as a foster parent applicant because he is gay.

18. Section 210.1 of the Minimum Licensing Standards provides that:

The agency shall select the home that is in the best interest of the child, the least restrictive possible, and is matched to the child's physical and emotional needs. The placement decision shall be

based on an individual assessment of the child's needs.

19. Arkansas needs more qualified foster parents.

20. Categorical exclusions eliminate from consideration people who would otherwise be good foster parents.

21. The child welfare system struggles with having a large enough pool of well-qualified foster parents to make good reasonable matches.

22. When the system doesn't have enough well-qualified foster parents, less than ideal matches occur, which might result in multiple foster home placements which are not good for the children.

23. The blanket exclusion may be harmful to promoting children's healthy adjustment because it excludes a pool of effective foster parents.

24. Determination of the foster home that is most appropriate for each child should be based on a careful and thorough assessment of each individual child, his or her circumstances and conditions, strengths and needs, at the time of placement.

25. The Child Welfare League of America has a standard that says that applicants for foster parenting should not be denied solely on the basis of age, marital status, income, sexual orientation, race, physical condition, handicap, or location.

26. The National Association of Social Workers has policy statements regarding best practices in the field of social work. One of the policy statements states that barriers to foster parenting that are unsupported by evidence need to be removed, the three examples of unsupported barriers being fostering by single parents, fostering by parents who want to adopt, and fostering by non-traditional families, including gay and lesbian parents.

*3 27. There are four well known predictors of

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in S.W.3d, 2004 WL 3200916 (Ark.Cir.)
**(Cite as: 2004 WL 3200916 (Ark.Cir.))**

healthy child adjustment: (i) the quality of the child's relationship with the parent primarily responsible for his or her care: (ii) the relationship the child has with another parent figure; (iii) the quality of the relationships between the adults; and (iv) the resources available to the child.

28. The traditional family form is now the minority family form in this country.

29. Being raised by gay parents does not increase the risk of problems in adjustment for children.

30. Being raised by gay parents does not increase the risk of psychological problems for children.

31. Being raised by gay parents does not increase the risk of behavioral problems.

32. Being raised by gay parents does not prevent children from forming healthy relationships with their peers and others.

33. Being raised by gay parents does not cause academic problems.

34. Being raised by gay parents does not cause gender identity problems.

35. Both men and women have the capacity to be good parents and there is nothing about gender, per se, that affects one's ability to be a good parent.

36. There are benefits to children's adjustment in having two parents as opposed to one parent and children in single parent families are more likely to have adjustment difficulties than children in two parent families.

37. Children of lesbian or gay parents are equivalently adjusted to children of heterosexual parents.

38. There is no factual basis for making the statement that heterosexual parents might be better able to guide their children through adolescence than gay parents.

39. There is no factual basis for making the statement that the sexual orientation of a parent or foster parent can predict children's adjustment.

40. There is no factual basis for making the statement that being raised by lesbian or gay parents has a negative effect on children's adjustment.

41. There is no reason in which the health, safety, or welfare of a foster child might be negatively impacted by being placed with a heterosexual foster parent who has an adult gay family member residing in that home.

42. Homosexuality is not a mental disorder.

43. Pedophilia is a mental disorder in which an adult is sexually attracted to children.

44. Pedophilia may be exclusive pedophilia or non-exclusive pedophilia. Exclusive pedophilia refers to situations in which there is no sexual attraction to adults. Non-exclusive pedophilia refers to situations in which there is some degree of attraction to adults but a stronger degree of attraction to children.

45. Conventional use of the words heterosexual, bisexual, and homosexual only relate to the gender of an age appropriate adult to which the individual is attracted.

46. There is no evidence that gay people, as a group, are more likely to engage in domestic violence than heterosexuals.

47. There is no evidence that gay people, as a group, are more likely to sexually abuse children than heterosexuals.

*4 48. The best predictors for whether a person will meet the criteria for drug or alcohol abuse and/or dependency are age, gender, and employment status.

49. There are a number of demographic factors correlating with the number of sexual partners of

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in S.W.3d, 2004 WL 3200916 (Ark.Cir.)
**(Cite as: 2004 WL 3200916 (Ark.Cir.))**

an individual; age and cohort difference, ethnicity, religiosity, and gender being some of the variables.

50. The determination of relationship durability requires a multi-variable approach, a prediction about relationship stability can't be made using only sexual orientation.

51. If Regulation section 200.2, subsection 4, which requires every member of a foster family to have a physical exam within 6 months before the initial approval of the foster home, requires HIV testing as part of the routine physical examination, such 6 month physical should adequately test for HIV.

52. A.C.A. § 9-28-409(a)(1)(C) requires that prior to the approval of an individual as a foster parent, that such individual and any foster parent household member over the age of ten (10) years be checked with the child maltreatment central registry in Arkansas and any state in which such individual has resided for the previous six (6) year period. Such check is to be repeated every two (2) years.

53. A.C.A. § 9-28-409(b)(1)(C) requires that prior to the approval of an individual who has lived continuously in Arkansas for six (6) years as a foster parent, that such individual and any foster parent household member over the age of sixteen (16) years, shall be checked with the Arkansas State Police, in accordance with agency policies, for convictions of certain offenses. Such check is to be repeated every five (5) years.

54. A.C.A. § 9-28-409(c)(1)(C) requires that prior to the approval of an individual who has not lived continuously in Arkansas for six (6) years as a foster parent, that such individual and any foster parent household member over the age of sixteen (16) years, shall be checked with the Federal Bureau of Investigations, in accordance with agency policies, for convictions of certain offenses.

### CONCLUSIONS OF LAW

1. The State of Arkansas stands *in loco parentis* to foster children in Arkansas.

2. The General Assembly legislatively delegated to the defendant Board the authority to promulgate rules and regulations to "promote the health, safety, and welfare of children."

3. The health, safety, and welfare of foster children are legitimate state interests.

4. The blanket exclusion contained in Section 200.3.2 of the Minimum Licensing Standards promulgated by the defendant Board is not rationally related to the legitimate state interest of protecting the health of foster children.

5. The blanket exclusion contained in Section 200.3.2 of the Minimum Licensing Standards promulgated by the defendant Board is not rationally related to the legitimate state interest of protecting the welfare of foster children.

6. The blanket exclusion contained in Section 200.3.2 of the Minimum Licensing Standards promulgated by the defendant Board is not rationally related to the legitimate state interest of protecting the safety of foster children.

**\*5** 7. The blanket exclusion contained in Section 200.3.2 of the Minimum Licensing Standards promulgated by the defendant Board is contrary to the statutory obligation of the defendant Board set forth in A.C.A. § 9-28-405(c).

8. Preservation of public morality is a legitimate state interest, either in conjunction with health, safety, and welfare and/or separate and apart from such legitimate state interests.

9. The General Assembly did not legislatively delegate to the defendant Board the authority to promulgate rules and regulations determining issues of "public morality".

10. The General Assembly has not legislatively

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in S.W.3d, 2004 WL 3200916 (Ark.Cir.)
**(Cite as: 2004 WL 3200916 (Ark.Cir.))**

defined the policy of the State of Arkansas concerning the preservation of "public morality" with respect to foster children and foster parents.

11. The blanket exclusion contained in Section 200.3.2 of the Minimum Licensing Standards promulgated by the defendant Board is not unconstitutional under a rational basis equal protection analysis because it may be rationally related to the legitimate state interest of preservation of "public morality."

IT IS SO ORDERED.

Ark.Cir.,2004.
Howard v. Child Welfare Agency Review Bd.
Not Reported in S.W.3d, 2004 WL 3200916 (Ark.Cir.)

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in So.2d, 2008 WL 5006172 (Fla.Cir.Ct.)
**(Cite as: 2008 WL 5006172 (Fla.Cir.Ct.))**

**C**
Only the Westlaw citation is currently available.

Florida Circuit Court, Eleventh Judicial Circuit, Miami–Dade County,
Juvenile Division.
In the Matter of the Adoption of: John DOE and James DOE.

Nov. 25, 2008.

**Background:** Prospective parent filed petition to adopt two foster children. The Department of Children and Families moved to dismiss the petition based on prospective parent's sexual orientation.

**Holdings:** The Circuit Court, Eleventh Judicial Circuit, Miami–Dade County, Cindy S. Lederman, J., held that:
(1) statute prohibiting homosexuals from adopting children violated foster children's constitutional right to permanency, and
(2) statute discriminated against homosexuals and children without a rational basis for the discrimination.

Petition granted.

West Headnotes

**[1] Adoption 17 ⟜2**

17 Adoption
   17k2 k. Constitutionality of statutes. Most Cited Cases

**Constitutional Law 92 ⟜4395**

92 Constitutional Law
   92XXVII Due Process
      92XXVII(G) Particular Issues and Applications
         92XXVII(G)18 Families and Children
         92k4395 k. Adoption. Most Cited Cases

**Infants 211 ⟜2226**

211 Infants
   211XIV Dependency, Permanent Custody, and Termination of Rights; Children in Need
      211XIV(G) Judgment, Order, and Disposition
         211XIV(G)2 Nature and Scope of Disposition
            211k2214 Placement or Custody
            211k2226 k. Sexual orientation and transgender issues. Most Cited Cases
         (Formerly 211k226)

Statute prohibiting homosexuals from adopting children violated foster children's constitutional right to permanency, protected under federal Adoption and Safe Families Act and state statutes providing that adoption was the preferred permanency option for children who cannot be returned to their biological families; prohibition burdened foster children's liberty interests by unduly restraining them in state custody, and simultaneously operating to deny them a permanent adoptive placement that was in their best interests. U.S.C.A. Const.Amend 14; 42 U.S.C.A. § 671; West's F.S.A. Const. Art. 1, § 9; West's F.S.A. §§ 39.001(1)(h), 39.621(6), 63.042(3).

**[2] Adoption 17 ⟜2**

17 Adoption
   17k2 k. Constitutionality of statutes. Most Cited Cases

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in So.2d, 2008 WL 5006172 (Fla.Cir.Ct.)
(Cite as: 2008 WL 5006172 (Fla.Cir.Ct.))

Constitutional Law 92 ☞3439

92 Constitutional Law
    92XXVI Equal Protection
        92XXVI(B) Particular Classes
            92XXVI(B)12 Sexual Orientation
                92k3436 Families and Children
                    92k3439 k. Adoption. Most Cited
Cases

    Statute prohibiting homosexuals from adopting children discriminated against homosexuals and children without a rational basis for the discrimination; homosexuals were no more susceptible to mental health or psychological disorders, substance or alcohol abuse or relationship instability than their heterosexual counterparts, psychology, psychiatry and child development professionals and associations agreed that there was a well established and accepted consensus that there was no optimal gender combination of parents, and public morality per se, disconnected from any separate legitimate interest, was not a legitimate government interest to justify unequal treatment. U.S.C.A. Const.Amend. 14; West's F.S.A. Const. Art. 1, § 2; West's F.S.A. § 63.042(3).

West Codenotes
Held UnconstitutionalWest's F.S.A. § 63.042(3) Robert F. Rosenwald, Miami, FL, Leslie Cooper, New York, NY, for Petitioner.

Hilarie Bass, Charles M. Auslander, Miami, FL, Counsel for the Children, Valerie J. Martin, Fort Lauderdale, FL, Counsel for Dep't of Children & Families, Jessica Allen, Miami, FL, Counsel for Guardian Ad Litem Program.

Honorable CINDY S. LEDERMAN, Circuit Court J.
    FINAL JUDGMENT OF ADOPTION
    *1 THIS MATTER came before the Court on Petitioner's sworn Petition for Adoption of John Doe,

born June 15, 2000, and his biological half-brother James Doe, born August 2, 2004. The Department of Children and Families moved to dismiss the Petition based on Petitioner's sexual orientation. The Court, having considered the record, testimony and arguments of counsel, makes the following Findings of Fact and Conclusions of Law:

I. PROCEDURAL HISTORY
    On December 11, 2004, two male siblings, ages four and four months, were removed from their home on allegations of abandonment and neglect and placed into the custody of the State. Searching for an immediate placement, the child protective investigator contacted Petitioner, a licensed foster caregiver, to inquire of his availability and willingness to accept the two children on a temporary basis. The investigator explained that the two children, John Doe and James Doe, needed, and deserved, a good Christmas. Petitioner agreed to accept the children, temporarily, until a more permanent placement could be found.

    Twenty-months later, upon the termination of parental rights of John and James respective biological fathers in July and April 2006, respectively, and the termination of the parental rights of their mother in July 2006, the children became available for adoption. The children remained in Petitioner's care throughout the pendency of those proceedings and currently, while they continue to await adoption. Although all parties involved initially contemplated that the foster care placement would be temporary, the children have now been in Petitioner's care and custody for four years. John is now eight and James is four, the same age John was at the time of the initial placement. Since the date the children were placed in care, neither the Center for Family and Child Enrichment ("CFCE"), nor the Department of Children and Families (the "Department") received any applications from prospective adoptive parents seeking to adopt John or James until this petition in September 2006.

    Petitioner, the unmarried 45-year old [FN1] foster

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in So.2d, 2008 WL 5006172 (Fla.Cir.Ct.)
**(Cite as: 2008 WL 5006172 (Fla.Cir.Ct.))**

care provider of John and James petitioned to adopt the siblings to, among other ambitions, "provide a permanent family for them where they will be nurtured and well taken care of." [FN2] Thereafter, CFCE performed a positive preliminary home study as to the suitability of Petitioner as a prospective adoptive parent. However, CFCE did not recommend, and the Department subsequently denied, Petitioner's application for adoption. Petitioner is a homosexual.

> FN1. Age at the time of filing the Petition to Adopt.

> FN2. January 17, 2007 Petition for Adoption, ¶ 20.

Thereafter, on January 18, 2007, Petitioner petitioned this Court to adopt John and James and requested a judicial determination that the Department's only ground asserted for denial of Petitioner's Petition for Adoption under Fla. Stat. § 63.042(3)(2008), which states, "[n]o person eligible to adopt under this statute may adopt if that person is a homosexual" be declared unconstitutional. Petitioner's claims attack the constitutionality of the categorical exclusion on equal protection and substantive due process grounds. Through counsel, the Children also assert equal protection, due process and separation of powers claims as to the constitutionality of the statute. The Department moved to dismiss Petitioner's Petition for Adoption arguing that the exclusion serves a legitimate government interest. That motion was denied. The parties tendered various witnesses, experts and arguments during a four-day final hearing in October 2008, testing the constitutionality of Fla. Stat. § 63.042(3).

## II. FACTS
### A. Arrival in the Petitioner–Roe home
**\*2** The children arrived at the home of Petitioner and Tom Roe, Sr., domestic partners, and Tom Roe, Sr.'s then eight-year old biological son, Tom Roe, Jr.,

on the evening of December 11, 2004. John, the elder sibling, arrived with his four-month old brother wearing a dirty adult sized t-shirt and sneakers four sizes too small that seemed more like flip-flops than shoes. Both children were suffering from scalp ringworm. Although John was clearly suffering from a severe case of ringworm, the medication brought from John's home to treat his scalp was unopened and expired. James, too, suffered from an untreated ear infection, as evidenced by the one-month old, nearly unused, medication. John did not speak and had no affect. He had one concern: changing, feeding, and caring for his baby brother. It was clear from the children's first evening at the Petitioner–Roe home that the baby's main caretaker was John, his four year old brother.

On that December evening, John and James left a world of chronic neglect, emotional impoverishment and deprivation to enter a new world, foreign to them, that was nurturing, safe, structured and stimulating. Although Petitioner and Roe had fostered other children, caring for John was the most challenging of their foster care experiences. For the first few months, John seemed depressed and presented a void, unresponsive demeanor and appearance. Upon arriving at the Petitioner home, John did not speak a word for about one week. After two weeks, he began to mumble imperceptible utterances. After about one month, John finally began speaking. Petitioner quickly learned that John had never seen a book, could not distinguish letters from numbers, could not identify colors and could not count. He could not hold a pencil. He had never been in an early childhood program or day care. Nevertheless, John's potential for educational development was apparent. Although he had not had any formal education, John could sing and pick up lyrics very quickly. Early on, Petitioner and Roe noticed that John hoarded food by requesting additional servings at the start of dinnertime and later hiding the extra food in his room. John eventually grew out of this behavior, due in part to a tactic employed by Petitioner and Roe of showing John, in advance of mealtime, the more

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in So.2d, 2008 WL 5006172 (Fla.Cir.Ct.)
(Cite as: 2008 WL 5006172 (Fla.Cir.Ct.))

than sufficient amount of food on the stove prepared
and available for the family.

James was a very happy baby and was content
with anyone, even strangers. After approximately two
months, James began to exhibit signs of attachment to
his primary caregivers, Petitioner and Roe. John,
however, took about two years to fully bond. At one
time, John shunned hugs from Petitioner and Roe.
However, in his own time, John developed bonding
and today, initiates goodbye hugs each morning before
going to school.

*B. Petitioner and Roe*

Petitioner and Roe met in 1999 and began living
together in July 2000. Petitioner, who has a Bachelor
in Psychology and Masters Degree in Public Health,
has worked as a flight attendant for American Airlines
for 17 years. Roe has worked for Amtrak for 10 years.
On their second anniversary, the two acknowledged
their commitment before friends and family by ex-
changing matching rings at an informal ceremony at
their home. Since that time, they have considered
themselves spouses. They support each other finan-
cially by pooling their money into joint checking
accounts. Both Petitioner and Roe's families support
their union. At some point, Petitioner and Roe decided
to expand their family. After considering surrogacy
and adopting abroad they decided to become foster
parents. Since becoming foster parents, Petitioner and
Roe have fostered a total of nine children including
John and James. When fostering, Petitioner says they
treat their foster children just like a biological child.
Petitioner describes Roe as nurturing and stable. Al-
though both Petitioner and Roe parent the three
children in their home, they made a strategic decision
that only Petitioner should petition to adopt John and
James, believing a two-parent gay adoption would be
impossible. If Petitioner's petition to adopt is suc-
cessful, Roe plans to initiate a second parent adoption
at a later date. Nonetheless, Roe signed an affidavit
committing to adopt the children alone should Peti-
tioner die prior to the conclusion of the instant case.

*C. The Household*

*3 On weekdays, the household wakes up at about
6:30 a.m. Petitioner usually prepares breakfast, per-
mitting each child to assist with an assigned kitchen
duty. Each morning, the family eats together without
distraction from the television. As each child finishes
his breakfast, he puts his dish in the sink and proceeds
to the bathroom to brush his teeth and hair. Petitioner
and Roe purchased a Ford minivan, which Petitioner
jokes was not his dream car, however, to accommo-
date the family size, is the most feasible. Tom Roe, Jr.
is dropped off at school first. Afterwards, Petitioner
takes John and James to school, walking them into
their classrooms and usually speaking to their respec-
tive teachers. In the afternoon, after Petitioner picks
the boys up from school, they generally go to the park
for tennis lessons. At the conclusion of their lessons,
the family heads home for dinner. At mealtime, the
family blesses the food together and takes turns shar-
ing the highlights of their day. Phones are not an-
swered and the television is off during dinner. After the
children are excused from the table, the older children
load the dishwasher.

After dinner, the children spend one hour doing
their homework. Although James does not have
homework, he spends time at the table pretending to
do homework. John requires more supervision and
one-on-one interaction to complete his homework. If a
child finishes his homework early, the remaining time
is spent reading. After homework is completed, the
children are allowed to watch television. At bedtime,
the boys retreat to their separate beds.[FN3] By morning,
however, James seems to always find his way into
John's bed.

FN3. As required in foster care placements.

The family attends a non-denominational Chris-
tian church and have as pets, a dog, rabbit and kitten.
John and James refer to Petitioner and Roe as "papi"

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in So.2d, 2008 WL 5006172 (Fla.Cir.Ct.)
**(Cite as: 2008 WL 5006172 (Fla.Cir.Ct.))**

and "daddy" respectively. John and James have lived in the same neighborhood, attended the same school, day care and aftercare since their arrival in the Petitioner–Roe home. As a result, each child has created friendships from school and in the neighborhood. John and James are closely bonded to Tom Roe, Jr., and their extended family. The boys consider Petitioner and Roe's parents, brothers and sisters their grandparents, uncles and aunts. The extended family sends the boys gifts for their birthdays and the holidays. Roe's mother, who lives in Tampa, visits the family regularly.

### III. PROFESSIONAL ASSESSMENTS

The Children presented Dr. David Brodzinsky, a Clinical and Developmental Psychologist from Oakland, California as an expert in child clinical psychology, developmental psychology with a specialization in adoption, foster care, attachment and the adjustment of children in adoption. Dr. Brodzinsky was retained to conduct an evaluation and assessment of the children's relationship and attachment to Petitioner, specifically, as the Petitioner, but also to Roe and Tom Roe, Jr., as part of the family unit. Dr. Brodzinsky's assessment entails compiling facts about the children's history, observing and interviewing to determine the existence and quality of the children's attachment to their caregivers. In forming an assessment, the doctor also analyzes the behaviors and tendencies of the children towards the caregivers when stressed, the verbal and non-verbal cues to determine whether the children view their foster parents as individuals capable of offering comfort and advice and, whether the foster parents offer a secure base for the children. Dr. Brodzinsky evaluated the family for six hours over a two-day period in May 2007, at home, during play, individually, during familial interactions and at school.

**\*4** According to Dr. Brodzinsky, at the time of the assessment, the children were, understandably, slightly more attached to Petitioner, as the primary caregiver who also took time off of work to help the children adjust immediately after the placement. However, the witness also noted that the children exhibited strong signs of attachment to Roe and Tom Roe, Jr., who they consider their "daddy" and older brother. The children showed healthy signs of social development, in that, they were appropriately friendly, but not overly friendly with the witness, who tried to act as a non-participating observer. During playtime, the children rode their bikes after Petitioner reviewed the rules of bicycle riding. During the children's play, Petitioner maintained focus on their whereabouts and surroundings. The witness was also privy to appropriate levels of sibling conflict, which were quickly resolved.

The children's teachers, coined in the field as "collateral informants" typically provide useful information into a child's day-to-day life, cleanliness, and parental involvement. Here, during individual interviews with Dr. Brodzinsky, John and James teachers reported that Petitioner and Roe were very involved in the children's educational development. Due to the lack of educational support prior to arrival at the Petitioner–Roe home, John struggled in school and had to repeat first grade, but was progressing.

With regard to the children's understanding of their family dynamic, Dr. Brodzinsky reported that, obviously, James has no independent memory of his former family or caretakers. John has a limited memory of his former family and sometimes confused interactions with his mother and aunt. John, who has had no contact with his sisters in about two years, stated that he misses them. While John did not understand the meaning of adoption at the time of the assessment, Tom Roe, Jr., comprehended the concept in an age appropriate manner.

Based on his assessment, Dr. Brodzinsky concluded that John and James would be emotionally devastated if removed from the Petitioner–Roe home. As Petitioner, Roe and Tom Roe, Jr., are the only family James knows and as John has not yet developed

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in So.2d, 2008 WL 5006172 (Fla.Cir.Ct.)
(Cite as: 2008 WL 5006172 (Fla.Cir.Ct.))

stability, a second separation would cause academic regression, separation anxiety, sleep problems, and trust issues. The witness also opined that it is in children's best interest to be adopted by Petitioner, as opposed to maintaining lesser forms of permanency through continued foster care, permanent guardianship or the like. According to Dr. Brodzinsky, children, at age appropriate levels, understand that foster parents and guardians are not a legal family. The doctor does not consider Petitioner and Roe's sexual orientation a factor in their parental abilities or the children's well-being. He concludes that: (1) Petitioner and Roe's quality of parenting is high and healthy; (2) the parent-child relationships are strong and healthy; (3) the resources and educational opportunities available to the children in the Petitioner–Roe home are beneficial; and (4) separation would cause emotional trauma to John, James and Tom Roe, Jr.

*5 The Court also heard testimony from Ronald Gilbert, the children's Guardian Ad Litem since June 2005. Mr. Gilbert, who has served as Guardian Ad Litem to over 100 children, visits the Petitioner–Roe household monthly to observe the children and the family. Based on Mr. Gilbert's observations, the children are in excellent health, well behaved, performing well in school and bonded to Petitioner, Roe and Tom Roe, Jr. During his visits, the Guardian regularly sees the three children playing and hugging one another like brothers. Based on his interactions and observations of other foster parents, Mr. Gilbert believes Petitioner and Roe are model parents. In fact, he testified that in all of his 100 cases as a Guardian Ad Litem, the Petitioner home is one of the most caring and nurturing placements he has encountered. He further opines that adoption is the preferred form of permanency over permanent guardianship because John and James deserve parents. According to the Guardian, the children would suffer mentally and physically if separated from Petitioner, Roe and Tom Roe, Jr. The Guardian Ad Litem's official recommendation is to allow the Petitioner to adopt the children and states it is in the manifest best interest of

the children.

The Guardian Ad Litem Program presented the testimony of Yves Francois, Adoption Supervisor for the Center for Family and Child Enrichment. Mr. Francois was assigned to this case in December 2005. He testified as to his personal knowledge of the minor children and the Petitioner and his knowledge of the policies and procedures for adoption in Florida. Mr. Francois confirmed that no one else has applied to adopt the minor children, and there is an adoption hold placed on the minor children until a final determination is made on Petitioner's petition to adopt, as is customary. The witness explained that a "permanency plan" attempts to place the children in a stable home environment until the age of majority. By definition, permanency is achieved when a child is reunified with his/her parents, placed with a permanent guardian or family member or adopted. Mr. Francois stressed that, when adopted, a child gains parents and shares legal rights with those parents. The witness reports that when it became evident that John and James were in a termination of parental rights case, their permanency plan became, and remains, adoption.

In October 2006, Mr. Francois performed a home study in connection with Petitioner's petition for adoption. According to Mr. Francois, although all aspects of the home study were positive, CFCE could not recommend adoption only because of the statutory exclusion of homosexuals as adoptive parents. Lastly, Mr. Francois stated that if the children are not adopted by Petitioner, rather than allowing the children to remain in foster care until they reach the age of majority, CFCE would recruit other prospective adoptive parents, which, due to the age of the children, may result in separation of the siblings.

## IV. EXPERT TESTIMONY
*A. Psychological*
*6 The parties tendered experts from all over the country to proffer testimony relating to the social, psychological, interpersonal, and physical effects of

Not Reported in So.2d, 2008 WL 5006172 (Fla.Cir.Ct.)
**(Cite as: 2008 WL 5006172 (Fla.Cir.Ct.))**

same-sex relationships on individuals, families, children, and to some extent, society as a whole. The Department argues that the homosexual adoption restriction serves the legitimate state interest of promoting the well-being of minor children, as well as broader, societal morality interests. To support their contention, one of the Department's two experts testified that the law should not include a blanket exclusion of homosexuals, rather a case by case judicial determination is more appropriate. The other expert witness generally testified that the law's restriction serves the best interests of children because when compared to heterosexual behaving individuals, homosexual behaving individuals experience: (1) a lifetime prevalence of significantly increased psychiatric disorders; (2) higher levels of alcohol and substance abuse; (3) higher levels of major depression; (4) higher levels of affective disorder; (5) four times higher levels of suicide attempts; and (6) substantially increased rates of relationship instability and breakup. Such factors, according to the Department, harm children of homosexual parents. Petitioner's expert witnesses countered these conclusions and suggested that: (1) homosexually behaving individuals are no more susceptible to mental health or psychological disorders than their heterosexual counterparts; (2) both heterosexual and homosexual parents can provide nurturing, safe, healthy environments for children; and (3) children of homosexual parents are no more at risk of maladjustment than their counterparts with heterosexual parents.

Petitioner presented Dr. Letitia Peplau, Professor of Psychology at the University of California in Los Angeles, California, as an expert in psychology with a specialization in couple relationships, same-sex couple relationships and violence within relationships. Dr. Peplau testified as to the quality and durability of same-sex relationships. According to Dr. Peplau, the research in the field suggests that the relationships of lesbians and gay men are similar in stability, quality, satisfaction, shared experiences and conflict resolution, to that of heterosexual married and unmarried

couples. She points out that close, caring relationships are important for the psychological well being of all people, including lesbians and gay men and emphasizes that homosexual couples seek long term relationships and permanency by purchasing homes, supporting friends and families in times of need, and celebrating holidays together, just like heterosexual couples. Dr. Peplau further testified the break-up rates of unmarried, co-habiting heterosexuals and that of gay and lesbian couples were fairly similar.[FN4] According to Dr. Peplau, among all of the predictors of couple break-ups, including age, income, religion, education and race, sexual orientation is no more a significant predictor of break-up than the other demographic characteristics. Dr. Peplau opines that there is no basis for the assertion that gay people or gay couples have higher rates of domestic violence than heterosexual couples. In response to evidence presented of a number of studies reporting rates as low as 7% to as high as 60% or more, Dr. Peplau describes the results as inconsistent and inconclusive. In her opinion, one reason for such differential rates is the inconsistent definition of "domestic violence" used in the studies and the lack of population-based, representative surveys of the homosexual population.

FN4. Pepper Schwartz and Bill Bluestein (1970) reported the break-up rates as follows: unmarried cohabiting heterosexuals (14%), homosexual cohabiting men (13%), cohabiting lesbians (19%). Kimberly Balsum (2001) reported break-up rates as follows: married heterosexuals (2.7%), same sex couples in civil unions (3.8%), same-sex couples not in civil union (9.3%). Gunner Anderson (mid–1990s) studied break-up rates of couples in Norway and Sweden where same sex couples may register as partnerships and reported the break-up rates for Norwegian couples as follows: gay male registered partnerships (8%); lesbian registered partnerships (11%). The break-up rates for Swedish couples were as follows: gay

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in So.2d, 2008 WL 5006172 (Fla.Cir.Ct.)
**(Cite as: 2008 WL 5006172 (Fla.Cir.Ct.))**

male registered partnerships (14%); lesbian registered partnerships (20%) married heterosexuals (8%). Bluestein and Schwartz (1970) study based on length of relationship reported as follows: for 10+ year relationships, the break-up rates were: married heterosexuals (4%), gay men (4%). lesbians (6%); for 0–2 year relationships, the break-up rates were: married heterosexuals (4%), cohabiting heterosexuals (17%); gay men (16%); lesbians (22%).

*7 Dr. Peplau also opined that the presence of children typically promotes stability in relationships.[FN5] As recently as 2004, the American Psychological Association, the nations leading association in the field, concluded that same sex couples: (1) want to have primary and committed relationships and are successful in dong so; (2) are no more dysfunctional or less satisfying than heterosexual relationships; (3) are able to form committed, stable enduring relationships; and (4) are affected by the same internal and external processes as heterosexual couples.[FN6] She thus concludes that the presence of children in a home of homosexual parents add to the factors promoting relationship stability.

FN5. Larry Burdick's longitudinal study reported the break-up rates of couples without children as follows: gay male (19%); heterosexual couples (18.7%); lesbians (23.8%). The break-up rate for married heterosexual couples with children was 3.2%. Dr. Peplau notes that the difference between heterosexuals and gay men without children is not statistically different. Therefore, the presence of children is an important factor.

FN6. American Psychological Association Resolution on Sexual Orientation, Parents and Children (July 2004).

In analyzing the divorce rates of various demographic characteristics such as ethnicity, race, education, income, and religion, Dr. Peplau finds that sexual orientation is no more a predictor of divorce than other demographic characteristics.[FN7] According to the research, an individual with a low level of education tends to earn less, thus increasing the chance of divorce. If the individual is also African–American, the chances of divorce again increase. Thus, Dr. Peplau concludes that the success of a marriage is affected by multiple characteristics, as opposed to one single factor. Therefore, according to the witness, the research taken as a whole, shows that any one demographic characteristic, such as sexual orientation taken alone, is not a strong predictor of break-up rates. In fact, as homosexually behaving individuals tend to be more highly educated and high income earners, sexual orientation is less correlated to break-up rates than race or income, for example.

FN7. According to studies by Bramlett and Mosier (2002) and R. Kelly Raley & Larry Bumpass, based on the following demographical characteristics, the 10–year divorce rates are: Blacks (47%), Hispanics (34%), Whites (32%), Asian (20%); when same race (31%), when different race (41%); when married as teenagers (43%); when married over 30(20%); less than HS education (39%–42%), HS graduate (35%–36%), more than HS (29%–30%), college graduates (20%); family income less than $25k (53%), up to $50k (31%), more than $50k (23%); some religion affiliation (32%), w/o religious affiliation(46%); from intact family (29%), divorced parents (43%); military service members having served in combat (62%).

Petitioner also presented Dr. Susan Cochran, a Professor of Epidemiology and Statistics at the University of California, Los Angeles as an expert in psychology and epidemiology with a specialization in health disparities among minority communities, in-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in So.2d, 2008 WL 5006172 (Fla.Cir.Ct.)
**(Cite as: 2008 WL 5006172 (Fla.Cir.Ct.))**

cluding lesbians and gay men, and in the use of statistical analysis in social science research. Among other aspects, Dr. Cochran testified as to the effects of sexual orientation on mental health and the prevalence of psychiatric disorders. As a general premise, elevated occurrences of psychiatric disorders and rates of depression and suicidality are associated with demographic characteristics, such as race, gender, age, socioeconomic status and sexual orientation. In terms of the specific demographic characteristic of sexual orientation, the witness cited to several population-based studies comparing the mental health of gay and heterosexual individuals including the 1996 National Survey on Drug Abuse, the National Co-morbidity Survey (1990–1992), the National Health and Nutrition Examination Survey (1971–1975, 1976–1980, 1988–1994, 1999–2002, 2003–2004, 2005–2006), the National Examination Survey, the Midlife Survey of Adult Development (1995–1996), the Add Health Cohort study (1994–95, 1996, 2001–2002, 2007–2008) the California Quality of Life Survey (2001) and the National Latino and Asian–American Survey (May 2002 and November 2003). According to the witness, taken as a whole, the research shows that sexual orientation alone is not a proxy for psychiatric conditions, mental health conditions, substance abuse or smoking; members of every demographic group suffer from these conditions at rates not significantly higher than for homosexuals.[FN8] Therefore, based on the research, while the average rates of psychiatric conditions, substance abuse and smoking are generally slightly higher for homosexuals than heterosexuals, the rates of psychiatric conditions, substance abuse and smoking are also higher for American–Indians as compared to other races, the unemployed as compared to the employed and non-high school graduates as compared to high school graduates, for example. Poignantly, Dr. Cochran pointed out that if every demographic group with elevated rates of psychiatric disorders, substance abuse and smoking were excluded from adopting, the only group eligible to adopt under this rationale would be Asian American men.

[FN8]. According to state and federal data from the 2006 National Survey on Drug Use and Health, the 2006 NHSDA, Epidemiologic Catchment Area Survey (1980–1985), California Health Interview Survey (2001, 2003, 2005, 2007), the California Tobacco Survey (1990, 1992, 1993, 1996, 1999, 2002, 2005) and the Center for Disease Control, the average rates of various types of psychiatric disorders and substance abuse for various demographic groups are as follows: major depression: American Indians and Alaskan natives (12%), non-Hispanic whites (8%), Blacks (6%), Hispanics (5.5%), Asian–Americans (3%), women (9%), men (5%), ages 18–25(9%), over 50(5%), homosexual men (17%), heterosexual men (8%), lesbian/bisexual women (27%), heterosexual women (14%); substance abuse/dependency: American Indians and Alaskan natives (19%), non-Hispanic Whites (9%), Blacks (9%), Hispanics (10%), Asian–Americans (4%), women (6%), men (12%), ages 18–25(21%), over 26(7%), non-HS graduates (10%), college graduates (7%); smokingnon-HS graduates (36%), college graduates (14%), Native Americans (42%), Whites (31%), Blacks (29%), Hispanics (24%), Asian Americans (16%), unemployed (19 .5%), employed (10%), men (36.4%), women (23%), bisexual men (28%), heterosexual men (19%), lesbians (23%), heterosexual women (13%); alcohol dependency: homosexual/bisexual men (9.2%), heterosexual men (6.5%), lesbian (9%), heterosexual women (2.7%)—noting the difference between the gay and heterosexual men is not a statistically significant difference; drug dependency: homosexual/bisexual men (7.5%), heterosexual men (3%), lesbian (5%), heterosexual women (1.5%); suicide: Native Americans (15%), Whites (11.8%),

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in So.2d, 2008 WL 5006172 (Fla.Cir.Ct.)
(Cite as: 2008 WL 5006172 (Fla.Cir.Ct.))

Blacks (6%), Hispanics (6%), Asian Americans (6%); suicide attempts: Whites (3.3%), Blacks (2.7%), Hispanics (3.7%); anxiety; homosexual men (5.6%), heterosexual men (2.8%), lesbian/bisexual women (11%), heterosexual women (4.5%); lifetime history of suicide attempts: homosexuals (14%), heterosexuals (4.5%).

**\*8** With regard to life expectancy, the rates vary based on several demographic characteristics. For example, African Americans live five to six years less than whites; women live five years longer than men; educated white women live five years longer than uneducated white women; the financially privileged live four and a half years longer than their counterparts. The witness reports that there are no studies about the life expectancy of gay people because sexual orientation is not reported on death certificates. Based on her professional opinion, however, Dr. Cochran does not credit sexual orientation alone as a predictor of life expectancy.

Petitioner's final witness in the area of psychology was Dr. Michael Lamb, Professor of Psychology at the University of Cambridge, London, England. Dr. Lamb spent 17 years as a senior research scientist at the National Institute of Child Health and Human Development (part of the National Institute of Health) before moving to England in 2004 to serve as the head of the Department of Psychology and head of the Faculty of Social Sciences at the University of Cambridge. One area of Dr. Lamb's 30 years of research focuses on the factors relating to children's development and adjustment. Dr. Lamb was qualified as an expert witness in psychology with a specialization in the development and adjustment of children, including children of gay and lesbian parents. Dr. Lamb stated that most families, today, are not traditional families. According to Dr. Lamb, there are three important factors that are predictors of healthy adjustment for children. One well recognized predictor of healthy adjustment is a child's relationship with his parents: a

child is more likely to be well adjusted if he has a warm, harmonious relationship with committed, involved, sensitive parents. The second predictor is the relationship between the adults in the child's life. Children are more likely to be adjusted when the relationship between the parents is harmonious and positive. The third widely recognized predictor of adjustment is the resources available to a child. Children tend to adjust and better when they have adequate resources available and children who grow up in less well resourced homes are more likely to have issues with maladjustment. Providing additional insight into the development of the field in this area, Dr. Lamb points out that researchers once believed that traditional families provided the best environment for children. As the research developed, however, the notion was proven to be flawed, because the quality of the parenting itself is more important.

The witness testified that based on his 30 years of research and experience in the field, he can say with certainty that children raised by homosexual parents do not suffer an increased risk of behavioral problems, psychological problems, academic development, gender identity, sexual identity, maladjustment, or interpersonal relationship development.[FN9]

> FN9. As also supported by studies included in and performed by the Journal of Child Development, Child Psychology, Journal of Family Psychology, Journal of Child Psychology and Psychiatry; Professor Susan Golombok, Professor Shana Patterson, Professor Cum Ta Rey Chan; Trial transcript, Oct. 2, 2008, p. 57 *l.* 19—p. 62 *l.* 21.

**\*9** Dr. Lamb's work is consistent with other studies of same sex parents indicating their children are not more likely to be maladjusted.[FN10] As such, pursuant to the witness' testimony the assumption that children raised by gay parents are harmed is not a reliable finding. In fact, it is contrary to the consensus in the field. Although much of the research in this area

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in So.2d, 2008 WL 5006172 (Fla.Cir.Ct.)
(Cite as: 2008 WL 5006172 (Fla.Cir.Ct.))

compares children raised from birth by lesbian couples to children raised from birth by heterosexual couples, the witness believes the research would prove consistent if the samples included children raised by homosexual fathers. Explaining the literature to the contrary,[FN11] Dr. Lamb offers that such research is unreliable, not methodologically sound, unpublished or published in non-peer review publications, and over-emphasizes non-statistical differences, among other methodological flaws. Additionally, the witness states that longitudinal studies reveal the same results as cross-sectional studies. Also, as to the contention that research need be conducted of adoptive children raised by homosexual parents versus children raised by biological homosexual parents, Dr. Lamb rejects the idea stating that the predictors in adoptive and biological gay parenting are not different. Moreover, although adoptive children have an additional factor to consider (their prior background), this does not relate to the sexual orientation of their caregiver.

FN10. *Id.*

FN11. R. Lerner and A.K. Nagai, No Basis: What the Studies Don't Tell Us About Same–Sex Parenting, Marriage Law Project (Jan.2001) (reviewing 49 studies on same-sex parenting and finding recurring methodological flaws); W. Schumm, Re-examination of Evidence Concerning Child Development, reported in F. Tasker and S. Golombok's 1997 Growing Up In a Lesbian Family; K. Cameron & P. Cameron, Homosexual Parents, 31 Adolescence 757, 770–774 (1996) (P. Cameron was censured and ousted by the APA for misreporting results about homosexual parenting); J. Stacy & T. Biblarz, How does the Sexual Orientation of Parents Matter, 66 Am Soc. Rev. 159, 166 (2001) (although cited by Lofton as opposing homosexual parenting, Stacy and Biblarz concluded, "Because every relevant study to date shows the parental sexual

orientation per say has no measurable effect on the quality of parent/child relationships, or on children's mental health and social adjustment, there is no evidentiary basis for considering parental sexual orientation in decisions about children's best interest"); Zatieros Zaranticos, Children in Three Contexts, Family, Education, and Social Development (Zaranticos is not a psychologist. The article was not published in a peer reviewed journal, but an Australian magazine. According to critics, the study fails to prove maladjustment of children raised by homosexual parents because of the failure to account for the divorce or separation many of the children had recently experienced and was likely the cause for their maladjustment.)

Relating to sexual activity and/or orientation of children of homosexual parents one study [FN12] revealed that female children raised by lesbians were more sexually active than males raised by lesbians. Dr. Lamb interjects that such results reveal only that children raised by lesbians are less strictly tied to sexual roles and rigid applications of sex roles. Dr. Lamb emphasizes that there was no difference in the age the children raised by lesbians began engaging in sex versus those raised by heterosexuals. Moreover, according to the witness, there was no significant difference between the sexual orientation of children with lesbian parents and those with heterosexual parents.[FN13] Although children raised by lesbian mothers expressed openness to considering same sex attraction,[FN14] Dr. Lamb explains that children of lesbian mothers tended to believe their parent would be more tolerant of a same sex relationship. Dr. Lamb states the import of the research revealed by the study is not that gay parents rear gay children, but more a lesson in promoting tolerance.

FN12. Columbo study. Trial Transcript, Oct. 2.2008, p. 94, *l.* 12.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in So.2d, 2008 WL 5006172 (Fla.Cir.Ct.)
**(Cite as: 2008 WL 5006172 (Fla.Cir.Ct.))**

> FN13. Golombok study, Trial Transcript, Oct. 2, 2008, p. 95, *l.* 17

> FN14. One-fourth of the children raised by lesbians were open to same sex relationships while none of the children raised by heterosexuals considered he option.

With regard to social relationships and peer adjustments, Dr. Lamb reports that children raised by gay parents develop social relationships the same as those raised by heterosexual parents. The research shows that children of gay parents are not ostracized and do not experience discrimination any more than children of heterosexual parents.[FN15] According to the witness, children have always and will continue to tease and bully their peers about their parent's appearance, employment, ethnic background, parenting style, or sexual orientation. A child that is teased views one reason no less hurtful than another. Therefore, Dr. Lamb concludes that the exclusion of homosexuals from adoption does not shield a child from being teased by his/her peers.

> FN15. Golombok study, Trial Transcript, Oct. 2, 2008, p. 104, *l.* 11

**\*10** Lastly, Dr. Lamb opined that the assumption that children need a mother and a father in order to be well adjusted is outdated and not supported by the research. According to the witness, there is no optimal gender combination of parents; neither men nor women have a greater ability to parent. Additionally, today, two-parent households are less attached to static roles than in the past. Moreover, there is a well established and generally accepted consensus in the field that children do not need a parent of each gender to adjust healthily. The witness opines that the exclusion of homosexuals as adoptive parents is not rationally related to child adjustment. Rather, the witness believes the exclusion hurts children by reducing the number of capable and appropriate parents avail-

able and willing to adopt.

To rebut Petitioner's testimony relating to the absence of negative psychological affects of homosexuality on individuals, relationships, parenting and ultimately the two children at issue here, the Department offered Dr. George Rekers, a Clinical Psychologist and Behavioral Scientist from Miami, Florida, as an expert in clinical psychology and behavioral science to include the stressors of homosexual adults. Dr. Rekers is also an ordained Baptist minister. The State of Florida has paid Dr. Rekers an advance retainer of $60,900 for work performed on this case to date.[FN16]

> FN16. Dr. Rekers also testified that he may bill the State for additional time.

Specifically, Dr. Rekers reported that in comparing several studies [FN17] on the quality of life with regard to mental health, emotions, physical health and vitality, homosexual adults have two to four times the odds of having a lifetime prevalence of major depression, affective disorders, anxiety disorders, and substance abuse.[FN18] According to Dr. Rekers, homosexually behaving individuals also have two to four times the odds of having lifetime prevalence of major depression and affective disorders in general.[FN19]

> FN17. Same Sex Sexuality and Quality of Life, Findings from the Netherlands Mental Health Survey and Incidence Study, published in the Archives of Sexual Behavior, Volume 32, Number 1; Prevalence of Mental Disorders, Psychological Distress and Mental Health Services Use Among Lesbian, Gay and Bisexuals in the United States by Gillman, Cochran and Colleagues (reporting that the odds ratio for thoughts of suicide of homosexuals is higher, 12 month prevalence of substance abuse disorder is higher for homosexuals. Of 2,844 subjects, 12 month

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in So.2d, 2008 WL 5006172 (Fla.Cir.Ct.)
**(Cite as: 2008 WL 5006172 (Fla.Cir.Ct.))**

prevalence of major depression for homosexual men was 41% versus 10% for heterosexual men; 12 month prevalence of two or more disorders was 2.88 times more for homosexuals than heterosexuals.)

FN18. King and the BMC Psychiatry Journal (2008), "Systematic Review of Mental Disorder, Suicide, Deliberate Self Harm in Lesbian, Gay and Homosexual People, study reported that homosexual men have 2 .58 times higher risk of suicide; 2.3 times increased risk of deliberate self harm; 2.41 times increased risk of 12 month drug dependence. Among lesbians, 2.05 times higher depression, four times higher 12–month prevalence of alcohol dependence, 3.5 times higher risk of 12 month prevalence of drug dependence, and 3.42 times higher risk of 12 month prevalence of any drug use.

FN19. The psychiatric disorders discussed include major depression, bipolar disorder, post-traumatic stress disorder, alcohol abuse, alcohol dependence, substance abuse and substance dependence.

Regarding relationship stability, Dr. Rekers proffered that homosexually behaving individuals have a substantially and significantly larger number of lifetime partners and maintain fewer relationships over a long period of time, partly due to the lack of recognizable legal unions and social support.[FN20] He also submits that homosexuals suffer from higher rates of distressing conditions,[FN21] which may or may not constitute a disorder. He therefore suggests that since homosexual couples break-up more, children in these homes suffer repeated detachment due to the frequency of new partners. According to the witness, homosexuals are less able to provide a stable home for children than heterosexuals. Additionally, as foster children already have high rates of psychological disorders, placement in a household with fewer risks is

preferred. Furthermore, as children in homosexual homes are subject to more stressors than children in heterosexual homes, the doctor concludes that such conditions can lead to instability in the home and should be considered when contemplating adopting a child into a homosexual household.

FN20. According to Edward Laumann's study, regarding the number of break-ups and sexual partners study showed: heterosexual men (15.7), homosexual men (44.3), heterosexual women (4.9), homosexual women (18.7). However, it appears this study inquired of the subjects number of sexual partners as opposed to the number of relationships. The Social Organization of Sexuality—Sexual Practices In the United States, The University of Chicago Press, Chicago and London, 1994.

FN21. Including suicide, relationship breakups, multiple sex partners, substance abuse.

**\*11** During Dr. Rekers' testimony, attention was drawn to his authorship of a St. Thomas Law Review[FN22] article entitled "An Empirically Supported Rational Basis for Prohibiting Adoption, Foster Parenting, and Contested Child Custody by Any Person in a Household that Includes a Homosexually–Behaving Member" wherein the doctor heavily cited to the conclusions of a colleague who is sharply criticized as distorting data and was censured and ousted[FN23] by the American Psychological Association for misreporting evidence regarding homosexual households. Although the American Psychological Association, has concluded that there is no difference between heterosexual and homosexual parenting, Dr. Rekers believes the Association's stance is political and not based on science. Dr. Rekers' much contested and hardly empirical article also cited to journals from authors who were neither psychotherapists nor social scientists.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in So.2d, 2008 WL 5006172 (Fla.Cir.Ct.)
(Cite as: 2008 WL 5006172 (Fla.Cir.Ct.))

FN22. St. Thomas Law Review, 2005/2006, Volume 18. Issue 2, pages 325–424.

FN23. Or voluntarily withdrew in lieu of ousting.

There is no question that Dr. Rekers supports the continued ban on homosexual adoption and even the imposition of a ban on homosexual foster parenting based on the high rates of disorders, distressing conditions and relationship instability reported in the studies he considers telling. The witness testified that he does not support such a categorical exclusion of a demographic group based on one variable; rather, his opinion for the exclusion is based an overall sum of variables. Thus, according to the doctor, any demographic group with overall high variable risks poses a threat to an adoptive child and should be excluded. As applied to the instant facts, the witness opines that Petitioner is in a high risk group; the majority of individuals sharing Petitioner's demographic characteristic of homosexuality suffer from a disorder or have the propensity to suffer from a disorder; therefore, even if Petitioner is studied to determine his individual risk factor, the prediction for his propensity to succumb to a lifetime prevalence of risk cannot be overcome. Based on Dr. Rekers' theory, as Native Americans have a high rate of alcohol abuse, substance abuse, domestic violence, depression, and a life time prevalence of these risks, Native Americans should also be considered a high risk group as prospective adoptive parents as well.[FN24]

FN24. See n.8; Trial Transcript, October 3, 2008, p. 143 l. 14.

Furthermore, according to Dr. Rekers, if children are bonded to a homosexual foster parent, such a placement may continue because the foster care laws permit regular monitoring. However, adoption should not be an option because of the absence of monitoring and safeguards. Dr. Rekers astounded the Court when he testified that he favors removal of any child from a homosexual household, even after placement in that household for ten years, in favor of a heterosexual household. To this Court's further astonishment, the witness hypothesized that such a child would recover from the removal from his family of 10 years after one year in a heterosexual household. The Court finds this testimony to be contrary to science and decades of research in child development.

*12 As to the studies finding that the well being of children raised by homosexual versus heterosexual parents is more similar than dissimilar than the studies he relies on suggest, Dr. Rekers intimates that such studies are replete with statistical errors and should not form public policy. Dr. Rekers, in his role as an ordained Baptist minister has written books entitled "The Christian in an Age of Sexual Eclipse" (1981),[FN25] "Growing Up Straight: What Every Family Should Know About Homosexuality" (1982),[FN26] and "Shaping Your Child's Sexual Identity" (1982).[FN27] Excerpts from those books are included in the footnotes below.

FN25. Within which, Dr. Reker's states, "Non–Christian psychologists often encourage their clients to do form their own values regarding sexual expression. In doing so, they mistakenly assume that they are providing the most appropriate and sensitive counsel. In reality they are tacitly creating an impression that the universe was constructed with no moral law inherent to the system, but God has spoken. God has given us explicit instruction as to what his moral laws are. The psychologist who recommends that a person simply define his own sexual values ends up not being an advocate of human freedom, instead he becomes a revolutionary, attempting to overthrow the moral laws of God. Instead of being helped, the client is therefore led down a fanciful path of alleged

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in So.2d, 2008 WL 5006172 (Fla.Cir.Ct.)
(Cite as: 2008 WL 5006172 (Fla.Cir.Ct.))

morality called, quote, liberation." p. 14;

"An honest scholarly search for the truth about homosexuality should not stop with psychological or medical information alone. Wise professionals should also consider evidence for moral truth as well. The bible teaches that people are foolish if they deny God's reality and live their lives as though he were not there.... What happens when psychologists and psychiatrists search for truth about homosexuality, but close the door to any possibility of information from the creator of the human race? What happens if scholars deliberately discard all moral evidence as irrelevant to their professional judgments? Roman's describes the consequences in suppressing truth revealed by the creator.... Those verses indicate that the existence of God is evident within each person, so psychologists and psychiatrists who proceed as though he does not exist are deliberately suppressing truth. To search for truth about homosexuality in psychology and psychiatry, while ignoring God, will result in futile and foolish speculations." p. 54–56;

Stating, "In my clinical training, as well as my experience as a university psychologist, I've been impressed by the devastating radical changes in sexual roles, which have occurred in America over the past 30 years. In the push and shove of these social changes, many kinds of individual problems have cropped up for men, women and children. Some unresponsive and insensitive husbands have failed to provide their problem masculine leadership in the home. Some women have allowed themselves to be sucked into the resulting vacuum, overstepping a more natural and supportive role in the home. This domestic upheaval has been labeled by many psychologists as the dominant wife syndrome. In other cases I've seen emotional or merely materialistic motives woe many mothers of preschool children out of their home and into the job market. This functional desertion has often caused serious emotional conflicts for their children.... Those who counsel people in distress have to be impressed by the clear correlation between the acceleration deterioration of the family unit, and the major changes that are taking place in our society's conception of the male and female roles. Could it be that the wholesale American abandonment of the God ordained male and female roles has brought upon our families a destructive force that will ultimately disintegrate marriage and family, if not soon reversed. I believe that the family will self destruct in direct proportion to its retreat from the biblically defined male and female roles." p. 12

FN26. Including chapters entitled, "The Truth About Homosexuality" "The Trap of Homosexuality" "Liberation from Homosexuality" "The Search for Truth About Homosexuality."

Within which Dr. Reker's states, "wise professionals should seek God's answer as well. When scholars disregard divine law, they deliberately suppress truth and result in foolish and futile speculations." p. 54.

"As a psychologist who has counseled scores of homosexuals, I have observed the pain suffered by individual homosexuals who have been manipulated by leaders of the homosexual revolt. Alone the homosexual seizes the deviance of other types of homosexuals, and he can even feel the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in So.2d, 2008 WL 5006172 (Fla.Cir.Ct.)
(Cite as: 2008 WL 5006172 (Fla.Cir.Ct.))

need to change himself. But the homosexual leaders use the manipulative techniques of classic revolutionary strategies to achieve their own diabolical objectives, to the detriment of the individual suffering the effects of sexual perversion." p. 38.

"Homosexual activists seek to lure our children into a deceptive and destruction fantasy world that ignores the obvious physical, social and moral boundaries of sexual expression. Everything that the gay activists are working for stands diametrically opposed to everything concerned the parents stand for in seeking future family fulfillment for their children. Parents who are more aware of the tactics of homosexual activists will be better prepared to protect their own children, from the ploys of these enemies of normal sexual development." p. 40

FN27. Within which, Dr. Reker's states, "The gay liberationists have taken the deliberate ploy of pressing first for legislation to legalize the sexual behavior between two consenting adults. After they had succeeded in winning the emotional war of soothing the public's queasy feelings about homosexuality activity among adults, the next planned step of the gay liberationists is to press for an elimination of laws of age discrimination, (in the terminology of the rhetoric of revolt). This means that the Gay activists are now beginning to press for the rights of the children to engage in homosexual behavior with adults. This will be their battle to legalize pedophilia!" p. 89.

Dr. Rekers' testimony was far from a neutral and unbiased recitation of the relevant scientific evidence. Dr. Rekers' beliefs are motivated by his strong ideological and theological convictions that are not consistent with the science. Based on his testimony and demeanor at trial, the court can not consider his testimony to be credible nor worthy of forming the basis of public policy.

The Department also tendered Dr. Walter Schumm, Associate Professor of Family Studies, Kansas State University, as an expert in family child development, empirical and theoretical family studies and research methodology. Dr. Schumm also integrates his religious and ideological beliefs into his research. In an article he published in the Journal of Psychology and Theology he wrote, "With respect to the integration of faith and research, I have been trying to use statistics to highlight the truth of the Scripture." In another paper that he co-authored with Dr. Rekers concerning the authors' disagreement with homosexual practices, he wrote:

Within the limitations imposed by context, errors in translation and errors of individual interpretation, we prefer to accept the authority of the Bible as the best guide for sexual decision making, as well as for many other areas of life. We consider Scripture to be important, not because of tradition or institutional affiliation, but because after reasoned study, we make the assumption that they contain the wisdom of the Creator regarding the human condition and effective ways of relating to others interpersonally. In particular, we turn to the life of Jesus as a guide for our own value system.

Although Dr. Schumm is not a psychologist, a summary of his testimony is included in this section because he conducted a methodological analysis of the works of psychologists on homosexual parenting. When reanalyzing studies on outcomes of children raised by gay parents, he found some differences in outcomes as a factor of parental sexual orientation where the original researchers reported no differences (the null hypothesis). He suggests that his re-analyses, mostly unpublished, should be accepted over the analyses of well respected researchers in peer re-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in So.2d, 2008 WL 5006172 (Fla.Cir.Ct.)
(Cite as: 2008 WL 5006172 (Fla.Cir.Ct.))

viewed journals. Dr. Schumm admitted that he applies statistical standards that depart from conventions in the field. In fact, Dr. Cochran and Dr. Lamb testified that Dr. Schumm's statistical re-analyses contained a number of fundamental errors. Dr. Schumm ultimately concluded that based on his re-analysis of the data, there are statistically significant differences between children of gay and lesbian parents as compared to children of heterosexual parents. Dr. Schumm understands that much of the scientific community disagrees with his conclusions and concedes to the possibility that some gay parents may be beneficial to some children. He does so despite his objection to allowing homosexuals in the military due to the ease with which they can have oral sex and his belief that, since homosexuals violate one social norm, they are likely to also violate military rules. Candidly, the witness does not agree with Dr. Rekers that homosexuals should be banned from adopting but rather states that gay parents can be good foster parents, and opines that the decision to permit homosexuals to adopt is best made by the judiciary on a case by case basis.

*B. Medical*

**\*13** Dr. Margaret Fischl, a Professor of Medicine at the University of Miami School of Medicine, Director of the AIDS Clinical Research Unit and Co–Director of the Center for AIDS, was admitted as an expert in the diagnosis and treatment of human immune-deficiency virus (HIV) and other STDs. Dr. Fischl testified the majority of cases of HIV are transmitted by heterosexual transmission. However, homosexual and heterosexual sex, as well as drug use account for the major means of transmission in the United States. Thus, Dr. Fischl affirms that HIV is clearly not only a gay disease. The doctor provided the most recent data from the Center for Disease Control; of current infections of HIV, approximately 50% occur among homosexual men, 35% occur among heterosexual men and women and the remainder occur among intravenous drug abusers. Further, CDC studies show that 25% of homosexual men are infected with the virus, while lesbian women have a low rate of

transmission and are described as having no risk of transmission of HIV. Dr. Fischl reports that the rates of transmission for African–Americans is 20 times more than Whites. Moreover, for African American women, the risk is 50 to 60 percent more than that of white women. Overall, women generally contract HIV heterosexually.

Dr. Fischl suggests, as HIV is an STD transmitted sexually or by blood, the risk of household transmission is low to nonexistent. Furthermore, due to medical advancements in the detection and treatment of HIV, most HIV patients taking medication as prescribed now have a normal lifespan and will likely die of something other than AIDS. Dr. Fischl concludes that HIV patients receiving regular doses of AZT can live a healthy, normal life and feel well enough to work and parent effectively.

*C. Sexual Disorders*

Petitioner presented Dr. Frederick Berlin, an Associate Professor at John Hopkins University School of Medicine in Baltimore, Maryland as an expert in human sexuality, to include homosexuality, pedophilia, and child sex abuse. Dr. Berlin testified, among other aspects, that paraphilia is a sexual disorder defined by the Diagnostic and Statistical Manual of Psychiatric Disorders (DSM) and that homosexuality as a paraphilic disorder was removed from the DSM in 1973. In times past, homosexuality was regarded as the effect of a domineering mother and a weak father. Today, Dr. Berlin reports that the leading professionals agree that homosexuality defines one's same sex attraction only. According to the witness, homosexuality was removed from the DSM because the evidence of it's classification as a disorder did not justify the conclusion.

As to whether the sexual orientation of a parent influences the sexual orientation of a child, Dr. Berlin testified that sexual orientation of a child is not affected by one's environment. He reports the majority of homosexual children are not from homosexual

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in So.2d, 2008 WL 5006172 (Fla.Cir.Ct.)
**(Cite as: 2008 WL 5006172 (Fla.Cir.Ct.))**

parented households although homosexual children in homosexual households are more willing to consider, expose and/or express their homosexual feelings. Dr. Berlin strongly opposes Dr. Reker's suggestion [FN28] that children in male homosexual households will be drawn to participate in anal sex. Dr. Berlin explains that children in heterosexual households do not determine their sexual orientation based on fanciful ideas of the heterosexual bedroom activities of their parents. Dr. Berlin stated that if parents could influence the sexual orientation of their children, there would likely be fewer homosexuals today.

> FN28. See n.21 for Dr. Rekers' St. Thomas Law Review article which states, "In homes with a homosexually behaving adult, children are more likely to experience the stress and associated harm of an ill-timed sex education that is not timed to match the psychosexual development needs of the child, but instead exposes the child to information about males engaging in oral sex, and inserting penis' into rectums. at formative ages, when those mental images can become strongly associated with sexual arousal patterns, predisposing the child to developing anxiety about sex, a confused sexual identity, or homosexual behavior. Knowledge of specific abnormal or deviant sexual practices is more safely introduced after the child has had the opportunity to develop a stable and secure gender identity and psychosexual identity." p. 377.

**\*14** Dr. Berlin explained that pedophilia and its subtypes are mental disorders in the DSM, typified by adults sexually drawn to children. By definition, an adult male who is attracted to male children is not a homosexual. According to a study [FN29] performed testing the erectile movements of homosexual and heterosexual men when shown photographs of children in descending ages the results showed heterosexual men were no more attracted to girls than homo-

sexual men were attracted to boys. The reverse appeared true in another study of adult men who were abusers of boys. [FN30] There, the data showed that such men were not also homosexuals and showed no attraction to adult men. Thus, the doctor reiterates that pedophilia and homosexuality are not analogous.

> FN29. Kurt Freund study (1973). Defined and repeated in 1984.

> FN30. Jenny, Carol et al. Are Children At Risk For Sexual Abuse By Homosexuals, Pediatrics, 1994, 94; 41–44.

Dr. Berlin also clarifies that gay people are no more likely to abuse children, or be sexually attracted to children than heterosexual people. Dr. Berlin notes the author of the one study finding that homosexuals are at a higher risk of abusing children was censured by the APA because his conclusions were not justified by the data. He further testified as to the consensus that homosexuality and heterosexuality are not the consequence of a conscious decision a child makes and that an adult's sexual orientation does not normally change during his/her lifetime. According to the witness, environmental factors associated with a parent's sexual orientation will not likely result in an adopted child eventually self-identifying as homosexual.

Lastly, Dr. Berlin stated that if an individual is sexually abused as a child, there is no way to tell what type of adults that individual will be sexually attracted to. Accordingly, neither the American Academy of Adolescent and Child Psychiatry, the American Psychological Association nor Dr. Berlin, opine that there is a relationship between homosexuality and child sexual abuse.

*D. Child Welfare Policy and Practice*
Petitioner presented the expert testimony of Patricia Lager, a licensed clinical social worker and

Not Reported in So.2d, 2008 WL 5006172 (Fla.Cir.Ct.)
**(Cite as: 2008 WL 5006172 (Fla.Cir.Ct.))**

Professor of Social Work at Florida State University in Tallahassee, Florida. Professor Lager testified there are a number of characteristics which make up a good adoptive parent but not one kind of family is best for all children; there may be situations where a single parent, disabled parent, ethnic parent or homosexual parent may be appropriate for a particular child. She testified there is a consensus in the child welfare field that any such categorical exclusion is not in the best interest of children, particularly since Florida has a shortage of adoptive homes. The witness recommends the usage of an individualized screening to determine a prospective adoptive parent's strengths and parenting abilities without regard to any one demographic characteristic.[FN31] She also testified that Florida's categorical exclusion of homosexuals would reduce the number of potential qualified applicants, however she did not know how many people in Florida had been denied the opportunity to adopt based on their homosexuality nor did she know how many more would petition to adopt if the exclusion of homosexually behaving persons was removed. The witness further opines that categorical exclusions of prospective adoptive parents results in multiple placements of children, causes children to suffer attachment disorder or age out of foster care.

FN31. Absent sexual abusers.

*15 Professor Lager testified the Child Welfare League of America and the National Association of Social Workers published position statements that homosexually behaving individuals should not be treated any differently than heterosexuals in terms of their ability to adopt. Professor Lager also testified that, in Florida, foster care is meant to be a temporary environment for a child. The next stage of permanency, a permanent guardianship, is more stable, but should not be the preferred option. The witness concludes, in the eyes of a child, true permanency is always through reunification or adoption.

DCF Quality Assurance Manager, Christine Thorne, interpreted Department regulations, operating procedures and practices regarding foster care including the eligibility requirements for foster parenting, placement of children in foster care with lesbians and gay men and the recruitment of lesbians and gays as foster parents. Thorne essentially concluded that there is no law, policy or procedure that permits any one dependent child to receive disparate treatment from another child. She further testified that it is not the Department's policy or procedure to treat children placed with homosexual caregivers differently from children placed with heterosexual caregivers. The witness also acknowledged that children with homosexual foster parents could not be adopted by their caregivers while children with heterosexual foster parents could. Regarding permanency, the witness established that the optimal permanency goal as established by the law and the Department's policies and procedures absent reunification is adoption. Lastly, Thorne confirmed that the court must consider the opinion of the Guardian when ruling on an adoption petition.

Portions of Ada Gonzalez's deposition were read into the record. Ms. Gonzalez is the Licensing Foster Care Specialist in District 11. Her testimony provided that it is the Department's policy to encourage foster parents to adopt children in their homes because of the established relationship and the need to maintain stability for the child. She stated that displacements from one home to another tend to have negative effects on children and are discouraged in order to prevent emotional and developmental harm. Ms. Gonzalez provided that it can be harmful for a child to switch families, schools and their social network. As to the Department's allowance and encouragement of homosexuals to become foster parents, Ms. Gonzalez testified that the Department advertises and recruits for foster parents at gay events and functions. The witness could not identify any harms to children from gay foster parents and identified the risk to the child from removal from a gay foster home to the home of a heterosexual family who is willing to adopt. Lastly,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in So.2d, 2008 WL 5006172 (Fla.Cir.Ct.)
**(Cite as: 2008 WL 5006172 (Fla.Cir.Ct.))**

Ms. Gonzalez admitted the ban of homosexuals as adoptive parents interferes with the Department's ability to find qualified adoptive parents.

Portions of Gay Frizzell's deposition were also read into the record. Ms. Frizzell is the Chief of Child Welfare Services and Training in the Family Safety Program Office for the State of Florida. Ms. Frizzell pointed out that the Department's policies were "inconsistent" with regard to gay foster parents and gay adoptive applicants. Ms. Frizzell revealed that in order for a child in a gay foster home to receive the permanency provided by statute and aimed for by the Department, the child must first be uprooted from their current family, school, and neighborhood. The witness reasserted that adoption is preferred over guardianship because of the physical and emotional stability, legality, inheritance and familial relationship benefits afforded to adoptees. She also explained that adopted children perceive themselves differently than children in guardianship because adoptees feel a stronger sense of belonging and a legal connection to their parents that children in lesser forms of permanency can never truly feel.

## V. STIPULATED FACTS

*16 Petitioner, the Children through counsel and the Department agree as to the following undisputed facts:

*Eligibility to adopt in Florida*

1. State adoption law expressly permits unmarried adults to adopt children. Fla. Stat. § 63.042(2)(b).

2. The State makes over a third of its adoptive placements with single adults. The percentage of adoptions of dependent children in Florida that were by single parents for the year 2006 was 34.47%. Respondent's Response to Petitioner's First Request for Production of Documents ("RFP Response") 19H.

3. Florida recognizes that single and married people can make equally good adoptive parents. Deposition of Kathleen Waters pursuant to Fla. R. Civ. P. 1.310(b)(6) ("Waters Dep."), at 70.

4. DCF and/or its agents recruit unmarried people to become adoptive parents. RFA Response 18; Waters Dep., at 70.

5. DCF and its agents will not approve an adoptive parent applicant who is not currently deemed suitable to care for a child based on speculation about the applicant's improved future circumstances. RFA Response 12.

6. Florida does not exclude single adoptive parent applicants if they state an intent never to marry. Waters Dep., at 69.

7. The State and its designees accept applications to adopt from married couples and from single adults. Couples married less than two years must be given particularly careful evaluation. Fla. Admin. Code section 65C–16.005(3)(e).

8. The State recognizes that for certain children, single adoptive parents are preferred, even over available married couples. RFA Response 23.

9. No person eligible to adopt shall be prohibited from adopting solely because such person possesses a physical handicap, unless it is determined that such disability or handicap renders such person incapable of serving as an effective parent. Fla. Stat. § 63.042(4).

10. Adoptive parent applicants with serious or chronic medical conditions that could predictably compromise or could compromise the ability to provide the physical, emotional, social and economic support necessary for a child to thrive are subject to review by the Adoption Review Committee. Fla. Admin. Code section 65C–16.005(9)(1).

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in So.2d, 2008 WL 5006172 (Fla.Cir.Ct.)
**(Cite as: 2008 WL 5006172 (Fla.Cir.Ct.))**

11. Florida does not exclude someone from adopting solely because of the fact that he or she is HIV-positive. An individual who is HIV-positive but healthy and able to care for a child is not excluded if, after having a physical and a doctor stating the applicant is healthy and the child is not going to go through another loss.

12. The Department may not place a child with a person other than a parent if the criminal history records check reveals that the person has been convicted of any felony that falls within any of the following categories: (a) child abuse, abandonment, or neglect; (b) domestic violence; (c) child pornography or other felony in which a child was a victim of the offense; or (d) homicide, sexual battery, or other felony involving violence, other than felony assault or felony battery when an adult was the victim of the assault or battery. Fla. Stat. § 39.0138(2). The Department may not place a child with a person other than a parent if the criminal history records check reveals that the person has, within the pervious 5 years, been convicted of a felony that falls within any of the following categories: (a) assault; (b) batter; or (c) a drug-related offense. Fla. Stat. § 39.0138(3). Individuals with any such convictions are not barred from adopting children who are not placed by the Department and/or its agents. And individuals convicted of any other crimes not referenced in Fla. Stat. § 39.0138(2) or (3) may be considered as adoptive parents even when the placement is made by DCF and/or its agents. Fla. Stat. § 39.0138(3); Fla. Admin. Code r. 65C–16.007(4).

**\*17** 13. Applicants who have been convicted of any felony specified in section 39.0138(3) within the last five years cannot be considered for approval until five years after the violation was committed and then must be referred to the adoption review committee.

14. Applicants who have been convicted of any felony specified in section 39.0138(2) shall be carefully evaluated as to the extent of their habilitation. Fla. Stat. § 39.0138(2) and (3); Fla. Admin. Code r. 65C–16.007(4).

15. Adoption applicants who have previous verified findings of abuse, neglect or abandonment of a child are subject to a special review before they can be approved to adopt, but are not automatically disqualified from adopting. RFA Response 7.

16. Applicants who have experienced an adoption disruption or dissolution in the past are carefully evaluated but are not excluded from adoption on that basis alone. Fla. Admin. Code r. 65C–16.005(3)(d).

17. A social study which involves careful observation, screening and evaluation is made of the child and adoptive applicant prior to the placement of the child to select families who will be able to meet the physical, emotional, social, educational and financial needs of a child, while safeguarding the child from further loss and separation from primary caretakers. Fla. Admin. Code r. 65C–16.005(2).

18. Adoptive applicants in Florida seeking to adopt children who are in state custody are subjected to a home study, a reference check, a criminal records check, a child abuse registry check, and a medical screening. RFA Response 9; Fla. Admin. Code rr. 65C–16.005; 65C–16.007.

19. Before DCF or its agents approve an applicant seeking to adopt a child, that applicant is individually screened to ensure that he or she can provide a safe, healthy, stable, nurturing environment for a child. RFA Response 10.

20. Unmarried couples are screened for relationship stability in the same way married couples jointly applying to adopt are screened.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in So.2d, 2008 WL 5006172 (Fla.Cir.Ct.)
**(Cite as: 2008 WL 5006172 (Fla.Cir.Ct.))**

21. Anyone deemed by DCF or its agents, after an individualized evaluation, unable to provide a safe, healthy, stable, nurturing home for a child is not approved to adopt a child in Florida. RFA Response 11.

22. The percentage of adoptions of dependent children in Florida that were by the children's foster parents in 2006 was 34.74%. RFP Response 19I.

23. DCF is a member of the CWLA and looks to its policies for guidance in developing best practices in child welfare. RFA Response 14.

*Florida's placement of children with lesbians and gay men*

24. Lesbians and gay men are not prohibited by any state law, regulation or policy from serving as foster parents. RFA Response 1.

25. DCF and/or its agents have placed children in long-term foster care with individuals known by DCF and/or its agents to be lesbians or gay men. RFA Response 2.

26. DCF and/or its agents have placed children in the permanent care of foster parents known by DCF and/or its agents to be lesbians or gay men. RFA Response 3.

**\*18** 27. Lesbians and gay men are not prohibited by any state law or regulation from being legal guardians of children in Florida. RFA Response 4.

28. DCF and/or its agents have placed children in the legal guardianship of individuals known by DCF and/or its agents to be lesbians or gay men, and ceased DCF supervision. RFA Response 5.

29. DCF and/or its agents have placed children in the permanent care of legal guardians known by DCF and/or its agents to be lesbians or gay men, and ceased DCF supervision. RFA Response 6.

30. There are no special considerations applied if the home study reveals that the foster parent is gay or lesbian. Deposition of Ada Gonzalez pursuant to Fla. R. Civ. P. 1.310(b)(6) ("Gonzalez Dep."), at 63–64, 67.

31. DCF agrees that gay people and heterosexuals make equally good parents. Waters Dep., at 114.

32. The qualities that make a particular applicant the optimal match for a particular child could exist in a heterosexual or gay person. Waters Dep., at 88.

*Florida's need for more adoptive parents*

33. Florida seeks to find adoptive parents who are able to meet the unique needs of each child who is eligible for adoption and provide a secure and stable permanent family home. Fla. Admin. Code rr. 65C–16.002, 004 and 005; Fla. Stat. Section 409.166(1).

34. Florida has set up several programs to increase the pool of potential adoptive parents. *See, e.g.,* Fla. Stats. §§ 409.166 (subsidies for adopting "special needs" children); 409.167 (statewide adoption exchange);409.1755 (recruitment of adoptive parents for African American children); 409.401 (Interstate Compact on the Placement of Children to facilitate interstate adoption).

35. In 2006, there were 3,535 children in State custody and waiting to be adopted (RFP Response 19A) and as of March 20, 2007, 941 children were listed on the Adoption Exchange and had their pictures on the DCF's recruitment website because more than 90 days had passed since termination of parental rights and no adoptive families were identified. RFP Response 19B; Waters Dep., at 30.

36. At any given point, there are about 900 to 1,000 children in Florida who need adoptive parents to

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in So.2d, 2008 WL 5006172 (Fla.Cir.Ct.)
**(Cite as: 2008 WL 5006172 (Fla.Cir.Ct.))**

be recruited for them. Waters Dep., at 29–30.

37. 165 children in Florida aged out of the system in 2006 without ever being adopted. RFP Response 19D.

38. The average length of stay for children in foster care in Florida before a finalized adoption was over 30 months (data for fiscal year 2005/2006). RFP Response 19C.

39. DCF agrees that the shortage of adoptive parents is a serious problem. Waters Dep., at 72.

40. DCF agrees that having a bigger pool of qualified adoptive parents would help DCF find families for medically involved children, teens, large sibling groups and children with mental health problems. Waters Dep., at 32.

*Guardianship*

41. Where reunification with birth family is not possible, adoption—not guardianship—is the optimal goal for the child. Waters Dep., at 27; Gonzalez Dep., at 92.

**\*19** 42. Adoption is preferred over guardianship because it's a cleaner legal resolution, it creates a forever relationship with the parents and stability. Deposition of Gay Frizzell pursuant to Fla. R. Civ. P. 1.310(b)(6) ("Frizzell Dep."), at 57. In the case of adoption, a child feels a sense of belonging, that a legal commitment has been made to him. Frizzell Dep., at 58.

43. When children in foster care are placed in permanent guardianships with non-relatives, they are not entitled to adoption maintenance subsidies or Medicaid, which they would be entitled to if adopted. Waters Dep., at 28–29.

*John and James*

44. John, who is 8 years old, and James, who is 4, had to be placed in DCF custody because their biological parents were not able to take care of them and extended family resources were already overburdened caring for the boys' other siblings.

45. John and James were placed by DCF and its agents in foster care with Petitioner and Tom in December, 2004.

46. DCF and/or its agents were aware that Petitioner and Tom were a same-sex couple when they licensed both men to be foster parents.

47. John and James are now free for adoption. A final judgment terminating their mother's parental rights was entered on July 28, 2006. James father's parental rights were terminated on April 5, 2006. John's father's parental rights were terminated on July 25, 2006.

48. In September, 2006, Petitioner submitted an application to adopt John and James with the Center for Family and Child Enrichment ("CFCE"), an agency under contract with DCF to handle foster and adoptive placements of children in State custody.

49. CFCE conducted a preliminary home study in October, 2006. CFCE's home study report included the results of criminal and child abuse registry checks and reference checks as well as an assessment of Petitioner and Tom's character, health, relationship, ability to care for children and home environment. CFCE'S home study report stated that although the caregiver meets suitability requirements, he lives an alternative lifestyle, which by Florida Statutes, precludes him from becoming an adoptive parent.

50. On January 2, 2007, DCF sent a letter to Petitioner informing him that his application was denied based on Fla. Stat. § 63.042(3).

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in So.2d, 2008 WL 5006172 (Fla.Cir.Ct.)
(Cite as: 2008 WL 5006172 (Fla.Cir.Ct.))

51. Since their placement in December 2004 with Petitioner and Tom, DCF and/or its agents have deemed this placement to be in John and James best interests. RFA Response 25.

52. Petitioner and Tom are providing a safe, healthy, stable and nurturing home for John and James and meeting their physical, emotional, social and educational needs. RFA Response 26.

53. John and James are bonded to Petitioner and Tom. RFA Response 27.

54. But for Section 64.042(3), Fla. Stats., DCF would have approved Petitioner's application to adopt John and James. RFA Response 30.

55. Ron Gilbert, the Guardian ad Litem for John and James, has stated his view that adoption by Petitioner is in the boys' best interest.

*20 56. One case worker supervising the family wrote in his review of Petitioner and Tom: "Petitioner and Mr. Roe have been model foster parents throughout the duration of the dependency case involving this child. There should be more foster parents of this quality and caliber. If there were more foster parents like these foster parents, the system would work more smoothly!" Bates Nos. 2655–59.

VI. SUMMARY OF FINDINGS OF FACT

Based on the evidence presented from experts from all over this country and abroad, it is clear that sexual orientation is not a predictor of a person's ability to parent. Sexual orientation no more leads to psychiatric disorders, alcohol and substance abuse, relationship instability, a lower life expectancy or sexual disorders than race, gender, socioeconomic class or any other demographic characteristic. Qualities indicative of good parenting include attentiveness, involvement in a child's educational development, the ability to sooth, offer comfort, advice and a secure

base for a child, the provision of resources and maintaining a warm, harmonious environment. The most important factor in ensuring a well adjusted child is the quality of parenting.

Similarly, a child in need of love, safety and stability does not first consider the sexual orientation of his parent. More importantly, sexual orientation, solely, should not interfere with a child's right to enjoy the accoutrements of a legal family. John and James, due to no fault of their own, were removed from an environment perilous to their physical, emotional and educational well being. Their biological parents relinquished them to the State, which in turn placed them into an environment that allowed them, eventually, to heal, and now flourish.

The quality and breadth of research available, as well as the results of the studies performed about gay parenting and children of gay parents, is robust and has provided the basis for a consensus in the field. Many well renowned, regarded and respected professionals have reduced methodologically sound longitudinal and cross-sectional studies into hundreds of reports. Some of the longitudinal studies have tracked children for six, ten and fourteen years. The starting ages of the children in the longitudinal studies has varied from birth, six to ten years old and followed them throughout childhood, adolescence and into adulthood. The studies and reports are published in many well respected peer reviewed journals including the Journal of Child Development, the Journal of Family Psychology, the Journal of Child Psychology, and the Journal of Child Psychiatry. Each of the studies and hundreds of reports also withstood the rigorous peer review process and were tested statistically, rationally and methodologically by seasoned professionals prior to publication.

In addition to the volume, the body of research is broad; comparing children raised by lesbian couples to children raised by married heterosexual couples; children raised by lesbian parents from birth to

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in So.2d, 2008 WL 5006172 (Fla.Cir.Ct.)
**(Cite as: 2008 WL 5006172 (Fla.Cir.Ct.))**

children raised by heterosexual married couples from birth; children raised by single homosexuals to children raised by single heterosexuals; and children adopted by homosexual parents to those raised by homosexual biological parents, to name a few. These reports and studies find that there are no differences in the parenting of homosexuals or the adjustment of their children. These conclusions have been accepted, adopted and ratified by the American Psychological Association, the American Psychiatry Association, the American Pediatric Association, the American Academy of Pediatrics, the Child Welfare League of America and the National Association of Social Workers. As a result, based on the robust nature of the evidence available in the field, this Court is satisfied that the issue is so far beyond dispute that it would be irrational to hold otherwise; the best interests of children are not preserved by prohibiting homosexual adoption.

**\*21** The Guardian Ad Litem, the adoption agency and the assessing professionals agree that Petitioner and his domestic partner's ability to parent is excellent. The quality of parenting, the level of bonding and attachment and the thriving relationship of the children with Petitioner, Roe and Tom Junior is uncontroverted by all parties to this litigation. This Court has presided over John and James case since its inception. This Court has presided over 58 hearings in their case and has had the opportunity to observe the children, Petitioner, and the growing relationship between them. It is clear to this Court that Petitioner is an exceptional parent to John and James who have healed in his care and are now thriving. Accordingly, Petitioner, John and James should be permitted to permanently and legally share the emotional, psychological, and familial bonds of parentage. Nevertheless, based on the law of this state, only a finding that the statute is unconstitutional will permit this Court to grant the petition.

VI. CONCLUSIONS OF LAW
Originally enacted in 1977, Florida Statute §

63.042(3)(2008), provides, "No person eligible to adopt under this statute may adopt if that person is a homosexual." Since that time, the statute has survived several challenges [FN32] and has not been repealed. Recently, a Final Judgment of Adoption by a Circuit Court Judge in Monroe County [FN33] concluded the statute was an unconstitutional special law, an unconstitutional bill of attainder, and in violation of the separation of powers doctrine and permitted the adoption of a child by his homosexual former foster parent/permanent guardian. However, as neither the Department nor the Attorney General opposed the petition, that decision is not binding on any other court. Nevertheless, it is mentioned as of significance, clearly, to the family involved, but also to sister circuits. It should also be noted for contextual purposes that Florida is the only remaining state to expressly ban all gay adoptions without exception.

FN32. *Seebol v. Farie,* 16 Fla. L. Weekly C52 (Fla.Cir.Ct.1991); *Amer v. Johnson,* 4 Fla. L. Weekly Supp., 854b (Fla.Cir.Ct.1997); *D.H.R.S. v. Cox,* 627 So.2d 1210 (Fla. 2d DCA 1993).

FN33. In the Matter of the Adoption of John Doe, Case No. Redacted (Fla. 16th Cir.Ct. Aug. 29, 2008).

Here, Petitioner attacks the constitutionality of the categorical exclusion of homosexuals as eligible adoptive parents on equal protection and substantive due process grounds. The Guardian Ad Litem, on behalf of the Children also asserts equal protection, substantive due process and separation of powers claims as to the constitutionality of the statute. This Court finds merit in the Petitioner and the Children's equal protection claim and further finds that the statute infringes on the Children's right to permanency pursuant to the Adoption and Safe Families Act of 1997, adopted in Chapter 39 of the Florida Statutes.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in So.2d, 2008 WL 5006172 (Fla.Cir.Ct.)
(Cite as: 2008 WL 5006172 (Fla.Cir.Ct.))

A. Child's Right to Permanency

[1] Chapter 39 of the Florida Statutes requires the State to provide all dependent children with a stable and permanent home. The aim is to ensure that every child in foster care is placed in a permanent home as soon as possible. Fla. Stat. §§ 39.001(1)(h); 39.621(6). The law also provides that adoption is the preferred permanency option for children who cannot be returned to their biological families. Fla. Stat. § 39.621(6). Furthermore, the federal Adoption and Safe Families Act of 1997 ("ASFA") (P.L. 105–89), 42 U.S.C. § 671, sets strict time limits for states to make certain children achieve permanency to prevent them from lingering in foster care.

*22 Florida's statutory framework is explicit that dependent children have the right to permanency and stability in adoptive placements. Fla. Stat. §§ 39.621; 39.001(1)(h). The law is also explicit that there is a compelling state interest in providing such permanent, adoptive placement as rapidly as possible. Id. Florida's dependency and adoption laws thereby embody the substance of state and federal decisions that declare a child's constitutional right to a true home, and in the case of a foster child, to a permanent adoptive home. "Constitutional rights do not mature and come into being magically only when one attains the state-defined age of maturity. Minors, as well as adults, are protected by the Constitution and possess constitutional rights." Planned Parenthood of Cent. Mo. v. Danforth, 428 U.S. 52, 74, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976); In re T.W., 551 So.2d 1186, 1193 (Fla.1989) (approving Danforth as a principle of Florida constitutional law).

The legislature has recognized that permanency in an adoptive home is a foster child's right, and that the state has a compelling interest in achieving that result in the most expeditious way. Accordingly, when it exercises its parens patriae authority to remove a child, the State's actions must be in accordance with that child's best interest in achieving a permanent adoptive home. Laws that would interfere with a child's fundamental right to be free from unnecessary restraint, rather than aid the State's interest in achieving adoptive permanency for the child, are subject to enforcement as impinging on the child's rights. See State v. Robinson, 873 So.2d 1205, 1214 (Fla.2004) (laws that burden fundamental rights protected by the substantive due process clause are subject to strict scrutiny). Under Florida law, a child's rights are co-extensive with an adult's rights, unless there is a specific reason to protect the child that requires a limitation on the child's rights. In re T.W., 551 So.2d at 1193. A law such as the blanket ban on adoptions by homosexuals infringes on the foster child's right to be free from undue restraint and to be expeditiously placed in an adoptive home that serves the child's best permanency interests. Indeed, a law that subverts judicial process and imposes on the court the burden of taking action harmful to the child should be immediately suspect because the injury it imposes contradicts the legislative purpose and constitutional basis of the child's having been taken into custody by the State in the first place. It has been specifically recognized that when the State takes a child into foster care it is a restraint on that child's liberty. Taylor by and through Walker v. Ledbetter, 818 F.2d 791, 796 (11th Cir.1987). Florida's Supreme Court recognizes that the actions of the State in placing a foster child in residential treatment must be safeguarded by reference to the Fourteenth Amendment and the Florida Constitution's requirement that "[n]o person shall be deprived of life, liberty or property without due process of law." Art. I, § 9, Fla. Const. M.W. v. Davis, 756 So.2d 90, 97 (Fla.2000). The exclusion of gay people from adopting should not survive this impairment of foster children's rights. In re T.W., 551 So.2d at 1193.

*23 The Florida Supreme Court recently reestablished the child's right to permanency doctrine and confirmed that adoption is the highest and preferred form of permanency. In G.S. v. T.B., 985 So.2d 978 (Fla.2008), the court affirmed the recognition of the State's compelling interest in "providing stable and permanent homes for adoptive children...and to en-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in So.2d, 2008 WL 5006172 (Fla.Cir.Ct.)
**(Cite as: 2008 WL 5006172 (Fla.Cir.Ct.))**

*force the child's statutory right to permanence and stability in adoptive placements.... " Id. at 982 (emphasis added*). In *G.S.,* the court considered whether it may deny a petition for adoption in preference for a lesser form of permanency in order to permit continued visitation by family members. The Florida Supreme Court, firmly guiding its decision by the legislative intent with regard to adoptions, reminds trial courts that the State has a "compelling interest *in providing stable and permanent homes for adoptive children* in a prompt manner...." Fla. Stat. § 63.022(1)(a). Further citing to subsections (1)(c) and (3) of Fla. Stat. § 63.022, the Florida Supreme Court noted that the legislature took an affirmative stance regarding its intent; "[a]doptive children have the *right to permanence and stability* in adoptive placement" which provide "a permanent family life, and, whenever appropriate, to maintain sibling groups." Further solidifying the focus in of adoption petitions, the *G.B.* court stated,

> The issue is not whether the children should or should not be adopted or should live with the petitioners in some other form of custody such as guardianship. That decision has been made by the Legislature in favor of adoption over guardianship when adoption is available and serves the children's best interests.

> [T]he petition for adoption should be determined on the basis of the fitness of a petitioner who is petitioning to adopt the child and whether the adoptive home that would be provided for the child by that petitioner is suitable for the child so that the child can grow up in a stable, permanent, and loving environment. It is within those criteria that the determination as to the best interests of the child is to be made with regard to an adoption petition. *Id.* at 983.

There, as here, it was undisputed that the petitioners would provide the children with a permanent and stable home, which is the goal of the statutory scheme. Moreover, Chapter 63, as a whole, makes

clear that adoption is the highest and preferred form of permanency. When a child cannot be reunified with his parents, either due to death or termination of parental rights, there is no substitute for adoption. *Id.* at 984. As such, in a case such as here where Petitioner is qualified and meets all the suitability requirements for an adoptive parent, all the parties stipulate that Petitioner and his partner provide a safe, healthy, stable and nurturing home for John and James meeting their physical, emotional, social and educational needs, and that placement is in the children's best interest, the *G.B.* court advises this Court to look no further.

**\*24** The California Supreme Court also recognized that foster children have fundamental interests of their own that are subject to constitutional protection. *In re Jasmon O. v. Gavin O.,* 8 Cal.4th 398, 33 Cal.Rptr.2d 85, 878 P.2d 1297, 1307 (Cal.1994). "Children, too, have fundamental rights-including the fundamental right to be protected from neglect and to 'have a placement that is stable [and] permanent. ' " *Id.* (internal citations omitted). "Children are not simply chattels belonging to the parent, but have fundamental interests of their own that may diverge from the interests of the parent." *Id.* (internal citations omitted). "[A]fter a child has spent a substantial period in foster care and attempts at reunification have proved fruitless, the child's interest in stability outweighs the parent's interest in asserting the right to the custody and companionship of the child." *Id.* (internal citations omitted). Each of these statements from the California Supreme Court rings true, unsurprisingly so because each of these rights are familiar to Florida's statutory and constitutional framework for the protection of foster children's rights. The declared foster child's right to an adoptive home when the child is available for adoption is a fundamental right.

So too, a federal court has recognized that state wards are entitled to liberty from confinement in foster care. In *E.C. v. Sherman,* 2006 WL 1307641 (W.D.Mo.2006), the court determined that a state funding classification infringed "on the fundamental

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in So.2d, 2008 WL 5006172 (Fla.Cir.Ct.)
**(Cite as: 2008 WL 5006172 (Fla.Cir.Ct.))**

right of foster children—their liberty interest in avoiding unnecessary government confinement-and cannot survive strict scrutiny review." This case appropriately relies on United States Supreme Court precedent to the effect that the right to freedom from bodily restraint is a core liberty preserved by the Due Process Clause and any government action impairing that interest must be narrowly tailored to achieve a compelling state purpose. *E.C. v. Sherman,* 2006 WL 1307641 (quoting *Youngberg v. Romeo,* 457 U.S. 307, 316, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982)) ("Liberty from bodily restraint always has been recognized as the core of the liberty protected from arbitrary governmental action."). *See also Addington v. Texas,* 441 U.S. 418, 419, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979) (civil commitment of child is subject to clear and convincing evidence standard of proof to satisfy Due Process Clause). The very premise of Florida's dependency law following termination of parental rights must be consistent with the *parens patriae* responsibility of the state to achieve adoption for foster children unless their best interests are demonstrably shown to be otherwise. *In re Camm,* 294 So.2d 318, 320 (Fla.1974).

It is evident that public policy favors permanent family life rather than a mere indefinite length of protective custody. *See Hamilton v. Rose,* 99 So.2d 234 (Fla.1957). Even the *Lofton* court agreed, "Under Florida law, foster care is designed to be a short-term arrangement while the state attempts to find a permanent adoptive home." *Lofton,* 358 F.3d at 814 (quoting *Drummond v. Fulton County Dep't of Family and Children's Servs.,* 563 F.2d 1200, 1207 (5th Cir.1977). According to the most recent figures provided at trial, 3,535 children in Florida are eligible for adoption. As such, the homosexual exclusion is diametrically contrary to the permanency goal. Children placed in the care of homosexual foster care givers are effectively denied the primary permanency option available to other children whose parental rights have been terminated and placed in homes with heterosexual caregivers. This primary permanency option

becomes a legal fiction to children placed with gay foster parents without reference to their best interests despite the law's insistence that the State "ensure that permanent placement with the... adoptive family is achieved as soon as possible for every child in foster care...." Fla. Stat. § 39.001(1)(h).

**\*25** Here, Fla. Stat. § 63.042(3) violates the Children's rights by burdening liberty interests by unduly restraining them in State custody on one hand and simultaneously operating to deny them a permanent adoptive placement that is in their best interests on the other. This Court cannot permit such a double-edged sword to continue to lie dormant in our state law, to the peril of children like John and James, without review. The challenged statute, in precluding otherwise qualified homosexuals from adopting available children, does not promote the interests of children and in effect, causes harm to the children it is meant to protect. Both the state and federal governments recognize the critical nature of adoption to the well-being of children who cannot be raised by their biological parents. There is no question, the blanket exclusion of gay applicants defeats Florida's goal of providing dependent children a permanent family through adoption. The exclusion causes some children to be deprived of a permanent placement with a family that is best suited to meet their needs. As it relates to the case at bar, John and James were placed into the foster case placement of Petitioner by the State. The record clearly reflects that it is in their best interests to remain in this placement permanently and to be adopted by Petitioner. However, the statutory exclusion deprives John and James the ability to be adopted by their caregivers, to whom they are strongly bonded. Failure of the State to effectuate a permanent placement for John and James with applicants willing and qualified to assume the task creates the risk of severing the Children's healthy attachments and causing profound long-term negative consequences to their development or relegating them to a childhood and adolescence without a permanent home in foster care.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in So.2d, 2008 WL 5006172 (Fla.Cir.Ct.)
**(Cite as: 2008 WL 5006172 (Fla.Cir.Ct.))**

It is clear that the statutory exclusion of homosexuals as prospective adoptive parents deters permanent placements for children in the care of gay foster parents. Alternative forms of permanency, such as guardianship, deprive children of the significant material benefits appurtenant to adoption including inheritance rights. Such alternate forms of permanency also do not provide the significant psychological benefits afforded by adoption including sharing a common surname or enjoying the sense of belonging to a family adoption provides. (Stipulated Facts, 42, 43.) In addition to the foregoing, the exclusion exacerbates the shortage of adoptive families (Stipulated Facts, 34–39), leaving more children, especially dependent children, without a legal family at all.

*B. Equal Protection*

[2] Article I, § 2 of the Florida Constitution states, in pertinent part, "All natural persons, female and male alike, are equal before the law...." Petitioner and the Children argue that the statute violates their right to equal protection under the law because it singles out homosexuals and children raised by homosexual caregivers for unequal treatment without serving a rational basis. Similarly, the Children posit they are not offered equal protection because one class of children placed by the state with heterosexual caregivers have the potential to be adopted by their caregivers, while other children who are also adoptable, but placed by the state with lesbians and gay men cannot be adopted by their caregivers.

**\*26** The equal protection argument of the Petitioner has been considered by other courts. In *D.H.R.S. v. Cox,* 627 So.2d 1210 (Fla. 2d DCA 1993), two gay petitioners sought to adopt a child. Per Fla. Stat. § 63.042(3), the application was denied. The men filed a state action to declare the statute unconstitutional on right of privacy, substantive due process, and equal protection grounds. Relying solely on copies of various law review articles, reports, editorials, and discussions appearing in magazines and journals submitted by the parties, the trial court granted summary judgment in favor of the petitioners as to the three constitutional arguments. On appeal, the Second District Court of Appeal overruled the trial court's findings holding there was virtually no evidence in the record to support a constitutional attack. The Florida Supreme Court agreed that the record below lacked factual evidence to determine whether the statute could sustain an attack as to its constitutional validity on equal protection grounds [FN34] and remanded the matter to the trial court for further fact-finding. The petitioners, however, did not pursue the case.

> [FN34.] The court upheld the District Court's findings as to the substantive due process and vagueness grounds.

With regard to the evidence presented in *Cox,* the lack of "major scientific articles," the credentials and expertise of the authors, the quality and objectivity of the publishing journal, and the only "glimmers of answers" provided for by the available research caused pause for the reviewing court. *Id.* at 1213. The court further provided, "It may be that the legislature should revisit this issue in light of the research that has taken place in the last fifteen years, but we cannot say that the *limited research reflected in this record* compels the judiciary to override the legislature's reasoning." *Id.* at 1220 (*emphasis added* ). The research reflected in the record in this case is far from limited and compels a different result.

Section 63.042(3) was also challenged at the federal level in *Lofton v. Secretary of Dept. of Children and Family Srvcs.,* 358 F.3d 804 (11th Cir.2004). There, homosexual foster parents attacked the constitutionality of the statute on various right to privacy theories and equal protection claims.[FN35] The *Lofton* court, nearly five years ago, acknowledged the question to be determined was not whether the research and experts "support" the legislative prohibition, "but whether that evidence is so well established and so far beyond dispute that it would be irrational for the Florida legislature to believe that the interest of its

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in So.2d, 2008 WL 5006172 (Fla.Cir.Ct.)
**(Cite as: 2008 WL 5006172 (Fla.Cir.Ct.))**

children are best served by not permitting homosexual adoption." *Id.* at 825. At that time, the Lofton court also reasoned,

> FN35. Under the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution.

Openly homosexual households represent a very recent phenomenon, and sufficient time has not yet passed to permit any scientific study of how children raised in those households fare as adults. Scientific attempts to study homosexual parenting in general are still in their nascent stages and so far have yielded inconclusive and conflicting results. Thus, it is hardly surprising that the question of the effects of homosexual parenting on childhood development is one on which even experts of good faith reasonably disagree. *Given this state of affairs,* it is not irrational for the Florida legislature to credit one side of the debate over the other. *Id.* at 826 (*emphasis added*).

**\*27** As to the respective equal protection arguments, the failure to present any evidence in *Cox* 15 years ago and the weight of the evidence presented in *Lofton* nearly five year ago are both cited as the grounds for the courts' inability to find the statute unconstitutional as violative of the equal protection of the U.S. and Florida Constitutions. However, today, based on the developments in the fields of social science, psychology, human sexuality, social work and medicine, the existence of additional studies, the re-analysis and peer review of prior studies, the endorsements by the major psychological, psychiatry, child welfare and social work associations, and the now, consensus based on widely accepted results of respected studies by qualified experts, the issue of whether Fla. Stat. § 63.042(3) violates the equal protection of homosexuals and children adoptable by homosexuals, is again ripe for consideration.

1. Rational Basis Review

This matter does not involve a fundamental right or a suspect class and is thus reviewed under the rational basis test.[FN36] *Lofton v. Sec., Dep't of Children and Families,* 358 F.3d 804, 818 (11th Cir.2004) ("A constitutional equal protection challenge to a statute that does not involve a fundamental right or suspect classification is evaluated by the rational relationship test."). Additionally, Petitioner, as the challenger of the constitutionality of a statute, has the heavy burden to prove the statute unconstitutional. *Chicago Title Ins. Co. v. Butler,* 770 So.2d 1210, 1214 (Fla.2000); *Lasky v. State Farm Insurance Co.,* 296 So.2d 9, 15 (Fla.1974). States are not required to convince the courts of the correctness of their legislative judgments. Rather, those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decision maker. *See Florida Hometown Democracy, Inc., v. Cobb,* 953 So.2d 666, 676 (Fla. 1st DCA 2007), *citing Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981). Under rational basis scrutiny, § 63.042(3) must be upheld if there is any reasonably conceivable set of facts that could provide a rational basis for the classification. *FCC v. Beach Communications,* 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993). If any doubt exists as to the validity of the law, it must be resolved in favor of constitutionality where reasonably possible. *Dep't of Law Enforcement v. Real Prop.,* 588 So.2d 957, 961 (Fla.1991); *State v. Yocum,* 136 Fla. 246, 186 So. 448, 451 (Fla.1939). Therefore, Petitioner and the Children must show that the statute discriminates against homosexuals and children without a rational basis for the discrimination. *Id.* at 676, 186 So. 448, *citing McElrath v. Burley,* 707 So.2d 836, 839 (Fla. 1st DCA 1998).

> FN36. In *People v. Garcia,* 77 P.2d 1269 (Cal.4th Ct.App.2000), the California Supreme Court held that homosexuals comprise a suspect class deserving of strict scrutiny

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in So.2d, 2008 WL 5006172 (Fla.Cir.Ct.)
**(Cite as: 2008 WL 5006172 (Fla.Cir.Ct.))**

analysis in the equal protection context. In reaching its conclusion the Garcia court found in order to establish a case of impermissible exclusion for equal protection purposes, the party must show that he was a member of a "cognizable group" and that exclusion of members of that group was systematic. citing *Batson v. Kentucky* (1986) 476 U.S. 79, 96, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The court defined a cognizable group as "one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied." quoting *Castaneda v. Partida,* 430 U.S. 482, 494, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977). The Garcia court further determined that lesbians and gay men qualify under this standard and "share a history of persecution comparable to that of Blacks and women. While there is room to argue about degree, based upon their number and the relative indiscernibility of their membership in the group, it is just that: an argument about degree. It is a matter of quantity, not quality." *Id.* at 1276. This Court finds the foregoing persuasive. but ultimately that based on Florida precedent, the statute in the case at bar fails qualification under the strict scrutiny test.

## 2. Florida's Rational Basis

While the Court agrees the burden is on Petitioner, a presentation of the State's legitimate governmental interest provides a helpful outline for a discussion of Petitioner's arguments. First, the Department argues that the homosexual adoption restriction serves the legitimate state interests of promoting the well-being of minor children. According to the Department, the law's restriction serves the best interests of children because when compared to heterosexual behaving individuals, homosexual behaving individuals experience higher levels of stressors disadvantageous to children. Second, the State also aims to protect the best interest of children by placing them

in an adoptive home which minimizes social stigmatization. A third basis for the State's ban on homosexual adoption is its protection of societal moral interests of the child.

i. Promoting the well-being of children

**\*28** The Department argues Fla. Stat. § 63.042(3) is rationally related to Florida's interest by protecting children from the undesirable realities of the homosexual lifestyle. However, as thoroughly summarized in the Findings of Fact section of this Final Judgment, the foregoing is, frankly, false. [FN37]

> FN37. See n. 7 and 8. For example, according to the rates recorded by six studies and the records of federal agencies, the top three sufferers of substance abuse and dependency among all demographic classifications are 18–25 year olds (21%), American Indians and Alaskan natives (19%), and men (12%); the top three groups of smokers are Native Americans (42%), non-HS graduates (36%), and Whites (31%); the top three break-up rates of groups in relationships lasting 10 or more years are military service members having served in combat (62%), Blacks (47%), those when married as teenagers (43%) and those whose parents are divorced (43%).

Obviously, in order to be considered rationally related to a governmental interest, the distinctions between individuals may not be based on unsubstantiated assumptions. *U.S. Dept. of Agriculture v. Moreno,* 413 U.S. 528, 535, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973). Based on the statistics, there are no set of facts for which such a stated interest can be reasonably conceived of to justify the legislation. *Panama City Med. Diagnostic Lt. v. Williams,* 13 F.3d 1541, 1545 (11th Cir.1994). Fortunate for the Department, the government has no obligation to produce evidence to sustain the rationality of the statutory classification. *Heller v. Doe,* 509 U.S. 312, 320, 113 S.Ct. 2637, 125

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in So.2d, 2008 WL 5006172 (Fla.Cir.Ct.)
**(Cite as: 2008 WL 5006172 (Fla.Cir.Ct.))**

L.Ed.2d 257 (1993). Here, the two witnesses proffered by the Department failed to offer any reasonable, credible evidence to substantiate their beliefs or to justify the legislation. Viewing the statute from this point of view clearly renders it "illogical to the point of irrationality." *Lofton v. Secretary of Dept. of Children and Family Services,* 377 F.3d 1275, 1293 (11th Cir.2004), J. Barkett's dissent (*quoting Eisenstadt v. Baird,* 405 U.S. 438, 451, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972)). Any exclusion that would declassify an entire group of people based on identical factors is clearly "both discriminatory and overbroad." *Id.* at 1294. *See also City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)(when a statute imposes a classification on one group, the failure to impose the same classification on other groups is probative of a lack of rational basis.). Interestingly, in distinguishing *Cleburne,* the *Lofton* court posited that homosexuals were not similarly situated as heterosexuals, citing a 1987 New Hampshire Supreme Court decision holding that a similar statute was rationally related. However, in 1999, the New Hampshire legislature removed its prohibition of adoption and foster parenting by homosexuals.[FN38] Nevertheless, here, the evidence proves quite the contrary; homosexuals are no more susceptible to mental health or psychological disorders, substance or alcohol abuse or relationship instability than their heterosexual counterparts. Accordingly, such governmental interest does not justify the legislation.

> FN38. 1999 N.H. H.B. 90. The House of Representatives approved the bill 226–130, the Senate 18–6 and Governor Jeanne Shaheen signed it on May 4, 1999.

ii. Social Stigmatization/Necessity of dual gender homes

The Department next claims that best interests of children are served by placing them in an adoptive home which minimizes the social stigmatization they may experience. Again applying rational basis review,

this Court rejects the Department's attempt to justify the statute by reference to a supposed dark cloud hovering over homes of homosexuals and their children. Neither the judiciary, nor the legislature are experts in psychology, psychiatry or child development. As such, we must rely on the professionals in those areas to provide an assessment of the relevant science. Since, the adoption of the statute in 1977, *Cox* in 1993, *Amer* in 1997 or even *Lofton* in 2004, the amount and quality of the relevant research and literature is robust. As expressed by the Florida Supreme Court in *Cox,* the legislature should revisit this issue in light of the research that has taken place in the last fifteen years. In this regard, the professionals and the major associations now agree there is a well established and accepted consensus in the field that there is no optimal gender combination of parents. As such, the statute is no longer rationally related to serve this interest.

iii. Morality

**\*29** The Department's final rationale is that § 63.042(3) rationally relates to Florida's legitimate moral interest to promote public morality. However, public morality per se, disconnected from any separate legitimate interest, is not a legitimate government interest to justify unequal treatment. *Lawrence v. Texas,* 539 U.S. 558, 582, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003); In re *Fla. Bar Examiners, In re Eimers,* 358 So.2d 7 (Fla.1978); *State v. Limon,* 280 Kan. 275, 122 P.3d 22 (Kan.2005). (O'Connor, J., concurring); *Jegley v. Picado,* 349 Ark. 600, 80 S.W.3d 332 (Ark.2002). In other words, promoting public morals, in and of itself, does not rescue the statute from constitutional infirmity. Under the rational basis test, a classification can only be upheld if it "bears a reasonable relationship to a permissible legislative objective and is not discriminatory, arbitrary, or oppressive." *Abdala v. World Omni Leasing, Inc.,* 583 So.2d 330, 333 (Fla.1991).

Nevertheless, a public morality interest is inapplicable in the adoption context. Electing to parent and assume full responsibility for a child not one's own is

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in So.2d, 2008 WL 5006172 (Fla.Cir.Ct.)
**(Cite as: 2008 WL 5006172 (Fla.Cir.Ct.))**

one of the most noble decisions made in a lifetime; it is respected by many, considered by some, made by few and approved for fewer still. Here Petitioner qualifies for approval as an adoptive parent in all respects but one; his sexual orientation. The Department's position is that homosexuality is immoral. Yet, homosexuals may be lawful foster parents in Florida and care for our most fragile children who have been abused, neglected and abandoned. As such, the exclusion forbidding homosexuals to adopt children does not further the public morality interest it seeks to combat. Based on this scenario, there can be no rationally related public morality interest differentiating in the State's support of a homosexual's long-term foster care relationship with a child and a denial of their legal relationship through adoption. Consequently, there is no "morality" interest with regard to one group of individuals permitted to form the visage of a family in one context but prohibited in another. The contradiction between the adoption and foster care statutes defeats the public morality argument and is thus not rationally related to serving a governmental interest. See _City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 448–50, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)_ (unless the group that is singled out poses a special issue not posed by other non-burdened groups, the classification fails rational basis review).

### VII. CONCLUSION

This Court finds Fla. Stat. § 63.042(3) violates the Petitioner and the Children's equal protection rights guaranteed by Article I, § 2 of the Florida Constitution without satisfying a rational basis. Moreover, the statutory exclusion defeats a child's right to permanency as provided by federal and state law pursuant to the Adoption and Safe Families Act of 1997.

Accordingly, it is ORDERED and ADJUDGED that John Doe and James Doe be declared the legal children of Petitioner. The Children shall from this day forth assume the names JOHN DOE and JAMES DOE and by such names shall be hereafter known. A consent to adoption by the minors' birth parents is not

required due to the prior termination of their parental rights. This Final Judgment of Adoption terminates all legal relationships between the Children and their former relatives for all purposes including inheritance. This Final Judgment of Adoption now and forever creates a filial relationship between Petitioner, JOHN DOE and JAMES DOE. This relationship is hereby created for all purposes including inheritance and applicability of statutes, documents and instruments.

Fla.Cir.Ct.,2008.
In re Adoption of Doe
Not Reported in So.2d, 2008 WL 5006172 (Fla.Cir.Ct.)

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.