## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DEB WHITEWOOD and SUSAN
WHITEWOOD, FREDIA HURDLE and LYNN
HURDLE, EDWIN HILL and DAVID
PALMER, HEATHER POEHLER and KATH
POEHLER, FERNANDO CHANG-MUY and
LEN RIESER, DAWN PLUMMER and DIANA
POLSON, ANGELA GILLEM and GAIL
LLOYD, HELENA MILLER and DARA
RASPBERRY, RON GEBHARDTSBAUER and
GREG WRIGHT, MARLA CATTERMOLE and
JULIA LOBUR, SANDY FERLANIE and
CHRISTINE DONATO, MAUREEN
HENNESSEY, and A.W. AND K.W., minor
children, by and through their parents and next
friends, DEB WHITEWOOD and SUSAN
WHITEWOOD,

**Civil Action**

**No. 13-1861-JEJ**

**Plaintiffs,**

v.

MICHAEL WOLF, in his official capacity as
Secretary, Department of Health; DAN
MEUSER, in his official capacity as Secretary,
Department of Revenue; and DONALD
PETRILLE, JR., in his official capacity as
Register of Wills and Clerk of Orphans' Court of
Bucks County,

**Defendants.**

## FIRST AMENDED COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

**INTRODUCTION**

1.       Plaintiffs bring this action to challenge the constitutionality of Pennsylvania's laws excluding same-sex couples from marriage and voiding within Pennsylvania the marriages of same-sex couples entered into in other states.  23 Pa. C.S. §§ 1102 and 1704.

2.       Plaintiffs Fredia and Lynn Hurdle, Fernando Chang-Muy and Len Rieser, Dawn Plummer and Diana Polson, Angela Gillem and Gail Lloyd, Ron Gebhardtsbauer and Greg Wright, and Sandy Ferlanie and Christine Donato are lesbian and gay couples in committed relationships who wish to marry for the same reasons so many other couples get married – to publicly declare their love and commitment before their family, friends and community, and to give one another the security and protections that only marriage provides.

3.       Plaintiffs Deb and Susan Whitewood, Edwin Hill and David Palmer, Heather and Kath Poehler, Helena Miller and Dara Raspberry, and Marla Cattermole and Julia Lobur are already married, having wed in other states, but are treated as legal strangers in their home state, the Commonwealth of Pennsylvania.

4.       Plaintiff Maureen Hennessey is a widow who lost her spouse after 29 years together.  Because her spouse was a woman, their marriage is not recognized by the Commonwealth of Pennsylvania and she is not provided the protections afforded to widows under Pennsylvania law.

5.     Plaintiffs A.W. and K.W. are the children of one of the plaintiff couples.  The fact that their parents' marriage is not recognized harms them materially by reducing family resources and stigmatizes them by denying their family social recognition and respect.

6.     The plaintiffs come from across the Commonwealth, hailing from Philadelphia, Swarthmore, Downingtown, Bangor, Harrisburg, State College, and Pittsburgh.  They come from all walks of life:  they include an emergency room doctor, university professors, a truck driver, an executive at BNY Mellon, a psychologist, a dog trainer, state employees, lawyers, an artist, a stay-at-home mom, and retirees.  One of the plaintiffs served in the Navy in Vietnam; another is a 12-year veteran of the Army.  The plaintiffs reflect the rich diversity of the Commonwealth:  they are African-American, Caucasian, Latino, and Asian; they are Methodist, Baptist, Catholic, Quaker, Jewish, Buddhist, and secular.  Many have been together for decades, and some are raising children together.  The situations faced by these couples are similar to those faced by the thousands of same-sex couples in Pennsylvania who are being denied the basic rights that are afforded by marriage.

7.     The plaintiff couples, like other committed couples, have cared for each other, supported each other, sacrificed for each other, and made plans for the future with each other.  Some have endured great challenges and hardships

together, such as financial troubles and serious illness.  Maureen Hennessey's commitment to her spouse endured through her spouse's four year battle with cancer and untimely death.

8.      Like other couples who have made a lifetime commitment to each other, the plaintiff couples are spouses in every sense, except that Pennsylvania law says they cannot marry and, if they are married under the laws of another state, their marriages are not honored here.

9.      The Commonwealth's exclusion of same-sex couples from marriage adversely impacts the plaintiffs and same-sex couples across the Commonwealth in significant ways.  It excludes them from the many legal protections available to spouses.  For example, when one partner dies, the surviving partner may face serious financial hardship, including the loss of her home, because she is denied the inheritance tax exemption provided to widows.  Lesbian and gay police officers, firefighters and other first responders are denied the peace of mind of knowing that if they make the ultimate sacrifice, their partner will be taken care of through the financial support available to help those who lost their spouses in service to the community.  Because of Pennsylvania's refusal to allow or recognize their marriages, same-sex couples are also denied many federal protections afforded to married couples such as the ability to take time off work to care for a

sick spouse under the Family Medical Leave Act and access to a spouse's social security retirement benefits.

10.     The exclusion from marriage undermines the plaintiff couples' ability to achieve their life goals and dreams, threatens their mutual economic stability, and denies them "a dignity and status of immense import." *United States v. Windsor*, 133 S. Ct. 2675, 2692 (June 26, 2013). Moreover, they and their children are stigmatized and relegated to a second class status by being barred from marriage. The exclusion "tells [same-sex] couples and all the world that their relationships are unworthy" of recognition. *Id.* at 2694. And it "humiliates the . . . children now being raised by same-sex couples" and "makes it even more difficult for the children to understand the integrity and closeness of their own family and its concord with other families in their community and in their daily lives." *Id.*

11.     Some of the plaintiffs are old enough to remember when a majority of states had laws prohibiting marriage between people of different races and when the Supreme Court struck down such prohibitions in *Loving v. Virginia*, 388 U.S. 1, 12 (1967), declaring: "The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men."

12.     Our courts and our society have discarded, one by one, marriage laws that violated the Constitution's mandate of equality, such as anti-miscegenation laws and laws that denied married women legal independence and the right to

make decisions for themselves. History has taught us that the vitality of marriage does not depend on maintaining such discriminatory laws. To the contrary, eliminating these unconstitutional aspects of marriage has enhanced the institution. Ending the exclusion of lesbian and gay couples from marriage is no different. Indeed, in 14 states and the District of Columbia, same-sex couples are marrying and the institution of marriage continues to thrive.[1]

13.     This is because, at its heart, marriage is both a personal and a public commitment of two people to one another, licensed by the state. Through marriage, the Commonwealth recognizes a couple's decision to establish a family unit together and support one another and any children of the marriage.

14.     Marriage contributes to the happiness of countless couples and their families and also contributes to society. Pennsylvania, like other states, encourages and regulates marriage through hundreds of laws that provide benefits to and impose obligations on married couples. In exchange, the Commonwealth receives the well-established benefits that marriage brings: stable, supportive families that contribute to both the social and economic well-being of the Commonwealth.

---

[1] In addition, Illinois is about to become the fifteenth state to allow same sex couples to marry. On November 5, 2013, the Illinois legislature passed a bill legalizing marriage for same-sex couples, and the Illinois Governor has pledged to sign the bill into law.

15.     Pennsylvania's exclusion of same-sex couples from marriage infringes on the Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.  This discriminatory treatment is subject to heightened scrutiny because it burdens the fundamental right to marry and because it discriminates based on sex and sexual orientation.  But it cannot stand under any level of scrutiny because the exclusion does not rationally further any legitimate government interest.  It serves only to disparage and injure lesbian and gay couples and their families.

16.     Plaintiffs bring this suit pursuant to 42 U.S.C. § 1983 for declaratory and injunctive relief against defendants.  Specifically, plaintiffs seek:  (a) a declaration that the Commonwealth's prohibition of marriage for same-sex couples and its refusal to recognize marriages of same-sex couples validly entered into outside of the Commonwealth violate the Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution; and (b) a permanent injunction i) preventing defendants from denying the plaintiff couples and all other same-sex couples otherwise eligible to marry the right to marry in the Commonwealth of Pennsylvania, and ii) directing defendants to recognize the marriages of the plaintiff couples and other same-sex couples validly entered into outside of Pennsylvania.

## THE PARTIES

### Plaintiffs

***Deb and Susan Whitewood and A.W. and K.W.***

17.    Plaintiffs Deb Whitewood ("Deb") and Susan Whitewood ("Susan") have lived together in a committed relationship for 22 years.  Deb and Susan live in Bridgeville, in Allegheny County, with their three children.  Susan, 49, is a human resources executive at BNY Mellon.  Deb, 45, is a stay-at-home mom.  Deb was born and raised in Pittsburgh.  Susan has lived in Pennsylvania since attending college in Pittsburgh.

18.    Deb and Susan have two daughters, Plaintiff A.W., who is 16, and Plaintiff K.W., who is 15.  Deb is the children's biological mother and Susan obtained second parent adoptions after the children's births to establish a legal parent-child relationship with both children.  Deb and Susan also have a two-year-old son, L.W.  He was placed with them by the Allegheny County Department of Children and Youth Services when he was 11 months old.  The placement initially was a foster placement.  When L.W. was 20 months old, Deb and Susan jointly adopted him.  The judge in the Allegheny County Children's Court granted the adoption after determining that the welfare of L.W. will be promoted by this adoption.

19.     Deb and Susan are very involved in their children's school and activities.  Susan has coached their volleyball and softball teams.  When the girls were younger, Deb was active in the PTA and was the "classroom mom" who planned activities and parties for the class and chaperoned field trips.  Deb is currently chair of the band festival, which raises most of the money to support the high school band.  She also coordinates the concession stand at volleyball games.

20.     Deb and Susan are devout Christians and they and their children are members of and actively involved in the Christ United Methodist Church of Bethel Park.  Deb is the president of the Altar Guild, which prepares the church's communion, cares for the sanctuary and holy items, and decorates for the holidays.  A.W. and K.W. are in the church choir and sing every Sunday.  A.W. is also in the Youth Praise band, which sings contemporary Christian songs at church and at community performances.

21.     In 1993, Deb and Susan had a Holy Union ceremony at the church they attended at the time.  They both changed their last names to Whitewood, a combination of their surnames.  They entered into a civil union in Vermont after that became possible.  On October 19, 2013, Deb and Susan married in Maryland.  They would have preferred to have been married in their home state of Pennsylvania.

22.     Deb and Susan would like their marriage to be recognized in Pennsylvania to have the same legal protections married couples rely on.  They are fearful of how they might be treated in a time of crisis and therefore had a lawyer draw up powers of attorney for them, which they carry with them everywhere

23.     In addition, the exclusion from marriage impacts the family financially.  The health insurance Deb gets from Susan's company is taxable income in Pennsylvania; if their marriage were recognized, the health insurance benefits would not be taxed.  Moreover, if anything were to happen to Susan, Deb would be denied Susan's social security and she would have to pay a 15% inheritance tax on half of the couple's joint property, a tax from which spouses are exempt.

24.     Deb and Susan also want their marriage recognized because they are concerned that their children are being taught the message that their family is less deserving of respect and support than other families.

25.     A.W. and K.W. grew up assuming that their moms were married.  As they got older and came to learn that their parents were not allowed to marry in Pennsylvania, and, later, when their parents did marry in another state, that Pennsylvania would not recognize their marriage, both girls felt that this was unfair to the whole family.  They know they are a family and want to be legally recognized as one.  They believe they should not be deprived of economic

resources available to families headed by married couples. And they feel stigmatized by the fact that their parents' marriage is not recognized. They believe that if their parents' marriage were recognized by the Commonwealth, that would demonstrate that society accepts their family and considers it worthy of respect.

***Fredia and Lynn Hurdle***

26. Plaintiffs Fredia Hurdle ("Fredia") and Lynn Hurdle ("Lynn") of Pittsburgh have lived together in a committed relationship for 22 years. Fredia, 50, is a member of the Teamsters' Union and drives a truck for the Pittsburgh Post-Gazette. Lynn, 43, is a pediatric nurse.

27. Fredia and Lynn met in 1990 when Fredia was a Greyhound bus driver and Lynn was a passenger. Fredia had been assigned to a new route and Lynn tried to help her out with directions. They ended up dating via Greyhound for about five months until Fredia moved to Pittsburgh.

28. Fredia and Lynn's family includes Lynn's daughter Ashley, now 25, who lived with Fredia and Lynn from the time she was two years old until she went to college. After Fredia's sister died, two of Fredia's nephews and a niece came to live with Fredia and Lynn until they were ready to move out on their own. One of the boys lived with them for 9 years.

29. Fredia and Lynn are caregivers by nature and have become known locally as the couple people go to when there are people in need of care. They

took care of two children in the neighborhood when their families were going through difficult times. And an elderly family friend of Lynn's lived with Fredia and Lynn, who looked after her for 16 years until she passed away.

30.     Fredia and Lynn had a commitment ceremony at a church in 2009. More than 200 friends and family members celebrated with them. Lynn took Fredia's last name.

31.     Fredia and Lynn want to get married because they love each other and believe that families should be recognized through marriage. Because they cannot be married, when Fredia was hospitalized for emergency gall bladder surgery, the nurses refused to give Lynn any information about Fredia's condition because she was not considered family. When Fredia had to undergo medical testing after an injury, Lynn was not allowed to be present because she was not considered a relative. Because of these experiences, they hired an attorney to prepare powers of attorney for them, which they carry with them at all times.

32.     The exclusion from marriage has also meant that Lynn had to go without health insurance for about 3 years because her job did not offer health benefits and Fredia could not add Lynn to her employee health plan. During that time, Lynn had an accident in which she injured her shoulder and had to pay about $2,000 in hospital bills.

33.     Because they cannot be married in Pennsylvania, the couple worries about how Lynn will support herself if Fredia passes away first because Lynn would not be able to count on Fredia's social security (Fredia earns a larger income than Lynn) or pension for support.

34.     Fredia and Lynn also feel that the exclusion from marriage stigmatizes them and other lesbian and gay couples and sends the message that they are not entitled to the same respect other couples enjoy.  As an interracial couple, Fredia and Lynn are very aware that before the Supreme Court's historic decision in *Loving v. Virginia*, they would have been barred from marrying based on their races.  And as an African American who grew up in Virginia and attended a segregated school until third grade, Fredia has experienced the profound social and dignitary harms that come with discrimination.  She and Lynn pray that they will soon be permitted to marry and be treated as full and equal citizens in Pennsylvania.

***Edwin Hill and David Palmer***

35.     Plaintiffs Edwin Hill ("Ed") and David Palmer ("David") have lived together in a committed relationship for 25 years.  Ed, 67, and David, 66, live in Bangor, in Northampton County, the town where they met in 1988 while attending a Christian retreat.

36.     Both Ed and David were born and raised in Pennsylvania.  Ed grew up just outside of Pittsburgh and graduated from the University of Pittsburgh.  David is from Trucksville, just outside of Wilkes-Barre, and he is a graduate of Wilkes University.  He also holds a masters' degree in theology from Drew University.

37.     Both men are retired.  Ed is a veteran of the United States Navy, having served from 1968 to 1971.  He served in Vietnam as a sonar technician aboard the U.S.S. Brooke.  He also worked for over 20 years at the Department of Veterans Affairs where he oversaw programs to support veterans.  David worked at a museum for 30 years, eventually obtaining the position of Director of Exhibitions.  In 1996, after they retired from their careers, David and Ed opened the Arrowheart Inn, a bed and breakfast in Bangor, which they ran for 12 years until, as they say, they retired "for real" in 2008.

38.     Ed and David were married on May 10, 2013, in Kennebunk, Maine, accompanied by a few of their dearest friends and members of Ed's family who live in Maine.  Their marriage license was witnessed by Ed's ninety-year-old aunt and David's oldest friend.  They would have preferred to marry in their home state of Pennsylvania, where more of their friends and family could have joined in their celebration.  But after 25 years together, they did not want to wait any longer to marry.  And as seniors, they worried that they might not live to see the day when they could marry at home.  Since they couldn't have their wedding in

Pennsylvania, they had a party in their home town in August for more than seventy family members and friends to celebrate their 25th anniversary as a couple.

39. Even after a quarter century together, the act of marrying has had a profound impact on Ed and David. It meant the world to them to be able to stand before loved ones and declare their love and commitment and to be able to call one another husband.

40. However, Ed and David cannot enjoy the protections and security that marriage brings other couples because their marriage is not recognized in their home state of Pennsylvania. Like many seniors on fixed incomes, they are concerned about managing financially in their retirement. They are especially worried about the fact that when one of them passes away, the widower will be denied the estate tax protections Pennsylvania law provides to married couples. Any inheritance from one to the other – including one half of the value of their home and joint bank accounts – will be taxed at the rate of 15%, the highest rate. If their marriage were recognized, there would be no such tax. Ed and David have worked hard to save extra money for retirement so that neither of them will be forced out of their home due to the large tax bill that will come when one of them passes. But losing such a large share of the family's assets will significantly reduce the economic security of the surviving spouse and the standard of living he will have for the rest of his years.

41.     Ed and David have talked about moving to another state where their marriage would be recognized and they would have more financial security.  But they do not want to leave their home and community.  They want to grow old together in the place where they met twenty-five years ago.

### *Heather and Kath Poehler*

42.     Plaintiffs Heather Poehler ("Heather") and Katherine Poehler ("Kath") have lived together in a committed relationship for 10 years.  Heather, 44, and Kath, 42, live in Downingtown, in Chester County.  They live off a country road on 8 acres of land with three dogs that they rescued from an animal shelter, two cats, and seven chickens.  Heather is a Medicaid Liaison Manager at a healthcare auditing firm.  Kath owns a dog training and dog walking business.

43.     On September 10, 2005, Heather and Kath got married in Massachusetts, their home state at the time.  Heather changed her last name to share Kath's.

44.     In 2007, during difficult economic times, Heather was offered a promising job in Philadelphia and the couple relocated there.  Going from being treated as the married couple that they are in Massachusetts to being treated as legal strangers in Pennsylvania has been hard for them logistically, financially, and emotionally.  For example, they had difficulty preparing their tax returns and completing mortgage paperwork in Pennsylvania because accountants and bank

officials were unsure whether to treat the couple as married or unmarried. They pay more for health insurance than they would if their marriage were recognized in Pennsylvania because they must pay taxes on the health insurance for Kath that Heather gets through her employer.

45.     Having their marriage disregarded by the Commonwealth has also taken an emotional toll on the couple. It is painful not to be respected as a married couple or recognized as a family. And they feel vulnerable about what could happen in times of crisis. They felt especially anxious last year when Heather underwent surgeries for a broken leg and Kath had to be hospitalized for a severe allergic reaction. Because they are not recognized as spouses in Pennsylvania, neither is automatically legally authorized to make medical decisions for the other if necessary. Instead, with each trip to the hospital or doctor, they have had to explain their relationship and prove it with paperwork.

46.     Heather and Kath have developed roots in Pennsylvania. It has become their home. The idea of having to leave the community they love in order to have their marriage respected saddens them.

### *Fernando Chang-Muy and Len Rieser*

47.     Plaintiffs Fernando Chang-Muy ("Fernando") and Len Rieser ("Len") have lived together in a committed relationship for 32 years. Fernando, who is 58, was born in Cuba and emigrated to the United States with his family when he was

a child.  Len, 64, grew up in Vermont.  The couple moved to Philadelphia in 1982, when Fernando was offered a job there.  Philadelphia has been their home ever since.

48.     Fernando and Len are the proud parents of Isabel, whom they adopted when she was 10 months old.  Isabel, now 21, is a student at Temple University and aspires to be a teacher.

49.     Fernando and Len are both lawyers and professors who have dedicated their careers to the public interest.  Fernando currently teaches a course on refugee law and policy at the University of Pennsylvania Law School and non-profit management and immigration policy courses at the University's Graduate School of Social Policy and Practice.  Len has dedicated his career to advocating for children in the educational, mental health, and child welfare settings.  For approximately 17 years, he co-directed and directed the Education Law Center-PA.  He currently teaches in the clinical program at the University of Pennsylvania Law School and is an adjunct professor at Temple University and Arcadia University.

50.     Fernando and Len entered into a civil union in Vermont on February 14, 2004.  They celebrated with their family at Len's parents' house there.  Although obtaining the civil union was an important moment for them, it also reinforced the fact that their relationship is not legally recognized in the state where they actually live.

51.     Fernando and Len want to be able to be married and have their marriage recognized in Pennsylvania.  They see marriage as an appropriate recognition of the deep and permanent commitment they have made to each other.  More importantly, Fernando and Len know that if they could marry, it would mean a lot to their daughter, who would like her parents to be married to each other.

52.     When Isabel was growing up, it was important to Fernando and Len for her to have the same sense of security that any other child gets from being part of a loving family.  Fernando and Len made a point, when Isabel was in elementary and secondary school, of making sure her teachers understood that they were a family and that they desired to be active in the school community just like any other parents.  Fortunately, they managed to find school personnel who would support them, as well as health care providers, a religious community, neighbors, and other essential components of their lives as a family.

53.     Fernando and Len recognize that even if they had been able to be married, the process of establishing themselves and their daughter as a family would still have had its challenges, as they know that there are people who disapprove of relationships such as theirs.  But they are convinced that if marriage had been available to them, a major barrier to their acceptance and well-being as a family would have been removed, and that, even now, the availability of marriage would make a significant, positive difference to their life as a family.

54. Moreover, as lawyers, Fernando and Len are aware of how vulnerable they are because they are excluded from the many legal protections of marriage. They have done everything that lawyers can do to protect themselves in the absence of marriage, such as drawing up wills and powers of attorney, but they know that there is nothing they can do to access most of the protections available to married couples.

### *Dawn Plummer and Diana Polson*

55. Plaintiffs Dawn Plummer ("Dawn") and Diana Polson ("Diana") of Pittsburgh have lived together in a committed relationship for 13 years. They met as college students on a study abroad program in Brazil.

56. Dawn, 37, is a fundraiser for The Poverty Initiative, an anti-poverty organization. Diana, 37, recently finished her Ph.D. and now works for a nonprofit research think tank aimed at improving the Pennsylvania economy for working people.

57. Dawn and Diana settled in Pittsburgh in 2011 because Dawn has Pennsylvania roots, having grown up in Camp Hill and having family in Pittsburgh, and they thought Pittsburgh would be a great city in which to raise children.

58. Dawn and Diana have two sons – a five-year-old, E.P., and a one-year-old, J.P. They each gave birth to one of the children. They have completed a

second parent adoption for E.P.  They plan to do the same for J.P. but need to save money to be able to pay the more than $2,500 they were told it will cost.  Until then, they feel vulnerable because if anything were to happen to Diana, J.P. has no legal tie to Dawn.  If they were legally married in Pennsylvania this would not be the case because both spouses would be recognized as parents from the moment of the child's birth.

59.     Dawn and Diana had a commitment ceremony in the Catskills in front of 50 family members and friends in 2007.  They want to be legally married because they want the same legal protections other couples enjoy.  Every time they have to check the "single" box on a form, it feels demeaning to their relationship.  And it would mean a lot to their relatives for them to marry.  Moreover, Dawn and Diana's five-year-old son is beginning to understand what marriage is.  He asks a lot of questions, and they struggle to come up with a way to explain to him why his parents aren't allowed to get legally married.

### Angela Gillem and Gail Lloyd

60.     Plaintiffs Angela Gillem ("Angela") and Gail Lloyd ("Gail") of Philadelphia have lived together in a committed relationship for 17 years.  Angela, 61, is a clinical psychologist and professor at Arcadia University whose current area of research is multi-cultural competency for counselors.  Gail, 55, is a

filmmaker and visual artist who graduated from Temple University's Film and Media Arts Program.

61.     Angela and Gail feel incredibly lucky to have found one another and have long known that they would be together forever.  They wear matching rings to symbolize their commitment to one another and to show the world that they each "belong to someone."  They are registered domestic partners in Philadelphia.

62.     Angela and Gail would like to get married and be recognized as a married couple in their home state because they love each other and want the chance to stand up and have their family and community witness them make the fullest commitment two people can make to one another.

63.     They also want the security that comes with marriage and the protections the law provides to married couples in times of need.  Because Angela is the primary breadwinner and Gail, as an artist, does not draw a steady paycheck to contribute to social security, the couple fears for Gail's economic security should Angela be the first of them to pass away.  Because they cannot be married, Gail would not get Angela's social security and she would lose a substantial portion of the family's assets because she would not be entitled to the spousal exemption from the inheritance tax.

64.     They have tried to replicate some of the security that comes with marriage by having wills and healthcare and financial powers of attorney drawn up

to grant each other some of the rights and decision-making power that would have come automatically with marriage.

65.     On July 1, 2013, Angela and Gail went to the office of the Register of Wills and Clerk of Orphans' Court of Bucks County to apply for a marriage license.  Their application was refused because they are a same-sex couple.

### Helena Miller and Dara Raspberry

66.     Plaintiffs Helena Miller ("Helena") and Dara Raspberry ("Dara") of Philadelphia have lived together in a committed relationship for six years.  Helena, 39, is a teacher and educational consultant.  Dara, 43, is an emergency medicine physician at Einstein Medical Center Philadelphia.

67.     In 2010, while they resided in New York, Helena and Dara decided to get married.  They wanted to make a public commitment to each other in front of their friends and families, to join their families together, and to start a new family together.  They got married in Connecticut on September 25, 2010, with 140 of their loved ones in attendance.

68.     In the fall of 2011, because they were hoping to soon have children of their own, they decided to move from New York to Philadelphia in order to be closer to their families.

69.     Helena and Dara's dream to start a family came true on May 28, 2013, when Helena gave birth to their daughter, Z.R.  Dara's second-parent adoption of

Z.R. was completed on September 6, 2013. During the time between Z.R.'s birth and the second-parent adoption, Z.R. had only one legally recognized parent. Helena and Dara had to spend more than $1,800 in attorney fees and costs to complete the adoption. If their marriage were recognized in Pennsylvania, Dara would automatically **and immediately** have been recognized as a parent to any child born to her spouse.

70.     Sadly, for Helena and Dara, the cost of moving to Pennsylvania to be close to family was to be effectively "unmarried" and, thus, considered less of a family in the eyes of the state. Helena and Dara would like their marriage to be recognized in Pennsylvania not only because of the concrete protections it would provide to them and their daughter, but also because they feel that being treated as an unmarried couple disrespects the commitment they have made to one another and devalues their family. They hope that their marriage will be recognized in Pennsylvania before their baby is old enough to be aware that the Commonwealth does not consider her family deserving of the same respect afforded other families.

### *Ron Gebhardtsbauer and Greg Wright*

71.     Plaintiffs Ron Gebhardtsbauer ("Ron") and Greg Wright ("Greg") have lived together in a committed relationship for 19 years. Ron, who is 61, is a Clinical Associate Professor and head of the Actuarial Science Program at Penn

State University.  Greg, 57, is an acupuncturist in private practice.  Ron and Greg have lived in State College since 2008.

72.    Ron and Greg registered as domestic partners in State College when that became possible in 2011.  They are engaged to be married.  They want to get married to declare publicly and officially their commitment.  They would like to be able to refer to one another officially as spouses.  They feel that using the term "partner" is inadequate as it does not convey the level of commitment they have made to one another.

73.    It is important to them to marry in Pennsylvania, where they have made their home and built their lives together.  And they would like to be able to marry in their own church.  Their minister has already agreed to officiate at the ceremony if that becomes an option for them legally.

74.    Because their relationship is not legally recognized in Pennsylvania, when one of them passes away, the surviving partner will be denied the spousal exemption from the inheritance tax and will have to pay a 15% tax on half of everything the couple owns together, including their home.

***Marla Cattermole and Julia Lobur***

75.    Plaintiffs Marla Cattermole ("Marla") and Julia Lobur ("Julia") of Harrisburg have lived together in a committed relationship for 27 years.  They met during Army basic training.

76.     Julia, who is 58, is a lifelong Pennsylvanian, born and raised in New Kensington, just outside of Pittsburgh.  Marla, 54, grew up in Iowa but moved to Pennsylvania in 1986 to be with Julia.  Marla and Julia both work for the Commonwealth, Julia as a software architect and project manager and Marla as a senior benefits manager.  Julia is also an adjunct lecturer in computer science at Penn State Harrisburg.

77.     Marla is a 12-year veteran of the Army.  She left the Army as a sergeant in 1995, having earned various commendations.  Julia attempted to serve her country and enlisted in the Army in 1983 but she was discharged during basic training after her sexual orientation was revealed to her superiors.  Military policy at the time barred service by lesbians and gay men.

78.     Marla and Julia strongly support each other.  They share finances and all of their property, including their home, is jointly owned.  They not only take care of each other, they also took care of Julia's mother for 12 years when it became difficult for her physically and financially to live on her own.  She lived with them until she passed away in 1997.

79.     In 2009, Marla and Julia got married in Carroll, Iowa, where Marla grew up.  Marla's mother and sister were there to celebrate with them.  They had wanted to marry for years but did not want to do it far from home.  They decided to

marry in Iowa as soon as that became a possibility because it was the closest thing they thought they would get to marrying at "home."

80.     Because their marriage is not recognized in their home state of Pennsylvania, Marla and Julia have gone to considerable expense to have an attorney draw up documents, such as living wills and healthcare proxies, to try to protect themselves.  They understand, however, that this affords them only a fraction of the protections that come with marriage and they are concerned that those papers will not hold up in times of crisis.

81.     The non-recognition of their marriage also affects them financially. For example, they worked hard to save money for their retirement but worry that when one of them dies, the widow will be left financially insecure because she will be denied the spousal exemption from the inheritance tax.  A financial advisor estimated that the tax bill could be up to approximately $50,000.  Marla and Julia pay hundreds of dollars a year to carry life insurance policies in order to cover the cost of inheritance tax when one of them dies.

82.     The recognition and legitimacy that marriage provides to them means the world to Marla and Julia when they get to experience it.  Most recently, when they visited Washington State, they felt joyful and free every time they were recognized as a legal couple, even in matters as mundane as renting a car together.

They feel the loss of that freedom every time they return to home to Pennsylvania after travelling in a state where their marriage is respected.

### *Sandy Ferlanie and Christine Donato*

83.     Plaintiffs Sandra Ferlanie ("Sandy") and Christine Donato ("Christine") have lived together in a committed relationship for 17 years.  They live in Swarthmore with their five-year-old son, H.F., who is in kindergarten. Sandy, 45, is a trained nurse and works on drug safety at a pharmaceutical company.  Christine, 44, is a consultant for pharmaceutical companies.

84.     Sandy and Christine's life is centered around their son and family. After H.F.'s birth, Sandy returned to work at a reduced schedule to have more time at home with him.  Sandy and Christine feel blessed to have both sets of their parents close by and that their son is able to spend so much time with his grandparents.  Sandy and Christine's siblings, aunts and uncles, and cousins also live nearby and their son regularly plays with his many cousins.  Their home is the center of family life for both of their extended families and is filled with relatives at every holiday.

85.     Sandy and Christine would like to get married because they love each other and want their family to be treated no differently than any other.  They have hired an attorney to draw up wills and powers of attorney to provide protections

where possible but know that they cannot access most of the protections and obligations of marriage through any documents.

86.     Sandy and Christine have already experienced stresses from the inability to marry.  After their son was born, it took about a year for Christine's second parent adoption to be finalized.  During that time, Sandy and Christine felt vulnerable about the lack of legal tie between Christine and H.F. should anything happen to Sandy.  A few years later, Sandy was diagnosed with a life-threatening cancer.  During this difficult time, the couple realized that their situation would have been even scarier and more precarious for the family if Sandy had fallen gravely ill before Christine's adoption of their son was final.  Dealing with major surgery and chemotherapy reinforced for them the need for the security of marriage as they experienced additional stress about whether Christine would be able to get information from medical staff about Sandy's condition or be able to make medical decisions for her if necessary given that she wasn't a legally recognized family member.

87.     It's important for Sandy and Christine to marry in the state where they were raised and have spent their lives.  They would also like to be able to marry in their church, Trinity Episcopal, before all of their friends and family.

88.     On November 6, 2013, Sandy and Christine went to the office of the Register of Wills and Clerk of Orphans' Court of Bucks County to apply for a

marriage license. Their application was refused because they are a same-sex couple.

### Maureen Hennessey

89. Plaintiff Maureen Hennessey ("Maureen"), 53, lived in a committed relationship with Mary Beth McIntyre ("Mary Beth") from 1984 until Mary Beth's death on May 18, 2013, at the age of 55.

90. Both Maureen and Mary Beth were born and raised in Philadelphia and they shared their lives together in Philadelphia for 29 years. They raised 3 children together – Maureen's son from a previous relationship, and Mary Beth's niece and nephew, whose mother died when they were young. And they became grandmothers to three grandchildren, now 19, 9, and 8. They registered as Life Partners with the city of Philadelphia in 2002.

91. In August 2009, Mary Beth was diagnosed with inoperable Stage 4 lung cancer that had spread to her brain and bones. After Mary Beth fell ill, Maureen left her job as a middle school teacher in the Philadelphia School District to care for Mary Beth and help Mary Beth run her business, which was the family's primary source of income.

92. Maureen and Mary Beth were married in Massachusetts on June 9, 2011. They would have preferred to marry in their home state of Pennsylvania because their loved ones are there and they would have liked to have been able to

solemnize their marriage at Germantown Friends Meeting. But getting married in Pennsylvania was not an option and they knew their time together was too limited to try to wait for that to change to come.

93. As Mary Beth's condition deteriorated, she was unable to take basic care of herself. She needed Maureen's help to get in and out of bed and to the bathroom. Maureen helped bathe her and administered her medications. Because Mary Beth had difficulty chewing and swallowing, Maureen prepared foods that were easy to swallow.

94. While Mary Beth was suffering the physical and emotional pain of end stage cancer, she had the additional burden of worrying about how Maureen would manage financially after she was gone. The couple consulted with an attorney about ways to protect Maureen financially. The attorney was able to provide some protections, such as a will to ensure that Mary Beth's wishes to leave her property to Maureen would be honored. But there was nothing the attorney could do to establish most of the legal protections that are available to widows and widowers.

95. Because Maureen's marriage to Mary Beth is not recognized in Pennsylvania, Maureen must pay a 15% inheritance tax on property that Mary Beth left to her, including their shared home. And unless their marriage is recognized in Pennsylvania, Maureen will not be eligible to receive Mary Beth's social security

benefits when she turns 65.  Because Mary Beth was the primary breadwinner, this will leave Maureen financially vulnerable in her retirement.

96.    Pennsylvania's refusal to recognize her marriage to Mary Beth does not just cause Maureen economic hardship.  In her time of grief, she is denied the comfort and dignity of being acknowledged as Mary Beth's widow.

97.    Despite their lengthy committed relationship, which lasted through sickness and health and until death, Mary Beth's Certificate of Death does not recognize Maureen and Mary Beth's marriage.  Under the heading "Marital Status at Time of Death," the Certificate of Death states that Mary Beth was "Never Married."  Maureen does not appear under the heading "Surviving Spouse's Name."  Instead, she is listed under "Informant" as "Partner."

98.    Maureen desires and seeks to have Mary Beth's Certificate of Death amended to reflect that Mary Beth was married at the time of her death and to identify Maureen as Mary Beth's surviving spouse.

99.    It would be futile to seek this amendment of Mary Beth's Certificate of Death through the Department of Health because 23 Pa. C.S. § 1704 prohibits the recognition of Maureen and Mary Beth's marriage and deems their marriage to be "void."

_____

100.    Plaintiffs Fredia and Lynn Hurdle, Fernando Chang-Muy and Len Rieser, Dawn Plummer and Diana Polson, Angela Gillem and Gail Lloyd, Ron Gebhardtsbauer and Greg Wright, and Sandy Ferlanie and Christine Donato are all eligible to marry but for the fact that they wish to marry someone of the same sex. They are all over the age of 18, fully competent, are not married to anyone else, are not within a prohibited degree of consanguinity of each other, and are prepared to provide the required information and pay the license fee.  They are willing and able to assume all of the obligations of marriage.

101.    Plaintiffs Deb and Susan Whitewood, Edwin Hill and David Palmer, Heather and Kath Poehler, Helena Miller and Dara Raspberry, Marla Cattermole and Julia Lobur, and Maureen Hennessey all were married legally under the laws of other states and their marriages would be recognized within the Commonwealth but for the fact that they are married to a person of the same sex.

102.    All of the married plaintiffs are residents of Pennsylvania and file personal income tax returns with the state.  All of the married plaintiffs desire and seek to be able to declare themselves as "Married" and not "Single" on their income tax returns and desire and seek to have the option of filing "Jointly," but 23 Pa. C.S. § 1704 prohibits and will continue to prohibit the same absent relief from this Court.

103.    Upon their deaths, all of the married plaintiffs want their own and their spouse's respective Certificates of Death issued and maintained by the Commonwealth of Pennsylvania to reflect their marriage, but 23 Pa. C.S. § 1704 prohibits and will continue to prohibit the same absent relief from this Court. Unless enforcement of 23 Pa. C.S. § 1704 is enjoined, when each of the married plaintiffs dies, their Certificates of Death will, like Mary Beth's, fail to accurately reflect their marital status and, if their spouse survives, the name of their surviving spouse.

## Defendants

*Michael Wolf, Secretary of Health of the Commonwealth of Pennsylvania*

104.    Defendant MICHAEL WOLF is the Secretary of Health of the Commonwealth of Pennsylvania and as such serves as chief executive of the Pennsylvania Department of Health.

105.    Secretary Wolf enforces Pennsylvania's practices, policies, and laws prohibiting marriage and recognition of marriage for same-sex couples, including 23 Pa. C.S. §§ 1102 and 1704.

106.    In his official capacity, pursuant to 23 Pa. C.S. §§ 1104 and 1306, he is responsible for preparing and approving the marriage license application and marriage license forms used in county offices across the Commonwealth, which presently prohibit persons of the same sex from marrying by requiring both a

"Bride" and "Groom." In his official capacity, pursuant to 23 Pa. C.S. § 1106, he is charged with receiving reports of issued marriage licenses from individual counties and with publishing statistics derived from those reports.

107. In his official capacity, he also is responsible for creating forms for Certificates of Death, and the issuance, maintenance, and amendments to such certificates. *See, e.g.*, 35 P.S. §§ 450.201, 450.202, 450.204. The forms prescribed by the Secretary of Health require a declaration of the "Marital Status at Time of Death" and "Surviving Spouse's Name" of the deceased, if there is one. Those terms are controlled by 23 Pa. C.S. §§ 1102 and 1704, and individuals with same-sex spouses are prohibited from having their marriage and spouse recognized on their Certificate of Death or from being recognized on their spouse's Certificate of Death, and they are prohibited from having any previously issued Certificate of Death amended to reflect a deceased person's marriage to an individual of the same sex. In fact, the 2012 Death Certificate Registration Manual, Revised March 13, 2013, published by the Department of Health, states in emphasized bold-face text that for listing the identity of "Surviving Spouse's Name" under item 11 of a Certificate of Death, "The name of partner or companion is **not acceptable.**" *Id.* at 11 (emphasis in original), *available at* http://www.portal.state. pa.us/portal/portal/server.pt/community/data_provider/20590 (last visited Nov. 6, 2013).

108.   This refusal to recognize the marriages of plaintiffs denies them dignity, and injures and stigmatizes plaintiffs at one of the must vulnerable periods of life, when they are grieving for the loss of their spouse.

**Dan Meuser, Secretary of Revenue of the Commonwealth of Pennsylvania**

109.   Defendant DAN MEUSER is the Secretary of Revenue of the Commonwealth of Pennsylvania and as such serves as chief executive of the Pennsylvania Department of Revenue.

110.   Secretary Meuser enforces Pennsylvania's practices, policies, and laws prohibiting marriage and recognition of marriage for same-sex couples, including 23 Pa. C.S. §§ 1102 and 1704.

111.   In his official capacity, the Secretary of Revenue is responsible for the preparation of forms used for the assessment and collection of state taxes, including state income taxes. *See, e.g.*, 72 P.S. § 207 ("The Department of Revenue shall prepare, promulgate, and distribute such forms as may be necessary to persons, associations, corporations, public officers, and other debtors, required by law to make and file reports or returns with the department."); 72 P.S. § 7332 ("The department shall prescribe by regulation the place for filing and return, declaration, statement, or other document required pursuant to this article [Personal Income Tax] and for payment of any tax."); 72 P.S. § 7335(a) ("The department may prescribe by regulation for the keeping of records, the content and form of

returns, declarations, statements and other documents and the filing of copies of Federal income tax returns and determinations."); 61 Pa. Code § 117.9 ("Persons filing returns should use the envelopes and preaddressed prescribed forms furnished to them by the Department.").

112.    The personal income tax return forms set forth by the Department of Revenue (*i.e.*, form PA-40) require a current resident filer to check a box and declare his or her filing status as "S Single," "J Married, Filing Jointly," or "M Married, Filing Separately."  *Cf.* 72 P.S. § 7331 ("Returns of married individuals, deceased or disabled individuals and fiduciaries"); 61 Pa. Code § 117.2 ("Returns of married individuals").  Because of 23 Pa. C.S. § 1704, however, married same-sex couples may not file as "Married, Filing Jointly" or "Married, Filing Separately," but, instead, each individual must separately file as "Single."

113.    These forms mean that married same-sex couples, such as the married plaintiffs in this action, are denied the dignity of filing as the married couples they are.  In addition to suffering the indignity of the state denying recognition of their marriages, these couples suffer further by being subject to the state's demand that they themselves also publicly deny their lifelong commitments to each other and declare themselves to be "Single" under penalty of perjury even though they are not.  Further, this also means that married same-sex couples, such as the married plaintiffs, are denied the option of filing their income taxes jointly, which is an

option the Department states is provided as a matter of "convenience" for married couples and which can save married filers additional costs by preparing just one return instead of two. 2012 Pennsylvania Personal Income Tax Return Booklet, at 7, *available at* http://www.portal.state.pa.us/portal/server.pt/ community/personal_income_tax/14692 (last visited Nov. 6, 2013).

### Donald Petrille, Jr., Register of Wills and Clerk of Orphans' Court of Bucks County

114. The Commonwealth's Marriage Law provides that "[n]o person shall be joined in marriage in this Commonwealth until a marriage license has been obtained," and "[n]o marriage license shall be issued except upon written and verified application made by both of the parties intending to marry." 23 Pa. C.S. §§ 1301(a), 1302(a).

115. In each county in the Commonwealth, either the county Register of Wills or the county Clerk of Orphans' Court issues marriage licenses.

116. Defendant DONALD PETRILLE, JR., is the Register of Wills and Clerk of Orphans' Court of Bucks County, Pennsylvania, and his office is responsible for issuing marriage licenses in that county.

117. On July 1, 2013, invoking Commonwealth law, the office of Mr. Petrille refused to issue a marriage license to plaintiffs Angela Gillem and Gail Lloyd because they are a same-sex couple.

118.   On November 6, 2013, invoking Commonwealth law, the office of Mr. Petrille refused to issue a marriage license to plaintiffs Sandy Ferlanie and Christine Donato because they are a same-sex couple.

119.   All defendants named above are, and at all relevant times have been, acting under color of state law, and are sued in their official capacities.

## JURISDICTION AND VENUE

120.   This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343 because the suit raises federal questions under 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution.

121.   Venue is proper in the Middle District of Pennsylvania under 28 U.S.C. § 1391(b) because defendants Wolf and Meuser reside in this district.

## FACTUAL BACKGROUND

### Pennsylvania's Prohibition of Marriage for Same-Sex Couples

122.   Pennsylvania's Marriage Law, 23 Pa. C.S. §§ 1101 *et seq.*, governs marriages in the Commonwealth.  In 1996, the Marriage Law was amended to expressly prohibit marriage for same-sex couples.  The 1996 amendment had two parts.  First, it defined marriage as "[a] civil contract by which one man and one woman take each other for husband and wife."  23 Pa. C.S. § 1102.  Second, in a stark departure from Pennsylvania's usual recognition of marriages entered into in other states, it made "void in this Commonwealth" any "marriage between persons

of the same sex . . . entered into in another state or foreign jurisdiction, even if valid where entered into."  23 Pa. C.S. § 1704.

123.   As a result, marriage in Pennsylvania is legally available only to opposite-sex couples.  Same-sex couples may not marry in Pennsylvania, and if they are married elsewhere, their marriages are not recognized in Pennsylvania.

<strong>Same-Sex and Opposite-Sex Couples Are<br><u>Similarly Situated for Purposes of Marriage</u></strong>

124.   The Supreme Court has called marriage "the most important relation in life," *Zablocki v. Redhail*, 434 U.S. 374, 384 (1978) (internal quotation marks omitted), and an "expression[] of emotional support and public commitment." *Turner v. Safley*, 482 U.S.  78, 95 (1987).  It is "a far-reaching legal acknowledgement of the intimate relationship between two people. . . ." *Windsor*, 133 S. Ct. at 2692.  This is as true for same-sex couples as it is for opposite-sex couples.

125.   Same-sex couples such as the plaintiff couples are identical to opposite-sex couples in all of the characteristics relevant to marriage.

126.   Same-sex couples make the same commitment to one another as opposite-sex couples.  Like opposite-sex couples, same-sex couples build their lives together, plan their futures together, and hope to grow old together.  Like opposite-sex couples, same-sex couples support one another emotionally and financially and take care of one another physically when faced with injury or

illness.  For example, when plaintiff Maureen Hennessey's spouse, Mary Beth, was dying of cancer, Maureen left her job as a teacher to take care of Mary Beth until Mary Beth passed away.  Maureen's devotion to Mary Beth, the person with whom she shared her life for 29 years, is what marriage is about.

127.   Like some opposite-sex couples, some same-sex couples like plaintiffs Deb and Susan Whitewood, Fernando Chang-Muy and Len Rieser, Dawn Plummer and Diana Polson, Helena Miller and Dara Raspberry, and Sandy Ferlanie and Christine Donato, are parents raising children together.

128.   Same-sex couples seeking to marry or have their marriages recognized are just as willing and able as opposite-sex couples to assume the obligations of marriage.

129.   The plaintiff couples and other same-sex couples in Pennsylvania, if permitted to marry or have their marriages recognized, would benefit no less than opposite-sex couples from the many legal protections and the social recognition afforded to married couples.

130.   There was a time when an individual's sex was relevant to his or her legal rights and duties within the marital relationship.  For example, husbands had a duty to support their wives but not vice versa and husbands had legal ownership of all property belonging to their wives.  But these legal distinctions have all been removed such that the legal rights and duties of husbands and wives are now

identical. *See* 1 Pa. C.S. § 2301(a) ("[W]here in any statute heretofore enacted there is a designation restricted to a single sex, the designation shall be deemed to refer to both sexes unless the designation does not operate to deny or abridge equality of rights under the law of this Commonwealth because of the sex of the individual.").

### The Exclusion of Same-Sex Couples from Marriage Causes Substantial Harm to Couples and Their Families

131.   By preventing same-sex couples from marrying and refusing to recognize their marriages from others states, Commonwealth law deprives them of numerous legal protections that are available to opposite-sex couples in Pennsylvania by virtue of their marriages.  By way of example only:

   a.   A married person is exempt from inheritance tax on property left to him by an opposite-sex spouse, including the spouse's share of the couple's home, and, thus, protected against economic distress or loss of a home because of an inheritance tax bill.  72 P.S. § 9116(a)(1.1)(ii).  A same-sex surviving spouse or partner is denied this exemption and must pay a 15% tax, the highest rate, which applies to non-family members.  72 P.S. § 9116(a)(3).

   b.   A widow or widower of an opposite-sex spouse is entitled to 50% to 100% of his or her deceased spouse's estate if the spouse died without a will.  20 Pa. C.S. § 2102.  A same-sex surviving spouse or partner in this situation receives nothing.

   c.   If an opposite-sex spouse becomes incapacitated, her spouse is automatically authorized to make decisions regarding her care.  20 Pa. C.S. § 5461(d)(1)(i).  This protection does not extend to a same-sex spouse or partner.

d. Under the workers' compensation laws, the opposite-sex spouse of someone who dies or is injured in the workplace is entitled to damages and may bring suit. 77 P.S. §§ 431 *et seq.* Same-sex spouses or partners have no legal standing to sue over their spouse or partner's workplace injury.

e. The Commonwealth requires opposite-sex spouses to support one another financially. 23 Pa. C.S. § 4603(a)(1)(i). There is no support obligation for same-sex spouses or partners.

f. Commonwealth laws promote the stability of marriages through rules such as mandatory waiting periods prior to divorce by mutual consent. 23 Pa. C.S. § 3301(c). The divorce laws, including these provisions, do not apply to same-sex spouses or partners.

g. Opposite-sex widows and widowers of military personnel and veterans are eligible for numerous assistance programs. *E.g.*, 51 Pa. C.S. §§ 3502, 7319, 8502; 51 P.S. §§ 20010, 20046, 20096, 20125, 20305. These programs are not available to same-sex surviving spouses or partners of military personnel and veterans.

h. Opposite-sex widows and widowers of public employees in the Commonwealth are eligible to receive various pensions and survivor benefits upon their spouse's death. *E.g.*, 53 P.S. §§767(a)(2)(i), 23654.1, 23654–23654.2 (receipt of police officer spouse's pension by surviving spouse); 53 P.S. § 881.115 (tax exemption of public employee spouse's retirement allowance); 53 P.S. §§ 23609.2, 23609.3 (lifetime survivor benefits for spouse of retired pensioner); 53 P.S. § 39320 (receipt of fireman's pension by surviving spouse). These benefits are not provided to surviving same-sex spouses or partners of public employees.

i. Opposite-sex widows and widowers of firefighters, police officers, and other first responders killed in the line of duty are provided financial assistance. 53 P.S. § 891(d) ($100,000 payment to surviving spouse of a firefighter, ambulance or rescue squad member, hazardous material response team member, law enforcement officer, or National Guard member who died in the line of duty). This assistance is not provided to same-sex surviving spouses or partners of first responders.

j.  Property tax rebates or rent rebates are available under
    Pennsylvania law to certain people over the age of 50 who are
    widows and widowers of opposite-sex spouses.  53 P.S.
    §§ 6926.1303-6926.1306.  They are not available to same-sex
    surviving spouses or partners.

k.  "Gold Star Family" license plates are available to the opposite-sex
    widows and widowers of people killed on active military duty.  75
    Pa. C.S. § 1365.  Surviving same-sex spouses or partners are not
    eligible for license plates recognizing their loved one's sacrifice.

132.   Same-sex couples are excluded from these and many other legal
protections provided for married couples under Pennsylvania law.

133.   The exclusion of same-sex couples from marriage also denies them
eligibility for numerous federal protections afforded to married couples including
in the areas of immigration and citizenship, taxes, and social security.  Some of the
federal protections for married couples are only available to couples if their
marriages are legally recognized in the state in which they live.  *See, e.g.*, 42
U.S.C. § 416(h)(1)(A)(i) (marriage for eligibility for social security benefits based
on law of state where couple resides at time of application); 29 C.F.R.
§ 825.122(b) (same for Family Medical Leave Act).  Thus, even plaintiffs Deb and
Susan Whitewood, Edwin Hill and David Palmer, Heather and Kath Poehler,
Helena Miller and Dara Raspberry, Marla Cattermole and Julia Lobur, and
Maureen Hennessey, who are already married, cannot access such federal
protections as long as Pennsylvania refuses to recognize their existing marriages.

134.   The exclusion from marriage also harms same-sex couples and their families in less tangible ways.

135.   Although the plaintiff couples are all in long-term committed relationships, they and other same-sex couples are denied the stabilizing effects of marriage, which helps keep couples together during times of crisis or conflict.

136.   Excluding same-sex couples from marriage also harms couples and their children by denying them the social recognition that comes with marriage. Marriage has profound social significance both for the couple that gets married and the family, friends and community that surround them.  The terms "married" and "spouse" have universally understood meanings that command respect for a couple's relationship and the commitment they have made.

137.   The exclusion from the esteemed institution of marriage also demeans and stigmatizes lesbian and gay couples and their children by sending the message that they are less worthy and valued than families headed by opposite-sex couples.

138.   The impact of the exclusion from marriage on same-sex couples and their families is extensive and real.  The denial of the right to marry causes these couples and their families to suffer significant emotional, physical, and economic harms.

139.   The plaintiff couples recognize that marriage entails both benefits to and obligations on the partners and they welcome both.

**Excluding Same-Sex Couples from Marriage Is Not
Rationally Related to a Legitimate Government Interest,
<u>Let Alone Able to Withstand Heightened Scrutiny</u>**

140.   As the evidence will show, the prohibition against marriage for same-sex couples in Pennsylvania is not closely tailored to serve an important government interest or substantially related to an exceedingly persuasive justification.  In fact, as the evidence also will show, the prohibition fails any level of constitutional scrutiny.  It is not even rationally related to any legitimate government interests that were offered in support of it when the Marriage Law was amended in 1996 or to any legitimate interest of the Commonwealth that defendants might now offer as a basis for denying same-sex couples the freedom to marry in Pennsylvania.

141.   When the Commonwealth enacted the 1996 amendment prohibiting marriage for same-sex couples, legislators in favor of the amendment relied on "moral opposition to same-sex marriages . . . and support of the traditional family unit."  1996 Pa. Legis. J. (House), at 2017; *see also id.* at 2019 ("[T]he large majority [of Pennsylvanians] do not want our traditional marriage institution and our state of morals to be changed."); *id.* at 2022 ("This is a vote about family values and traditional beliefs . . . .").  Some legislators said there was a need to protect against a financial burden on businesses and taxpayers.  *Id.* at 2018 ("[I]f we are forced to recognize same-sex marriages, this would put an unfunded

mandate on our businesses, another burden on our taxpayers, and so on."); *id.* at 2017 ("Social Security, tax and other benefits presently conferred on spouses would have to be expanded to include married partners of the same sex. The financial costs imposed on society by the forced recognition of same-sex marriage cannot even be calculated at this time."). And, it was argued, "it is imperative that we in Pennsylvania should stand up for traditional marriage for the benefit of families and children in the Commonwealth and our future." *Id.* at 2022. None of these justifications – or any other justification that might now be offered – passes constitutional muster.

### Moral Opposition to Marriage for Same-Sex Couples and Support of the Traditional Family

142. Neither tradition nor moral disapproval of same-sex relationships or marriage for lesbian and gay couples is a legitimate basis for unequal treatment of same-sex couples under the law. The fact that a discriminatory law is long-standing does not immunize it from constitutional scrutiny. And the Supreme Court has made clear that the law cannot, directly or indirectly, give effect to private biases and has expressly rejected moral disapproval of marriage for same-sex couples as a legitimate basis for discriminatory treatment of lesbian and gay couples. *Windsor*, 133 S. Ct. at 2693 (an "interest in protecting traditional moral teachings reflected in heterosexual-only marriage laws" was not a legitimate justification for federal Defense of Marriage Act).

***Preserving the Public Fisc and the Coffers of Private Business***

143.    The Commonwealth cannot justify its denial of marriage to lesbian and gay couples by claiming an interest in preserving the public fisc or the coffers of private business.  Saving money is not a justification for excluding a group from a government benefit without an independent rationale for why the cost savings ought to be borne by the particular group denied the benefit.  Moreover, the evidence will show that there is no factual basis for the notion that allowing and recognizing the marriages of same-sex couples will burden the Commonwealth financially or constitute a burden on businesses.

***Protection of Children***

144.    The Commonwealth's ban on marriage for same-sex couples is not rationally related to child welfare concerns. The government has a vital interest in protecting the well-being of children, but the exclusion of same-sex couples from marriage bears no relation to this interest.  To the contrary, it harms children in the Commonwealth.

145.    Commonwealth law recognizes that neither sexual orientation nor gender has any bearing on a couple's ability to successfully rear children and, thus, treats gay and lesbian couples the same as heterosexual couples with respect to adoption and recognition as parents through the *in loco parentis* doctrine. Pennsylvania judges routinely grant adoptions to same-sex couples, recognizing

that the adoptions are in the best interest of the child. Indeed, the government itself places children for adoption with same-sex couples like plaintiffs Deb and Susan Whitewood, who jointly adopted their son L.W. out of the foster care system. Any assertion that the Commonwealth does not consider same-sex couples equally effective parents cannot be credited given its own conduct evidencing a different view.

146. Moreover, there is no valid basis for the Commonwealth to assert a preference for child-rearing by opposite-sex couples over same-sex couples. The evidence will demonstrate that there is a consensus within the scientific community, based on over thirty years of research, that children raised by same-sex couples are just as well adjusted as children raised by opposite-sex couples. This is recognized by every major professional organization dedicated to children's health and welfare including the American Academy of Pediatrics, the American Psychological Association, the American Medical Association, the National Association of Social Workers, and the Child Welfare League of America.

147. Other courts have found, after trials involving expert testimony, that there is no rational basis for favoring parenting by heterosexual couples over gay and lesbian couples. *See*, *e.g.*, *Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 980 (N.D. Cal. 2010) (finding that the research supporting the conclusion that "[c]hildren raised by gay or lesbian parents are as likely as children raised by

heterosexual parents to be healthy, successful and well-adjusted" is "accepted beyond serious debate in the field of developmental psychology"), *aff'd sub nom. Perry v. Brown*, 671 F.3d 1052 (9th Cir. 2012), *vacated for lack of standing sub nom Hollingsworth v. Perry*, No. 12-144, 2013 WL 3196927 (U.S. June 26, 2013); *In re Adoption of Doe*, 2008 WL 5006172, at *20 (Fla. Cir. Ct. Nov. 25, 2008) ("[B]ased on the robust nature of the evidence available in the field, this Court is satisfied that the issue is so far beyond dispute that it would be irrational to hold otherwise; the best interests of children are not preserved by prohibiting homosexual adoption."), *aff'd sub nom Florida Dep't of Children & Families v. Adoption of X.X.G.*, 45 So.3d 79 (Fla. Dist. Ct. App. 2010); *Howard v. Child Welfare Agency Review Bd.*, Nos. 1999-9881, 2004 WL 3154530, at *9 and 2004 WL 3200916, at *3-4 (Ark. Cir. Ct. Dec. 29, 2004) (holding based on factual findings regarding the well-being of children of gay parents that "there was no rational relationship between the [exclusion of gay people from becoming foster parents] and the health, safety, and welfare of the foster children."), *aff'd sub nom Dep't of Human Servs. v. Howard*, 238 S.W.3d 1 (Ark. 2006).

148. Excluding same-sex couples from marriage has no conceivable benefit to children of heterosexual couples. Denying same-sex couples the right to marry does not encourage opposite-sex couples who have children to marry or stay married for the benefit of their children. And regardless of whether same-sex

couples are permitted to marry, the children of opposite-sex spouses will continue to enjoy the same benefits and protections that flow from their parents' marriage.

149. Excluding same-sex couples from marriage serves only to harm the children raised by lesbian and gay couples by denying their families significant benefits and by branding their families as inferior and less deserving of respect and, thus, encouraging private bias and discrimination. According to the 2010 United States Census, there are over 6,000 same-sex couples raising children in Pennsylvania. The state's interest in the welfare of children of lesbian and gay parents is or should be as great as its interest in the welfare of other children.

## CLAIMS FOR RELIEF

### COUNT I:
### Deprivation of the Fundamental Right to Marry in
### Violation of the Due Process Clause of the
### Fourteenth Amendment to the United States Constitution
### (42 U.S.C. § 1983)

150. Plaintiffs incorporate by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

151. The Fourteenth Amendment to the United States Constitution precludes any State from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Governmental interference with a fundamental right may be sustained only upon a showing that the legislation is closely tailored to serve an important governmental interest.

152.   The Supreme Court has long recognized that marriage is a fundamental right and that choices about marriage, like choices about other aspects of family, are a central part of the liberty protected by the Due Process Clause.

153.   Pennsylvania law denies the plaintiff couples and other same-sex couples this fundamental right by denying them access to the state-recognized institution of marriage and refusing to recognize the marriages they entered into in other states.

154.   The Commonwealth can demonstrate no important interest to justify denying the plaintiff couples this fundamental right.  Indeed, it cannot demonstrate that the denial is tailored to any legitimate interest at all.

155.   The Commonwealth's prohibition of marriage between persons of the same sex and its refusal to recognize marriages entered into by same-sex couples in other jurisdictions violates the Due Process Clause.

156.   Defendants, acting under color of state law, are depriving plaintiffs of rights secured by the Due Process Clause of the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. § 1983.

## COUNT II:
### Discrimination on the Basis of Sexual Orientation in Violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution
### (42 U.S.C. § 1983)

157.   Plaintiffs incorporate by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

158.   The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that "no State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

159.   By denying the plaintiff couples and other lesbian and gay couples the ability to marry and to have their out-of-state marriages recognized, the Commonwealth, through defendants, disadvantages lesbian and gay people on the basis of their sexual orientation. It denies them significant legal protections. And it "degrade[s] [and] demean[s]" them by "instruct[ing] . . . all persons with whom same-sex couples interact, including their own children," that their relationship is "less worthy" than the relationships of others. *Windsor*, 133 S. Ct. at 2696.

160.   Same-sex couples and opposite-sex couples are similarly situated for purposes of marriage.

161.   The evidence will show that classifications based on sexual orientation demand heightened scrutiny.

162.  Lesbians and gay men are members of a discrete and insular minority that has suffered a history of discrimination in the Commonwealth and across the United States.

163.  Sexual orientation bears no relation to an individual's ability to perform or contribute to society.

164.  Sexual orientation is a core, defining trait that is so fundamental to one's identity that a person may not legitimately be required to abandon it (even if that were possible) as a condition of equal treatment.  Sexual orientation generally is fixed at an early age and highly resistant to change through intervention.  Efforts to change a person's sexual orientation through interventions by medical professionals have not been shown to be effective.  No mainstream mental health professional organization approves interventions that attempt to change sexual orientation, and many – including the American Psychological Association and the American Psychiatric Association – have adopted policy statements cautioning professionals and the public about these treatments.

165.  Prejudice against lesbians and gay men continues to seriously curtail the operation of the political process preventing this group from obtaining redress through legislative means.  Lesbians and gay men lack statutory protection against discrimination in employment, public accommodations, and housing at the federal level and in more than half of the states, including Pennsylvania.  Lesbians and gay

men have far fewer civil rights protections at the state and federal level than women and racial minorities had when sex and race classifications were declared to be suspect or quasi suspect. They have been stripped of the right to marry through 30 state constitutional amendments, and have been targeted through the voter initiative process more than any other group.

166. For all these reasons, classification based on sexual orientation should be reviewed under heightened scrutiny, but this one cannot survive under any level of constitutional scrutiny. The Commonwealth's exclusion of same-sex couples from marriage is not rationally related to any legitimate governmental interest. All it does it disparage and injure lesbian and gay couples and their children.

167. The Commonwealth's prohibition of marriage for same-sex couples and its refusal to recognize the marriages of same-sex couples entered into elsewhere violates the Equal Protection Clause.

168. Defendants, acting under color of state law, are depriving plaintiffs of rights secured by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

## COUNT III:
### Discrimination on the Basis of Sex in
### Violation of the Equal Protection Clause of the
### Fourteenth Amendment to the United States Constitution
### (42 U.S.C. § 1983)

169.   Plaintiffs incorporate by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

170.   The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that "no State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.

171.   Commonwealth law defines marriage as "[a] civil contract by which one man and one woman take each other for husband and wife."  23 Pa. C.S. § 1102.

172.   By defining marriage in this way, the Commonwealth discriminates on the basis of sex.  For example, plaintiff Angela Gillem is not permitted to marry plaintiff Gail Lloyd solely because they are both women.  If Angela (or Gail) were a man, the marriage would be allowed.  The only reason the marriage is prohibited is the sex of the partners.

173.   In addition, the Commonwealth has made "void in this Commonwealth" any "marriage between persons of the same sex . . . entered into in another state or foreign jurisdiction, even if valid where entered into."  23 Pa.

C.S. § 1704. The marriage of Edwin Hill and David Palmer, for example, is denied recognition by the Commonwealth solely because they are both men.

174. The Supreme Court has made clear that perpetuation of traditional gender roles is not a legitimate government interest.

175. Given that there are no longer legal distinctions between the duties of husbands and wives, there is no basis for the sex-based eligibility requirements for marriage.

176. The defendants can demonstrate no exceedingly persuasive justification for this discrimination based on sex.

177. Commonwealth law prohibiting marriage and recognition of marriage for same-sex couples thus violates the Equal Protection Clause.

178. Defendants, acting under color of state law, are depriving plaintiffs of rights secured by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. § 1983.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1. Enter a declaratory judgment that 23 Pa. C.S. §§ 1102 and 1704 violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution;

2.	Enter a declaratory judgment that 23 Pa. C.S. §§ 1102 and 1704 violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution;

3.	Enter a permanent injunction enjoining defendants from denying the plaintiff couples and all other same-sex couples the right to marry in the Commonwealth of Pennsylvania and directing defendants to recognize marriages validly entered into by the plaintiff couples and other same-sex couples outside of the Commonwealth of Pennsylvania;

4.	Award costs of suit, including reasonable attorneys' fees under 42 U.S.C. § 1988; and

5.	Enter all further relief to which plaintiffs may be justly entitled.

Dated:  November 7, 2013

HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER

By:   /s/ Mark A. Aronchick
		Mark A. Aronchick (PA ID No. 20261)
		John S. Stapleton (PA ID No. 200872)
		Dylan J. Steinberg (PA ID No. 203222)
		Rebecca S. Melley (PA ID No. 206210)
One Logan Square, 27th Floor
Philadelphia, PA  19103
(215) 568-6200
maronchick@hangley.com
jstapleton@hangley.com
dsteinberg@hangley.com
rmelley@hangley.com

Helen E. Casale
HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER
401 DeKalb Street, 4th Floor
Norristown, PA 19401
(610) 313-1670
hcasale@hangley.com

James D. Esseks
Leslie Cooper
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
jesseks@aclu.org
lcooper@aclu.org

Witold J. Walczak (PA ID No. 62976)
ACLU FOUNDATION OF
PENNSYLVANIA
313 Atwood Street
Pittsburgh, PA 15213
(412) 681-7736
vwalczak@aclupa.org

Mary Catherine Roper (PA ID No. 71107)
Molly Tack-Hooper (PA ID No. 307828)
ACLU FOUNDATION OF
PENNSYLVANIA
P.O. Box 40008
Philadelphia, PA 19106
(215) 592-1513
mroper@aclupa.org
mtack-hooper@aclupa.org

Seth F. Kreimer (PA ID No. 26102)
3400 Chestnut St.
Philadelphia, Pa. 19104
(215) 898-7447
skreimer@law.upenn.edu

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of November, 2013, I caused the foregoing First Amended Complaint for Declaratory and Injunctive Relief to be filed electronically using the Court's electronic filing system, and that the filing is available to counsel for all parties for downloading and viewing from the electronic filing system.

   /s/ Mark A. Aronchick      <br>
Mark A. Aronchick
