IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DEB WHITEWOOD, *et al.,* | : | 1:13-cv-1861 |
| | : | |
| Plaintiffs, | : | |
| | : | Hon. John E. Jones III |
| v. | : | |
| | : | |
| MICHAEL WOLF, *in his official* | : | |
| *capacity as Secretary, Pennsylvania* | : | |
| *Department of Health*, *et al.,* | : | |
| | : | |
| Defendants. | : | |

## **MEMORANDUM OPINION**

### **May 20, 2014**

Today, certain citizens of the Commonwealth of Pennsylvania are not

guaranteed the right to marry the person they love.  Nor does Pennsylvania

recognize the marriages of other couples who have wed elsewhere.  Hoping to end

this injustice, eleven courageous lesbian and gay couples, one widow, and two

teenage children of one of the aforesaid couples have come together as plaintiffs

and asked this Court to declare that all Pennsylvanians have the right to marry the

person of their choice and consequently, that the Commonwealth's laws to the

contrary are unconstitutional.   We now join the twelve federal district courts

across the country which, when confronted with these inequities in their own

states, have concluded that all couples deserve equal dignity in the realm of civil

marriage.

## I.   BACKGROUND

Plaintiffs in this action protest the constitutionality of two provisions of Pennsylvania's Domestic Relations Code, which limit marriage to opposite-sex couples and prohibit the recognition of same-sex marriages legally entered into in other jurisdictions (collectively, "the Marriage Laws").

### A.   The Marriage Laws

In 1996, Pennsylvania was one of 14 states to amend its laws to add anti-ceremony and anti-recognition provisions applicable to same-sex couples.  The proliferation of such laws across the country – another 11 states added similar provisions the following year – was in response to litigation in Hawaii, in which the Hawaii Supreme Court had held the state's ban on same-sex marriage to be presumptively violative of the state's equal protection clause.  *See Baehr v. Lewin*, 852 P.2d 44 (Haw. 1993).

In Pennsylvania, Representative C. Allan Egolf of Perry County sponsored the marriage amendment and described it as "an expression of Pennsylvania's traditional and longstanding policy of moral opposition to same-sex marriages . . . and support of the traditional family unit." (Doc. 115-18, p. 27).  Ultimately, both houses passed the legislation by overwhelming majorities, the House by 177 to 16,

and the Senate by 43 to 5.

The Pennsylvania Marriage Laws define "marriage" as "[a] civil contract by which one man and one woman take each other for husband and wife."  23 Pa. C.S. § 1102.  In addition, a provision entitled "Marriage between persons of the same sex" states as follows:

> It is hereby declared to be the strong and longstanding public policy of this Commonwealth that marriage shall be between one man and one woman. A marriage between persons of the same sex which was entered into in another state or foreign jurisdiction, even if valid where entered into, shall be void in this Commonwealth.

23 Pa. C.S. § 1704.  As stated, the Marriage Laws have the effect of preventing same-sex couples from marrying in Pennsylvania and nullifying the marriages of same-sex couples legally married elsewhere for purposes of  recognition in the Commonwealth.

### B.    The Plaintiffs[1]

Plaintiffs are Deb and Susan Whitewood, and their teenage daughters, A.W. and K.W.; Maureen Hennessey; Lynn and Fredia Hurdle; Fernando Chang-Muy and Len Rieser; Julia Lobur and Marla Cattermole; Dawn Plummer and Diana Polson; Dara Raspberry and Helena Miller; Ron Gebhardtsbauer and Greg Wright;

---

[1] The facts regarding Plaintiffs' personal backgrounds are derived from their Statement of Facts (Doc. 115) and personal declarations.  (Docs. 115-2 – 115-14).

Sandy Ferlanie and Christine Donato; Heather and Kath Poehler; Angela Gillem and Gail Lloyd; and Edwin Hill and David Palmer.  Five of the couples are unmarried, seeking to wed in Pennsylvania, and six of the couples, as well as Maureen Hennessey, desire to have their valid, out-of-state marriages recognized by the Commonwealth.

As a group, they represent the great diversity of the Commonwealth of Pennsylvania.  They hail from across the state, making their homes in Allegheny, Dauphin, Centre, Northampton, Delaware, Chester, and Philadelphia Counties. They come from all walks of life; they include a nurse, state employees, lawyers, doctors, an artist, a newspaper delivery person, a corporate executive, a dog trainer, university professors, and a stay-at-home parent.  They have served our country in the Army and Navy.  Plaintiffs' personal backgrounds reflect a richness and diversity: they are African-American, Caucasian, Latino, and Asian; they are Catholic, Baptist, Methodist, Jewish, Quaker, Buddhist, and secular.  In terms of age, they range from a couple in their 30s with young children, to retirees in their 60s.  Many of the couples have been together for decades.

As plainly reflected in the way they live their lives, the plaintiff couples are spouses in every sense, except that the laws of the Commonwealth prevent them from being recognized as such.

4

**For better, for worse**

The plaintiff couples have shared in life's joys. They have purchased homes together and blended their property and finances. They have started families, welcoming children through birth and adoption. Some of them have celebrated their commitment to each other through marriage in other states, sharing their wedding day with family and friends.

Yet, with each of these joys there has been concomitant hardship resulting from the Marriage Laws. In terms of property ownership, all of the couples face the payment of Pennsylvania's inheritance tax – including on half of the value of jointly-owned homes and bank accounts – at 15 percent, the highest rate.

For those couples who have had children, like Dawn Plummer and Diana Polson, the non-biological parent has had to apply for a second-parent adoption. Dawn expresses that she and Diana are presently saving money so that she can legally adopt their second son, J.P. Until the adoption is complete, she has no legal ties to J.P., despite that, together, she and Diana dreamed of welcoming him to their family, prepared for his birth, and functioned as a married couple long before having him. Christine Donato, who together with Sandy Ferlanie completed a second-parent adoption in similar circumstances, describes the process as "long, expensive, and humiliating." The couples choosing to adopt,

like Fernando Chang-Muy and Len Rieser, had to undergo a two-step process, incurring double the costs, in which one became their child's legal parent and, later, the other petitioned for a second-parent adoption.  For the children of these couples, it can be difficult to understand why their parents are not married or recognized as married.  In the words of Deb Whitewood, "It sends the message to our children that their family is less deserving of respect and support than other families.  That's a hurtful message."

In addition, for the couples who have chosen to marry out-of-state, they are acutely sensitive that their marital status changes when they cross state lines. Edwin Hill describes driving home to Pennsylvania after wedding David Palmer in Maine in 2013, elated to be traveling through all of the northeastern states that recognize their marriage.  "And then we crossed the Delaware River into Pennsylvania," he recalls, "and we looked at each other and said, 'We're not married anymore.'  And that hurt."  Further, the married couples must still identify themselves as single in Pennsylvania, for example, on their state income taxes. Many have remarked on the pain this causes them, describing that it feels "terrible," "wrong," and "like a denial of [their] relationship" to tick the box marked "single."

**For richer, for poorer**

The plaintiff couples share their resources and support each other financially.  But Plaintiffs commonly echo a sense of legal and economic vulnerability because of Pennsylvania's Marriage Laws.  Many of them have paid lawyers to draft protective documents, like wills and powers of attorney, in efforts to emulate some of the protections afforded to couples recognized as married. Susan Whitewood estimates that her family has spent over $10,000 in legal fees for the preparation and maintenance of such documents, which would not have been necessary if the Commonwealth acknowledged their marriage.

Angela Gillem and Gail Lloyd describe feeling particularly insecure. Angela is a clinical psychologist and the primary bread-winner, while Gail is an artist who does not draw a steady paycheck or contribute to Social Security. Angela expresses that she has "taken every step [she] can to ensure [Gail's] financial security" but that they still cannot duplicate all of the protections married couples receive, and she "live[s] every day with the fear that the steps [she has] taken will not be enough to protect Gail if something should happen to [her]."

**In sickness and in health**

The plaintiff couples have supported each other through illness and medical emergencies.  Yet, because Pennsylvania considers them legal strangers, they may

7

be left vulnerable in times of crisis.  Various of the plaintiffs express anxiety at the possibility that they would not be allowed to comfort or gain information about their partner's condition in the event of an emergency, despite the fact that they have prepared powers of attorney.  Lynn Hurdle remembers feelings of fear and helplessness when her partner, Fredia, was admitted to the hospital for unexpected surgery.  Doctors began operating earlier than planned, and when Lynn discovered Fredia's hospital room to be empty, staff would not tell her why Fredia had been taken early or where she was.

### Until death do us part

The plaintiff couples demonstrate an intention to live out their lives together.  Plaintiff Maureen Hennessey and her partner of 29 years, Mary Beth McIntyre, present a powerful example.  When Mary Beth was diagnosed with inoperable Stage 4 lung cancer, Maureen left her job to care for her and to help run Mary Beth's business until her death.  Towards the end of her life, Mary Beth required Maureen's help to get out of bed and to the bathroom, and to assist in self-care and administer medications.  They were married in Massachusetts after Mary Beth fell ill, but because Pennsylvania does not recognize their marriage, the line for "surviving spouse" was left blank and Mary Beth was identified as "never married" on her death certificate.  Maureen was listed as the "informant."

8

Wishing to have their relationships recognized for what they are in the state they call home, and by doing so to transcend the pain, uncertainty, and injustice visited by the Marriage Laws, Plaintiffs brought this suit.

## II.   PROCEDURAL HISTORY

Plaintiffs commenced this action on July 9, 2013 against Defendants Governor Thomas Corbett; Secretary of the Pennsylvania Department of Health Michael Wolf; Attorney General Kathleen Kane; Register of Wills of Washington County Mary Jo Poknis; and Register of Wills and Clerk of Orphans' Court of Bucks County Donald Petrille, Jr. (Doc. 1).  Plaintiffs seek declarations that the Marriage Laws violate both the Due Process and Equal Protection Clauses of the Fourteenth Amendment and a permanent injunction enjoining Defendants from depriving Plaintiffs and other same-sex couples of the right to marry and directing Defendants to recognize same-sex marriages validly entered into in other jurisdictions, as well as costs, fees, and any other relief deemed appropriate by the Court.

On September 30, 2013, Defendants filed motions to dismiss.  During the pendency of those motions, Plaintiffs voluntarily dismissed Defendants Corbett, Kane, and Poknis.  Thereafter, on November 7, 2013, Plaintiffs filed an amended complaint against Defendants Wolf and Petrille, and additionally named

Pennsylvania Secretary of Revenue Dan Meuser, as a defendant. (Doc. 64). On

November 15, 2013, we denied Defendants' motions to dismiss. (Doc. 67).

After the conclusion of discovery, the parties filed cross-motions for

summary judgment. (Docs. 113, 116). The motions have been fully briefed, and

the parties agree that there are no genuine disputes of material fact.[2] Accordingly,

the constitutional issues presented to this Court are fully at issue and ripe for our

disposition.[3]

## III.   PRELIMINARY CHALLENGES

Before undertaking the due process and equal protection analyses at the

heart of this matter, we must first entertain two preliminary, yet threshold,

challenges to Plaintiffs' efforts to have the Marriage Laws declared

unconstitutional. First, Defendants contend that pursuant to the Supreme Court's

1972 decision in *Baker v. Nelson*, there is no substantial federal question

implicated by any of Plaintiffs' claims, and thus this Court lacks subject matter

jurisdiction to hear the case. Second, Defendants assert that Plaintiffs have failed

to meet their burden of proof under 42 U.S.C. § 1983 because they have not

---

[2] We thank all counsel for their consistent collegiality, dedication to alacrity, and general professionalism exhibited throughout the course of this litigation.

[3] Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

established a personal, cognizable harm caused by the enforcement of the

Marriage Laws.  We shall discuss each of these preliminary contentions *seriatim*.

## A.    *Baker v. Nelson*

Although we previously considered, and rejected, Defendants' argument

that we lack subject matter jurisdiction over this matter pursuant to the United

States Supreme Court's summary dismissal in *Baker v. Nelson,* 409 U.S. 810

(1972) (dismissing for want of a substantial federal question an appeal from a

ruling by the Supreme Court of Minnesota that a state law ban on same-sex

marriage did not violate the Due Process Clause of the United States Constitution),

inasmuch as Defendants have reiterated this jurisdictional challenge, we shall

repeat herein our reasons for rejecting this argument.

There is no dispute that the summary dismissal in *Baker* is considered

precedential, *see Hicks v. Miranda*, 422 U.S. 332, 344 (1975) (dismissal for lack

of a substantial federal question is a decision on the merits), however we, and our

sister district courts that have examined precisely this same issue, no longer

consider *Baker v. Nelson* controlling due to the significant doctrinal developments

in the four decades that have elapsed since it was announced by the Supreme

Court.  *See id.* ("[I]f the Court has branded a question as unsubstantial, it remains

so except when doctrinal developments indicate otherwise[.]"); *Windsor v. United*

*States*, 699 F.3d 169, 178-80 (2d Cir. 2012); *Geiger v. Kitzhaber,* 13-1834, 2014 U.S. Dist LEXIS 68171 (D. Oregon May 19, 2014); *Latta v. Otter*, No. 13-482, 2014 U.S. Dist. LEXIS 66417, at *22-29, 2014 WL 1909999, at * 7-10 (D. Idaho May 13, 2014); *DeBoer v. Snyder*, No. 12-10285, 2014 U.S. Dist. LEXIS 37274, at *46, n.6, 2014 WL 1100794, at *17, n.6 (E.D. Mich. Mar. 21, 2014); *De Leon v. Perry*, No. 13-982, 2014 U.S. Dist. LEXIS 26236, at *23-29, 2014 WL 715741, at *8-10 (W.D. Tex. Feb. 26, 2014); *Bostic v. Rainey*, 970 F. Supp. 2d 456, 469-70 (E.D. Va. 2014); *McGee v. Cole*, No. 13-24068, 2014 U.S. Dist. LEXIS 10864, at *24-33, 2014 WL 321122, at *8-10 (S.D. W. Va. Jan. 29, 2014); *Bishop v. U.S. ex rel. Holder*, 962. F. Supp. 2d 1252, 1274-77 (N.D. Okla. 2014); *Kitchen v. Herbert*, 961 F. Supp. 2d 1181, 1194-95 (D. Utah 2013).

As we previously explained:

> The jurisprudence of equal protection and substantive due process has undergone what can only be characterized as a sea change since 1972.  The Supreme Court has decided several cases since *Baker* which demonstrate that it no longer views constitutional challenges based on sex or sexual identity classifications as unsubstantial.  For example, when *Baker* was decided, "'intermediate scrutiny' was not yet in the Court's vernacular" and "classifications based on illegitimacy and sex were not yet deemed quasi-suspect." *Windsor v. United States*, 699 F.3d 169, 179 (2d Cir. 2012) (citing *Craig v. Boren*, 429 U.S. 190, 218 (1976) (Rehnquist, J., dissenting) (coining "intermediate level scrutiny"); *Lalli v. Lalli*, 439 U.S. 259, 264-65 (1978) (applying intermediate scrutiny to a classification based on illegitimacy, and describing how heightened scrutiny had been used for such classifications since 1976); *Frontiero v.*

> *Richardson*, 411 U.S. 677, 682 (1973) (plurality) (identifying sex as a
> suspect class)).  The Supreme Court had also not yet ruled that "a
> classification [based on sexuality] undertaken for its own sake"
> lacked a rational basis.  *Romer v. Evans*, 517 U.S. 620, 635 (1996).
> Further, in 1972, governments could lawfully "demean [homosexual
> persons'] existence or control their destiny by making their private
> sexual conduct a crime."  *Lawrence v. Texas*, 539 U.S. 558, 578
> (2003).  Finally, in June of [2013], the Supreme Court held that a
> federal statute defining marriage as only between heterosexual
> couples violated the equal protection and due process rights of same-
> sex couples who had married in states where same-sex marriage is
> legally recognized.  *See United States v. Windsor*, 570 U.S. – (2013).

(Doc. 67, pp. 5-6).  Defendants have presented us with no compelling reason to

part company with our previous determination, which has been resoundingly

echoed by our sister district courts which have considered, and rejected, *Baker's*

precedential value in light of doctrinal developments in the areas of constitutional

due process and equal protection.

The only new component of Defendants' argument is their contention that,

in view of the Supreme Court's recent decision to stay the District of Utah's order

in *Kitchen v. Herbert,* the Supreme Court is bound to overturn the District of

Utah's decision.[4]  *See Herbert v. Kitchen,* 134 S. Ct. 893 (2014).  Simply put, this

constitutes nothing more than speculation on the part of Defendants.  Accordingly,

---

[4] In *Kitchen*, the district judge held that Utah's prohibition on same-sex marriage conflicts
with the guarantees of equal protection and due process under the Fourteenth Amendment to the
United States Constitution.  The district court reasoned that Utah's laws denied gay and lesbian
citizens their fundamental right to marry and, in so doing, demeaned the dignity of these same-
sex couples for no rational reason.  *See Kitchen*, 961 F. Supp. 2d 1181.

we do not agree with Defendants that this procedural order of the Supreme Court forecasts pending disapproval of the District of Utah's decision or its intention to reaffirm the precedential value of *Baker*.

Based on the foregoing, we again reject the contention that *Baker v. Nelson* presents a jurisdictional bar to Plaintiffs' claims.

### B.    Burden of Proof under 42 U.S.C. § 1983[5]

Defendants contend that Plaintiffs have failed to meet their burden of proof with respect to their constitutional claims because they have offered no facts establishing that Defendants took an action against them or are likely to be involved in acts or omissions regarding the Marriage Laws that caused or is likely to cause Plaintiffs harm.  Defendants' argument focuses specifically on Plaintiffs' alleged failure to assert a cognizable injury against them by virtue of enforcement of the Marriage Laws.  In view of the reasoning and holding in *United States v. Windsor*, 133 S. Ct. 2675 (2013), this argument is easily rejected.

Writing for the majority in *Windsor*, Justice Kennedy opined that discrimination caused by the non-recognition of same-sex couples' marriages "impose[s] a disadvantage, a separate status, and so a stigma upon" same-sex

---

[5] 42 U.S.C. § 1983 is an enabling statute that provides individuals with access to remedies for violations of their federal constitutional or statutory rights.

couples in the eyes of the state and the broader community. *Id*. at 2693. Not only are these stigmatizing harms cognizable, they are profoundly personal to Plaintiffs and all other gay and lesbian couples, married or not, who live within the Commonwealth of Pennsylvania and thus are subject to the Marriage Laws. Additionally, and as discussed in greater detail above, *see* discussion *supra* Part I.B., Plaintiffs suffer a multitude of daily harms, for instance, in the areas of child-rearing, healthcare, taxation, and end-of-life planning. With the Plaintiffs' stories in mind, we easily find that Plaintiffs have sufficiently established that they suffer actionable harms, and Defendants' argument to the contrary is rejected.

## IV.    SUBSTANTIVE QUESTIONS

Having resolved the preliminary challenges advanced by Defendants against Plaintiffs' claims, we now turn to the substantive questions presented by Plaintiffs in this action. Specifically, those questions are as follows: (1) whether the Marriage Laws violate Plaintiffs' due process rights as guaranteed by the Fourteenth Amendment to the United States Constitution; and (2) whether the Marriage Laws violate Plaintiffs' rights to equal protection as guaranteed by the Fourteenth Amendment to the United States Constitution.

A.     **Due Process**

1.     **Fundamental Right to Marry**

The Due Process Clause of the Fourteenth Amendment guarantees that all citizens have certain "fundamental rights comprised within the term liberty [that] are protected by the Federal Constitution from invasion by the States." *Planned Parenthood v. Casey*, 505 U.S. 833, 847 (1992) (quoting *Whitney v. California*, 274 U.S. 357, 373 (1927)).  The Supreme Court has described the individual's right to liberty as "the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life.  Beliefs about these matters could not define the attributes of personhood were they formed under compulsion of the State." *Id.* at 851.

Encompassed within the right to liberty is the fundamental right to marry. *See Maynard v. Hill*, 125 U.S. 190, 205, 211 (1888) (characterizing marriage as "the most important relation in life" and "the foundation of the family and of society, without which there would be neither civilization nor progress"); *see also Zablocki v. Redhail*, 434 U.S. 374, 384 (1978) ("[T]he right to marry is of fundamental importance for all individuals.").  The fundamental right to marry has been historically and repeatedly recognized by the Supreme Court and was perhaps most eloquently described in the concluding lines of *Griswold v.*

16

*Connecticut,*

> We deal with a right of privacy older than the Bill of Rights - older
> than our political parties, older than our school system.  Marriage is a
> coming together for better or for worse, hopefully enduring, and
> intimate to the degree of being sacred.  It is an association that
> promotes a way of life, not causes; a harmony in living, not political
> faiths; a bilateral loyalty, not commercial or social projects.  Yet it is
> an association for as noble a purpose as any involved in our prior
> decisions.

381 U.S. 479, 486 (1965).

The parties to this action certainly do not dispute that the Due Process

Clause of the Fourteenth Amendment guarantees individuals the fundamental right

to marry.  They stridently part company, however, over whether the fundamental

right to marry encompasses the right to marry a person of the same sex.  Plaintiffs

contend that the fundamental right to marry belongs to the individual and protects

each individual's choice of whom to marry.  In stark contrast,  Defendants contend

that, because  "[t]he United States Supreme Court has never recognized that the

fundamental right to marry includes the right *to marry a person of one's choice,*"

the Marriage Laws do not violate Plaintiffs' due process rights.   (Doc. 117, p. 20)

(emphasis in original).  Against this jurisprudential backdrop, and in view of the

parties' polarized positions, we are tasked to consider and address the scope of the

fundamental right to marry.

While the Supreme Court has cautioned that the Due Process Clause only

"protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, . . . and implicit in the concept of ordered liberty," *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (internal citation and quotation marks ommitted), the Supreme Court has clarified the boundaries of the fundamental right to marry when tested by new societal norms. Perhaps the most classic example of such clarification is *Loving v. Virginia*, 388 U.S. 1 (1967).  In *Loving*, the Supreme Court struck down Virginia's laws against interracial marriage, finding the state's anti-miscegenation statutes violative of both the Due Process and Equal Protection Clauses of the Fourteenth Amendment.  The Supreme Court characterized the right to marry as one that "resides with the individual and cannot be infringed by the State." *Id*. at 12.

In a retrospective discussion of *Loving,* the Supreme Court reaffirmed that its decision to find Virginia's anti-miscegenation statutes unconstitutional was entirely correct, despite a long historical tradition in this nation of prohibiting interracial couples from marrying.  *See Casey*, 505 U.S. at 847-848; *see also Bowers v. Hardwick,* 478 U.S. 186, 216 (1986) (Stevens, J., dissenting) ("[N]either history nor tradition could save a law prohibiting miscegenation from constitutional attack."), *overruled by Lawrence*, 478 U.S. 186; *Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 992 (N.D. Cal. 2010) ("[T]he Court

18

recognized that race restrictions, despite their historical prevalence, stood in stark contrast to the concepts of liberty and choice inherent in the right to marry.").

Thereafter, in *Turner v. Safley*, 482 U.S. 78 (1987), the Supreme Court reaffirmed that the right to marry resides with the individual when it struck down a Missouri regulation that prohibited inmates from marrying unless the prison superintendent approved of the marriage.  The Supreme Court held that inmates retained their fundamental right to marry even though they had a reduced expectation of liberty during incarceration and despite the fact that the marriage, at least initially, would not result in procreation.  *See id*. at 95-96.

More recently, in *Lawrence v. Texas*, the Supreme Court confirmed that gay and lesbian individuals do not forfeit their constitutional liberties simply because of their sexual orientation, noting that "our laws and tradition afford constitutional protection to personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education."  539 U.S. at 574.  Emphasizing that these rights are personal to the individual, the Supreme Court stated that "[p]ersons in a homosexual relationship may seek autonomy for these purposes, just as heterosexual persons do."  *Id*.  In June of last year, the Supreme Court determined that the federal DOMA's one man and one woman definition of marriage was an unconstitutional "interference with the equal dignity of same-sex

19

marriages" legally recognized in some states.  *Windsor*, 133 S. Ct. at 2693.

With the weight and impetus of the foregoing Supreme Court jurisprudence in mind, this Court is not only moved by the logic that the fundamental right to marry is a personal right to be exercised by the individual, but also rejects Defendants' contention that concepts of history and tradition dictate that same-sex marriage is excluded from the fundamental right to marry.  The right Plaintiffs seek to exercise is not a new right, but is rather a right that these individuals have always been guaranteed by the United States Constitution.   As aptly explained by the Supreme Court in *Lawrence*:

> Had those who drew and ratified the Due Process Clauses of the Fifth Amendment or the Fourteenth Amendment known the components of liberty in its manifold possibilities, they might have been more specific.  They did not presume to have this insight.  They knew times can blind us to certain truths and later generations can see that laws once thought necessary and proper in fact serve only to oppress.  As the Constitution endures, persons in every generation can invoke its principles in their own search for greater freedom.

539 U.S. at 578-79; *see also Roberts v. U.S. Jaycees*, 468 U.S. 609, 620 (1984) ("[T]he Constitution undoubtedly imposes constraints on the State's power to control the selection of one's spouse . . . ."); *Kitchen,* 961 F. Supp. 2d at 1203 ("The Constitution is not so rigid that it always mandates the same outcome even when its principles operate on a new set of facts that were previously unknown[.]").  Recognizing that "[h]istory and tradition are the starting point but

20

not in all cases the ending point of the substantive due process inquiry,"

*Lawrence*, 539 U.S. at 572 (citation and internal quotation marks omitted), we

specifically hold that the fundamental right to marry as protected by the Due

Process Clause of the Fourteenth Amendment to the United States Constitution

encompasses the right to marry a person of one's own sex.[6]  We further hold that

this fundamental right is infringed upon by 23 Pa. C.S. § 1102, which defines

marriage as between one man and one woman and thus precludes same-sex

marriage.  Accordingly, 23 Pa. C.S. § 1102 is unconstitutional.

### 2.   Marriage Recognition

Having reached the conclusion that  same-sex marriage is included within

the fundamental right to marry and is infringed upon by 23 Pa. C.S. § 1102, it

necessarily follows that 23 Pa. C.S. § 1704, which refuses to recognize same-sex

marriages validly performed in other jurisdictions, is also unconstitutional.

Specifically, Pennsylvania's non-recognition law robs those of the Plaintiffs who

are already married of their fundamental liberty interest in the legal recognition of

their marriages in Pennsylvania.  *See De Leon*, 2014 U.S. Dist. LEXIS 26236, at

*66 ("[B]y declaring existing, lawful same-sex marriages void and denying

---

[6] Several of our sister district courts have reached precisely this same conclusion in recently penned opinions.  *See Latta,* 2014 U.S. Dist. LEXIS 66417; *Henry v. Himes*, No. 14-129, 2014 U.S. Dist. LEXIS 51211, 2014 WL 1418395 (S.D. Ohio April 14, 2014); *De Leon,* 2014 U.S. Dist. LEXIS 26236*; Bostic,* 970 F. Supp. 2d 456; *Kitchen,* 961 F. Supp. 2d 1181.

married couples the rights, responsibilities, and benefits of marriage, Texas denies

same-sex couples who have been married in other states their due process.”);

*Obergefell v. Wymyslo*, 962 F. Supp. 2d 968, 979 (S.D. Ohio 2013) (“When a state

effectively terminates the marriage of a same-sex couple married in another

jurisdiction, it intrudes into the realm of private marital, family, and intimate

relations specifically protected by the Supreme Court.”); *Henry,* 2014 U.S. Dist.

LEXIS 512111, at *29 (right to remain married is a fundamental liberty interest

appropriately protected by the Due Process Clause); *Baskin v. Bogan*, No. 14-355,

2014 U.S. Dist. LEXIS 63421, 2014 WL 1814064 (S.D. Ind. May 8, 2014); *see*

*also Windsor*, 133 S. Ct. at 2694 (When one jurisdiction refuses recognition of

family relationships legally established in another, “[t]he differentiation demeans

the couple, whose moral and sexual choices the Constitution protects . . . and

whose relationship the State has sought to dignify.”).   Accordingly, we declare

that 23 Pa. C.S. § 1704 violates the Due Process Clause of the United States

Constitution and is therefore unconstitutional.

### B.    Equal Protection

Plaintiffs also advocate that the Marriage Laws violate the Equal Protection

Clause of the Fourteenth Amendment.   That provision forbids a state from denying

to any person within its jurisdiction the equal protection of the laws,  *see* U.S.

CONST. amend. XIV, § 1, effectively directing the like treatment of similarly-situated persons, *see Plyler v. Doe*, 457 U.S. 202, 216 (1982).

Laws reviewed under the Equal Protection Clause are subject to various levels of scrutiny depending upon the classification imposed. *See generally City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439-41 (1985). Strict scrutiny is reserved for statutes engendering suspect classifications, such as those based on race, alienage, or national origin, and requires the government to demonstrate that the law is narrowly tailored to further compelling state interests. *See id.* at 440; *Johnson v. California*, 543 U.S. 499, 505 (2005). Intermediate or heightened scrutiny has been applied to classifications deemed "quasi-suspect,"[7] such as those based on sex or illegitimacy. *See Mills v. Habluetzel*, 456 U.S. 91, 99 (1982); *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982). To survive intermediate scrutiny, a statutory classification must be substantially related to an important governmental objective. *See Clark v. Jeter*, 486 U.S. 456, 461 (1988). Lastly, for classifications that do not target suspect or quasi-suspect groups, courts apply rational-basis review, which is satisfied if a statutory classification is rationally related to a legitimate governmental purpose. *See*

---

[7] We use the terms "heightened scrutiny" and "intermediate scrutiny" interchangeably to refer to the analysis applicable to laws targeting quasi-suspect classes.

*Heller v. Doe*, 509 U.S. 312, 320 (1993).  Review for rationality is highly

deferential to the legislature, and the burden rests with the challenger to negate

every possible basis for the law.  *See id.*[8]

As an initial matter, the parties disagree on the level of scrutiny applicable

to classifications based on sexual orientation.  Defendants argue for rational-basis

review, while Plaintiffs would have us apply heightened scrutiny.[9]

### 1.     Heightened Scrutiny

The Third Circuit has never discoursed on the appropriate level of scrutiny

to be applied to classifications based on sexual orientation, nor has the Supreme

---

[8] An additional strand of equal protection jurisprudence protects against the infringement of fundamental rights and applies strict scrutiny where the government discriminates among people as to the exercise of such rights.  *See generally* ERWIN CHEMERINSKY, CONSTITUTIONAL LAW: PRINCIPLES & POLICIES 691 (4th ed. 2011).  Based on our discussion *supra*, determining that Plaintiffs have suffered a deprivation of their fundamental right to marry and be recognized as married, we conclude that strict scrutiny is appropriate under the fundamental rights strand of equal protection jurisprudence.  However, we focus our attention on the more typical application of equal protection principles, involving the constitutionality of distinctions among classes.

[9] Specifically, Plaintiffs argue that, when evaluating statutes categorizing on the basis of sexual orientation, "[t]his Court should apply at least the intermediate scrutiny applied to quasi-suspect classifications . . .." (Doc. 114, p. 50).  Interpreting that Plaintiffs' arguments largely advocate for the application of intermediate scrutiny, rather than strict scrutiny, we, too, confine our analysis to the appropriateness of heightened scrutiny.

As an additional, alternative argument, Plaintiffs also contend that the Marriage Laws impose sex-based classifications and, on this ground, are subject to intermediate scrutiny.  We find this characterization less compelling, observing, as a practical matter, that "the intentional discrimination occurring in this case has nothing to do with gender-based prejudice or stereotypes[.]" *Bishop*, 962 F. Supp. 2d at 1286; *see In re Marriage Cases*, 183 P.3d 384, 439 (Cal. 2008) ("[D]iscrimination on the basis of sex[] and discrimination on the basis of sexual orientation . . . traditionally have been viewed as distinct phenomena.").

Court rendered an explicit holding on that point.  Thus, we must consider and determine whether gay and lesbian persons comprise a quasi-suspect class for purposes of an equal protection analysis of the Marriage Laws.  While *Windsor*, the most recent apposite pronouncement by the Supreme Court, offers little concrete guidance, we glean from it and other Supreme Court jurisprudence that heightened scrutiny is, at minimum, not foreclosed.  Indeed, in the tea leaves of *Windsor* and its forebears we apprehend the application of scrutiny more exacting than deferential.

As Justice Scalia cogently remarked in his dissent, "if [Windsor] is meant to be an equal-protection opinion, it is a confusing one."  *Windsor*, 133 S. Ct. at 2706 (Scalia, J., dissenting).  Although *Windsor* did not identify the appropriate level of scrutiny, its discussion is manifestly not representative of deferential review.  *See id.* (Scalia, J., dissenting) (observing that "the Court certainly does not apply anything that resembles [the rational-basis] framework" (emphasis omitted)).  The Court did not evaluate hypothetical justifications for the law but rather focused on the harm resulting from DOMA, which is inharmonious with deferential review.  *See*, *e.g.*, *McGowan v. State of Md.*, 366 U.S. 420, 425-26 (1961) (explaining that, under rational-basis scrutiny, legislatures are presumed to have acted constitutionally "despite the fact that, in practice, their laws result in some

25

inequality," and "[a] statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it").  Indeed, far from affording the statute the presumption of validity, *Windsor* found DOMA unconstitutional because "no legitimate purpose *overcomes* the purpose and effect to disparage and to injure." *Windsor*, 133 S. Ct. at 2696 (emphasis added); *see SmithKline Beecham Corp. v. Abbot Labs.*, 740 F.3d 471, 480, 483 (9th Cir. 2014) (examining "what the Court actually did" in *Windsor* and concluding that the decision requires heightened scrutiny) (citation and internal quotation marks omitted).

It has been observed that other of the Supreme Court's equal protection cases purporting to apply deferential review have also, in practice, probed more deeply, especially where the subject group has suffered historic patterns of deprivation.  *See, e.g., Massachusetts v. U.S. Dept. of Health & Human Servs.*, 682 F.3d 1, 11 (1st Cir. 2012) ("The Court has . . . undertaken a more careful assessment of the justifications than the light scrutiny offered by conventional rational basis review [in examining statutes targeting women, the poor, the mentally impaired, and gays and lesbians].").  Notably, the Court's sexual orientation jurisprudence has generally afforded considerably less deference than would be expected under usual rational-basis review.  *See generally* Note, *The Benefits of Unequal Protection*, 126 HARV. L. REV. 1348, 1362 (2013)

(referencing *Romer* and *Lawrence*, and explaining that many commentators have characterized the scrutiny applied to sexual orientation classifications as "rational basis with bite").

Furthermore, a determination to apply heightened scrutiny to classifications standing on sexual orientation would be far from unprecedented, as a number of federal and state courts have indicated that such scrutiny is warranted.[10]

Hence, we proceed to consider whether classifications based on sexual orientation qualify as quasi-suspect.

### a. Indicia of Suspectness[11]

The Supreme Court has established certain criteria for evaluating whether a class qualifies as suspect or quasi-suspect, which query whether the group:  (1) has been subjected to "a history of purposeful unequal treatment," *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 313 (1976) (*per curiam*); (2) possesses a characteristic that "frequently bears no relation to ability to perform or contribute to society,"

---

[10]  *See, e.g.*, *SmithKline*, 740 F.3d at 483-84; *Windsor*, 699 F.3d at 185; *Latta*, 2014 U.S. Dist. LEXIS 66417, at *22; *Henry*, 2014 U.S. Dist. LEXIS 51211, at *46-51; *De Leon*, 2014 U.S. Dist. LEXIS 26236, at *39; *Obergefell*, 962 F. Supp. 2d at 991; *Golinski v. U.S. Office of Personnel Mgmt.*, 824 F. Supp. 2d 968, 989-90 (N.D. Cal. 2012); *Pedersen v. Office of Personnel Mgmt.*, 881 F. Supp. 2d 294, 333 (D. Conn. 2012); *Perry*, 704 F. Supp. 2d at 997; *In re Balas*, 449 B.R. 567, 575 (Bankr. C.D. Cal. 2011) (decision of 20 Bankruptcy Judges); *Varnum v. Brien*, 763 N.W.2d 862, 895-96 (Iowa 2009); *In re Marriage Cases*, 183 P.3d at 444; *Kerrigan v. Comm'r of Pub. Health*, 957 A.2d 407, 475-76 (Conn. 2008).

[11]  *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28 (1973) (coining "indicia of suspectness").

*Cleburne*, 473 U.S. at 440-41; (3) exhibits "obvious, immutable, or distinguishing characteristics that define them as a discrete group[,]" *Bowen v. Gilliard*, 483 U.S. 587, 602 (1987) (citation and internal quotation marks omitted); and (4) is "a minority or politically powerless." *Id.* Of the four factors, the first two are most meaningful. *See Windsor*, 699 F.3d at 181 ("Immutability and lack of political power are not strictly necessary factors to identify a suspect class."). The criteria function as a lodestar, and as Justice Thurgood Marshall effectually observed, "[n]o single talisman can define those groups likely to be the target of classifications offensive to the Fourteenth Amendment and therefore warranting heightened or strict scrutiny; experience, not abstract logic, must be the primary guide." *Cleburne*, 473 U.S. at 472 n.24 (Marshall, J., concurring in part and dissenting in part).

Defendants do not advance that sexual orientation is mutable or bears a relation to ability to participate in society. Rather, they dispute only that gay and lesbian persons have suffered requisite historical discrimination and lack political power. Nonetheless, we address each criterion in turn.

### i.     History of Discrimination

That the gay and lesbian community has endured historical discrimination at the national level is uncontested. In terms of government-sanctioned

discrimination, in 1952, Congress prohibited gay men and women from entering the country or securing citizenship. (Doc. 115-1, pp. 129-30). In 1953, President Eisenhower issued an executive order banning the employment of homosexuals and requiring that private contractors currently employing gay individuals search out and terminate them. (*Id.* p. 129). Although the ban on hiring gay employees was lifted in 1975, federal agencies were free to discriminate against homosexuals in employment matters until President Clinton forbade the practice in 1998. (*Id.* p. 137). Beginning in World War II, the military developed systematic policies to exclude personnel on the basis of homosexuality, and, following the war, the Veterans Administration denied GI benefits to service members who had been discharged because of their sexuality. (*Id.* p. 128).

Within our lifetime, gay people have been the targets of pervasive police harassment, including raids on bars, clubs, and private homes; portrayed by the press as perverts and child molesters; and victimized in horrific hate crimes. (*E.g.*, *id.* pp. 126-28, 131-32, 141). Gay and lesbian persons have been prevented from adopting and serving as foster parents, and the majority of states prohibit same-sex marriage. (*Id.* pp. 139, 142).

Perhaps most illustrative of the pervasive historic discrimination faced by gays and lesbians was the widespread and enduring criminalization of homosexual

conduct.  Before the 1960s, all states punished sexual intimacy between men, and,

until the publish of *Lawrence v. Texas* in 2003, thirteen states categorized sodomy

as a felony offense.  (*Id.* p. 121).  Our country's military continued to make

sodomy a crime until 2013.  (*Id.* p. 128).

The nation's history of discrimination against gays and lesbians speaks for

itself.  What Defendants contest is a record of discrimination in Pennsylvania,

which they appear to believe is required for a finding of historical injustice.

However, Defendants provide no authority directing a narrowed geographic focus

in discerning longstanding discrimination, and our review of Supreme Court

jurisprudence suggests no such constraint.  *Cf.*, *e.g.*, *Murgia*, 427 U.S. at 313 (in

assessing the constitutionality of a Massachusetts mandatory retirement law,

evaluating "the treatment of the aged in this Nation").[12]

---

[12]  To address the merits of Defendants' concern, however, we pause to note that Pennsylvania's treatment of homosexuals also evidences long-term discrimination.  For example, in the 1950s, the Philadelphia police formed a "morals squad," arresting some 200 gay men per month.  (Doc. 115-1, p. 132).  In 1986, a Pennsylvania appellate court upheld an order heavily restricting a father's custody rights based on his sexuality, endorsing that his daughters were "innocent and impressionable" and that exposure to his homosexual relationship would inevitably result in "emotional disturbance, perhaps severe."  (*Id.* pp. 135-36) (citing *Pascarella v. Pascarella*, 512 A.2d 715 (Pa.Super. 1986)).  Also, state legislators have sponsored bills in every session since 2006 proposing to amend the Constitution to enshrine the definition of marriage as between one man and one woman.  (*Id.* p. 144).  During debate, elected officials remarked that failing to exclude same-sex couples from marriage could lead to the legalization of incest and bestiality, and one senator called homosexual relationships "dysfunctional," comparing same-sex marriage to pedophilia.  (*Id.* p. 145).  Further, as discussed *infra*, Pennsylvania lacks statutory anti-discrimination legislation protecting gay and lesbian persons, thereby permitting discrimination, *e.g.*, in the work place, housing, and public accommodation.

As an apparently alternative position, Defendants advocate taking a shorter view of national history, focusing on the legal and social progress of the gay community in the past few decades to argue against a finding of historical discrimination.  They highlight that many laws adversely targeting homosexuals have been repealed, a number of states have extended anti-discrimination protections to gay men and lesbians, and the media now depicts gay people more widely and positively.  (Doc. 115-1, pp. 122, 137, 139).  We agree with Plaintiffs that "[t]he fact that some forms of discrimination against gay people have ceased or become less prevalent does not change the fact that lesbian and gay people continue to live with the legacy of a long history of discrimination that created and reinforced the belief that they are an inferior class."  (Doc. 128, p. 6 (citing Doc. 115-1, pp. 120, 378)); *see Frontiero,* 411 U.S. at 685-86 (applying heightened scrutiny to classifications based on sex even though "the position of women in America has improved markedly in recent decades"; observing that "women still face pervasive, although at times more subtle, discrimination" in the public sphere) (footnotes omitted).

In view of the protracted historical record of injustices against gay and

---

*See* discussion *infra* Part IV.B.1.a.iv.  In view of this recitation, we would not find that Pennsylvania lacks a history of discrimination toward gay people.

31

lesbian persons in our country (inclusive of this Commonwealth), we find that this consideration points strongly toward the application of heightened scrutiny.

## ii.    Relation to Ability

We need not linger on this criterion: it is axiomatic that sexual orientation has no relevance to a person's capabilities as a citizen.  *Accord Golinski,* 824 F. Supp. 2d at 986 ("[T]here is no dispute in the record or the law that sexual orientation has no relevance to a person's ability to contribute to society.").[13] Defendants' silence on this point speaks volumes, and either connotes candor, agreement with Plaintiffs, or both.  This factor weighs heavily in favor of recognizing sexual orientation as a quasi-suspect class.

## iii.    Distinguishing Characteristic

Whether sexual orientation constitutes a sufficiently discernable characteristic is also little in debate and, for our purposes, undisputed by Defendants.  Briefly, although this factor is often phrased in terms of "immutability," the test is broader, encompassing groups whose members can hide

---

[13]  *See also Pedersen,* 881 F. Supp. 2d at 320 ("Sexual orientation is not a distinguishing characteristic like mental retardation or age which undeniably impacts an individual's capacity and ability to contribute to society. Instead like sex, race, or illegitimacy, homosexuals have been subjected to unique disabilities on the basis of stereotyped characteristics not truly indicative of their abilities."); *Varnum,* 763 N.W.2d at 890 ("Not surprisingly, none of the same-sex marriage decisions from other state courts around the nation have found a person's sexual orientation to be indicative of the person's general ability to contribute to society."  (footnote omitted)).

the distinguishing trait and where the characteristic is subject to change.  *See*

*Mathews v. Lucas*, 427 U.S. 495, 506 (1976) (observing that illegitimate children

do not "carry an obvious badge"); *Pedersen*, 881 F. Supp. 2d at 320 (noting that

status as a resident alien or as illegitimate may be subject to change, yet that these

classifications compel increased scrutiny).  Here, the characteristic in issue is "so

fundamental to one's identity that a person should not be required to abandon [it]."

*Hernandez-Montiel v. I.N.S.*, 225 F.3d 1084, 1093 (9th Cir. 2000), *overruled on*

*other grounds by Thomas v. Gonzales*, 409 F.3d 1177 (9th Cir. 2005).

This factor, too, indicates the appropriateness of heightened scrutiny.

### iv.    Political Power

Lastly, we consider whether the subject group lacks political power or is a

minority.  *See Bowen,* 483 U.S. at 602.  This consideration centers on relative

political influence and inquires whether the "'discrimination is unlikely to be soon

rectified by legislative means.'" *Golinski*, 824 F. Supp. 2d at 987 (quoting

*Cleburne*, 473 U.S. at 440); *see also San Antonio Indep. Sch. Dist.*, 411 U.S. at 28

(to satisfy this factor, the class must be "relegated to such a position of political

powerlessness as to command extraordinary protection from the majoritarian

political process").  While germane, this factor is not essential for recognition as a

suspect or quasi-suspect class.  *See Cleburne*, 473 U.S. at 472 n.24 (Marshall, J.,

concurring in part and dissenting in part) ("The 'political powerlessness' of a group may be relevant, . . . but that factor is neither necessary, as the gender cases demonstrate, nor sufficient, as the example of minors illustrates.").

In our case, "[t]he question is not whether homosexuals have achieved political successes over the years; they clearly have.  The question is whether they have the strength to politically protect themselves from wrongful discrimination." *Windsor*, 699 F.3d at 184.  Defendants contend that the gay community does possess such force, centrally citing *Sevcik v. Sandoval*, 911 F. Supp. 2d 996 (D. Nev. 2012).  In that case, a district court concluded that  homosexuals possessed sufficient political power, noting cultural shifts toward acceptance of gay people, including the President's endorsement of same-sex marriage, and recent political successes, such as on marriage ballot initiatives at the state level.  *See id.* at 1008, 1013.  Defendants highlight that, at present, at least 17 bills have been introduced in Pennsylvania that would protect and benefit gay men and lesbians, four of which redefine marriage inclusively.

While the gay rights movement has undoubtedly gained recognition as a vigorous force and has influenced public policy to some extent, there remains an absence of statutory, anti-discrimination protections which may indicate continuing political weakness.  *See Obergefell*, 962 F. Supp. 2d at 989; *Pedersen*,

881 F. Supp. 2d at 327.  Today, in over half of states including Pennsylvania, gay and lesbian individuals lack statewide, statutory protections against discrimination in housing and public accommodation, as well as in firing, refusal to hire, and demotion in private-sector employment.  (Doc. 115-1, p. 137).  As to the proposed legislation in Pennsylvania, we find it of little assistance to our inquiry as there can be no assurance that such bills will garner sufficient support for passage.

Furthermore, some courts finding homosexuals to be politically powerless have taken guidance from the plurality in *Frontiero*, noting that women had achieved great political victories at the time of the decision but were nonetheless considered a quasi-suspect class.  *See*, *e.g.*, *Pedersen*, 881 F. Supp. 2d at 328-29; *Varnum*, 763 N.W.2d at 894.  Similar to the status of women in 1973, homosexuals' position "has improved markedly in recent decades," but they still "face pervasive, although at times more subtle, discrimination . . . in the political arena."  *Frontiero*, 411 U.S. at 685-86 (footnotes omitted); *see Windsor*, 699 F.3d at 184.

This factor appears more equivocal than the others.  However, in view of the general lack of statutory protections for homosexual persons, we perceive a weak positive in favor of heightened scrutiny.

To summarize, we find that all four factors weigh in favor of a finding that

gay and lesbian persons compose a class that is subject to heightened scrutiny. We agree with the Second Circuit, and the district court cases that followed it, that the class is quasi-suspect – as opposed to suspect – "based on the weight of the factors and on analogy to the classifications recognized as suspect and quasi-suspect." *Windsor*, 699 F.3d at 185.

Having concluded that classifications based on sexual orientation are quasi-suspect, we proceed to apply intermediate scrutiny to the Marriage Laws in consideration of their constitutionality.

### b.    Application of Heightened Scrutiny

As stated, a statutory classification survives intermediate scrutiny if it is substantially related to an important governmental objective, with the party defending the statute carrying the burden to demonstrate the rationale. *See Clark*, 486 U.S. at 461.  The Supreme Court has also described the standard as demanding an "exceedingly persuasive justification" for the classification. *Miss. Univ. for Women*, 458 U.S. at 724 (citing *Kirchberg v. Feenstra*, 450 U.S. 455, 461 (1981); *Personnel Admin'r of Mass. v. Feeney*, 442 U.S. 256, 273 (1979)). Quasi-suspect classifications are subject to heightened review because the preeminent characteristic of the group "generally provides no sensible ground for differential treatment." *Cleburne*, 473 U.S. at 440.

In terms of state interests served by Pennsylvania's Marriage Laws, Defendants advance the following: the promotion of procreation, child-rearing and the well-being of children, tradition, and economic protection of Pennsylvania businesses.  Defendants appear to defend only the first two aims, stating that numerous federal and state courts have agreed that responsible procreation and child-rearing are legitimate state interests and providing extensive authority for that proposition.  Significantly, Defendants claim only that the objectives are "legitimate," advancing no argument that the interests are "important" state interests as required to withstand heightened scrutiny.  Also, Defendants do not explain the relationship between the classification and the governmental objectives served; much less do they provide an exceedingly persuasive justification.  In essence, Defendants argue within the framework of deferential review and go no further.[14]  Indeed, it is unsurprising that Defendants muster no argument engaging the strictures of heightened scrutiny, as we, too, are unable to fathom an ingenuous defense saving the Marriage Laws from being invalidated under this more-searching standard.[15]

---

[14]  *Amicus*, a group of current and former Pennsylvania legislators, submitted a brief also arguing that rational basis review is satisfied here.  Accordingly, their assertions do not aid our examination under heightened scrutiny.

[15]  Parenthetically, a number of courts considering the constitutionality of comparable state marriage laws, underpinned by state interests not dissimilar to those forwarded here, have

In sum, Defendants have failed to carry their burden, and we conclude that the classification imposed by the Marriage Laws based on sexual orientation is not substantially related to an important governmental interest. Accordingly, we hold that the Marriage Laws violate the principles of equal protection and are therefore unconstitutional.

## V.    CONCLUSION

Based on the foregoing, we hold that Pennsylvania's Marriage Laws violate both the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution. Because these laws are unconstitutional, we shall enter an order permanently enjoining their enforcement. By virtue of this ruling, same-sex couples who seek to marry in Pennsylvania may do so, and already married same-sex couples will be recognized as such in the Commonwealth.

The issue we resolve today is a divisive one. Some of our citizens are made deeply uncomfortable by the notion of same-sex marriage. However, that same-sex marriage causes discomfort in some does not make its prohibition constitutional. Nor can past tradition trump the bedrock constitutional guarantees

---

concluded that those laws cannot withstand even rational-basis review. *See*, *e.g.*, Geiger, 2014 U.S. Dist. LEXIS 68171; *DeBoer,* 2014 U.S. Dist. LEXIS 37274, at *33; *Bourke*, 2014 U.S. Dist. LEXIS 17457, at *32; *Bishop*, 962 F. Supp. 2d at 1295; *Kitchen*, 961 F. Supp. 2d at 1206.

of due process and equal protection. Were that not so, ours would still be a racially segregated nation according to the now rightfully discarded doctrine of "separate but equal." *See Brown v. Board of Education*, 347 U.S. 483 (1954), *overruling Plessy v. Ferguson*, 163 U.S. 537 (1896). In the sixty years since *Brown* was decided, "separate" has thankfully faded into history, and only "equal" remains. Similarly, in future generations the label *same-sex marriage* will be abandoned, to be replaced simply by *marriage.*

We are a better people than what these laws represent, and it is time to discard them into the ash heap of history.

An appropriate Order shall issue.

John E. Jones III
United States District Judge